# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEANETTE K. COAKLEY<br>1880 Chantilly Court<br>Virginia Beach, Virginia 23451; | ) ) ) ) | |
| FRANCES W. ROYSTER<br>175 Royster Lane<br>Randolph, Virginia 23962; | ) ) ) ) | |
| THERESA A. TORRISI<br>690 Lowell Street<br>Lawrence, Massachusetts 01841; and | ) ) ) ) | Civil Action No. 1:08-cv-00976 (EGS) |
| EUNICE L. KOZIRESKI<br>6032 Swanson Creek<br>Hughesville, Maryland 20637, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CIGNA GOVERNMENT SERVICES, LLC<br>Two Vantage Way<br>Nashville, Tennessee 37228; | ) ) ) ) | |
| NHIC, CORP.<br>402 Otterson Drive<br>Chico, California 95928-8206; | ) ) ) ) | |
| KERRY N. WEEMS, in his official capacity as<br>Acting Administrator of the Centers for Medicare<br>and Medicaid Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201; and | ) ) ) ) ) ) | |
| MICHAEL O. LEAVITT, in his official capacity<br>as Secretary of the Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' APPLICATION FOR A PRELIMINARY
## INJUNCTION AND REQUEST FOR A HEARING

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1 of the United States

District Court for the District of Columbia, Plaintiffs Jeanette K. Coakley, Frances W. Royster,

Theresa A. Torrisi, and Eunice L. Kozireski respectfully move this Court for a preliminary

injunction to enjoin the operation of local coverage determinations ("LCDs") issued by

Defendants that are set to take effect on July 1, 2008.  Plaintiffs filed their Complaint for

Declaratory and Injunctive Relief on June 6, 2008.

Plaintiffs are Medicare beneficiaries who are currently prescribed Xopenex®

(levalbuterol HC1) Inhalation Solution ("Xopenex") to treat asthma and chronic obstructive

pulmonary disease.  Plaintiffs receive coverage for Xopenex through Medicare Part B.  The

Defendants have issued LCDs that set the reimbursement rate for Xopenex at the rate for the

generic drug, albuterol.

As set out fully in the Complaint and Memorandum of Law in support of this

Application, Plaintiffs are likely to prevail on the merits of this case because the LCDs are

directly contrary to statutory and regulatory authority.  Moreover, Plaintiffs will suffer

irreparable injury if the LCDs take effect because the LCDs will drive Xopenex from the

Medicare market and Plaintiffs, who rely on Xopenex to treat their medical conditions and are

without sufficient means to purchase Xopenex outside the Medicare system, will be denied

access to this important drug.  Their negative experiences with generic albuterol make that drug

an unacceptable alternative.

Based on the foregoing, Plaintiffs respectfully request that the Court grant their

Application for a Preliminary Injunction and enjoin the operation of the LCDs scheduled to take

effect on July 1, 2008.  Pursuant to Local Rule 65.1(d), Plaintiffs request that the Court schedule

a hearing on this Application within 20 days of the date of filing.


Dated:  June 9, 2008

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
D.C. Bar No. 454271
Patrick Morrisey
D.C. Bar No. 459399
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
Email:  skinnaird@sidley.com
            pmorrisey@sidley.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEANETTE K. COAKLEY<br>1880 Chantilly Court<br>Virginia Beach, Virginia 23451; | ) )<br>)<br>) | |
| FRANCES W. ROYSTER<br>175 Royster Lane<br>Randolph, Virginia 23962; | )<br>)<br>)<br>) | |
| THERESA A. TORRISI<br>690 Lowell Street<br>Lawrence, Massachusetts 01841; and | )<br>)<br>)<br>) | Civil Action No. 1:08-cv-00976 (EGS) |
| EUNICE L. KOZIRESKI<br>6032 Swanson Creek<br>Hughesville, Maryland 20637, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>)<br>) | |
| CIGNA GOVERNMENT SERVICES, LLC<br>Two Vantage Way<br>Nashville, Tennessee 37228; | )<br>)<br>)<br>) | **PLAINTIFFS' MEMORANDUM OF<br>LAW IN SUPPORT<br>OF THE APPLICATION FOR A<br>PRELIMINARY INJUNCTION** |
| NHIC, CORP.<br>402 Otterson Drive<br>Chico, California 95928-8206; | )<br>)<br>)<br>) | |
| KERRY N. WEEMS, in his official capacity as<br>Acting Administrator of the Centers for Medicare<br>and Medicaid Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201; and | )<br>)<br>)<br>)<br>)<br>) | |
| MICHAEL O. LEAVITT, in his official capacity<br>as Secretary of the Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF THE CASE............................................................................. 2

    A.    Overview of the Medicare Program........................................................ 2

    B.    Xopenex Is An Innovator Product That Commands Substantial Market Share Even At A Higher Price Than Albuterol. ....................................... 6

    C.    The LCDs Will Impose High Costs on Medicare Beneficiaries........................... 12

SUMMARY OF ARGUMENT ........................................................................... 15

STANDARD OF REVIEW ................................................................................. 17

ARGUMENT........................................................................................................ 18

I.     MEDICARE CONTRACTORS HAVE NO AUTHORITY TO SET PAYMENT RATES IN LOCAL COVERAGE DETERMINATIONS. ............................................. 18

II.    THE CONTRACTORS' LOCAL COVERAGE DETERMINATIONS VIOLATE THE PAYMENT METHODOLOGY MANDATED BY STATUTE. ............................ 22

III.   THE AGENCY AND ITS CONTRACTORS' LEGAL JUSTIFICATIONS FOR A LEAST COSTLY ALTERNATIVE POLICY DO NOT WITHSTAND SCRUTINY.......................................................................................................... 24

    A.    The Manual Provision Authorizing LCA Policies Cannot Trump The Contrary Statutory and Regulatory Provisions. ..................................... 24

    B.    Section 1871 Requires Substantive Legal Standards To Be Promulgated By Regulation. ..................................................................................... 25

    C.    The "Reasonable and Necessary" Standard of The Medicare Statute Does Not Authorize The LCA Policy. ........................................................... 27

         1.    The Text and Structure of The Medicare Statute Demonstrate That The "Reasonable and Necessary" Requirement Involves Considerations of Medical Efficacy, Not Cost-Effectiveness. ................. 28

         2.    The Legislative History Demonstrates That The "Reasonable and Necessary" Requirement Does Not Encompass Cost Considerations............................................................................................ 31

3.  Judicial Interpretations of The "Reasonable and Necessary" Requirement Support the View That It Does Not Involve Considerations of Cost. ................................................................. 33

4.  The Agency's Current Stance Is At Odds With Its Stated Criteria For Determining When An Item Or Service Is "Reasonable and Necessary." ........................................................... 35

5.  The Agency Cannot Justify LCA Policies Under the "Reasonable and Necessary" Statute Because It Does Not Apply LCA Analysis To All Medicare Items And Services. ......................................... 36

D.  Even if the Agency Could Exclude Items Or Services On Grounds Of Cost-Effectiveness Under The "Reasonable and Necessary" Provision, It Cannot Invoke That Provision To Establish Payment Rates. ............................... 37

E.  The Agency Cannot Side-Step the Specific Statutory Mechanism for Addressing the Unreasonableness of Payment Amounts for Covered Items and Services. ...................................................................... 38

IV.  A STAY OF THE LOCAL COVERAGE DETERMINATIONS IS WARRANTED SHOULD THE COURT FAIL TO RESOLVE THE DISPUTE BY THEIR EFFECTIVE DATE. .................................................... 40

CONCLUSION .................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES

*Alabama Hosp. Ass'n v. United States*,
656 F.2d 606 (Ct. Cl. 1981) ...................................................................................34

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986) ...............................................................................................21

*Brae Loch Manor Health Care Facility v. Thompson*,
287 F. Supp. 2d 191 (W.D.N.Y. 2003), *aff'd*, 102 F. App'x 221 (2d Cir. 2004) ..........................34

*Center for Auto Safety v. Skinner*,
936 F.2d 1315 (D.C. Cir. 1991) ...............................................................................30

*Central Tex. Telegraph Coop., Inc. v. FCC*,
402 F.3d 205 (D.C. Cir. 2005) .................................................................................26

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ...............................................................................................25

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ...............................................................................................22

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ...............................................................................................22

*Cuomo v. U.S. NRC*,
772 F.2d 972 (D.C. Cir. 1985) ........................................................18, 40, 41, 42, 43

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ...............................................................................................29

*Duggan v. Bowen*,
691 F. Supp. 1487 (D.D.C. 1988) .............................................................................34

*Erringer v. Thompson*,
371 F.3d 625 (9th Cir. 2004) ...................................................................................26

*Foxboro Co. v. Arabian Am. Oil Co.*,
805 F.2d 34 (1st Cir. 1986) .....................................................................................42

*Gulfcoast Med. Supply, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs.*,
No. 04-2610, 2005 WL 3934860 (M.D. Fla. Nov. 16, 2005) ......................................34

*Harris v. Bd. of Supervisors*,
366 F.3d 754 (9th Cir. 2004) ...............................................................41

*Heckler v. Ringer*,
466 U.S. 602 (1984)...............................................................................29

*Henderson v. Bodine Aluminum, Inc.*,
70 F.3d 958 (8th Cir 1995) ..................................................................41

*Hoffmann-Laroche, Inc. v. Califano*,
453 F. Supp. 900 (D.D.C. 1978) .....................................................42, 43

*\*Hultzman v. Weinberger*,
495 F.2d 1276 (3d Cir. 1974).........................................................33, 34

*Lerum v. Heckler*,
774 F.2d 210 (7th Cir. 1985) .........................................................33, 34

*Martini v. Federal Nat'l Mortgage Ass'n*,
178 F.3d 1336 (D.C. Cir. 1999).............................................................22

*Maximum Comfort Inc. v. Sec'y of Health & Human Servs.*,
512 F.3d 1081 (9th Cir. 2007) ..............................................................34

*Mohammed v. Reno*,
309 F.3d 95 (2d Cir. 2002).....................................................................18

*Monmouth Med. Ctr. v. Thompson*,
257 F.3d 807 (D.C. Cir. 2001) .....................................................3, 25, 26

*Morton v. Ruiz*,
415 U.S. 199 (1974)...............................................................................25

*New York v. Sec'y of Health & Human Servs.*,
903 F.2d 122 (2d Cir. 1990)...................................................................34

*Ohio ex rel. Celebrezze v. NRC*,
812 F.2d 288 (6th Cir. 1987) ...........................................................17, 41

*Power Mobility Coalition v. Leavitt*,
404 F. Supp. 2d 190 (D.D.C. 2005) .......................................................34

*Presbyterian Hosp. of Dallas v. Harris*,
638 F.2d 1381 (5th Cir. 1981) ...............................................................30

*Roen v. Sullivan*,
764 F. Supp. 555 (D. Minn. 1991)..................................................................34

*Sentara-Hampton Gen. Hosp. v. Sullivan*,
980 F.2d 749 (D.C. Cir. 1992).......................................................................26

*Syncor Int'l Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997)..........................................................................26

*Torphy v. Weinberger*,
384 F. Supp. 1117 (E.D. Wis. 1974)..............................................................34

*Tucker v. Thompson*,
No. 04-3934, 2006 WL 39644 (D.N.J. Jan. 9, 2006)....................................34

*United States ex rel. Goldman v. Meredith*,
596 F.2d 1353 (8th Cir. 1979) ...................................................................2, 40

*United States v. Wilson*,
290 F.3d 347 (D.C. Cir. 2002)........................................................................24

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985).......................................................................42

## STATUTES AND REGULATIONS

Social Security Act Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286...................................2

Consolidated Appropriations Act, Pub. L. No. 106-554, 114 Stat. 2763A-463 (2000) .................3

Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No.
108-173, 117 Stat. 2066 ...................................................................................................3

Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. 110-173, 121 Stat. 2492.....3, 10

5 U.S.C. § 705 ................................................................................................................................40

42 U.S.C. §§ 1395-1395ccc (2008) ...............................................................................................2
42 U.S.C. § 1395f .........................................................................................................................30
42 U.S.C. §§ 1395j.........................................................................................................................3
42 U.S.C. § 1395k ................................................................................................................3, 4, 18
42 U.S.C. § 1395*l*.......................................................................................................4, 5, 19, 20, 30
42 U.S.C. § 1395m..................................................................................................................5, 19
42 U.S.C. § 1395n.........................................................................................................................6
42 U.S.C. § 1395u.................................................................................................3, 17, 20, 38, 39
*42 U.S.C. § 1395w-3a.................................................5, 8, 10, 11, 15, 20, 23, 38
42 U.S.C. § 1395x...................................................................................................3, 6, 30

*42 U.S.C. § 1395y................................................................4, 16, 18, 25, 26, 27, 28, 37, 38
42 U.S.C. § 1395ff..........................................................2, 4, 15, 18, 19, 20, 21, 31, 37
42 U.S.C. § 1395hh.................................................................................16, 25, 27
42 U.S.C. § 1395ddd..................................................................................3, 8

*42 C.F.R. § 400.202 ...........................................................................4, 15, 21, 38

54 Fed. Reg. 4,302 (Jan. 30, 1989) ..............................................................35, 36

64 Fed. Reg. 22,619 (Apr. 27, 1999) ..................................................................36

65 Fed. Reg. 31,124 (May 16, 2000) ..................................................................36

68 Fed. Reg. 63,692 (Nov. 7, 2003)....................................................................21

70 Fed. Reg. 39,021 (July 6, 2005)....................................................................26

70 Fed. Reg. 70,116 (Nov. 21, 2005)..................................................................26

70 Fed. Reg. 73,623 (Dec. 13, 2005) ..................................................................39

## RULE

Fed. R. Civ. P. 65(a)(2)..................................................................................40

## LEGISLATIVE HISTORY

H.R. Rep. No. 89-213 (1965)............................................................................32

H.R. Rep. No. 100-391 (1987)..........................................................................25

H.R. Rep. No. 110-284 (2007)......................................................................11, 23

S. Rep. No. 89-404 (1965) ...............................................................................32

## SCHOLARLY AUTHORITIES

Jacqueline Fox, *Medicare Should, But Cannot, Consider Cost: Legal Impediments to a Sound Policy,* 53 Buff. L. Rev. 577 (2005) ....................................................31, 33, 36

Sean R. Tunis, *Why Medicare Has Not Established Criteria for Coverage Decisions*, 350 New Eng. J. Med. 2196 (2004) ..............................................................28, 33

## OTHER AUTHORITIES

CMS, Pub. 100-02, *Medicare Benefit Policy Manual* (rev. Oct. 1, 2003), *available at* http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf *and* http://www.cms.hhs.gov/manuals/Downloads/bp102c16.pdf ....................................3, 26

CMS, *Medicare National Coverage Determinations Manual* (eff. Sept. 21, 2007), *available at* http://www.cms.hhs.gov/manuals/Downloads/ncd103c1_Part4.pdf ..........................9

CMS, Pub. 100-08, *Medicare Program Integrity Manual* (rev. Apr. 9, 2004), *available at* http://www.cms.hhs.gov/manuals/downloads/pim83c13.pdf ...............................16, 24, 26, 35, 37

CMS, *Update to Information Regarding Medicare Payment and Coding for Drugs & Biologics* (April 24, 2007) ........................................................................................................9

CMS, *Update to Information Regarding Medicare Payment and Coding for Drugs and Biologics* (May 18, 2007), *available at* http://www.cms.hhs.gov/MedHCPCSGenInfo/downloads/051807_coding_annoucement. pdf ....................................................................................................................................10

**INTRODUCTION**

This is an action challenging the *ultra vires* action of Medicare contractors charged with making local coverage determinations for drugs prescribed to Medicare beneficiaries.

Plaintiffs in this action are Medicare beneficiaries who take Xopenex® (levalbuterol HC1) Inhalation Solution ("Xopenex"), a single-source innovator drug used to treat reversible obstructive airway diseases such as asthma and chronic obstructive pulmonary disease ("COPD").

Defendants CIGNA Government Services, LLC and NHIC, Corp., as well as two other Medicare contractors, in identical local coverage determinations that together have national effect (attached as Exs. A, B, C, D), have refused to adhere to the mandate of the Medicare statute and regulations. Even though the contractors found that Xopenex is medically necessary for the diseases that Plaintiffs have, they deem Xopenex too expensive, and therefore will only reimburse for Xopenex at the rate of the generic drug, albuterol, which is a fraction of the legally mandated reimbursement price and suppliers' acquisition cost of Xopenex. Because of the disparity between the proposed reimbursement price for Xopenex and a Medicare supplier's net cost to acquire the drug, Medicare suppliers will lose money by supplying Xopenex. This decision will effectively exclude Xopenex from the Medicare program and deprive Plaintiffs of their lawful access to this drug under Medicare.

The contractors' action is a stark abuse of the Congressional authority granted to them. Medicare has always separated coverage and reimbursement decisions, prescribing different methodologies for each. In fact, the grant of authority to Medicare contractors to make local coverage determinations is expressly limited to coverage decisions, and does not include setting any payment terms. Furthermore, not only do the Medicare contractors lack authority to set payment rates, but their decision to do so at the price of the generic drug albuterol is contrary to

1

the specific payment rules established by Congress for inhalation drugs, such as Xopenex. The contractors purport to derive their authority to set those rates from a discretionary procedure authorized by an agency manual, but that procedure has no legal basis and cannot trump the statute and governing regulations prohibiting the actions taken by the Medicare contractors.

This Court should grant a preliminary injunction of the unlawful local coverage determinations taken here. As this action raises a strictly legal question concerning the validity of those determinations, resolution of that question for purposes of a preliminary injunction will also resolve the merits of this case, and this Court may enter a permanent injunction or declaration of invalidity. *See United States ex rel. Goldman v. Meredith*, 596 F.2d 1353, 1358 (8th Cir. 1979) ("[D]isposition on the merits may be appropriate whenever the evidence presented at the preliminary hearing indicates that there is no conflict of material fact that would justify holding the full trial on the merits.").

## JURISDICTIONAL STATEMENT

This is an action brought by aggrieved beneficiaries enrolled in Part B of Medicare under 42 U.S.C. § 1395ff(f)(3) (Social Security Act § 1869(f)(3)(B)). Section 1395ff(f)(3) authorizes a Medicare beneficiary to challenge a local coverage determination in federal court without exhausting administrative remedies if the challenge is strictly legal and if no material issues of fact are in dispute. *See* 42 U.S.C. § 1395ff(f)(3), (5) (§ 1869(f)(3), (5)).

## STATEMENT OF THE CASE

### A.     Overview of the Medicare Program

Established as part of the Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286, the Medicare program is the nation's largest health insurance program.[1]   Medicare

---

[1] The 1965 Amendments to the Social Security Act created the Medicare system, and are set forth in Title XVIII of the Social Security Act ("SSA").  *See* 42 U.S.C. §§ 1395-1395ccc (Social Security Act §§ 1801-1892) (2008).  The

covers certain medical care costs for those 65 years of age or older, as well as individuals under 65 years of age who are disabled or have other specified medical conditions. The Centers for Medicare and Medicaid Services is charged with administering the Medicare program on behalf of the Secretary of the Department of Health and Human Services (collectively "the Agency").[2] The Agency also employs independent contractors to develop and revise Medicare coverage policies, as well as to process reimbursements for Medicare-covered services or products. *See* 42 U.S.C. § 1395ddd (§ 1893). Those contractors, who are agents of the Secretary in performing their contractual functions, *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001), each service different geographic regions.

Medicare consists of multiple parts, each of which are set forth under different sections of the Social Security Act. Part A, for example, covers certain care furnished to inpatients at hospitals and other facilities. Relevant here is Part B, a supplementary medical insurance program that covers certain services of physicians, outpatient hospital care, and other medical professionals; a number of outpatient drugs and biologicals used to treat patients; and the rental or purchase of durable medical equipment ("DME") for use in the patient's home. *See* 42 U.S.C. §§ 1395j (§ 1831), 1395k(a) (§ 1832(a)), 1395x(s) (§ 1861(s)). Reimbursement for Part B drugs may also be made when drugs are placed into DME if the drugs are necessary to achieve the equipment's therapeutic effect and the drug is administered incident to such equipment. *See id.* § 1395u(o)(1)(G)(ii) (§ 1842(o)(1)(G)(ii)); CMS, Pub. 100-02, Medicare Benefit Policy Manual,

---

Medicare, Medicaid, and Benefits Improvement and Protection Act of 2000 ("BIPA"), which was enacted as part of the Consolidated Appropriations Act for fiscal year 2001, added numerous amendments to the Medicare provisions of the SSA. *See* Pub. L. No. 106-554, app. F, § 1(a), 114 Stat. 2763, 2763A-463 (2000). The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") and the Medicare, Medicaid, and SCHIP Extension Act of 2007 further amended Title XVIII of the SSA. Pub. L. No. 108-173, 117 Stat. 2066 (2003); Pub. L. No. 110-173, 121 Stat. 2492 (2007). This motion refers generally to Title XVIII of the SSA as "the Medicare statute."

[2] The Centers for Medicare and Medicaid Services ("CMS") are part of the Department of Health and Human Services. For ease of reference, "Agency" refers to either CMS, the Department, or both.

ch. 15, § 110.3 (rev. Oct. 1, 2003) ("Policy Manual") (Ex. E), *available at* http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf.

For purposes of determining the coverage and reimbursement of a drug under Part B, the Program is administered in two separate and distinct steps. First, the Agency and its contractors must evaluate whether a particular item or service is covered. The statute defines the categories of items and services that are covered, *see* 42 U.S.C. § 1395k (§ 1832) (describing the scope of the benefits covered under Part B), but excludes from coverage (among other things) services and items that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.* § 1395y(a)(1)(A) (§ 1862(a)(1)(A)). The Agency is authorized to make "national coverage determinations" ("NCDs") with respect to whether an item or service is covered nationally under the Medicare program. *See id.* § 1395ff(f)(1)(B) (§ 1869(f)(1)(B)). Significantly, though, NCDs are not vehicles for determining the amount of payment for the item or service. *Id.* In addition, the Agency's contractors are authorized to make "local coverage determinations" with respect to whether an item or service is covered within the jurisdiction that the contractor services. *See id.* § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)). As in the case of national coverage determinations, payment decisions are similarly excluded from local coverage determinations. *See* 42 C.F.R. § 400.202. Finally, the Agency is authorized to make initial determinations about whether individual claims for certain items or services are reimbursable under the Medicare program. *See* 42 U.S.C. § 1395ff(a)(1)(c) (§ 1869(a)(1)(c)).

After coverage is established for an item or a service, the Medicare program must then calculate the amount of payment that will be made on behalf of the beneficiary for items or services that are covered under step one. *See id.* § 1395*l*(a) (§ 1833(a)) (providing the methodologies for determining the reimbursement or payment amount "in the case of each

individual who is covered under [Medicare Part B] and incurs expenses for services covered with respect to which benefits are payable under this part"). As described above, the Agency or its contractors must first determine whether "benefits are payable" under Medicare before they may pay for expenses incurred by a beneficiary according to statutory payment levels.

In general, for medical and other health services, unless provided otherwise, Medicare will reimburse "80 percent of the reasonable charges for the services" that are covered and not subject to exclusion. *Id.* § 1395*l*(a)(1) (§ 1833(a)(1)). Durable medical equipment (other than drugs delivered thereby) is reimbursed at statutorily prescribed rates. *Id.* § 1395m (§ 1834). For drugs covered under Part B, including drugs administered incident to DME, such as Xopenex, the statute mandates a detailed payment methodology. *See id.* § 1395w-3a (§ 1847A). These payment provisions generally distinguish between "multiple-source" or generic drugs and "single-source" or "innovator" drugs, but they also have special rules and clearly delineated exceptions which allow Medicare to treat certain single-source drugs the same as multiple-source drugs.

For single-source drugs covered under Part B, the statute provides that they shall be reimbursed, with certain exceptions, at 106 percent of the volume-weighted average of the Average Sales Price ("ASP") for that single-source drug, which is effectively a measure of the drug's net acquisition price. *See id.* § 1395w-3a(b)(1), (4), (6) (§ 1847A(b)(1), (4), (6)). The ASP is the manufacturer's total sales to all qualified purchasers divided by the total number of units sold in a calendar quarter. *Id.* § 1395w-3a(c) (§ 1837A(c)). For multiple-source or generic drugs, the reimbursement rate is 106 percent of the volume-weighted average of all the ASPs for the generic drugs in a particular billing code. *Id.* § 1395w-3a(b)(1), (6) (§ 1847A(b)(1), (6)). In

5

other words, the ASPs for generic drugs supplied by multiple labelers are blended together to determine the reimbursement rate.

Many Medicare claims for drug reimbursement are filed by suppliers (such as a home health care supplier, *see id.* § 1395x (§ 1861)). A supplier purchases the drug directly from the drug's manufacturer or a wholesaler and then dispenses the drug to the patient, a Medicare beneficiary. Next, the supplier submits a claim for reimbursement directly to Medicare. *See id.* § 1395n (§ 1835) (procedure for payment of claims).

### B. Xopenex Is An Innovator Product That Commands Substantial Market Share Even At A Higher Price Than Albuterol.

Xopenex (the brand name for levalbuterol) is a drug used to treat or prevent symptoms arising from respiratory conditions such as asthma and COPD. When delivered through a nebulizer, Xopenex works by relaxing the muscles surrounding the airways, thus permitting patients to breathe more easily. Xopenex is an "innovator," single-source drug, meaning that its manufacturer, Sepracor Inc. ("Sepracor"), has demonstrated the product's safety and efficacy to the U.S. Food and Drug Administration ("FDA") through an extensive approval process. *See* Sepracor Comments to Regions A & B's Draft LCD for Nebulizers Dated March 24, 2006, at 3 (May 8, 2006) ("Sepracor Comments") (Ex. F).

Another drug used to treat asthma and chronic obstructive pulmonary disease is racemic albuterol ("albuterol"), a competitor of Xopenex. Albuterol is a multiple-source, or generic, drug that differs chemically from Xopenex. Certain studies have found that the use of lower doses of Xopenex achieves comparable efficacy to albuterol (with fewer side effects); that the therapeutic effect of Xopenex may have a longer duration; and that Xopenex may result in accelerated and greater improvements in lung function. *See* Sepracor Comments 18-42. Xopenex sells at a higher price than the generic drug albuterol. Despite the higher cost, physicians continue to

prescribe Xopenex in both the commercial, Medicaid, Medicare fee-for-service and Medicare managed care markets, indicating that all of these payors perceive differences between Xopenex and albuterol in terms of patient outcomes. *See* Sepracor Comments 4.

*Xopenex's Reimbursement History*.  Xopenex is covered under Part B pursuant to the provisions governing DME.[3]  Those provisions apply because Xopenex is delivered to a patient through a nebulizer, equipment that converts the drug solution into a spray that a patient inhales.

Prior to January 2005, the Agency did not differentiate between Xopenex and albuterol for reimbursement and billing purposes.  The Agency included both Xopenex and albuterol in the same billing and payment code (or "J-code"), in effect treating Xopenex as a multiple-source (generic) drug for reimbursement purposes.  Sepracor Comments 4-5.  In that time period, Medicare reimbursed Part B drugs based on a calculation called the Average Wholesale Price ("AWP"), which was determined based on list prices published for manufacturer products rather than actual sales.  The reimbursement paid for Xopenex and generic albuterol was based on the AWP for albuterol, which was significantly higher than the acquisition cost for albuterol and significantly lower than the acquisition cost for Xopenex.  This reimbursement created a substantial artificial incentive for Medicare suppliers to provide albuterol rather than Xopenex to patients, even if Xopenex was the drug of choice for the patient, because suppliers would receive the same reimbursement whether they provided Xopenex (which had a high net cost to the supplier relative to albuterol) or albuterol (which had a much lower net cost).

The same reimbursement disincentives would have continued under the ASP regime that was signed into law on December 8, 2003, and went into effect on January 1, 2005, if Xopenex had continued to be grouped with albuterol in the same J-code (and thus effectively treated as a

---

[3] Most outpatient drugs, and in certain other circumstances, Xopenex, are covered under Part D, the Medicare Prescription Drug Program, which is not at issue here.

multiple-source drug). *Cf.* 42 U.S.C. § 1395w-3a(b)(3) (§ 1847A(b)(3)) (ASP for multiple-source drugs based on a volume-weighted average of the sales prices of the different products). Instead, Sepracor requested that the Agency assign Xopenex its own unique J-code, and presented evidence that Xopenex was clinically differentiated from racemic albuterol. Requests to modify a J-code are evaluated under a number of factors, including factors that call for differentiation from other products. *See* HCPCS Level II Code Modification Request Process Re: The 2010 HCPCS Update (Ex. G), *available at* http://www.cms.hhs.gov/MedHCPCS GenInfo/Downloads/2008_ALPHA.pdf. These factors include examining codes used by commercial insurers that pay for the product and identifying significant differences between the product at issue and similar products made by other manufacturers. *See id.* In November 2004, the Agency announced it would assign Xopenex its own J-code, effective January 2005. *See* Sepracor Comments Attach. B.

    *The Proposed Local Coverage Determinations.* Medicare utilization of Xopenex increased once the new J-code took effect, in part because the artificial barrier to Xopenex utilization described above was lifted. *See* Sepracor Comments 5.

    With increased utilization of Xopenex by Medicare patients, Medicare expenditures for Xopenex also increased. In March 2006, the contractors, who were charged with developing and revising coverage policies for the geographical regions they serve, *see* 42 U.S.C. § 1395ddd (§ 1893), simultaneously issued draft local coverage determinations ("LCDs") that would reimburse Xopenex suppliers at a small fraction of that drug's price. *See* Exs. H, I, J.

    The draft LCDs announced the Medicare contractors' intention to apply a "least costly alternative" ("LCA") policy to Xopenex.[4] Specifically, the draft LCDs provided as follows:

---

[4] The Medicare contractors who announced the draft LCDs here are different from the contractors who finalized the LCDs being challenged, but their authority is the same.

"The medical necessity for levalbuterol [Xopenex] compared to albuterol has not been established. Therefore, when codes J7612 or J7614 [for Xopenex] are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively." Exs. H, I, J.

The contractors then solicited comments on the draft LCDs and received responses challenging both the legality of the LCA policy and the medical basis for the contractors' decision, *i.e.*, that Xopenex was not clinically differentiated from albuterol. *See, e.g.*, Sepracor Comments; Nebulizers - Response to Comments (April 2008) ("Response to Comments") (Ex. K). In the wake of the substantial negative responses to the proposed LCA policy, the contractors' LCDs were put on hold. In December 2006, the Agency itself initiated a national coverage determination process to address coverage issues for drugs administered through a nebulizer to treat lung diseases. Ultimately, the Agency concluded in September 2007 that "no national coverage determination (NCD) is appropriate at this time." CMS, Medicare National Coverage Determinations Manual § 200.2 (eff. Sept. 21, 2007) (Nebulized Beta Adrenergic Agonist Therapy for Lung Diseases) (Ex. L), *available at* http://www.cms.hhs.gov/manuals/downloads/ncd103c1_Part4.pdf.

*The Agency's Reimbursement Change and the Legislative Response.* On July 1, 2007, the agency instituted, as part of its ongoing effort to limit utilization for Xopenex, another change in policy designed to reduce the reimbursement rate for Xopenex. From the time that the Agency had assigned Xopenex its own billing code, Xopenex had been reimbursed using the payment methodology for a single-source drug, *i.e.*, at 106 percent of its own ASP. However, in early 2007, the Agency sought to exploit a grandfathering provision in the statute and treat Xopenex as a multiple-source drug and thereby reduce its reimbursement rate. *See* CMS, Update to

9

Information Regarding Medicare Payment and Coding for Drugs & Biologics (Apr. 24, 2007) (Ex. M), *available at* http://www.cms.hhs.gov /MedHCPCS GenInfo/downloads/Code_Def.pdf.

Effective July 1, 2007, the Agency assigned Xopenex and albuterol to the same billing and payment codes. Thereafter, Xopenex was reimbursed using the methodology for multiple-source drugs, *i.e.*, at 106 percent of the blended average of the ASPs for Xopenex and albuterol. *See* CMS, Update to Information Regarding Medicare Payment and Coding for Drugs and Biologics (May 18, 2007) (Ex. N), *available at* http://www.cms.hhs.gov/MedHCPCSGenInfo/ downloads/051807_coding_annoucement.pdf. The change also meant that albuterol was reimbursed at this same rate. *Id.* Accordingly, while the reimbursement rate for Xopenex decreased significantly, the reimbursement rate for albuterol dramatically increased.

In many respects, this reimbursement change by the Agency created the same artificial incentive that had existed before Xopenex received its own billing code in 2005. Suppliers would be much more likely to supply albuterol over Xopenex (due to the increased profit margin they received as a result of the low acquisition cost of generic albuterol) and thereby receive a reimbursement rate many times the price of acquiring albuterol. This change threatened to drive Xopenex completely out of the Medicare market and to deny access to Xopenex to Medicare beneficiaries who had been prescribed that drug.

Recognizing the problem created by the Agency's reimbursement decision, Congress provided a legislative fix in the Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. 100-173, 121 Stat. 2492. This legislation added a special reimbursement rule for Part B inhalation drugs affected by the grandfathering provision. 42 U.S.C. § 1395w-3a(b)(7) (§ 1847A(b)(7). Under the special rule, Xopenex is reimbursed at the lesser of (1) 106 percent of its own ASP, or (2) 106 percent of the blended average of the ASPs for Xopenex and the various

generic forms of albuterol. *Id.* In the case of Xopenex, the lesser of these two rates is 106 percent of the blended ASPs of Xopenex and albuterol. In contrast, pursuant to the same statutory provisions, albuterol is reimbursed at the lesser of (1) 106 percent of the average of the ASPs of albuterol, or (2) 106 percent of the blended average of the ASPs for Xopenex and albuterol. *Id.* For albuterol, therefore, the lower rate is 106 percent of the ASPs for albuterol.

The practical effect of this provision was to maintain a higher payment rate for Xopenex (currently set at twenty-eight cents per one half milligram) than for albuterol (currently set at four-and-a-half cents per milligram). *See* CMS, Medicare Part B Average Sales Price Drug Pricing File for Second Quarter 2008 (Ex. O), *available at* http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice /01a_2008aspfiles.asp; Decl. of William Hewlett, June 5, 2008, ¶ 5 (Ex. P) ("Hewlett Decl."). The legislative history of this provision explains the congressional concern in greater detail:

> Under a provision of the MMA [the Medicare Prescription Drug, Improvement, and Modernization Act of 2003] known as the grandfather clause, some Part B drugs have been bundled together under a single ASP. Inhalation drugs are one such class of drugs, and CMS recently combined the ASPs for generic albuterol and brand name levalbuterol. When this change occurred, reimbursement for the brand name drug decreased substantially, while reimbursement for the generic increased substantially. The Committee is concerned that the profit spread created by increasing reimbursement for generic albuterol will cause physicians to use only albuterol even if levalbuterol may be more clinically appropriate. This provision merely requires albuterol to be reimbursed at its historic rate while reimbursing levalbuterol at the lower of its historic ASP or the bundled rate.

H.R. Rep. No. 110-284, pt.1, at 227-28 (2007).

Through this legislative reimbursement rule, which took effect on April 1, 2008, Congress provided an explicit statutory directive for establishing the reimbursement rate for Xopenex: it must be reimbursed at 106 percent of its own ASP or at 106 percent of the blended

average of the ASPs for Xopenex and albuterol, whichever is lower.[5]  This legislation did not foresee any scenario where Xopenex could be reimbursed at the "historic rate" of albuterol, which the LCDs' new least costly alternative rule would accomplish.

   *Contractors Finalize Their Local Coverage Determinations.*   Notwithstanding Congressional action to ensure the supply of Xopenex to Medicare beneficiaries, within months of the legislation taking effect, the contractors issued final LCDs, the operative provisions of which are identical to those proposed in the draft LCDs issued over two years earlier.  The LCDs provide, namely, "when codes J7612 or J7614 [for Xopenex] are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively."  Ex. A, B, C, D.  This least costly alternative policy determination that Xopenex will be reimbursed at the much lower rate of generic albuterol will mean that Medicare suppliers will be providing Xopenex to Medicare beneficiaries at a significant financial loss.  Faced with such a cost-prohibitive policy, suppliers will simply stop providing Xopenex to the many Medicare beneficiaries who rely on this important drug.  *See* Hewlett Decl. at ¶ 9; Decl. of Mark J. Wanda, June 5, 2008, ¶¶ 9-10 (Ex. Q) ("Wanda Decl.").  Xopenex, a more complex (and consequently more costly) innovator product will be effectively forced out of the Medicare market.  *Id.*  The consequence of the LCDs is that, as of their effective date, July 1, 2008, Plaintiffs and other beneficiaries will have no meaningful access to an important therapeutic alternative, Xopenex, under Medicare.

   **C.    The LCDs Will Impose High Costs on Medicare Beneficiaries.**

   Medicare beneficiaries like Plaintiffs, who live primarily on social security income, rely on the Medicare program to provide them with critical medical care, including the provision of

_____

[5] Following the enactment of the legislation, the Agency returned Xopenex to its old billing and payment codes.

prescription drugs such as Xopenex.  Decl. of Jeanette K. Coakley, Apr. 29, 2008, ¶ 7 (Ex. R)

("Coakley Decl."); Decl. of Frances W. Royster, June 3, 2008, ¶ 8 (Ex. S) ("Royster Decl.");

Decl. of Theresa A. Torrisi, June 5, 2008, ¶ 8 (Ex. T) ("Torrisi Decl."); Decl. of Eunice L.

Kozireski, June 5, 2008, ¶ 8 (Ex. U) ("Kozireski Decl.").  Because the LCDs will effectively

drive Xopenex from the Medicare market, Medicare beneficiaries, many of whom will be unable

to pay for Xopenex out of pocket, will not have access to Xopenex.

Plaintiff Jeanette Coakley is one such Medicare beneficiary who relies on Xopenex to

treat her medical conditions.  Ms. Coakley suffers from both asthma and COPD and has been

taking Xopenex for these conditions for approximately five-and-a-half years.  Coakley Decl. ¶¶

3, 5.  Before taking Xopenex, Ms. Coakley took generic albuterol, which caused her to suffer

negative side effects, including nausea, elevated blood pressure, shortness of breath, and physical

tremors.  *Id.* ¶ 5.  Ms. Coakley's doctor switched her to Xopenex, which she takes three times per

day, and which has markedly increased the quality of her health and life.  *Id.* ¶¶ 3, 5  Under the

LCA policy set to take effect on July 1, 2008, Ms. Coakley, who lives on social security

disability income and would be unable to pay for the cost of Xopenex out of pocket, *id.* ¶ 7, will

undoubtedly be denied access to necessary medical care.

Plaintiff Frances Royster also takes Xopenex to treat asthma and COPD and receives

coverage for Xopenex through Medicare Part B.  Royster Decl. ¶ 4.  Ms. Royster has been taking

Xopenex for approximately three years, prior to which she took generic albuterol. *Id.* ¶ 5.  Ms.

Royster's doctor changed her prescription because she was having serious difficulty breathing

while taking albuterol and had to take the generic drug more often to receive even limited benefit

to her breathing.  *Id.*  Ms. Royster currently takes a 1.25 mg dose of Xopenex two to four times

per day and has seen a substantial improvement in her breathing and quality of life since

13

switching to Xopenex.  *Id.* ¶¶ 4-5.  Because she lives on a fixed income, Ms. Royster, who needs Xopenex to breathe, would suffer significant hardship under the LCA policy set to take effect on July 1, 2008.  *Id.* ¶¶ 6-7.

Plaintiff Theresa Torrisi has been enrolled in Medicare since 1989 and receives coverage for Xopenex through Medicare Part B.  Torrisi Decl. ¶¶ 3-4.  To treat her COPD, Ms. Torrisi's physician prescribes a 1.25 mg dose of Xopenex three to four times per day, administered through a nebulizer.  *Id.* ¶ 4.  Ms. Torrisi has been taking Xopenex for approximately five years. *Id.* ¶ 6.  Prior to taking Xopenex, Ms. Torrisi took generic albuterol, which caused negative side effects, including significant physical tremors.  *Id.*  Switching to Xopenex has substantially eliminated this side effect and has allowed Ms. Torrisi to breathe much better.  *Id.*  Ms. Torrisi, who lives on social security income and takes numerous other prescription medications, would suffer significant hardship if she was unable to obtain coverage for Xopenex through Medicare. *Id.* ¶ 8.

Plaintiff Eunice Kozireski is a Medicare beneficiary who suffers from COPD and has undergone surgery for lung cancer.  Kozireski Decl. ¶¶ 3-4.  She receives coverage for Xopenex, which she has been taking for approximately a year, through Medicare Part B.  *Id.* ¶¶ 4, 6.  Ms. Kozireski's physician, who prescribes a 1.25 mg dose of Xopenex three to five times per day, switched her from generic albuterol to Xopenex because albuterol was causing her to suffer significant physical tremors.  *Id.*  This side effect has been substantially eliminated since Ms. Kozireski starting taking Xopenex.  *Id.* ¶ 6.  Because she lives on social security income, Ms. Kozireski would be unable to obtain Xopenex if the LCA policy takes effect on July 1, 2008.  *Id.* ¶ 8.

## SUMMARY OF ARGUMENT

The LCDs issued by the Medicare contractors are *ultra vires* and legally invalid. Employing a "least costly alternative" policy, the contractors ruled that Xopenex would be covered under Medicare, but "if coverage criteria are met, payment will be based on the allowance for" the generic drug, albuterol.

That decision runs afoul of both the Medicare statute and implementing regulations. The Medicare statute sets forth distinct rules for coverage and payment. Congress specifically provided that national coverage determinations (which are made by the Secretary, and are subject to a special review process) are restricted to determinations of whether items or services are covered; they are not payment determinations. 42 U.S.C. § 1395ff(f)(1)(B) (§ 1869(f)(1)(B)). The statutory and regulatory definition of LCDs is similarly limited. That is, they are only to determine whether items or services are to be covered, and are not to determine the payment for the covered items or services. *Id.* § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)); 42 C.F.R. § 400.202. However, that is what the LCDs at issue here seek to accomplish: they decree that the amount of payment for Xopenex will be the reimbursement rate for albuterol.

Not only do the contractors lack any authority to determine payment rates in LCDs, but a payment rate based on the "least costly alternative" also violates the statute. Congress made clear, by enacting the special reimbursement rule for Part B inhalation drugs in December 2007, that the reimbursement rate for Xopenex must be either a rate based on its own ASP or the rate based on the blended ASPs of Xopenex and albuterol, whichever is lower. 42 U.S.C. § 1395w-3a(b)(7) (§ 1847A(b)(7)). There is no provision in the statute that allows Xopenex to be reimbursed at the rate of albuterol only. The Agency and its contractors may not simply ignore the statutory reimbursement rate mandated by Congress.

15

Similarly, the contractors cannot justify the LCDs simply because an LCA policy is authorized by the Agency's Program Integrity Manual.  An agency manual cannot trump the countervailing statute and regulations.  Moreover, the Medicare statute specifically provides that the Agency can only establish a substantive legal standard governing benefit determinations through a duly promulgated regulation.  *Id.* § 1395hh(a)(2) (§ 1871(a)(2)).  Authorization in a policy manual does not suffice.  Nor can an LCA policy be defended as an exercise of the Agency's power under section 1862(a)(1)(A).  That provision provides that "no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."  *Id.* § 1395y(a)(1)(A) (§ 1862(a)(1)(A)).  As the plain language and prevailing judicial construction of this statute make clear, this section permits items or services to be excluded from coverage when they are not reasonable or necessary for treatment (*i.e.*, medically necessary).  The relative cost of treatment plays no part in these determinations.  Indeed, the reasonableness of costs is never a factor under the coverage provisions of the Act, but only under the payment provisions.  The Agency's own definition of the provision provides that a safe, effective, and appropriately furnished drug will be deemed "reasonable and necessary" if it is "[a]t least as beneficial as an existing and available medically appropriate alternative."  CMS, Pub. 100-08, Medicare Program Integrity Manual § 13.5.1 (rev. Apr. 9, 2004) ("PIM") (Ex. V), *available at* http://www.cms.hhs.gov/manuals/Downloads/pim83c13.pdf.  That definition is directly contrary to the LCDs at issue here, which deny coverage to Xopenex, even though it is indisputably at least as beneficial as albuterol.

Most fundamentally, section 1862(a)(1)(A) states a rule of exclusion:  "no payment . . . for any expenses" may be made if a drug is not reasonable and necessary.  Thus, a finding that a

drug is reasonable and necessary is made prior to determining whether payment can be made; that finding does not depend on the amount of payment the Agency is willing to authorize. If Xopenex indeed were not reasonable and necessary for the treatment of asthma and COPD, it would have to be wholly excluded, not reimbursed at the rate of albuterol. The Agency's claim that LCA authority is derived from section 1862(a)(1)(A) is unfounded.

Specific statutory authority does exist for the Agency to address the reasonableness of payment amounts for covered items and services, but the statute places strict limits on the exercise of that authority. *See* 42 U.S.C. § 1395u(b) (§ 1842(b)) ("Inherent Reasonableness Authority"). The LCDs at issue here in no way satisfy those statutory requirements for the exercise of such authority and, indeed, do not even purport to. When Congress establishes the specific mechanism to correct unreasonableness in payment amounts for covered items and services, the Agency may not simply ignore it. The contractors' attempt to simply circumvent these statutory requirements provides another reason why the LCDs here are *ultra vires*.

This Court should accordingly declare the LCDs invalid. If this Court does not reach a final decision on the invalidity of the LCDs before their effective date of July 1, 2008, it should stay the LCDs. Plaintiffs have a high likelihood of success on the merits; they will be irreparably harmed by the denial of needed medication to which they are legally entitled; third parties (in particular other beneficiaries and the drug's manufacturer) will be irreparably harmed; and the public interest militates in favor of a stay.

## STANDARD OF REVIEW

The factors for determining whether to grant a preliminary injunction or a stay of an agency order are the same. *Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987). A district court balances four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the

prospect that third parties will be harmed if the court grants the stay; and (4) the public interest in granting the stay. *Cuomo v. U.S. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). *See also Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002).

## ARGUMENT

The defendant Medicare contractors, as well as two other Medicare contractors, have issued identical LCDs providing that "when codes J7612 or J7614 [for Xopenex] are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively." Exs. A, B, C, D. These determinations are wholly *ultra vires* and contrary to law. Under the Medicare statute, coverage determinations are made prior to and independently of payment determinations. Moreover, even if a contractor had such authority, the payment rule announced in the LCDs is contrary to the explicit statutory payment rule for Part B inhalation drugs like Xopenex. The authorization of "least costly alternative" payment determinations in an agency manual cannot trump the statute or regulation; legal standards affecting benefit payments have no effect unless promulgated in a regulation; and regardless, the Agency cannot derive the authority to establish payment rates from the statute's prohibition of payment for services that are not "reasonable and necessary" to medical treatment.

## I.    MEDICARE CONTRACTORS HAVE NO AUTHORITY TO SET PAYMENT RATES IN LOCAL COVERAGE DETERMINATIONS.

The Medicare statute creates a clear dichotomy between coverage and payment determinations. Section 1832 of the Social Security Act outlines the types of items and services covered under part B, 42 U.S.C. § 1395k (§ 1832), subject to specific exclusions, *id.* § 1395y (§ 1862). Three kinds of coverage determinations are authorized by statute: (1) "national coverage determinations" made by the Secretary, *id.* § 1395ff(f)(1)(B) (§ 1869(f)(1)(B)); (2)

"local coverage determinations" by contractors, which determine whether an item or service is covered within the jurisdiction that the contractor serves, *id.* § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)); and (3) an "initial determination with respect to a claim for benefits under such parts, including an initial determination by the Secretary that payment may not be made, or may no longer be made, for an item or service under such parts." *See id.* § 1395ff(a)(1) (§ 1869(a)(1)).

Wholly separate provisions govern the amount of payment that will be made for covered items and services. *Id.* §§ 1395*l* (§ 1833), 1395m (§ 1834). Critically, those statutory payment-amount rules apply to items and services only once coverage has been determined. The statute is explicit in that regard:

> [T]here shall be paid from the Federal Supplementary Medical Insurance Trust Fund, in the case of each individual who is covered under the insurance program established by this part and *incurs expenses for services with respect to which benefits are payable under this part*, amounts equal to—

*Id.* § 1395*l*(a) (§ 1833(a)) (emphasis added). Determinations regarding the amount of payment are separate from, and can only be made after a determination that "benefits are payable under this part," *id.*, *i.e.*, after coverage is determined.

The remainder of § 1395*l*, as well as § 1395m, then introduce the specific payment methodologies used for the various types of items and services Part B covers. These range from the general rule that medical services will be reimbursed at "80 percent of the reasonable charges for the services," *id.* § 1395*l*(a)(1) (§ 1833(a)(1)), to specific rules regarding the payment amount for discrete items and services. The statute specifically outlines the rule for an inhalation drug like Xopenex. It mandates that "with respect to drugs and biologicals . . . not paid on a cost or prospective payment basis . . . the amounts paid *shall be* 80 percent of the lesser of the actual charge or the payment amount established in section [1842(o)] (or, if applicable, under section

19

[1847, 1847A, or 1847B])." *Id.* § 1395*l*(a)(1)(S) (§ 1833(a)(1)(S)) (emphasis added). Section

1842(o) then provides that

> If a physician's, supplier's, or any other person's bill or request for payment for services includes a charge for a drug or biological *for which payment may be made under this part* and the drug or biological is not paid on a cost or prospective payment basis as otherwise provided in this part, the amount payable for the drug or biological is equal . . .
>
> [i]n the case of inhalation drugs or biologicals furnished through durable medical equipment covered under section [1861(n)] that are furnished . . . in 2005 and subsequent years, the amount provided under section [1847A] for the drug or biological.

*Id.* § 1395u(o)(1)(G)(ii) (§ 1842(o)(1)(G)(ii)). Section 1847A sets forth the ASP payment rule,

establishing the reimbursement rate for such drugs at "106 percent of the [average sales price]"

of that drug or at another payment amount dictated under the special rules of that section. *Id.*

§ 1395w-3a (§ 1847A). The least costly alternative policy is not one of those special rules.

    Congress has consistently distinguished between coverage and payment determinations

throughout the Medicare Act. Even for specific claims, Congress differentiated between "[t]he

initial determination of the amount of benefits available" and "[a]ny other initial determination

with respect to a claim for benefits under such parts, including an initial determination by the

Secretary that payment may not be made, or may no longer be made, for an item or service under

such parts." *Id.* § 1395ff(a)(1)(B)-(C) (§ 1869(a)(1)(B)-(C)). More fundamentally, Congress

excluded payment determinations from national coverage determinations, which are subject to a

special review process by statute. *See id.* § 1395ff(f)(1) (§ 1869(f)(1)). Congress provided that

"the term 'national coverage determination' means a determination by the Secretary with respect

to whether or not a particular item or service is covered nationally under this subchapter, *but*

*does not include . . . a determination with respect to the amount of payment made for a*

*particular item or service so covered.*"  *Id.* § 1395ff(f)(1)(B) (§ 1869(f)(1)(B)) (emphasis added);
*see also* 42 C.F.R. § 400.202.

The statute similarly defines a "local coverage determination" as "a determination by a fiscal intermediary or a carrier under part A or part B of this subchapter, as applicable, respecting whether or not a particular item or service *is covered* on an intermediary- or carrier-wide basis under such parts, in accordance with section 1395y(a)(1)(A) of this title." 42 U.S.C. § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)) (emphasis added).  Agency regulations clarify that "[a]n LCD may provide that a service is not reasonable and necessary for certain diagnoses and/or for certain diagnosis codes.  An LCD does not include a . . . determination with respect to the amount of payment to be made for the service."  42 C.F.R. § 400.202; 68 Fed. Reg. 63,692, 63,706 (Nov. 7, 2003).

While the specific exclusion of "amount of payment" determinations in the NCD statute and LCD regulation may refer only to those Part B determinations of individual benefit claims that are committed exclusively to carrier decisions after a hearing, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 675-82 (1986), the critical point is that NCDs and LCDs encompass only determinations of whether an item or service is "covered" (not determinations of payment amounts or payment methods, such as an LCA).

The LCDs issued by the contractors here flatly violate the authorizing statute and regulation.  The contractors have repeatedly determined that Xopenex is medically reasonable and necessary for the treatment of an illness, such as asthma and COPD.  Nevertheless, the LCDs at issue go beyond making a coverage determination and dictate that Xopenex, *if covered*, is to be reimbursed on the basis of a drug that costs less.  The LCDs provide that "when codes J7612 or J7614 [for Xopenex] are billed, *if coverage criteria are met, payment will be based* on the

allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively." Exs. A, B, C, D. The LCDs at issue here are not confined to determining whether Xopenex is covered; they impermissibly go on to establish an LCA payment methodology *when* Xopenex is covered. Because the LCDs here involve payment and not coverage determinations, the Medicare contractors have exceeded the scope of their statutory and regulatory authority.

## II.  THE CONTRACTORS' LOCAL COVERAGE DETERMINATIONS VIOLATE THE PAYMENT METHODOLOGY MANDATED BY STATUTE.

Even if contractors had any authority to prescribe payment rates in an LCD, they cannot do so in violation of the payment rules prescribed in the statute. "The starting point for [the] interpretation of a statute is always its language," *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Where, as here, the words of the statute are unambiguous, the "judicial inquiry is complete." *Id.* at 254 (internal quotation marks omitted). If a statute speaks clearly "to the precise question at issue," a court "must give effect to the unambiguously expressed intent of Congress." *Martini v. Fed. Nat'l Mortgage Ass'n,* 178 F.3d 1336, 1342 (D.C. Cir. 1999) (internal quotation marks omitted).

The Medicare statute speaks directly to the question of how a drug such as Xopenex should be reimbursed. It does not speak in permissive terms, so as to suggest that the Agency has a choice of reimbursement schemes. Rather, the statute expressly provides through the new "[s]pecial rule" that "the payment amount for . . . each single source drug or biological described in section 1842(o)(1)(G) [Part B inhalation drugs] that is treated as a multiple source drug because of the application of subsection (c)(6)(C)(ii) [*i.e.*, the grandfather provision] is the lower of—(i) the payment amount that would be determined for such drug or biological applying [the

22

grandfather provision, *i.e.*, 106 percent of the blended average of the ASPs of the single-source drug and the other drugs in its same billing code]; or (ii) the payment amount that would have been determined for such drug or biological if [the grandfather provision] were not applied [*i.e.*, 106 percent of the single-source drug's own ASP]." 42 U.S.C. § 1395w-3a(b)(7) (§ 1847A(b)(7)). The statute does not allow Xopenex, defined for purposes of this special rule as a single-source drug, to be reimbursed at a payment rate that includes only the ASPs of multiple-source drugs, such as albuterol. Congress established this very specific payment rule for Xopenex (and albuterol), because of the concern that significantly lowering the reimbursement rate for Xopenex "will cause physicians to use only albuterol even if levalbuterol [Xopenex] may be more clinically appropriate." H.R. Rep. No. 110-284, pt. 1, at 228. The special rule thus accomplished multiple purposes: it bifurcated the payment levels between Xopenex and albuterol as the payment amount for each drug was determined separately under the formula, and it lowered albuterol's payment so that suppliers would no longer maintain an untoward incentive to supply albuterol even if clinical circumstances justified the use of Xopenex.

In passing this legislation, Congress thus was clearly concerned that Medicare beneficiaries, like Plaintiffs, not be deprived of medications that their doctors deem more suitable for them because of artificial payment differentials.

Despite this legislative mandate evincing an unambiguous legislative intent, the LCDs – despite acknowledging that Xopenex is *medically* reasonable and necessary – purport to calculate reimbursement for Xopenex based only on albuterol's ASP. The LCDs would thus reimburse Xopenex not at the rate the statute commands, but instead at a fraction of this amount. *See* Exs. A, B, C, D. This is at odds with the statutory language establishing a mandatory reimbursement scheme for Part B inhalation drugs like Xopenex. The Medicare statute does not give any

discretion to the Medicare contractors (or the Secretary for that matter) to carve out exceptions to this payment method when they suppose that a cheaper drug will suffice for the average patient. Because the statute speaks precisely to the question at issue in plain and unambiguous terms, this Court should find that the LCDs are invalid.  *United States v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002).

**III.    THE AGENCY AND ITS CONTRACTORS' LEGAL JUSTIFICATIONS FOR A LEAST COSTLY ALTERNATIVE POLICY DO NOT WITHSTAND SCRUTINY.**

   **A.    The Manual Provision Authorizing LCA Policies Cannot Trump The Contrary Statutory and Regulatory Provisions.**

The authority that the Medicare contractors invoke to implement "least costly alternative" policies is found nowhere in the Medicare statute or regulations, but instead appears in a single paragraph of the Program Integrity Manual that the Agency issued to rationalize the divergent practices of Medicare contractors:

> Contractors *shall* implement new Least Costly Alternative (LCA) determinations through an LCD.  "Least Costly Alternative" is a national policy provision that shall be applied by contractors when determining payment for all durable medical equipment (DME). Contractors have the discretion to apply this principle to payment for non-DME services as well.

PIM, § 13.4.A.

The manual provision authorizing LCA policies does not save the LCDs here from invalidity.  As an initial matter, even if LCAs were sometimes permissible, an agency manual provision cannot authorize a Medicare carrier to act in contravention of a statute or regulation, and thus this particular LCA cannot survive scrutiny.  Regardless, the Medicare contractors lack LCA authority because (1) the statute forbids the Agency to adopt any substantive standard governing the scope of benefits or payment for services except by regulation, and (2) the Agency cannot derive LCA authority from the provision authorizing exclusion from coverage for items

24

or services that are not "reasonable and necessary" for medical treatment, 42 U.S.C.

§ 1395y(a)(1)(A) (§ 1862(a)(1)(A)).

**B.    Section 1871 Requires Substantive Legal Standards To Be Promulgated By Regulation.**

Section 1871 of the Social Security Act expressly provides:

> No rule, requirement, *or other statement of policy* (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title shall take effect *unless it is promulgated by the Secretary by regulation* under paragraph (1).

*Id.* § 1395hh(a)(2) (§ 1871(a)(2)) (emphasis added).  This provision was added to prevent the

Agency from adopting substantive standards in its manuals.  H.R. Rep. No. 100-391, at 430

(1987) ("The Committee is concerned that important policies are being developed without

benefit of the public notice and comment period and, with growing frequency, are being

transmitted, if at all, through manual instructions and other informal means.").

Section 13.4.A of the Manual defines a "substantive" legal standard because it "'affect[s]

individual rights and obligations.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (quoting

*Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (holding that BIA improperly promulgated substantive

rules governing benefits in an agency manual)).  This Manual provision authorizes carriers –

who are "agents of the Secretary charged with the relevant duties under the Medicare Act and its

regulations," *Monmouth Med. Ctr.*, 257 F.3d at 813 – to limit a beneficiary's right to receive

reimbursement for Xopenex to the amount at which a competitor drug is reimbursed.  The

substantive LCA standard for reimbursing Xopenex is void under section 1871 unless, under

D.C. Circuit precedent, it is merely interpretive of a pre-existing statutory or regulatory

obligation.  *Id.* at 814.

The Agency has attempted to justify its controversial LCA policy as merely an interpretation of the statutory requirement that it deny coverage of items or services that are not "reasonable and necessary" for medical treatment, 42 U.S.C. § 1395y(a)(1)(A) (§ 1862(a)(1)(A)).[6]   Although the Ninth Circuit has accepted that position, *Erringer v. Thompson*, 371 F.3d 625 (9th Cir. 2004), its analysis does not withstand scrutiny.  The LCA authorization in the Manual "does not purport to construe any language in a relevant statute or regulation;  it does not interpret anything."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997).  "[T]he interpretative rule exception is to be narrowly construed and only reluctantly countenanced,"  and applies only when the agency is "intending to explain ambiguous language, or remind parties of existing duties—not create new law."   *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) (per curiam) (internal quotation marks omitted); *Central Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005).  Not only does the reasonable-and-necessary requirement say nothing about relative costs of items or services, CMS did not interpret section 1862(a)(1)(A) as imposing a pre-existing duty to base coverage determinations on the relative costs of alternative treatments.  Instead, invoking its delegated legislative authority, it established a rule mandating LCAs for DME, but granting discretion to contractors to institute LCAs for other items and services.  PIM § 13.4.A.  Finally, section 1871 does not simply duplicate the legislative/interpretative rule distinction of the Administrative Procedure Act.  *Cf. Monmouth Med. Ctr.*, 257 F.3d at 813 (leaving open this question).  Section 1871 clearly anticipates that substantive changes to legal standards (for purposes of subsection

---

[6] In responses to comments as part of the preamble of a rule involving the new Part B Competitive Acquisition Program, the Agency has stated that "[n]othing in this interim final rule is intended to disrupt the longstanding ability of contractors to apply this [LCA] policy under section 1862(a)(1)(A) of the Act."  70 Fed. Reg. 39,021, 39,029 (July 6, 2005); *see also* 70 Fed. Reg. 70,116, 70,243 (Nov. 21, 2005) (the final rule repeating the same language).  Policy Manual, ch. 15, § 110.1(C)(2) ("Even though an item of DME may serve a useful medical purpose, the [contractor] must also consider *to what extent, if any, it would be reasonable for the Medicare program to pay for the item prescribed*.") (emphasis added).

(a)) may be accomplished through, among other things, interpretive rules.  42 U.S.C. § 1395hh(e)(1)(A)  (§ 1871(e)(1)(A)).    Section 1871 simply provides that if any "rule, requirement, or other statement of policy (other than a national coverage determination) . . . establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title," it may only take effect if "it is promulgated by the Secretary by regulation."  *Id.* § 1395hh(a)(2) (§ 1871(a)(2)).  The LCA mandate for DME in § 13.4 of the Manual clearly establishes or changes a substantive legal standard governing the scope of benefits and/or the payment for services, and thus is invalid under section 1871 because it was not promulgated by regulation.

### C.    The "Reasonable and Necessary" Standard of The Medicare Statute Does Not Authorize The LCA Policy.

Even if the Secretary's LCA authorization does not violate section 1871, the LCA is unauthorized by statute.  The "reasonable and necessary" provision of section 1862(a)(1)(A) of the Act provides no authority for the Secretary or Medicare contractors to set payment rates for covered items, much less rates in contravention of specific payment rules mandated by Congress.

Section 1862(a)(1)(A), which applies to all reimbursement under Medicare, states a rule of *exclusion* for certain items and services:

> Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services--
>
> (1)(A) which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

42 U.S.C. § 1395y(a)(1)(A) (§ 1862(a)(1)(A)).

The LCDs at issue here do not purport to make a medical determination that Xopenex is not clinically "reasonable and necessary for the . . . treatment of illness." *Id.* Indeed, the LCDs acknowledge that Xopenex is a "bronchodilator[] with beta-adrenergic stimulatory effect," and may be used for "the management of obstructive pulmonary disease." Exs. A, B, C, D. Nor do the LCDs seek to exclude Xopenex from Medicare coverage; they simply provide that, "if coverage criteria are met, payment will be based on the allowance for" the comparable unit of albuterol. Exs. A, B, C, D. The LCDs thus seek to limit the reimbursement rate for Xopenex *in spite of the fact* that it is a medically appropriate treatment for such illnesses.

This LCA policy represents a radical step on the part of the Agency to make Medicare coverage determinations turn on cost. As the former medical director of the Agency has stated, "Medicare has not explicitly considered costs in making coverage decisions. Health care services are generally covered when there is adequate evidence that they improve health outcomes, irrespective of the unit or aggregate cost." Sean R. Tunis, *Why Medicare Has Not Established Criteria for Coverage Decisions*, 350 New Eng. J. Med. 2196, 2197 (2004) (Ex. W), *available at* http://content.nejm.org/cgi/content/full/350/21/2196. The "reasonable and necessary" provision of section 1862(a)(1)(A) cannot be contorted to justify the LCA policy here.

### 1. The Text and Structure of The Medicare Statute Demonstrate That The "Reasonable and Necessary" Requirement Involves Considerations of Medical Efficacy, Not Cost-Effectiveness.

The text of section 1862(a)(1)(A) itself demonstrates why the "reasonable and necessary" requirement does not authorize the Agency or its contractors to base coverage exclusions on the cost of the item or service. The provision mandates that "no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A) (§ 1862(a)(1)(A)).

28

A close reading of this provision reveals that it cannot be understood to encompass considerations of cost. *First*, the phrase, "which . . . are not reasonable and necessary," directly follows "items or services," indicating that it is the items or services—i.e., the specific medical procedures, treatments, and medications—that must be reasonable and necessary and not the "expenses incurred" for those services. This is the consistent reading of the courts and the Agency, which generally refer to the need for services to be "reasonable and necessary." *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602, 617 (1984) (stating that § 1395y(a)(1)(A) concerns "whether a particular medical *service* is 'reasonable and necessary'") (emphasis added).

*Second*, the subsequent language of the provision states that the items or services must be "reasonable and necessary *for the . . . treatment of illness or injury or to improve the functioning of a malformed body member*." This makes clear that the reasonableness and necessity specifically relate to the "treatment of illness or injury." Thus, the statute specifically provides the standard against which reasonableness and necessity are to be gauged, namely, medical treatment goals and not cost-containment goals.

Reading the "reasonable and necessary" provision in the context of the Medicare statute as a whole, further demonstrates that "reasonable and necessary" does not refer to the relative cost-effectiveness of the treatment. *See, e.g.*, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). As discussed above, *supra* at 5-6, 17-18, Medicare reimbursement decisions involve a two-step process: first, determining whether an item or service is covered, and second, determining what payment Medicare will provide. The "reasonable and necessary" requirement is involved in the first step: if items or service are not "reasonable and necessary"

29

they are excluded from coverage. The reimbursement rate for Medicare services is specifically articulated by completely different statutory provisions from section 1862's "reasonable and necessary" provision. For some Medicare services, the reimbursement rate is based on "reasonable charges" or the "reasonable cost" of the services. *See* 42 U.S.C. §§ 1395f (§ 1814), 1395*l* (§ 1833), 1395x(v) (§ 1861(v)).[7] However, the use of the term "reasonable" in the context of *payment* determinations is wholly separate from the "reasonable and necessary" provision which involves a determination of *coverage*. *See, e.g.*, *Presbyterian Hosp. of Dallas v. Harris*, 638 F.2d 1381, 1384 n.2 (5th Cir. 1981) (noting that the "reasonable cost of services," reimbursed pursuant to 42 U.S.C. § 1395f, is different from the exclusion in 42 U.S.C. § 1395y for items "not reasonable and necessary"), *superseded by statute on other grounds*, Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 106, 96 Stat. 324. The statutory scheme, therefore, is strong evidence that the "reasonable and necessary" requirement does not involve decisions about the rate of reimbursement, as these decisions are specifically covered by other statutory provisions, *see supra* at 17-18, and it must be presumed that Congress did not enact redundant or superfluous legislation, *see Center for Auto Safety v. Skinner*, 936 F.2d 1315, 1316 (D.C. Cir. 1991) (per curiam).

Furthermore, statutory provisions that explicitly cross-reference section 1862(a)(1)(A) demonstrate that it involves decisions regarding medical reasonableness and necessity and not cost-effectiveness relative to other services. For example, the statute articulating the independent review of initial coverage determinations provides:

---

[7] One of the Agency's contractors has pointed to 42 U.S.C. § 1395x(v) as "regulatory guidance" for the use of LCA policies. Appendix, Draft LCD for Gonadotropin-Releasing Hormone Analogs, Northern and Southern California Carrier (eff. Jan. 1, 2008) (Exs. X, Y). However, this statutory definition of "reasonable costs" in the context of payment determinations cannot be the basis for taking cost into account in the determination of coverage.

> Where an initial determination is made with respect to whether an item or service is *reasonable and necessary for the diagnosis or treatment of illness or injury* (under section [1862(a)(1)(A)]), such review shall include consideration of the facts and circumstances of the initial determination *by a panel of physicians or other appropriate health care professionals and any decisions with respect to the reconsideration shall be based on applicable information, including clinical experience (including the medical records of the individual involved) and medical, technical, and scientific evidence*.

42 U.S.C. § 1395ff(c)(3)(B)(i) (§ 1869(c)(3)(B)(i)).  *See also id.* § 1395ff(c)(3)(E) (§ 1869(c)(3)(E)) (requiring reviewer to provide "an explanation of the *medical and scientific rationale* for the decision") (emphasis added).  When read as a whole, therefore, the "reasonable and necessary" requirement involves decisions regarding medical necessity and not the reasonableness of the service's cost.

### 2.    The Legislative History Demonstrates That The "Reasonable and Necessary" Requirement Does Not Encompass Cost Considerations.

The legislative history of the Medicare statute, in general, and of section 1862(a)(1)(A) in particular, also reveal Congress's clear intent that the "reasonable and necessary" requirement concern the medical efficacy of the services provided and not the reimbursement rate.  In 1965, Congress passed amendments to the Social Security Act that created the Medicare system.  The 1965 Amendments represented a sweeping change in the government's approach to benefits for the aged.  Although many of the statute's particular provisions were hotly debated, this was not the case with the "reasonable and necessary" provision, which was added late to the bill.  *See* Jacqueline Fox, *Medicare Should, But Cannot, Consider Cost:  Legal Impediments to a Sound Policy*, 53 Buff. L. Rev. 577, 584-95 (2005).  The only explicit reference to the provision in the published legislative history is a brief explanation of the purpose of section 1862(a)(1)(A), which is identical in both the House and Senate reports:

31

> [T]he bill would bar payment for health items or services that are not reasonable and necessary for the treatment of illness or injury or to improve the functioning of a malformed body member. Thus payment could be made for the rental of a special hospital bed to be used by a patient in his home only if it was a reasonable and necessary part of a sick person's treatment. Similarly, such potential personal comfort items and services as massages and heat lamp treatments would only be covered where they contribute meaningfully to the treatment of an illness or injury or the functioning of a malformed body member.

H.R. Rep. No. 89-213, at 41 (1965); S. Rep. No. 89-404, pt. 1, at 48 (1965). This explanation makes clear that the "reasonable and necessary" provision involves a decision about whether an item or service "contribute[s] meaningfully to the treatment of an illness or injury." This standard reflects a medical decision, *i.e.*, whether the items or services will provide a medical benefit to the patient. Nowhere does the legislative history suggest that the "reasonable and necessary" requirement has any connection to decisions about reimbursement rates.

Furthermore, reading the "reasonable and necessary" standard to include considerations about reimbursement or cost is in tension with the Medicare statute's broad purpose to "encourage participating institutions, agencies, and individuals to make the best of modern medicine more readily available to the aged." S. Rep. No. 89-404, pt. 1, at 24. The purpose of Medicare was to expand access to health care, and, at the time it was passed, one of Congress's greatest concerns was ensuring that the elderly received high-quality care and that providers were adequately compensated for providing it. Indeed, when discussing the "reasonable cost" for the purposes of reimbursement, the legislative concern was *not* with containing costs but was with adequately compensating providers: "Since the reasonable cost of the services would be covered, hospitals would not be deterred, because of nonpaying or underpaying patients in this aged group, from trying to provide the best of modern care." *Id.* at 27.

32

Certainly the drafters of section 1862(a)(1)(A) in 1965 would not have understood that provision to require inquiry into the relative cost-effectiveness of the medical treatment that a physician ordered. "There is a common understanding among federal officials who participated in drafting the legislation that the 'reasonable and necessary' provision was modeled on language from an Aetna health insurance policy for federal employees. Although there was concern at the time that services of unknown value would sometimes be used, payers generally accepted the judgments of physicians at face value." Tunis, *supra* at 2196; *accord* Fox, *supra* at 593-95 (noting that the Aetna policy and similar private insurance policies were typically interpreted to refer to medical reasonableness and necessity, not the reasonableness of the service's cost). The current attempt by the contractors to shoe-horn considerations about reimbursement rates into section 1862(a)(1)(A) is plainly inconsistent with the Medicare statute's history.

> **3.    Judicial Interpretations of The "Reasonable and Necessary" Requirement Support the View That It Does Not Involve Considerations of Cost.**

Although there have been a limited number of judicial opinions that have squarely addressed the meaning of section 1862(a)(1)(A)'s "reasonable and necessary" requirement, *see Lerum v. Heckler*, 774 F.2d 210, 212 (7th Cir. 1985) ("[V]ery few cases have addressed the meaning of the 'reasonable and necessary' provision of the Medicare Act."), the prevailing judicial construction has specifically rejected attempts to tie cost concerns to the "reasonable and necessary" provision. In *Hultzman v. Weinberger*, 495 F.2d 1276, 1281-82 (3d Cir. 1974), the court held that the Secretary could not deny coverage for a particular service merely because it could have been obtained in a less costly facility. Rejecting the Secretary's arguments under the "reasonable and necessary" exclusion, the court stated as follows:

> The Secretary apparently construes section 1395y(a)(1) to mean that services which are admittedly reasonable and necessary for the treatment and diagnosis of a patient's ailments are nonetheless

33

> excluded from coverage if the Secretary determines that it was not reasonable and necessary to render those services in a hospital (as opposed to a lesser care facility). This construction of section 1395y(a)(1), however, *cannot be sustained in the face of the clear and plain language of that section.* Section 1395y(a)(1) excludes from coverage only those services which are not reasonable and necessary to the treatment or diagnosis of a patient's ailments. It does not speak at all to the question of whether it is medically necessary to provide such services on an inpatient or outpatient basis or in a hospital rather than extended care facility.

*Id.* at 1282 (emphasis added); *see also Lerum*, 774 F.2d at 212-14 (citing the Third Circuit's approach in *Hultzman* with approval); *Torphy v. Weinberger*, 384 F. Supp. 1117, 1120-21 (E.D. Wis. 1974) (applying *Hultzman*'s holding to a similar factual situation); *but cf. New York v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990) ("In determining whether services rendered are 'not reasonable and necessary,' we have no doubt that the Secretary may take into account . . . *where* those services were provided, *i.e.*, whether those services were provided in the most appropriate, cost-effective setting."). If an item or service is "admittedly reasonable and necessary for the treatment and diagnosis of a patient's ailments," the Agency cannot limit coverage because it is not reasonable and necessary with regard to some other purpose, *i.e.*, cost-containment.[8] *Hultzman*, 495 F.2d at 1282.

---

[8] Furthermore, when courts refer to section 1862(a)(1)(A)'s requirement they consistently modify "reasonable and necessary" with the word "medically." *See, e.g., Alabama Hosp. Ass'n v. United States*, 656 F.2d 606, 608-09 (Ct. Cl. 1981) (section 1862(a)(1)(A) requires a determination of "whether the services which had been rendered were *medically* 'reasonable and necessary'" (emphasis added)); *Maximum Comfort Inc. v. Sec'y of Health & Human Servs.*, 512 F.3d 1081, 1084 (9th Cir. 2007); *Tucker v. Thompson*, No. 04-3934, 2006 WL 39644, at *2 (D.N.J. Jan. 9, 2006); *Gulfcoast Med. Supply, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs.*, No. 04-2610, 2005 WL 3934860, at *3 (M.D. Fla. Nov. 16, 2005); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 194 (D.D.C. 2005); *Brae Loch Manor Health Care Facility v. Thompson*, 287 F. Supp. 2d 191, 195 (W.D.N.Y. 2003), *aff'd*, 102 F. App'x. 221 (2d Cir. 2004); *Roen v. Sullivan*, 764 F. Supp. 555, 557 (D. Minn. 1991); *Duggan v. Bowen*, 691 F. Supp. 1487, 1490 (D.D.C. 1988). The "reasonable and necessary" requirement embraces concerns about *medical* efficacy, not cost.

4.    **The Agency's Current Stance Is At Odds With Its Stated Criteria For Determining When An Item Or Service Is "Reasonable and Necessary."**

The Agency's current *ad hoc* justification of its extra-statutory LCA authority as derived from section 1862(a)(1)(A) is not only at odds with the plain language and the prevailing judicial construction of the statute, but it is at odds with its own (unrescinded) interpretation of that provision.  Although no regulation elucidates the term, the Medicare Program Integrity Manual provides that contractors "shall consider a service to be reasonable and necessary if the contractor determines that the service is:  [1] Safe and effective; [2] Not experimental or investigational . . .; and [3] Appropriate" in terms of whether it is "[f]urnished in accordance with accepted standards of medical practice"; "[f]urnished in a setting appropriate to the patient's medical needs and condition"; "[o]rdered and furnished by qualified personnel; "[o]ne that meets, but does not exceed, the patient's medical need"; and is "[a]t least as beneficial as an existing and available medically appropriate alternative."  PIM, § 13.5.1.  The Manual thus focuses on the medical reasonableness and necessity of the services and not on the reasonableness of the item's cost.  The very last factor on the list speaks of alternative treatments, but it provides that an item or service would be "reasonable and necessary" if it were at least as beneficial as an "available medically appropriate alternative."  This plainly does not mean that the item or service is "reasonable and necessary" only if reimbursed by Medicare at the same rate as the lower-cost alternative.  Although the Agency may grasp for statutory authority to justify its controversial LCA practices, its position cannot be squared with its own current interpretation of the "reasonable and necessary" provision.[9]

---

[9] Notably, the Agency has repeatedly failed in its attempts to promulgate regulations allowing it to consider cost in determining whether items or services are "reasonable and necessary."  In 1989, the Agency proposed a new rule concerning the criteria for determining what could be considered "reasonable and necessary."  54 Fed. Reg. 4,302, 4,302 (Jan. 30, 1989).  In the proposed rule, the Agency set forth cost-effectiveness as an explicit consideration for

5.    **The Agency Cannot Justify LCA Policies Under the "Reasonable and Necessary" Statute Because It Does Not Apply LCA Analysis To All Medicare Items And Services.**

There is yet another reason why LCA authority cannot be derived from the "reasonable and necessary" requirement of the statute—namely, because the Agency does not apply that analysis for all items and services covered by Medicare.  Section 1862(a)(1)(A) is a rule of exclusion that applies to all items and services under both Part A and Part B.  If that mandate required an individualized assessment of the relative cost-effectiveness of every item or service subject to reimbursement—such as whether a hospital service could have been provided on an out-patient versus an in-patient basis, or whether dietary changes would have been a cheaper yet equally effective way to control cholesterol for a given patient than statin therapy—the Medicare program would grind to a halt.  The Agency and its contractors for good reason do not undertake such burdensome analyses, but they cannot have it both ways.  They cannot say that a mandatory statute requires such analysis, but only undertake it when it suits their purposes.

The stark fact is that the Agency does not assess every item or service to determine if there was a least costly alternative.   Indeed, the Medicare Program Integrity Manual specifically states that LCA policies are mandatory only for DME, and discretionary for non-DME services.

coverage decisions under the "reasonable and necessary" requirement.  Although not explicitly mentioning LCA policies, the Agency put forward that the provision's requirement "that a covered service be 'reasonable' encompasses the authority to consider cost as a factor in making Medicare coverage determinations." *Id.* at 4,309. The notice generated a flood of negative comments, most of which disagreed with the Agency's position that the "reasonable and necessary" provision authorized the consideration of cost. *See* Fox, *supra* at 612-13.  The proposed regulation never became final, and no further action was taken on this issue until ten years later in 1999, when the proposed regulation was formally withdrawn.  64 Fed. Reg. 22,619 (Apr. 27, 1999).  The Agency again published a proposed rule regarding the criteria for making coverage decisions in May 2000.  65 Fed. Reg. 31,124 (May 16, 2000).  The proposed rule suggests that Medicare coverage decisions should be made based on two criteria:  medical benefit and added value to the Medicare population.  The proposed rule provides that, when an item or service is not substantially more beneficial than a Medicare-covered alternative, coverage can be denied for the item or service if it is not equivalent or lower cost. *Id.* at 31,127.  Although this regulation was proposed almost eight years ago, the Agency has not promulgated a final rule based on the proposal.  As noted above, the Agency cannot adopt legal standards governing payments *except by* formal regulation, *supra* at 26-29, but at a minimum its inability to promulgate a formal regulation adopting this controversial position discredits the interpretation of section 1862(a)(1)(A) that it now advances.

PIM § 13.4(A).  But the statute's "reasonable and necessary" requirement draws no such distinctions between DME and other items and services, and contractors may not consider cost for some items and services and not others.  Selective application of a statute that purports to be mandatory and universal is the height of arbitrary-and-capricious agency action. The LCA authority that the Agency and its contractors purport to exercise here is clearly *ultra vires*.

> **D.    Even if the Agency Could Exclude Items Or Services On Grounds Of Cost-Effectiveness Under The "Reasonable and Necessary" Provision, It Cannot Invoke That Provision To Establish Payment Rates.**

Even if *arguendo* the "reasonable and necessary" statute permits consideration of the relative cost-effectiveness of an item or service, as opposed to its medical necessity, that would still not justify LCA policies.  The statute is plain that, if an item is not "reasonable and necessary," then "no payment may be made under part A or part B of this subchapter for any expenses incurred for [such] items or services."  42 U.S.C. § 1395y (§ 1862).  The statute thus gives the Agency only the authority to deny all coverage to an item or service which is not "reasonable and necessary," but not the authority to decide the reimbursement rate for that item or service.  Once the Agency makes a clinical determination that a particular drug is not "reasonable and necessary" for the diagnosis or treatment of the patients at issue, it then must disallow Medicare coverage for that drug entirely.  Under an LCA policy, by contrast, the Agency does not disallow the coverage for a drug altogether but only prescribes a particular reimbursement rate.  The Medicare program would be making at least some payment for the expenses incurred for that drug.

This brings the analysis back full circle.  The determination of whether an item or service is excluded as not "reasonable and necessary" is a coverage determination.  *See, e.g.*, *id.* § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)) ("the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable,

respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, *in accordance with section 1395y(a)(1)(A)*.") (emphasis added).  If *arguendo* a drug is not "reasonable and necessary" because it is not clinically differentiated from a less costly drug, it would be *excluded from* coverage, and "no payment" could be made for "any expenses" incurred therefor by or on behalf of a beneficiary.  *See* 42 U.S.C. § 1395y (§ 1862) (entitled "Exclusions from coverage").  But in all events no contractor may issue "local coverage determinations" that go beyond coverage determinations to set payment rates.  42 C.F.R. § 400.202.  Once the contractors determined that Xopenex is a covered drug "for which payment may be made under this part . . . , the amount payable for the drug or biological is equal" to the amount dictated by the statutory "[s]pecial rule" applicable to Xopenex.  42 U.S.C. §§ 1395u(o)(1)(A) (§ 1842(o)(1)(A)), 1395w-3a(b)(7) (§ 1847A(b)(7)).  The LCDs imposing an LCA policy that requires payment for Xopenex at a different rate are invalid.

**E.    The Agency Cannot Side-Step the Specific Statutory Mechanism for Addressing the Unreasonableness of Payment Amounts for Covered Items and Services.**

Finally, section 1862(a)(1)(A) cannot grant the Agency or its contractors the authority to override the detailed payment methodology established in the Medicare statute when a wholly different provision prescribes the strictly limited conditions for the exercise of such authority.  Section 1842(b) of the Medicare statute provides specific authority for the Agency through regulation to address instances in which the payment amount for an item or service "because of its being grossly excessive or grossly deficient, is not inherently reasonable."  *Id.* § 1395u(b)(8)(A)(i) (§ 1842(b)(8)(A)(i)).  Thus, any attempt by the Agency or its contractors to address some perceived "unreasonableness" in the payment amount for a covered item or service must follow the statutory requirements for doing so.

38

Under the inherent reasonableness provision, the Agency through regulation must develop "factors to be considered in determining an amount that is realistic and equitable." *Id.* The statute further provides that if an adjustment in the payment for an item or service is more than fifteen percent from the payment of the previous year, before implementing the payment change, the Agency must consider, *inter alia*, the potential impacts of such determination "on quality, access, and beneficiary liability, including the likely effects on assignment rates and participation rates." *Id.* § 1395u(b)(8)(D) (§ 1842(b)(8)(D)). Furthermore, before implementing any change in the payment amount greater than fifteen percent, the Agency must follow certain "procedural requirements," including consulting with "representatives of suppliers or other individuals who furnish" the item or service, publishing in the Federal Register a notice of the proposed action with a sixty-day comment period, and publishing the final determination with an explanation of the factors and data that the Agency considered. *Id.* § 1395u(b)(9) (§ 1842(b)(9)).

The Agency has declared that the "inherent reasonableness" provision applies in the context of Part B drugs. 70 Fed. Reg. 73,623, 73,625-26 (Dec. 13, 2005). In implementing the regulations required by section 1842(b)(8) in 2005, the Agency noted in the preamble to the rule that it potentially applies to all Part B items or services not expressly exempted. *Id.* The Agency decided, however, as a matter of discretion not to apply the new rule at this point in time to Part B drugs because of the new pricing rules established in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). *Id.* The Agency explained that "because of the new pricing methodology for Part B drugs established by [the MMA], we do not anticipate the need to apply the inherent reasonableness provisions to these drugs at this time; however, we are retaining our authority to apply inherent reasonableness to these drugs if the need arises." *Id.* This explanation shows that the Agency recognized both (1) that the payment

methodologies for drugs in the statute should obviate any need for the Agency to exercise its "inherent reasonableness" authority in this area, and (2) that any Agency action to address payments that it deems "unreasonable" must be pursuant to that authority.

The method by which the agency must address payment amounts that it believes are "not inherently reasonable" are only those allowed by the statute, *i.e.*, through regulation pursuant to specific statutory requirements. The inherent reasonableness provision is not equivalent to an LCA policy and does not authorize the agency to implement an LCA policy. The Medicare contractors' attempt to the limit payment amount for Xopenex through LCDs implementing an LCA policy under the authority of section 1862(a)(1)(A)'s "reasonable and necessary" provision is an end-run around the specific processes established by Congress to address this issue. For this reason also, the contractors' LCDs are *ultra vires* and must be stayed.

**IV.    A STAY OF THE LOCAL COVERAGE DETERMINATIONS IS WARRANTED SHOULD THE COURT FAIL TO RESOLVE THE DISPUTE BY THEIR EFFECTIVE DATE.**

As noted above, the legal question of the authority of the Medicare contractors to issue the LCDs is dispositive of this case, and if this Court resolves that question in favor of Plaintiffs, it may simply convert the preliminary injunction into a permanent injunction (or declaratory judgment). *See United States ex rel. Goldman*, 596 F.2d at 1358; *see also* Fed. R. Civ. P. 65(a)(2). If the Court is able to resolve that question prior to the date the LCDs take effect (July 1, 2008) and declare the LCDs invalid, the Court should thus enter a permanent injunction or declaratory judgment. But if the Court does not resolve the legal issue by that time, Plaintiffs respectfully request a preliminary injunction (or stay) of the LCDs. 5 U.S.C. § 705; *Cuomo*, 772 F.2d at 974 (stay of agency action based on traditional preliminary injunction factors).

The application of the four factors relevant to stays of agency action demonstrates that the issuance of a stay of the LCA is justified. With regard to the first factor, courts have held

that "[t]o justify the granting of a stay, a movant need not always establish a high probability of success on the merits." *Id.* at 974. Instead, the "[p]robability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or vice versa." *Id.*; *see also Ohio ex rel. Celebreeze*, 812 F.2d at 290 (adopting this approach). In assessing the irreparable injury factor, courts look to "(1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio ex rel. Celebreeze*, 812 F.2d at 290.

As discussed at length above, Plaintiffs have presented a strong likelihood of success on the merits, as the issuance of the LCDs is directly contrary to statutory and regulatory authority and cannot be justified by the "reasonable and necessary" provision. Moreover, the irreparable harm to Plaintiffs from the implementation of the policy is substantial. The LCDs would have the effect of denying Xopenex to Medicare beneficiaries for whom it is currently prescribed, including Plaintiffs. *See* Hewlett Decl. at ¶ 9; Wanda Decl. at ¶¶ 9-10. Without doubt, the LCDs will deny to Plaintiffs medication that has been prescribed for them by their doctors, thereby denying them medical care that has been determined to be necessary for their treatment. Courts have recognized the possibility of delaying or denying needed medical treatment as irreparable injury. *See, e.g.*, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 759 (9th Cir. 2004) (affirming district court's determination that "delays of needed medical treatment" constituted irreparable harm); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir 1995) (per curiam) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment.").

Moreover, the Plaintiffs had suffered negative side effects when they had previously taken albuterol, and they do not experience comparable effects from Xopenex. The Plaintiffs are

41

persons of limited means who either cannot afford to pay for Xopenex if it is not available through Medicare, or cannot do so without hardship.  If the LCA policy is not enjoined, they would be forced to take albuterol, and are likely to suffer irreparable injury of physical pain and discomfort and reduced quality of life that they would not suffer if they still had access to Xopenex through Medicare.  Coakley Decl. ¶¶ 6-7; Royster Decl. ¶¶ 7-8; Kozireski Decl. ¶¶ 7-8; Torrisi Decl. ¶¶ 7-8.  Given the strength of Plaintiffs' legal arguments and the potential for irreparable harm represented by denying them access to Xopenex, these factors clearly weigh in favor of issuing the stay.

The remaining factors also weigh heavily in favor of a stay.  With regard to the third factor, the potential harm to third parties and those opposing the stay are tested by the same standards as irreparable injury to the movant.  *Cuomo*, 772 F.2d at 977.  In addition to Plaintiffs, there are tens of thousands of other Medicare beneficiaries who use Xopenex who effectively will be denied access to the drug should the LCDs be issued.  Wanda Decl. at ¶ 5.  Furthermore, as Medicare coverage decisions are often duplicated outside of the Medicare system, the LCDs have the likely potential of severely limiting patient access to Xopenex outside of the Medicare market as well.  Xopenex's manufacturer, Sepracor, will also face a real and definite economic harm as a result of the LCDs, as the market share for Xopenex substantially declines.  Economic harm constitutes irreparable injury when it cannot adequately be recovered through legal means or when the economic harm substantially threatens a business's existence.  *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake *and* where the plaintiff has a satisfactory remedy at law to recover the money at issue.") (emphasis added).  In *Hoffmann-Laroche, Inc. v. Califano*, 453 F. Supp. 900 (D.D.C. 1978), for

example, the court granted a stay based on the finding that a drug manufacturer, who would lose

substantial market share from the Agency's decision to limit reimbursement for the drug, had

shown an irreparable injury:

> If the order goes into effect, plaintiff will suffer loss of sales and
> good will for which it would have no right of recourse, and thus its
> injury will be irreparable.  The loss is admittedly economic, but
> since no "adequate compensatory or other corrective relief will be
> available at a later date," it is not one of the "'mere' economic
> injuries which under *Virginia Petroleum Jobbers* are insufficient to
> warrant a stay."

*Id.* at 903 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir.

1958)).  The Agency and its contractors' interest in the LCDs and in opposition to the stay is

purely economic, and it could not itself outweigh the potential harm to Medicare beneficiaries

who require Xopenex or to Sepracor.

Finally, courts have recognized that, of the four factors, "the calculation of the public

interest is perhaps the most difficult." *Cuomo*, 772 F.2d at 978.  The reason for this is that what,

exactly, is in the public interest is hard to define because the public interest has "many faces."

*Id.* (citing *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925).   The public interest could

potentially include public health and safety, protecting the public fisc, promoting economic

competition, as well as preserving the intent of Congress when it passed a statute.  *See id.*  In

*Hoffman-Laroche*, the court specifically found that the public interest represented by "lower

prices for drugs," did not outweigh the public interest in "a continuous and adequate supply of

[medications] for which eligible purchasers can be reimbursed." *Hoffmann-Laroche, Inc.*, 453 F.

Supp. at 903.  Furthermore, because the public interest includes following the will of Congress,

Plaintiffs' arguments on the illegality of the LCDs also weigh in favor of the stay.

In the end, a careful balancing of the factors shows that the potential economic harm to

the Agency (which is the only factor disfavoring a stay) cannot outweigh serious potential harm

to Plaintiffs who would be cut-off from access to Xopenex, the irreparable economic harm to Sepracor, the interest in maintaining access for all Medicare patients to needed medications such as Xopenex, and the interest in following the law prescribed by Congress.  Thus, should this Court fail to decide the legal issues presented in this motion by the time the LCDs are set to take effect, an order staying their implementation is clearly warranted.

## CONCLUSION

This Court should declare the invalidity of the LCDs and enjoin their application.


Dated:  June 9, 2008

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
D.C. Bar No. 454271
Patrick Morrisey
D.C. Bar No. 459399
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
Email:  skinnaird@sidley.com
          pmorrisey@sidley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June, 2008, I caused a true and correct copy of the foregoing APPLICATION FOR A PRELIMINARY INJUNCTION, the accompanying MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION FOR A PRELIMINARY INJUNCTION, PROPOSED ORDER, and DECLARATION OF AMY L. HANKE to be served upon the Defendants in this matter by hand delivery or by mailing the same by first-class United States mail, postage prepaid, to the following:

CIGNA GOVERNMENT SERVICES, LLC
2 VANTAGE WAY
NASHVILLE, TN 37228

NHIC, CORP.
402 OTTERSON DRIVE
CHICO, CALIFORNIA 95928-8206

MICHAEL O. LEAVITT, SECRETARY OF
THE DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 INDEPENDENCE AVENUE, S.W.
WASHINGTON, D.C. 20201

KERRY N. WEEMS, ACTING
ADMINISTRATOR OF THE CENTERS FOR
MEDICARE AND MEDICAID SERVICES
200 INDEPENDENCE AVENUE, S.W.
WASHINGTON, D.C. 20201

U.S. ATTORNEY GENERAL
U.S. DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE N.W.
WASHINGTON, D.C. 20530-0001

OFFICE OF THE U.S. ATTORNEY
CIVIL PROCESS CLERK
555 4TH STREET, N.W.
WASHINGTON, D.C.  20530

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEANETTE K. COAKLEY<br>1880 Chantilly Court<br>Virginia Beach, Virginia 23451; | ) )  ) ) | |
| FRANCES W. ROYSTER<br>175 Royster Lane<br>Randolph, Virginia 23962; | ) ) ) ) | |
| THERESA A. TORRISI<br>690 Lowell Street<br>Lawrence, Massachusetts 01841; and | ) ) ) ) | Civil Action No. 1:08-cv-00976 (EGS) |
| EUNICE L. KOZIRESKI<br>6032 Swanson Creek<br>Hughesville, Maryland 20637, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| CIGNA GOVERNMENT SERVICES, LLC<br>Two Vantage Way<br>Nashville, Tennessee 37228; | ) ) ) ) | |
| NHIC, CORP.<br>402 Otterson Drive<br>Chico, California 95928-8206; | ) ) ) ) | |
| KERRY N. WEEMS, in his official capacity as<br>Acting Administrator of the Centers for Medicare<br>and Medicaid Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201; and | ) ) ) ) ) ) | |
| MICHAEL O. LEAVITT, in his official capacity<br>as Secretary of the Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PROPOSED ORDER**

Upon consideration of Plaintiffs' Application for a Preliminary Injunction, their supporting memorandum, and the entire record herein, it is by this Court this _____ day of _____ 2008,

ORDERED that the Defendants are hereby enjoined from implementing the Local Coverage Determination issued by CIGNA Government Services, LLC titled "Nebulizers" and identified as number L5007 and the Local Coverage Determination issued by NHIC, Corp. titled "Nebulizers" and identified as number L11499.

So Ordered.

_____
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEANETTE K. COAKLEY<br>1880 Chantilly Court<br>Virginia Beach, Virginia 23451; | ) ) ) ) |
| FRANCES W. ROYSTER<br>175 Royster Lane<br>Randolph, Virginia 23962; | ) ) ) ) ) |
| THERESA A. TORRISI<br>690 Lowell Street<br>Lawrence, Massachusetts 01841; and | ) ) ) ) |
| EUNICE L. KOZIRESKI<br>6032 Swanson Creek<br>Hughesville, Maryland 20637, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| CIGNA GOVERNMENT SERVICES, LLC<br>Two Vantage Way<br>Nashville, Tennessee 37228; | ) ) ) ) |
| NHIC, CORP.<br>402 Otterson Drive<br>Chico, California 95928-8206; | ) ) ) ) ) |
| KERRY N. WEEMS, in his official capacity as<br>Acting Administrator of the Centers for Medicare<br>and Medicaid Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201; and | ) ) ) ) ) ) |
| MICHAEL O. LEAVITT, in his official capacity<br>as Secretary of the Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:08-cv-00976 (EGS)

## DECLARATION OF AMY L. HANKE

I, AMY L. HANKE, do hereby state and affirm as follows:

1.      I am over the age of 21 years.  I am of sound mind and capable of making this declaration.  I have personal knowledge of the facts set forth in this declaration, and they are true and accurate to the best of my knowledge and belief.

2.      Exhibit A attached hereto is a true and correct copy of the Local Coverage Determination issued by NHIC, Corp. titled "Nebulizers" and identified as number L11499, available at http://www.medicarenhic.com/dme/medical_review/mr_lcds/mr_lcd_current /nebulizers_0408.htm (last visited June 5, 2008).

3.      Exhibit B attached hereto is a true and correct copy of the Local Coverage Determination issued by National Government Services, Inc. titled "Nebulizers" and identified as number L27226, available at http://www.empiremedicare.com/dme_lcd/policy/l27226_ notice_ dme_lcd.htm (last visited June 5, 2008).

4.      Exhibit C attached hereto is a true and correct copy of the Local Coverage Determination issued by CIGNA Government Services, LLC titled "Nebulizers" and identified as number L5007, available at http://www.cms.hhs.gov/mcd/viewlcd.asp?lcd_id=5007&lcd_ version =53&show=all (last visited June 5, 2008).

5.      Exhibit D attached hereto is a true and correct copy of the Local Coverage Determination issued by Noridian Administrative Services titled "Nebulizers" and identified as number L11488, available at https://www.cms.hhs.gov/scripts/ctredirector.dll/.pdf? @_CPR0a0a043a07d1.BR_0jnE_Qwi9 (last visited June 5, 2008).

6.    Exhibit E attached hereto is a true and correct copy of sections 110.1 through 110.3 of Chapter 15 of the Medicare Benefit Policy Manual, available at http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf (last visited June 6, 2008).

7.    Exhibit F attached hereto is a true and correct copy of the Comments to Region A & B's Draft LCD for Nebulizers Dated March 24, 2006, and Attachment B to those comments, submitted by Sepracor Inc. on May 8, 2006.

8.    Exhibit G attached hereto is a true and correct copy of the HCPCS Level II Code Modification Request Process Re: The 2010 HCPCS Update, available at http://www.cms.hhs.gov/MedHCPCS GenInfo/Downloads/2008_ALPHA.pdf (last visited June 5, 2008).

9.    Exhibit H attached hereto is a true and correct copy of the draft Local Coverage Determination issued by TriCenturion on March 24, 2006, titled "Nebulizers – Draft" and identified as number DL11499.

10.    Exhibit I attached hereto is a true and correct copy of the draft Local Coverage Determination issued by TrustSolutions on March 24, 2006, titled "Nebulizers" and identified as number DL5007.

11.    Exhibit J attached hereto is a true and correct copy of the draft Local Coverage Determination issued by Electronic Data Systems Corp. on March 24, 2006, titled "Nebulizers – Draft" and identified as number DL11488.

12.    Exhibit K attached hereto is a true and correct copy of the durable medical equipment contractors' response to comments regarding the LCDs titled "Nebulizers – Response to Comments" and dated April 2008, available at https://coverage.cms.fu.com/lcd_area/lcd_uploads/11499_55/NebulizersResponsetoCommentsApril2008.pdf (last visited June 6, 2008).

13.     Exhibit L attached hereto is a true and correct copy of section 200.2 of the Medicare National Coverage Determinations Manual, available at http://www.cms.hhs.gov/manuals/downloads/ncd103c1_Part4.pdf (last visited June 6, 2008).

14.     Exhibit M attached hereto is a true and correct copy of a Centers for Medicare and Medicaid Services Update to Information Regarding Medicare Payment and Coding for Drugs & Biologics, dated April 24, 2007, available at http://www.cms.hhs.gov/MedHCPCS geninfo/downloads/Code_Def.pdf (last visited June 5, 2008).

15.     Exhibit N attached hereto is a true and correct copy of a Centers for Medicare and Medicaid Services Update to Information Regarding Medicare Payment and Coding for Drugs & Biologics, dated May 18, 2007, available at http://www.cms.hhs.gov/MedHCPCSGenInfo /Downloads/051807_coding_annoucement.pdf (last visited June 5, 2008).

16.     Exhibit O attached hereto is a true and correct copy of portions of the Centers for Medicare and Medicaid Services Medicare Part B Average Sales Price Drug Pricing File for Second Quarter 2008, available at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/01a_2008aspfiles.asp (last visited June 5, 2008).

17.     Exhibit V attached hereto is a true and correct copy of sections 13.4 through 13.5 of Chapter 13 of the Medicare Program Integrity Manual, available at http://www.cms.hhs.gov/manuals/ downloads/pim83c13.pdf (last visited June 6, 2008).

18.     Exhibit W attached hereto is a true and correct copy of an article by Sean R. Tunis titled "Why Medicare Has Not Established Criteria for Coverage Decisions" published May 20, 2004, in the *New England Journal of Medicine*, available at http://content.nejm.org/cgi/content/full/350/21/2196 (last visited June 6, 2008).

4

19.     Exhibit X attached hereto is a true and correct copy of a local coverage determination issued by NHIC, Corp. titled "Gonadotropin-Releasing Hormone Analogs - Revised" and identified as number L22520 with a primary geographic jurisdiction of Northern California, available at https://www.cms.hhs.gov/scripts/ctredirector.dll/.pdf?@_CPR0 a0a043a07d1.DT_0nQJ_nxOY (last visited June 6, 2008).

20.     Exhibit Y attached hereto is a true and correct copy of a local coverage determination issued by NHIC, Corp. titled "Gonadotropin-Releasing Hormone Analogs - Revised" and identified as number L22520 with a primary geographic jurisdiction of Southern California, available at https://www.cms.hhs.gov/scripts/ ctredirector.dll/.pdf?@_CPR0 a0a043a07d1.ET_0nQT_rViL (last visited June 6, 2008).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2008, in Washington, D.C.

_Amy L. Hanke_
Amy L. Hanke

# EXHIBIT A



**Please note:** This is a Future LCD.

## Contractor Information



**Contractor Name**

NHIC

**Contractor Number**

16003

**Contractor Type**

DME MAC

## LCD Information



**LCD ID Number**

L11499

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB20080701

### AMA CPT / ADA CDT Copyright Statement

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

### CMS National Coverage Policy

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

**Primary Geographic Jurisdiction**

Connecticut
District of Columbia
Delaware
Massachusetts
Maryland
Maine
New Hampshire
New Jersey
New York - Entire State
Pennsylvania
Rhode Island
Vermont

**Oversight Region**

Region III

**DME Region LCD Covers**

Jurisdiction A

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

**LCD Information**

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator (**Related Accessories**)
E0565 (**A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372**)

**LCD Information**

E0570 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0571 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 (**A7006, A7014**)
E0574 (**A7014, A7016**)
E0585 (**A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525**)
K0730 (**A7005**)


This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.


The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.


Accessory (**Usual maximum replacement**)
A4619 (**One/month**)
A7003 (**Two/month**)
A7004 (**Two/month (in addition to A7003)**)
A7005 (**One/6 months**)
A7005 (**One/3 months only with K0730**)
A7006 (**One/month** )
A7007 (**Two/month**)
A7010 (**One unit (100 ft.)/ 2 months**)
A7011 (**One/year**)
A7012 (**Two/month**)
A7013 (**Two/month**)
A7014 (**One/3 months**)
A7015 (**One/month**)
A7016 (**Two/year**)
A7017 (**One/3 years**)
A7525 (**One/month**)
E1372 (**One/3 years**)


INHALATION DRUGS AND SOLUTIONS:


The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulized drug.


Acetylcysteine: (**up to 74 grams/month**)
Albuterol: (**up to 465 mg/month**) **- see below for exception**
Arformoterol: (**up to 930 micrograms per month (62 units per month)**)
Budesonide: (**up to 31 mg/month (62 units/month)**)
Cromolyn sodium: (**up to 2480 mg/month (248 units/month)**)
Dornase alpha: (**up to 78 mg/month**)
Formoterol: (**up to 1240 micrograms per month) (62 units per month**)
Ipratropium bromide: (**up to 93 mg/month**)
Levalbuterol: (**up to 232.5 mg/month (465 units/month)) - see below for exception**
Metaproterenol: (**up to 2800 mg/month (280 units/month)) – see below for exception**
Pentamidine: (**up to 300 mg/month**)
Sterile saline or water, 10 ml/unit (A4216, A4218): (**up to 56 units per month**)
Distilled water, sterile water, or sterile saline in large volume nebulizer: (**up to 18 liters/month**)

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month))**
Metaproterenol: **(up to 470 mg/month (47 units/month))**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to a long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                              TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX –Specified required documentation on file.

HCPCS CODES:
EQUIPMENT

E0565                          COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT
                               WHICH IS NOT SELF- CONTAINED OR CYLINDER
                               DRIVEN

**Coding Information**

| | |
|---|---|
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |

**Coding Information**

| | |
|---|---|
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

## INHALATION DRUGS

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg

J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg

J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg

J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg

Q4099 Formoterol fumarate, inhalation solution, FDA approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | |

**Coding Information**

| | |
|---|---|
| | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
|---|---|
| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | |

**Coding Information**

|  |  |
|---|---|
|  | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |

**Coding Information**

| | |
|---|---|
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7013, A7014, A7015, A7525:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, E0570, E0571, E0574:

011.50 - 011.56

**Coding Information**

| | |
|---|---|
| | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |

**Coding Information**

| | |
|---|---|
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes J7608:

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

For HCPCS code J7639:

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

For HCPCS code J7682:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

For HCPCS codes K0730, Q4080

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Coding Information**

For HCPCS code A7005:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For J7605 or Q4099:

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

Coding Information

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

General Information



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol)(J7605)or Performist (formoterol fumarate) (Q4099)and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

## Appendices

### Utilization Guidelines

Refer to Indications and Limitations of Coverage and/or Medical Necessity.

### Sources of Information and Basis for Decision

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

## General Information

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

## Combination albuterol and ipratropium

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

**General Information**

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

NEB011

**Revision History Explanation**

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol.
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided.
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)

**General Information**

ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to DME MAC NHIC (16003) LCD L11499 from DME PSC TriCenturion (77011) LCD L11499.


11/10/2007 - The description for CPT/HCPCS code J2545 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7608 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7631 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7639 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code Q4080 was changed in group 3


09/03/2007 - This policy was updated by the ICD-9 2007-2008 Annual Update.


Revision Effective Date : 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol


Revision Effective Date : 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685

## General Information

Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added 416.0 and 416.8 to covered codes for A7005
Removed J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


06/01/2007 - In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).


03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374

**General Information**

Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

**General Information**

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

**Reason for Change**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A24944 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**

Response to Comments-April 2008 (a comment and response document) (PDF - 76,467 bytes)

**Other Versions**



Updated on 04/04/2008 with effective dates 07/01/2008 - N/A

# EXHIBIT B



<span style="color:red">**Please note:**</span> **This is a Future LCD.**

**Contractor Information**



**Contractor Name**

National Government Services, Inc.

**Contractor Number**

17003

**Contractor Type**

DME MAC

**LCD Information**



**LCD ID Number**

L27226

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

**Primary Geographic Jurisdiction**

Illinois
Indiana
Kentucky
Michigan
Minnesota
Ohio
Wisconsin

**Oversight Region**

Region V

**DME Region LCD Covers**

Jurisdiction B

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

**LCD Information**

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator (**Related Accessories)**
E0565 (**A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525)**

E0571 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 (**A7006, A7014**)
E0574 (**A7014, A7016**)
E0585 (**A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525**)
K0730 (**A7005**)

This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory (**Usual maximum replacement**)
A4619 (**One/month**)
A7003 (**Two/month**)
A7004 (**Two/month (in addition to A7003)**)
A7005 (**One/6 months**)
A7005 (**One/3 months only with K0730**)
A7006 (**One/month **)
A7007 (**Two/month**)
A7010 (**One unit (100 ft.)/ 2 months**)
A7011 (**One/year**)
A7012 (**Two/month**)
A7013 (**Two/month**)
A7014 (**One/3 months**)
A7015 (**One/month**)
A7016 (**Two/year**)
A7017 (**One/3 years**)
A7525 (**One/month**)
E1372 (**One/3 years**)

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulized drug.

Acetylcysteine: (**up to 74 grams/month**)
Albuterol: (**up to 465 mg/month**) - see below for exception
Arformoterol: (**up to 930 micrograms per month (62 units per month)**)
Budesonide: (**up to 31 mg/month (62 units/month)**)
Cromolyn sodium: (**up to 2480 mg/month (248 units/month)**)
Dornase alpha: (**up to 78 mg/month**)
Formoterol: (**up to 1240 micrograms per month) (62 units per month**)
Ipratropium bromide: (**up to 93 mg/month**)
Levalbuterol: (**up to 232.5 mg/month (465 units/month)**) - see below for exception
Metaproterenol: (**up to 2800 mg/month (280 units/month)**) – see below for exception
Pentamidine: (**up to 300 mg/month**)
Sterile saline or water, 10 ml/unit (A4216, A4218): (**up to 56
units per month**)
Distilled water, sterile water, or sterile saline in large volume nebulizer: (**up to 18 liters/month**)

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:

Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month))**
Metaproterenol: **(up to 470 mg/month (47 units/month))**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to a long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Nebulizer

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                                TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX –Specified required documentation on file.

HCPCS CODES:
EQUIPMENT

E0565                                        COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT
                                             WHICH IS NOT SELF- CONTAINED OR CYLINDER
                                             DRIVEN

E0570                                        NEBULIZER, WITH COMPRESSOR

**Coding Information**

| | |
|---|---|
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | |

**Coding Information**

|  | AEROSOL MASK, USED WITH DME NEBULIZER |
|---|---|
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

INHALATION DRUGS

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg
J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg
J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg
J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg
Q4099 Formoterol fumarate, inhalation solution, FDA approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms.

| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
|---|---|
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | |

## Coding Information

| | | |
|---|---|---|
| | | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |

## Coding Information

| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| --- | --- |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |

**Coding Information**

| | |
|---|---|
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |

**Coding Information**

| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7013, A7014, A7015, A7525:

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, E0570, E0571, E0574:

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | |

**Coding Information**

| | |
|---|---|
| | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |

**Coding Information**

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes J7608:

| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

For HCPCS code J7639:

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

For HCPCS code J7682:

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

For HCPCS codes K0730, Q4080

| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

For HCPCS code A7005:

011.50 - 011.56

**Coding Information**

| | |
|---|---|
| | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For J7605 or Q4099:

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

**Coding Information**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol)(J7605)or Perforomist (formoterol fumarate) (Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.


**Appendices**


**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.


**Sources of Information and Basis for Decision**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

# General Information

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

## General Information

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

## Advisory Committee Meeting Notes

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

## Start Date of Comment Period

03/24/2006

## End Date of Comment Period

05/08/2006

## Start Date of Notice Period

04/10/2008

## Revision History Number

NEB011

## Revision History Explanation

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)

## General Information

ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614,Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Performist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Added: Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to
DME MAC National Government Services (17003) LCD L27226 from DME PSC TriCenturion (77011)
LCD L11499.


Revision Effective Date : 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded
inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol
when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol


Revision Effective Date : 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637,
J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added 416.0 and 416.8 to covered codes for A7005

**General Information**

Removed J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:

**General Information**

Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.


06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.


03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.
06/01/2007 - In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).


**Reason for Change**

**General Information**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A47233 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**

Neubulizers -- Response to Comments -- April 2008 (a comment and response document) (PDF - 76,467 bytes)

**Other Versions**



Updated on 02/27/2008 with effective dates 07/01/2007 - 06/30/2008

# EXHIBIT C



<span style="color:red">**Please note:**</span> **This is a Future LCD.**

**Contractor Information**



**Contractor Name**

CIGNA Government Services

**Contractor Number**

18003

**Contractor Type**

DME MAC

**LCD Information**



**LCD ID Number**

L5007

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, Section 280.1

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Louisiana
Mississippi
North Carolina
New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virginia
Virgin Islands
West Virginia

**Oversight Region**

Region VI

**DME Region LCD Covers**

Jurisdiction C

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

**ACCESSORIES:**

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003)**
A7005 **(One/6 months)**
A7005 **(One/3 months only with K0730)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

**INHALATION DRUGS AND SOLUTIONS:**

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)** See below for exception.
Arformoterol: **(up to 930 micrograms per month) (62 units per month))**
Budesonide: **(up to 31 mg/month) (62 units/month))**
Cromolyn sodium: **(up to 2480 mg/month) (248 units/month)**
Dornase alpha: **(up to 78 mg/month)**
Formoterol: **(up to 1240 micrograms per month) (62 units per month)**
Ipratropium bromide: **(up to 93 mg/month)**

**LCD Information**

Levalbuterol: **(up to 232.5 mg/month (465 units/month)** See below for exception.
Metaproterenol: **(up to 2800 mg/month) (280 units/month)** See below for exception.
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**


When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month)**
Metaproterenol: **(up to 470 mg/month (47 units/month))**


Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available on request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to the long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

**LCD Information**

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                                      TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation
KQ - Second or subsequent drug of a multiple drug unit dose formulation.

**Coding Information**

KX - Specified required documentation on file

HCPCS CODES:

## EQUIPMENT

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

## ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |

**Coding Information**

| | |
|---|---|
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

**INHALATION DRUGS**

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg
J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg
J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg
J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg
Q4099 Formoterol fumarate, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |

**Coding Information**

| | |
|---|---|
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | |

**Coding Information**

|  |  |
|---|---|
|  | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

## ICD-9 Codes that Support Medical Necessity

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

### For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |

**Coding Information**

| | |
|---|---|
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, E0570, E0571, E0574:**

| | |
|---|---|
| 011.50 - 011.56 | |

**Coding Information**

|  | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| --- | --- |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| --- | --- |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| --- | --- |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |

**Coding Information**

| | |
|---|---|
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS code J7608:**

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614 J7620, J7626, J7631, J7644, J7669:**

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

**For HCPCS code J7639:**

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**For HCPCS code J7682**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080**

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

Coding Information

**For HCPCS code A7005:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For J7605 or Q4099:**

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

**Coding Information**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider". It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol) (J7605) or Perforomist (formoterol fumarate)(Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity

**Sources of Information and Basis for Decision**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

**General Information**

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

**Combination albuterol and ipratropium**

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

**General Information**

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

010

**Revision History Explanation**

**Revision Effective Date: 07/01/2008**
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099

**General Information**

Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


**Revision Effective Date: 03/01/2008**

In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to DME
MAC CIGNA Government Services (18003) LCD L11517 from DME PSC TrustSolutions (77012) LCD
L11517.


**Revision Effective Date: 07/01/2007 (June publication)**
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added: Coverage criteria and maximum covered amount for arformoterol.
Revised: Statement about J7699 to say that it will be denied when it is used to bill for a compounded
inhalation solution.
Added: Coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol
when used in addition to arformoterol.
Substituted: Codes Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added: Covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed: J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with arformoterol.


**Revision Effective Date: 07/01/2007 (March publication)**
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated: Coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed: ICD-9 code 519.1 to 519.19.
Deleted: The statement concerning providing information on a claim about the need for a portable
compressor.
Added: Utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637,
J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed: ICD-9 code 519.1 to 519.19.
Added: 416.0 and 416.8 to covered codes for A7005.

**General Information**

Removed: J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added: A requirement for a specific statement on orders for compounded inhalation solutions.

**Revision Effective Date: 06/01/2007**
In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).

**Revision Effective Date: 03/01/2006**
In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TrustSolutions (77012) from DMERC Palmetto GBA (00885).

**Revision Effective Date: 01/01/2006**
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriately.
Added: Coverage statement for code A7007.
Added: A7007 to the related code table for E0565.
Added: A7007 to usual maximum amount.
Added: Usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added: HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted: HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added: A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added: A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised: E1399 and J7699 documentation requirements.

**Revision Effective Date: 10/01/2005**
HCPCS CODES & MODIFIERS:
Added: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added: Criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added: KX modifier requirement for K0730 and Q4080.

**Revision Effective Date: 04/01/2005**
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

**Revision Effective Date: 04/01/2004**

**General Information**

HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added: References to new HCPCS codes.
CODING GUIDELINES:
Added: References to new HCPCS codes.
Clarified: Use of J7699.
Added: Billing guidelines for J7621.
Removed: Billing guidelines for A4323.
Added: Correct coding guidelines for compounded albuterol and ipratropium.
Added: Instructions for billing metered dose sterile saline products.


**Revision Effective Date: 04/01/2003**
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added: Standard language concerning coverage of items without an order.
Added: Standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed: Language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed: Specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added: Definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.


06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.


03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Advisory for a detailed report of the revision.

**General Information**

**Reason for Change**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A24623 - Nebulizers - Policy Article - Effective - July 2008

**LCD Attachments**

Nebulizers - Response to Comments - April 2008 (a comment and response document) (PDF - 76,467 bytes)

# EXHIBIT D



**Please note:** This is a Future LCD.

## Contractor Information



**Contractor Name**

Noridian Administrative Services

**Contractor Number**

19003

**Contractor Type**

DME MAC

## LCD Information



**LCD ID Number**

L11488

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

**Primary Geographic Jurisdiction**

Alaska
American Samoa
Arizona
California - Entire State
Guam
Hawaii
Iowa
Idaho
Kansas
Missouri - Entire State
Montana
North Dakota
Nebraska
Nevada
Oregon
South Dakota
Utah
Washington
Wyoming
Northern Mariana Islands

**Oversight Region**

Region X

**DME Region LCD Covers**

Jurisdiction D

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**LCD Information**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

## ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator (**Related Accessories)**
E0565 (**A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 (**A7006, A7014)**
E0574 (**A7014, A7016)**
E0585 (**A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 (**A7005)**

This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory (**Usual maximum replacement)**
A4619 (**One/month)**
A7003 (**Two/month)**
A7004 (**Two/month [in addition to A7003])**
A7005 (**One/6 months)**
A7005 (**One/3 months - only with K0730)**
A7006 (**One/month)**
A7007 (**Two/month)**
A7010 (**One unit [100 ft.]/2 months)**
A7011 (**One/year)**
A7012 (**Two/month)**
A7013 (**Two/month)**
A7014 (**One/3 months)**
A7015 (**One/month)**
A7016 (**Two/year)**
A7017 (**One/3 years)**
A7525 (**One/month)**
E1372 (**One/3 years)**

## INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulizer drug.

Acetylcysteine: (**up to 74 grams/month)**
Albuterol: (**up to 465 mg/month)** – see below for exception
Arformoterol: (**up to 930 micrograms per month [62 units per month])**
Budesonide: (**up to 31 mg/month [62 units/month])**
Cromolyn sodium: (**up to 2480 mg/month [248 units/month])**
Dornase alpha: (**up to 78 mg/month)**
Formoterol: (**up to 1240 micrograms per month [62 units per month])**
Ipratropium bromide: (**up to 93 mg/month)**

Levalbuterol: **(up to 232.5 mg/month [465 units/month])** – see below for exception
Metaproterenol: **(up to 2800 mg/month [280 units/month])** – see below for exception
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month [78 units/month])**
Metaproterenol: **(up to 470 mg/month [47 units/month])**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available on request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017 or E0585).

Albuterol, levalbuterol and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to the long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively. The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

**LCD Information**

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                                    TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service.
KO - Single drug unit dose formulation.

**Coding Information**

KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX – Specified required documentation on file.

## EQUIPMENT

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

## ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | |

**Coding Information**

|  |  | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| --- | --- | --- |
| A7012 |  | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 |  | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 |  | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 |  | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 |  | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 |  | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 |  | TRACHEOSTOMY MASK, EACH |
| E0580 |  | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 |  | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

## INHALATION DRUGS

J7611 - Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg

J7612 - Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg

J7613 - Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg

J7614 - Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg

Q4099 - Formoterol fumarate, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| A4216 |  | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| --- | --- | --- |
| A4217 |  | STERILE WATER/SALINE, 500 ML |
| A4218 |  | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |

**Coding Information**

| | |
|---|---|
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |

**Coding Information**

J7627                                                  BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7628                                                  BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7629                                                  BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7631                                                  CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7632                                                  CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7634                                                  BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM

J7635                                                  ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7636                                                  ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7637                                                  DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7638                                                  DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7639                                                  DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7640                                                  FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS

J7641

**Coding Information**

|  |  |
|---|---|
|  | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 |  |

**Coding Information**

|  |  |
|---|---|
|  | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

**For HCPCS codes A4619, E0565, E0572:**

**Coding Information**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |

**Coding Information**

| | |
|---|---|
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, E0570, E0571, E0574:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | |

**Coding Information**

| | |
|---|---|
| | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS code J7608:**

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:**

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

**For HCPCS code J7639:**

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**For HCPCS code J7682:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**Coding Information**

| | |
|---|---|
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080:**

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**For HCPCS code A7005:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes J7605 or Q4099:**

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

**Coding Information**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider". It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

## General Information

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories and/or drugs.

If the drug being billed is Brovana (arformoterol)(J7605) or Perforomist (formoterol fumarate) (Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.

**Sources of Information and Basis for Decision**

**General Information**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

**General Information**

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

NEB0011

**Revision History Explanation**

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:

**General Information**

Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Performist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to DME MAC Noridian Administrative Services (19003) LCD L11488 from DME PSC Electronic Data Systems Corp. (77006) LCD L11488.


09/03/2007 - This policy was updated by the ICD-9 2007-2008 Annual Update.


Revision Effective Date: 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol.

**General Information**

Revision Effective Date: 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes that were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added: 416.0 and 416.8 to covered codes for A7005.
Removed: J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


Revision Effective Date: 03/01/2006
In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC Electronic Data Systems Corp. (77006) from DMERC CIGNA Government Services (05655).


Revision Effective Date: 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216, A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added: HCPCS codes A4218, G0333, J7620, J7627, Q0513 and Q0514.
Verbiage revision to description of HCPCS codes A4216, J7626.
Deleted: HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9; deleted J7616.
Added: A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier.
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080.
DOCUMENTATION REQUIREMENTS:

**General Information**

Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article.
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added references to new HCPCS codes.
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision Effective Date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer.
Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis.
Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization.
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field.


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume

**General Information**

nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

**Reason for Change**

**Last Reviewed On Date**

02/20/2008

**Related Documents**

**Article(s)**

A24942 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**

Response to Comments (a comment and response document) (PDF - 76,467 bytes)

# EXHIBIT E

the equipment, the intermediary makes the reimbursement.  The payment method is identified in the annual fee schedule update furnished by CMS.

The CMS issues quarterly updates to a fee schedule file that contains rates by HCPCS code and also identifies the classification of the HCPCS code within the following categories.

| Category Code | Definition |
| --- | --- |
| IN | Inexpensive and Other Routinely Purchased Items |
| FS | Frequently Serviced Items |
| CR | Capped Rental Items |
| OX | Oxygen and Oxygen Equipment |
| OS | Ostomy, Tracheostomy & Urological Items |
| SD | Surgical Dressings |
| PO | Prosthetics & Orthotics |
| SU | Supplies |
| TE | Transcutaneous Electrical Nerve Stimulators |

The DMERCs, carriers, and intermediaries, where appropriate, use the CMS files to determine payment rules.  See the Medicare Claims Processing Manual, Chapter 20, "Durable Medical Equipment, Surgical Dressings and Casts, Orthotics and Artificial Limbs, and Prosthetic Devices," for a detailed description of payment rules for each classification.

Payment may also be made for repairs, maintenance, and delivery of equipment and for expendable and nonreusable items essential to the effective use of the equipment subject to the conditions in §110.2.

See the Medicare Benefit Policy Manual, Chapter 11, "End Stage Renal Disease," for hemodialysis equipment and supplies.

## 110.1 - Definition of Durable Medical Equipment
**(Rev. 1, 10-01-03)**
**B3-2100.1, A3-3113.1, HO-235.1, HHA-220.1, B3-2100.2, A3-3113.2, HO-235.2, HHA-220.2**

Durable medical equipment is equipment which:

- Can withstand repeated use;

- Is primarily and customarily used to serve a medical purpose;

- Generally is not useful to a person in the absence of an illness or injury; and

- Is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be durable medical equipment.

The following describes the underlying policies for determining whether an item meets the definition of DME and may be covered.

## A.  Durability

An item is considered durable if it can withstand repeated use, i.e., the type of item that could normally be rented. Medical supplies of an expendable nature, such as incontinent pads, lambs wool pads, catheters, ace bandages, elastic stockings, surgical facemasks, irrigating kits, sheets, and bags are not considered "durable" within the meaning of the definition.  There are other items that, although durable in nature, may fall into other coverage categories such as supplies, braces, prosthetic devices, artificial arms, legs, and eyes.

## B.  Medical Equipment

Medical equipment is equipment primarily and customarily used for medical purposes and is not generally useful in the absence of illness or injury. In most instances, no development will be needed to determine whether a specific item of equipment is medical in nature.  However, some cases will require development to determine whether the item constitutes medical equipment.  This development would include the advice of local medical organizations (hospitals, medical schools, medical societies) and specialists in the field of physical medicine and rehabilitation.  If the equipment is new on the market, it may be necessary, prior to seeking professional advice, to obtain information from the supplier or manufacturer explaining the design, purpose, effectiveness and method of using the equipment in the home as well as the results of any tests or clinical studies that have been conducted.

## 1.  Equipment Presumptively Medical

Items such as hospital beds, wheelchairs, hemodialysis equipment, iron lungs, respirators, intermittent positive pressure breathing machines, medical regulators, oxygen tents, crutches, canes, trapeze bars, walkers, inhalators, nebulizers, commodes, suction machines, and traction equipment presumptively constitute medical equipment. (Although hemodialysis equipment is covered as a prosthetic device (§120), it also meets the definition of DME, and reimbursement for the rental or purchase of such equipment

for use in the beneficiary's home will be made only under the provisions for payment applicable to DME.  See the Medicare Benefit Policy Manual, Chapter 11, "End Stage Renal Disease," §30.1, for coverage of home use of hemodialysis.)  **NOTE:** There is a wide variety in types of respirators and suction machines.  The DMERC's medical staff should determine whether the apparatus specified in the claim is appropriate for home use.

## 2.  Equipment Presumptively Nonmedical

Equipment which is primarily and customarily used for a nonmedical purpose may not be considered "medical" equipment for which payment can be made under the medical insurance program. This is true even though the item has some remote medically related use.  For example, in the case of a cardiac patient, an air conditioner might possibly be used to lower room temperature to reduce fluid loss in the patient and to restore an environment conducive to maintenance of the proper fluid balance.  Nevertheless, because the primary and customary use of an air conditioner is a nonmedical one, the air conditioner cannot be deemed to be medical equipment for which payment can be made.

Other devices and equipment used for environmental control or to enhance the environmental setting in which the beneficiary is placed are not considered covered DME.  These include, for example, room heaters, humidifiers, dehumidifiers, and electric air cleaners.  Equipment which basically serves comfort or convenience functions or is primarily for the convenience of a person caring for the patient, such as elevators, stairway elevators, and posture chairs, do not constitute medical equipment.  Similarly, physical fitness equipment (such as an exercycle), first-aid or precautionary-type equipment (such as preset portable oxygen units), self-help devices (such as safety grab bars), and training equipment (such as Braille training texts) are considered nonmedical in nature.

## 3.  Special Exception Items

Specified items of equipment may be covered under certain conditions even though they do not meet the definition of DME because they are not primarily and customarily used to serve a medical purpose and/or are generally useful in the absence of illness or injury. These items would be covered when it is clearly established that they serve a therapeutic purpose in an individual case and would include:

> a.  Gel pads and pressure and water mattresses (which generally serve a preventive purpose) when prescribed for a patient who had bed sores or there is medical evidence indicating that they are highly susceptible to such ulceration; and

> b.  Heat lamps for a medical rather than a soothing or cosmetic purpose, e.g., where the need for heat therapy has been established.

In establishing medical necessity for the above items, the evidence must show that the item is included in the physician's course of treatment and a physician is supervising its use.

**NOTE:** The above items represent special exceptions and no extension of coverage to other items should be inferred

## C.  Necessary and Reasonable

Although an item may be classified as DME, it may not be covered in every instance. Coverage in a particular case is subject to the requirement that the equipment be necessary and reasonable for treatment of an illness or injury, or to improve the functioning of a malformed body member.  These considerations will bar payment for equipment which cannot reasonably be expected to perform a therapeutic function in an individual case or will permit only partial therapeutic function in an individual case or will permit only partial payment when the type of equipment furnished substantially exceeds that required for the treatment of the illness or injury involved.

See the Medicare Claims Processing Manual, Chapter 1, "General Billing Requirements;" §60, regarding the rules for providing advance beneficiary notices (ABNs) that advise beneficiaries, before items or services actually are furnished, when Medicare is likely to deny payment for them.  ABNs allow beneficiaries to make an informed consumer decision about receiving items or services for which they may have to pay out-of-pocket and to be more active participants in their own health care treatment decisions.

## 1.  Necessity for the Equipment

Equipment is necessary when it can be expected to make a meaningful contribution to the treatment of the patient's illness or injury or to the improvement of his or her malformed body member. In most cases the physician's prescription for the equipment and other medical information available to the DMERC will be sufficient to establish that the equipment serves this purpose.

## 2.  Reasonableness of the Equipment

Even though an item of DME may serve a useful medical purpose, the DMERC or intermediary must also consider to what extent, if any, it would be reasonable for the Medicare program to pay for the item prescribed.  The following considerations should enter into the determination of reasonableness:

1.  Would the expense of the item to the program be clearly disproportionate to the therapeutic benefits which could ordinarily be derived from use of the equipment?

2.  Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?

3.  Does the item serve essentially the same purpose as equipment already available to the beneficiary?

## 3. Payment Consistent With What is Necessary and Reasonable

Where a claim is filed for equipment containing features of an aesthetic nature or features of a medical nature which are not required by the patient's condition or where there exists a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished, the amount payable is based on the rate for the equipment or alternative treatment which meets the patient's medical needs.

The acceptance of an assignment binds the supplier-assignee to accept the payment for the medically required equipment or service as the full charge and the supplier-assignee cannot charge the beneficiary the differential attributable to the equipment actually furnished.

## 4. Establishing the Period of Medical Necessity

Generally, the period of time an item of durable medical equipment will be considered to be medically necessary is based on the physician's estimate of the time that his or her patient will need the equipment. See the Medicare Program Integrity Manual, Chapters 5 and 6, for medical review guidelines.

## D. Definition of a Beneficiary's Home

For purposes of rental and purchase of DME a beneficiary's home may be his/her own dwelling, an apartment, a relative's home, a home for the aged, or some other type of institution. However, an institution may not be considered a beneficiary's home if it:

- Meets at least the basic requirement in the definition of a hospital, i.e., it is primarily engaged in providing by or under the supervision of physicians, to inpatients, diagnostic and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, and sick persons, or rehabilitation services for the rehabilitation of injured, disabled, or sick persons; or

- Meets at least the basic requirement in the definition of a skilled nursing facility, i.e., it is primarily engaged in providing to inpatients skilled nursing care and related services for patients who require medical or nursing care, or rehabilitation services for the rehabilitation of injured, disabled, or sick persons.

Thus, if an individual is a patient in an institution or distinct part of an institution which provides the services described in the bullets above, the individual is not entitled to have separate Part B payment made for rental or purchase of DME. This is because such an institution may not be considered the individual's home. The same concept applies even if the patient resides in a bed or portion of the institution not certified for Medicare.

If the patient is at home for part of a month and, for part of the same month is in an institution that cannot qualify as his or her home, or is outside the U.S., monthly payments may be made for the entire month.  Similarly, if DME is returned to the provider before the end of a payment month because the beneficiary died in that month or because the equipment became unnecessary in that month, payment may be made for the entire month.

## 110.2 - Repairs, Maintenance, Replacement, and Delivery
**(Rev. 30, Issued 02-18-05, Effective/Implementation: Not Applicable)**

Under the circumstances specified below, payment may be made for repair, maintenance, and replacement of medically required DME, including equipment which had been in use before the user enrolled in Part B of the program.  However, do not pay for repair, maintenance, or replacement of equipment in the frequent and substantial servicing or oxygen equipment payment categories.  In addition, payments for repair and maintenance may not include payment for parts and labor covered under a manufacturer's or supplier's warranty.

### A.  Repairs

To repair means to fix or mend and to put the equipment back in good condition after damage or wear.  Repairs to equipment which a beneficiary owns are covered when necessary to make the equipment serviceable.  However, do not pay for repair of previously denied equipment or equipment in the frequent and substantial servicing or oxygen equipment payment categories.  If the expense for repairs exceeds the estimated expense of purchasing or renting another item of equipment for the remaining period of medical need, no payment can be made for the amount of the excess.  (See subsection C where claims for repairs suggest malicious damage or culpable neglect.)

Since renters of equipment recover from the rental charge the expenses they incur in maintaining in working order the equipment they rent out, separately itemized charges for repair of rented equipment are not covered.  This includes items in the frequent and substantial servicing, oxygen equipment, capped rental, and inexpensive or routinely purchased payment categories which are being rented.

A new Certificate of Medical Necessity (CMN) and/or physician's order is not needed for repairs.

For replacement items, see Subsection C below.

### B.  Maintenance

Routine periodic servicing, such as testing, cleaning, regulating, and checking of the beneficiary's equipment, is not covered.  The owner is expected to perform such routine maintenance rather than a retailer or some other person who charges the beneficiary.

Normally, purchasers of DME are given operating manuals which describe the type of servicing an owner may perform to properly maintain the equipment. It is reasonable to expect that beneficiaries will perform this maintenance. Thus, hiring a third party to do such work is for the convenience of the beneficiary and is not covered. However, more extensive maintenance which, based on the manufacturers' recommendations, is to be performed by authorized technicians, is covered as repairs for medically necessary equipment which a beneficiary owns. This might include, for example, breaking down sealed components and performing tests which require specialized testing equipment not available to the beneficiary. Do not pay for maintenance of purchased items that require frequent and substantial servicing or oxygen equipment.

Since renters of equipment recover from the rental charge the expenses they incur in maintaining in working order the equipment they rent out, separately itemized charges for maintenance of rented equipment are generally not covered. Payment may not be made for maintenance of rented equipment other than the maintenance and servicing fee established for capped rental items. For capped rental items which have reached the 15-month rental cap, contractors pay claims for maintenance and servicing fees after 6 months have passed from the end of the final paid rental month or from the end of the period the item is no longer covered under the supplier's or manufacturer's warranty, whichever is later. See the Medicare Claims Processing Manual, Chapter 20, "Durable Medical Equipment, Prosthetics and Orthotics, and Supplies (DMEPOS)," for additional instruction and an example.

A new CMN and/or physician's order is not needed for covered maintenance.

## C.  Replacement

Replacement refers to the provision of an identical or nearly identical item. Situations involving the provision of a different item because of a change in medical condition are not addressed in this section.

Equipment which the beneficiary owns or is a capped rental item may be replaced in cases of loss or irreparable damage. Irreparable damage refers to a specific accident or to a natural disaster (e.g., fire, flood). A physician's order and/or new Certificate of Medical Necessity (CMN), when required, is needed to reaffirm the medical necessity of the item.

Irreparable wear refers to deterioration sustained from day-to-day usage over time and a specific event cannot be identified. Replacement of equipment due to irreparable wear takes into consideration the reasonable useful lifetime of the equipment. If the item of equipment has been in continuous use by the patient on either a rental or purchase basis for the equipment's useful lifetime, the beneficiary may elect to obtain a new piece of equipment. Replacement may be reimbursed when a new physician order and/or new CMN, when required, is needed to reaffirm the medical necessity of the item.

The reasonable useful lifetime of durable medical equipment is determined through program instructions.  In the absence of program instructions, carriers may determine the reasonable useful lifetime of equipment, but in no case can it be less than 5 years. Computation of the useful lifetime is based on when the equipment is delivered to the beneficiary, not the age of the equipment.  Replacement due to wear is not covered during the reasonable useful lifetime of the equipment.  During the reasonable useful lifetime, Medicare does cover repair up to the cost of replacement (but not actual replacement) for medically necessary equipment owned by the beneficiary. (See subsection A.)

Charges for the replacement of oxygen equipment, items that require frequent and substantial servicing or inexpensive or routinely purchased items which are being rented are not covered.

Cases suggesting malicious damage, culpable neglect, or wrongful disposition of equipment should be investigated and denied where the DMERC determines that it is unreasonable to make program payment under the circumstances.  DMERCs refer such cases to the program integrity specialist in the RO.

### D.  Delivery

Payment for delivery of DME whether rented or purchased is generally included in the fee schedule allowance for the item.  See Pub. 100-04, Medicare Claims Processing Manual, Chapter 20, "Durable Medical Equipment, Prosthetics and Orthotics, and Supplies (DMEPOS)," for the rules that apply to making reimbursement for exceptional cases.

## 110.3 - Coverage of Supplies and Accessories
**(Rev. 1, 10-01-03)**
**B3-2100.5, A3-3113.4, HO-235.4, HHA-220.5**

Payment may be made for supplies, e.g., oxygen, that are necessary for the effective use of durable medical equipment.  Such supplies include those drugs and biologicals which must be put directly into the equipment in order to achieve the therapeutic benefit of the durable medical equipment or to assure the proper functioning of the equipment, e.g., tumor chemotherapy agents used with an infusion pump or heparin used with a home dialysis system.  However, the coverage of such drugs or biologicals does not preclude the need for a determination that the drug or biological itself is reasonable and necessary for treatment of the illness or injury or to improve the functioning of a malformed body member.

In the case of prescription drugs, other than oxygen, used in conjunction with durable medical equipment, prosthetic, orthotics, and supplies (DMEPOS) or prosthetic devices, the entity that dispenses the drug must furnish it directly to the patient for whom a prescription is written.  The entity that dispenses the drugs must have a Medicare supplier number, must possess a current license to dispense prescription drugs in the State in

which the drug is dispensed, and must bill and receive payment in its own name.  A supplier that is not the entity that dispenses the drugs cannot purchase the drugs used in conjunction with DME for resale to the beneficiary.  Reimbursement may be made for replacement of essential accessories such as hoses, tubes, mouthpieces, etc., for necessary DME, only if the beneficiary owns or is purchasing the equipment.

## 110.4 - Miscellaneous Issues Included in the Coverage of Equipment
**(Rev. 1, 10-01-03)**
**B3-2100.6, A3-3113.5, HO-235.5, HHA-220.6**

Payment can be made for the purchase of DME even though rental payments may have been made for prior months.  This could occur where, because of a change in his/her condition, the beneficiary feels that it would be to his/her advantage to purchase the equipment rather than to continue to rent it.

A beneficiary may sell or otherwise dispose of equipment for which they have no further use, for example, because of recovery from the illness or injury that gave rise to the need for the equipment. (There is no authority for the program to repossess the equipment.)  If after such disposal there is again medical need for similar equipment, payment can be made for the rental or purchase of that equipment.

However, where an arrangement is motivated solely by a desire to create artificial expenses to be met by the program and to realize a profit thereby, such expenses would not be covered under the program.  The resolution of questions involving the disposition and subsequent acquisition of durable medical equipment must be made on a case-by-case basis.

Cases where it appears that there has been an attempt to create an artificial expense and realize a profit thereby should be developed and when appropriate denied.  After adjudication the DMERC would refer such cases to the program integrity specialist in the RO.

When payments stop because the beneficiary's condition has changed and the equipment is no longer medically necessary, the beneficiary is responsible for the remaining noncovered charges.  Similarly, when payments stop because the beneficiary dies, the beneficiary's estate is responsible for the remaining noncovered charges.

Contractors do not get involved in issues relating to ownership or title of property.

## 110.5 - Incurred Expense Dates for Durable Medical Equipment
**(Rev. 1, 10-01-03)**
**A3-3113.7.B, HO-235.7.B, B3-3011**

The date of service on the claim must be the date that the beneficiary or authorized representative received the DMEPOS item.  If the date of delivery is not specified on the

# EXHIBIT F

VIA E-MAIL AND
FEDERAL EXPRESS

May 8, 2006

Paul J. Hughes, M.D.
Medical Director, DME PSC Regions A&B
TriCenturion
7909 Parklane Road, Suite 190
Columbia, SC 29223

RE:     Comments to Regions A&B's Draft LCD for Nebulizers Dated March 24, 2006

Dear Dr. Hughes:

The following comments are submitted by Sepracor Inc. to TriCenturion, Durable Medical Equipment Program Safeguard Contractor (DME PSC) for Regions A&B, in response to the draft nebulizer (DL11499) "Local Coverage Determination" (LCD) policy proposed by your organization on March 24, 2006. Although the draft policy proposed coverage determinations for a number of products, these comments respond solely to the "Least Costly Alternative" (LCA) reimbursement proposed for Xopenex® (levalbuterol HCl) Inhalation Solution.

If the proposed LCA is adopted, the reimbursement for Xopenex under Medicare Part B will be reduced to the level paid for albuterol sulfate (albuterol). This draconian action will effectively eliminate Medicare beneficiaries' ability to receive Xopenex, one of only two products available to treat asthma and chronic obstructive pulmonary disease (COPD). For those Medicare beneficiaries who suffer from asthma or COPD, using a product like Xopenex during an acute attack often is the difference in avoiding or limiting hospitalization and, in extreme but not uncommon situations, between living and dying.

For the following reasons, Sepracor believes that the proposed LCA should be withdrawn:

1. The clinical and pre-clinical data for Xopenex clearly establish the medical necessity of Xopenex in adult and Medicare populations;
2. The weight of the clinical and pre-clinical data clearly support the clinical differentiation between Xopenex and albuterol;
3. The Bibliography used by the DME PSCs to justify the LCA does not reflect the body of clinical information published on the differences between Xopenex and albuterol indicating that the DME PSCs failed to consider all of the relevant evidence; and
4. The proposed LCA for Xopenex is unlawful under the Medicare Modernization Act (MMA), the Social Security Act and applicable regulations.

In these comments, we emphasize that withdrawing the LCA is not Sepracor's only goal. Rather, we remain interested in following-up on our previous discussions with the Centers for Medicare and Medicaid Services (CMS) to reduce reimbursement for Xopenex in a manner that would address the government's fiscal considerations while simultaneously preserving access to this important product. Engaging in a long, costly fight over an LCA policy when a reasonable reimbursement alternative is available to the government does not serve the interests of Medicare beneficiaries, physicians, or the Medicare Program.

In summary, Sepracor's reimbursement alternative to the LCA would:

1. Reflect reasonable market pricing for Xopenex;
2. Ensure continued access to Xopenex for the tens of thousands of Medicare beneficiaries that currently benefit from taking it;
3. Honor the independent exercise of medical judgment by the healthcare professionals who treat Medicare beneficiaries, who have in a variety of circumstances determined that Xopenex is the correct treatment option for their patients; and
4. Generate significant savings for the Medicare Program.

These comments are divided into three sections. The first section provides detailed background information about Xopenex and the impact of the LCA on Medicare beneficiaries.

The second section outlines why the DME PSCs are acting outside the scope of legal authority. <u>As you consider these comments and the strong clinical evidence rebutting the draft LCA policy, we urge you to pay particular attention to the illegality of this action.</u>

Fundamentally, LCA policies are not permitted by the MMA, the Social Security Act, or the regulations published by CMS. The proposed policy, if finalized, is clearly in violation of all authoritative and binding provisions of law. Accordingly, the DME PSCs should withdraw this policy and agree to a reasonable compromise in order to avoid a legal challenge that, in our view, will undercut existing LCA policies.

Despite repeated pronouncements by the government to the contrary, use of an LCA is not permitted under these factual circumstances. Moreover, it is contrary to the plain language and the whole framework of the MMA and other Medicare laws, which clearly require single source drugs to be reimbursed through a single source payment methodology.

This action is also flatly prohibited by the applicable CMS regulations. Those regulations stipulate that an LCD is properly directed only to "whether or not a particular item or service is covered," and not with the reimbursement rate for a covered item or service. The implementing regulations state, simply and clearly, that a "LCD does <u>not</u>

include ... a determination with respect to the amount of payment to be made for the service." 42 C.F.R. § 400.202. (emphasis added.)

Unfortunately, the DME PSCs' decision to limit the reimbursement rate for Xopenex to generic racemic albuterol is in fact a "determination with respect to the amount of payment" for the drug. Id. (emphasis added.) As such, it is not permitted under the plain language of both the Medicare statute and implementing regulations.

The final and most compelling section of the submission demonstrates that the clear weight of clinical evidence supports the position that Xopenex and albuterol are clinically differentiated products. We note that many of the documents cited by the DME PSCs – which omit some of the favorable studies regarding Xopenex – do not support the draft LCA policy.

The literature cited in this submission highlights the advantages of Xopenex over albuterol. In summary, the overall weight of clinical evidence demonstrates Xopenex's clinical differentiation and advantages over albuterol. In contrast, the evidence does not suggest that Xopenex is inferior to albuterol. If the DME PSCs believe that Xopenex and albuterol are clinically undifferentiated, why wouldn't some clinical studies, as a statistical matter, show albuterol to be more advantageous than Xopenex?

We also ask that the DME PSCs pay particular attention to what is arguably the most relevant study for Medicare beneficiaries; namely, the study conducted in outpatients with COPD that was presented at Chest 2005 and will be published in the Journal of COPD later this year.

## I. Background

Sepracor is a research-based pharmaceutical company that is the exclusive manufacturer of an innovator single source product—Xopenex Inhalation Solution. Xopenex is a short-acting beta agonist approved to treat bronchospasm arising from respiratory conditions such as asthma and COPD. As previously indicated, it is one of only two products available to treat these conditions.

The product is covered under Medicare Part B because it is furnished to Medicare beneficiaries through durable medical equipment (i.e., nebulizers). This coverage is mandated by statute and by CMS regulation.

Xopenex inhalation solution (0.63 mg and 1.25 mg strengths) was approved by the Food and Drug Administration (FDA) for marketing in the United States in March, 1999. FDA approved a third, lower dose (0.31 mg) for Xopenex in January 2002 in recognition of levalbuterol's efficacy even in doses significantly lower than albuterol, its primary competition.

This development of Xopenex follows the FDA's Policy Statement on stereo isomeric drugs, which included as a guiding principle the isolation of the isomer with the desired therapeutic effect. (see FDA's Policy Statement for the Development of New

3

Sterioisomeric Drugs (May 1, 1992).)  Today, many *new* drugs are, like Xopenex, single isomers.

As a commitment to patients with asthma and COPD, Sepracor has invested significant resources into research and development and post-market clinical trials for Xopenex.  In fact, Sepracor may be one of the few entities conducting significant post-market research for short acting beta agonists.[1]

Given the product's effectiveness in all populations, Sepracor has pursued coverage and reimbursement through commercial payors, Medicaid and Medicare.  Currently, based on the available data, it enjoys approximately a 26% market share in the commercial setting, 18% in Medicaid and 12% in Medicare.

An integral part of obtaining appropriate coverage of Xopenex in Medicare was the approval of its own unique J Code (J7614).  Sepracor submitted a Healthcare Common Procedure Coding System (HCPCS) coding application for Xopenex on December 31, 2003.  *See* Attachment A, December 31, 2003 HCPCS Coding Application for Xopenex.  In November 2004, Sepracor was notified by CMS of their decision to award a unique J Code (J7614) for Xopenex.[2]  *See* Attachment B, CMS J Code Notification Letter.

Sepracor believes that CMS' decision to award a unique J Code for Xopenex is important for two reasons.  The decision reflects CMS' determination that Xopenex is clinically differentiated from albuterol, the class of generic drugs with which Xopenex competes.[3]

---

[1] In developing and implementing an aggressive post-marketing research program for Xopenex, Sepracor recognized that it was launching the product into a market that was dominated by a single generic product, albuterol, one that had significant acceptance among physicians. Sepracor believed that, to be successful in this market, it had to generate significant data, both clinical and pre-clinical and across populations and in different settings, that showed the effectiveness of Xopenex, not only on a stand-alone basis but in comparison to albuterol. Since the launch of Xopenex, Sepracor has invested tens of millions of dollars into these post-marketing research efforts, building a library of data that supports the use of Xopenex and a better understanding of how best to treat asthma and COPD. These studies have ultimately proven beneficial to the public because without Sepracor, few, if any studies would be pursued.

[2] At the same time, J Codes were awarded for a concentrated version of Xopenex (J7612) and a combination of Xopenex and ipratropium bromide (J7617), a code that has subsequently been revoked by CMS.

[3] Significantly, the decision occurred after Sepracor submitted the third HCPCS coding application for the product. The first two HCPCS coding applications for Xopenex resulted in: 1) the addition of Xopenex to the same J Code that already existed for albuterol (J7619) and; 2) approval of a multiplier for Xopenex that increased the level of reimbursement for the product (this level was still substantially lower than the commercial market price for Xopenex). CMS' decision to award a unique J Code for Xopenex in response to the third HCPCS coding application carries even greater weight in light of the first two actions by CMS, as it means that CMS was satisfied that Sepracor had established the clinical differentiation between Xopenex and albuterol. When the HCPCS Working Group issues a new J Code, it is a definitive statement that "significant therapeutic distinction" between the products in question have been established. *See* Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures 7 (2005) ("An

Although Medicare beneficiaries utilized Xopenex to a limited extent prior to 2005 when it was reimbursed under J7619, the decision by CMS to award a unique J Code for Xopenex has provided many additional Medicare beneficiaries who may benefit from this treatment with access to this important product.  Implementing an LCA would effectively eliminate Medicare coverage because suppliers would receive reimbursement less than the acquisition cost of the product. [4]

### A. Impact of the Proposed LCA

If the proposed LCA for Xopenex becomes effective, Medicare beneficiaries will lose access to one of the two nebulized short-acting beta agonists approved by FDA to treat the acute exacerbations that frequently arise in patients suffering from asthma or COPD.  Xopenex will effectively be unavailable to Medicare beneficiaries because the net result of the LCA is that Xopenex will be reimbursed at the level established for albuterol — approximately $0.17 per nebule (based on the Average Sales Price (ASP) information submitted for albuterol for the third quarter of 2005 and effective for the first quarter of 2006), a generic drug which is not comparable to Xopenex.

The proposed LCA will also place significant restrictions on physicians' ability to treat patients with asthma and COPD.  If the policy is finalized, physicians will find themselves effectively without a choice of short-acting beta agonists for their Medicare patients, many of whom first used albuterol and then subsequently benefited from Xopenex or exhibited a sensitivity to the (S)-albuterol isomer found only in albuterol. Ironically, physicians will be able to choose between Xopenex and albuterol for all of their patients, except Medicare beneficiaries.  Even those Medicare beneficiaries willing to pay the full cost for Xopenex will find it extremely difficult to obtain the product.  In the future, suppliers will only be able to provide Xopenex to Medicare beneficiaries if they are willing to assume the "loss" on each script of Xopenex they fill.

We believe that the driving force behind the LCA policy is the savings that will be realized by the DME PSCs.  Unfortunately, rather than pursue a compromise solution that saves the Medicare Program money and preserves access to this product, this LCA

---

existing code adequately describes an item in a coding request when the existing code describes procedures with the following: . . . No significant therapeutic distinctions from the item in the coding request.").  Of course, Sepracor also recognizes that CMS distinguishes between coding and coverage determinations, but that does not change the fact that a "significant therapeutic distinction" between Xopenex and albuterol has been made by CMS.

[4] We note that Sepracor does not even have the option to seek coverage for its product under Medicare Part D, where it would be able to negotiate an appropriate reimbursement amount.  Under Medicare law, reimbursement for Part D is prohibited when the product is otherwise available for coverage under Medicare Parts A or B.  In this case, even though the product would be subject to the LCA, it would technically be covered under Medicare Part B – thus there are no opportunities for Part D coverage for this population cohort.  There is one caveat to this rule: a limited number of Medicare patients do utilize Xopenex UDV under Part D because they are nursing home residents and do not otherwise have access to the product under Parts A or B.

will severely harm beneficiary access in Medicare Part B. The DME PSCs are seeking to completely eliminate market share for the product.

## B. The Xopenex Medicare Reimbursement Anomaly

Xopenex Inhalation Solution is sold at three different strengths, 0.31 mg (approved primarily for pediatric use), 0.63 mg, and 1.25 mg. As the difference in active ingredient costs is negligible across the three strengths while the manufacturing costs are identical, Sepracor has adopted a unitary pricing strategy, one that is quite common in the commercial marketplace. Accordingly, each of the three strengths of Xopenex is priced the same, currently at approximately $2.70 a nebule (wholesale acquisition cost).

This pricing practice was why Sepracor proposed J Code language for Xopenex that would have based reimbursement for Xopenex on a per unit dose vial basis. *See* Attachment A. If adopted, CMS would have paid the same level of reimbursement for each of the three strengths of Xopenex. Instead, CMS wrote the J Code for Xopenex on a per half-milligram basis, an action that, under the new ASP reimbursement methodology, has resulted in significant unintended consequences.

Paying the reimbursement for Xopenex on a per half-milligram basis has created a problem where the lower strengths of Xopenex have a disproportionate impact on the overall ASP calculation. The disproportionate impact is that the lower strengths of Xopenex have a pronounced effect on the weighted average ASP calculation resulting in a significantly higher reimbursement for the 1.25 mg strength product (as much as $1.00 higher in some quarters) than suppliers' acquisition cost for that dosage.

Sepracor identified this anomaly immediately upon its receipt of the J Code notification from CMS and proactively contacted CMS in November 2004 to make them aware of the problem. *See* Attachment C, Minutes from November 29, 2004 conference call with CMS. CMS, however, did not take any action, resulting in Medicare overpaying for this product strength.[5]

Apart from addressing the coding issue, Sepracor also sought to conserve Medicare funds in other ways. In two separate meetings with CMS (one in March 2005 and the other in April 2005), Sepracor offered to subject itself to the WAMP authority established under the MMA. Sepracor made this offer in an effort to reduce the reimbursement for Xopenex to a level more reflective of the product's acquisition cost. *See* Attachment D, Correspondence to CMS detailing Sepracor's offer. Although CMS initially expressed interest in Sepracor's offer, repeated attempts by Sepracor throughout 2005 and into 2006 to push the process along were unsuccessful.[6]

---

[5] Notably, though, the same anomaly that inflates the reimbursement of the 1.25 mg strength product also artificially places the lower strength products out of reach to Medicare beneficiaries. Suppliers lose money if they purchase the .63 mg and .31 mg strength products because the reimbursement rate is lower than the suppliers' acquisition cost.

[6] Upon request, we can document these efforts and CMS' failure to pursue these proactive requests by Sepracor to reduce its reimbursement rate.

If CMS had written the J Code for Xopenex as originally proposed by Sepracor in its December 31, 2003 HCPCS coding application and, if CMS has applied the methodology detailed by the HHS Office of Inspector General in its February 2006 report on ASP pricing, Sepracor estimates that CMS would have saved approximately $64 million in Xopenex reimbursement in 2005 (the savings to Medicare beneficiaries in terms of reduced co-pay expenditures would have been approximately $16 million). CMS could have realized even greater savings had they accepted Sepracor's offer to negotiate a reasonable WAMP.

The DME PSCs may not have realized that the 2005 Xopenex reimbursement costs would have been significantly reduced if CMS had acted within their authority to fix the coding problem and WAMP Xopenex. We think this is an important point that should influence the determination regarding whether to finalize the proposed LCA. It makes no sense for the DME PSCs to propose an action that inappropriately and unacceptably punishes the tens of thousands of Medicare patients who benefit from their Xopenex therapy.

## II. Illegality of Proposed LCA Action

In addition to all of the strong clinical reasons presented below, there is one overarching reason for the DME PSCs to abandon the LCA: it is unlawful under the MMA, the Social Security Act and CMS regulations. If challenged in court, Sepracor believes it would prevail, and the DME PSCs' and the Medicare Program's ability either to maintain current LCAs or to implement LCAs in the future would be compromised.

The limits of the authority of a DME PSC in establishing an LCA are clear. Significantly, those restrictions are reflected in mandatory language that is binding on the contractors. In issuing an LCD, a DME PSC "shall ensure that all LCDs are consistent with all statutes, rulings, regulations, and national coverage, payment, and coding policies." Medicare Program Integrity Manual § 13.1.3 (emphasis added). The proposed adoption of an LCA policy for levalbuterol in the draft LCD is contrary to both statute and regulation. Thus, it must be withdrawn for this reason, if for no other.

The LCA is plainly inconsistent with the reimbursement scheme established by Congress in the MMA. The MMA provides a detailed and comprehensive system for determining the reimbursement rate for drugs covered under Part B of the Medicare program.

Specifically, section 1847A of the MMA provides that the reimbursement rate for single source drugs shall be set at 106 percent of that drug's ASP. 42 U.S.C. § 1395w-3a(b). There is no dispute that levalbuterol is a single source drug. Moreover, the MMA specifically identifies inhalation drugs, such as levalbuterol, administered through durable medical equipment, as items that must be reimbursed under the ASP methodology. 42 U.S.C. § 1395u(o)(1)(G)(ii).

7

A single source drug such as levalbuterol, thus, must be reimbursed on the basis of its own ASP, not the ASP of other products with separate billing codes (such as here, albuterol). The only exceptions to the reimbursement rate of 106 percent of ASP were carefully delineated by Congress: the ASP may be disregarded when it exceeds the WAMP by a specified percentage, 42 U.S.C. § 1395w-3a(d)(3), in cases of public emergency, § 1395w-3a(e), or when it shared the same code with another single source product prior to October of 2003. Since the proposed LCA policy for levalbuterol does not fit within one of these exceptions, it is directly contrary to the reimbursement method mandated by Congress and is, therefore, unlawful.

Furthermore, the statutory and regulatory authority granted to CMS and its contractors does not permit an LCA policy, such as that proposed for levalbuterol, to be implemented through an LCD. Local Coverage Determinations, as the name implies, are decisions about the scope of coverage and not about the amount of reimbursement. This understanding is clearly laid out in the statutory provisions and the CMS regulations regarding LCDs. The statute defines an LCD as "a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A) [of the Medicare Act]." 42 U.S.C. § 1395ff(f)(2)(B).

CMS regulations clarify that an LCD is concerned with "whether or not a particular item or service is covered" and not with the reimbursement rate for a covered item or service. The implementing regulations specifically provide that an "LCD does not include . . . a determination with respect to the amount of payment to be made for the service." 42 C.F.R. § 400.202 (emphasis added). The DME PSCs' decision to limit the reimbursement rate for levalbuterol to that of generic albuterol is not a determination about whether levalbuterol will be covered (it clearly is now and would remain so covered under the LCA); it is instead a "determination with respect to the amount of payment" for the drug, precisely what is prohibited by the plain language of § 400.202.[7]

Likewise, the authority provided by the statute to exclude coverage for items or services "not reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," 42 U.S.C. § 1396y(a)(1)(A), cannot support the proposed LCA policy. The text, history, and prevailing judicial construction of this provision establish that it does not permit the regulation of reimbursement. Instead, this provision only permits a determination of whether or not an item should be covered irrespective of what its reimbursement may be. *See, e.g.,* *Hultzman v. Weinberger*, 495 F.2d 1276, 1281-82 (3d Cir. 1974) (rejecting the Secretary's argument that the "reasonable and necessary" provision allowed the consideration of cost where the item or service is "admittedly reasonable and necessary

---

[7] Sepracor acknowledges that CMS has stated in certain rulemakings that DME PSCs do retain an LCA authority. *See* 70 Fed. Reg. 39,021, 39029 (July 6, 2005); 70 Fed. Reg. 70,116, 70,243-44 (Nov. 21, 2005). These cursory assertions have no effect and cannot, under applicable law, be given any deference by a reviewing court. They do not address (or withstand) the controlling statutory and regulatory analysis above. Furthermore, the DME PSCs must ensure the legal validity of any LCDs they issue.

for the treatment and diagnosis of a patient's ailments"); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 194 (D.D.C. 2005) ("All Medicare coverage is limited to services that are medically 'reasonable and necessary' for the diagnosis or treatment of illness.") (emphasis added).

The DME PSCs' LCD does not purport to make a medical determination that levalbuterol is not clinically "reasonable and necessary for the . . . treatment of illness," in this case, for the treatment of asthma or chronic obstructive pulmonary disease. Indeed, the draft LCD expressly finds that "[i]t is medically necessary to administer ... levalbuterol . . . for the management of obstructive pulmonary disease." Draft LCD, at 3. Instead, the LCD seeks to limit the reimbursement rate for levalbuterol in spite of the fact that it is a medically appropriate treatment for such illnesses. This is clearly a decision about cost and not about medical necessity. As such, the LCA policy cannot be justified even if it applied here.

Moreover, the LCA policy for levalbuterol proposed by the DME PSCs is contrary to § 1395y(a)'s use of the terms "no payment" and "any expenses." These terms give the agency only the authority to deny all payment for an item or service which is not "reasonable and necessary." Once the agency makes a clinical determination that a particular drug is not "reasonable and necessary" for the diagnosis or treatment of the patients at issue, it then can only take one action — disallow Medicare coverage for that drug entirely. In a situation where such a clinical determination has been made Medicare must make "no payment" for "any expenses incurred" for that drug. Even if § 1395y applied here, it would not permit the DME PSC to do what it attempts to do in the proposed policy — reduce, but not wholly eliminate "payment."

As the above analysis shows, the DME PSCs are without legal authority to implement through an LCD an LCA policy that would set the reimbursement rate for levalbuterol. Should the DME PSCs finalize this LCA, Sepracor is prepared to challenge the illegality of this action and strike down the contractors' ability to implement these policies in the future.

## III. Xopenex Clinical and Pre-Clinical Data

### A. Review of Sources of Information and Research Summarizing Clinical and Pre-Clinical Studies that Differentiate Levalbuterol from Albuterol

#### 1. Purpose

In the Draft LCD Policy regarding reimbursement for Xopenex, the DME PSCs provided a list indicating the sources of information upon which they based their determination that levalbuterol is not medically necessary compared with albuterol.

The purpose of this section is to briefly summarize the findings in each of the clinical studies cited, as well as the opinions of the authors, for each of the references cited by the DME PSCs. This will demonstrate that the decision reached by the DME

PSCs is contrary to the findings of the majority of research studies listed in the LCD's Sources of Information. This information is provided in Section III.A.2., "Review of DME PSC Sources of Information." [8]

Section III.B., "Summary Of Clinical And Pre-Clinical Data Supporting Differentiation of Levalbuterol Compared With Albuterol," summarizes in detail information clearly demonstrating the scientific and clinical differences between Xopenex and albuterol. This section also includes summaries of new clinical studies not included in the DME PSCs' review:

- A large, well-controlled, randomized, double-blind, placebo-controlled, multicenter, out-patient study in patients with COPD that evaluated the efficacy of levalbuterol treatment for six weeks (Donohue 2005; Donohue 2006).

- A large, well-controlled, double-blind, randomized, multicenter, head-to-head emergency department study comparing levalbuterol with albuterol in the treatment of acute asthma (Nowak 2006).

- A large retrospective evaluation of acute treatment of levalbuterol compared with albuterol in the emergency department (Schreck 2005).

- A large, well-controlled, randomized, multicenter, head-to-head in-patient study evaluating levalbuterol compared with albuterol in patients with asthma and COPD (Sepracor data on file).

Finally, the Appendix includes a number of additional references summarizing pre-clinical and clinical data. *See* Attachment F, Appendix.


2.  Review of DME PSC Sources of Information

In the Draft LCD Policy regarding reimbursement for Xopenex, the DME PSCs provided a list indicating the sources of information upon which they based their determination that levalbuterol is not medically necessary compared with albuterol. Well over 300 references relating to levalbuterol or the isomers of albuterol were available for review: almost fifty manuscripts that summarize clinical research studies, almost 100 abstracts describing clinical studies, over 100 manuscripts and abstracts describing pre-clinical studies, over fifty review articles, and forty opinion pieces (Letters to the Editor, Editorials, or Commentary). Of these, the DME PSCs chose twenty-two references upon which to base their decision, eight of which were published, peer-reviewed manuscripts describing clinical research studies, seven abstracts describing clinical studies, two of which have been published as peer-reviewed manuscripts (however, only one of these published papers was also included in the list), and seven Letters to the Editor or other

---

[8] Attachment E analyzes each of the manuscripts, abstracts and opinions relied on by the DME PSCs.

opinion pieces. For the latter category, the DME PSCs did not cite the author replies to the Letters to the Editor.

In the field of research, published manuscripts of research studies are the gold standard and provide the most rigorous presentation of data for review by other researchers. The peer-review process is designed to provide authors with objective, often insightful comments, provided by researchers who review and comment on manuscripts being considered for publication by a journal. The peer-review process is also blinded, which is intended to give reviewers the freedom to critique fellow researchers' work in an open manner. Authors frequently revise their manuscripts and conduct other analysis of the data based on the comments that they receive from the reviewers, and they are required to respond to all of the reviewers' comments in order for their manuscript to be considered for publication. The objective of this process is to develop manuscripts that provide objective data and discuss the data in a fair and balanced manner, so that researchers and clinicians may review this information and make independent decisions on the study.

Abstracts are very brief summaries of research that are submitted for presentation at scientific meetings. The process for review and acceptance of abstracts varies greatly — many are peer-reviewed and are very selective, while others have a less restrictive review process. The very nature of an abstract, typically limited to 250 words, limits the ability to provide a detailed presentation of the study and the results. Therefore, abstracts summarize key findings from studies that have been recently completed, are often preliminary in nature, and are typically followed-up with a peer-reviewed manuscript. For example, the Sources of Information cited by the DME PSCs lists a number of abstracts that have been subsequently published as manuscripts. One of these peer-reviewed manuscripts (Datta et al.) was also included in the list, while another (Schreck et al.) was only provided in abstract form.

Letters to the Editor provide a mechanism for others to offer their opinion or personal critique of a manuscript, similar to a Letter to the Editor of a newspaper. Letters to the Editor are not peer-reviewed. However, journal editors provide the author of the manuscript that is being critiqued with an opportunity to respond, because most comments in such Letters are criticisms of the study. Doing so ensures proper balance and perspective, given that the author is privy to the entire study and database (much of which usually cannot be included in manuscripts due to the journal's restriction on the number of pages, tables, and figures), as well as knowledge of comments raised by the reviewers, which always result in changes to manuscripts by the author. Providing a Letter to the Editor without citing the response is neither objective nor fair-balanced, though that is exactly what happened in the draft policy

Letters to the Editor and Author Reply exchanges are more akin to Pro/Con debates, and these are an important part of the scientific process. In the Reply, the authors are often able to clarify issues of study design and results that are raised in the Letters to the Editor. The beneficiaries of this exchange are the readers of the journal and other researchers, who are then able to make their own decisions about the points made

by both parties. In the Letters to the Editor cited by the DME PSCs, the replies of the authors are not presented and, therefore, these negative letters may easily be taken out of context without appropriate balance and, most importantly, without appropriate scientific exchange of opinions.

Other forms of available opinion pieces are Editorials, which are similar to those found in newspapers and news magazines. In contrast to the Letters to the Editor, Editorials are typically stand-alone pieces — that is, they represent the opinion of the author of the Editorial. Most Editorials are scientific in approach and tone, and present both sides of controversial issues. They typically appear in conjunction with a paper that is noteworthy for its scientific value, its intrigue, or the potential for controversy.

As stated previously, while the decision reached by the DME PSCs is consistent with the few opinion pieces they have cited, it is contrary to the findings of the majority of research studies listed in the Sources of Information. Therefore, it does not provide justification for the draft policy decision.

The summary of the DME PSCs' studies is outlined in the tables below. The tables identify peer-reviewed documents (Yes/No) and categorize the efficacy findings of each study cited, (Lev>Rac, Lev=Rac, or Rac>Lev) along with the conclusions of the authors as supportive of levalbuterol improvement compared with albuterol (Yes/No). The last table is provided for Letters to the Editor and other opinion pieces.

We note that the tables below represents the DME PSCs' best arguments in support of their position. Focusing on the clinical evidence summarized below, however, demonstrates the weakness of the argument that the products are not differentiated. Furthermore, when the studies not examined below are factored in, the case for differentiation becomes compelling.

## DME PSCS' BEST ARGUMENTS STILL DO NOT JUSTIFY THE APPLICATION OF AN LCA

|  |  | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|---|
|  | **Manuscripts** |  |  |  |
| 1. | Carl J et al. *The Journal of Pediatrics*; 2003, 143:731-736. | Yes | Lev > Rac | Yes |
| 2. | Datta D et al. *Chest*; 2003; 124, 3:844-849. | Yes | Lev = Rac | No |
| 3. | Lötvall J et al. *Journal of* | Yes | Lev = Rac | No |

| | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|
| *Allergy and Clinical Immunology* 2001:726-731. | | | |
| 4. Nelson H et al. *Journal of Allergy and Clinical Immunology* 1998:943-952. | Yes | Lev > Rac | Yes |
| 5. Nowak R et al. *American Journal of Emergency Medicine* 2004; Vol. 22, No. 1:29-36. | Yes | Lev > Rac | Yes |
| 6. Pleskow WW et al. *Allergy and Asthma Proceedings* 2004; Vol. 25:1-8. | Yes | Lev > Rac | Yes |
| 7. Scott V, Frazee L. *American Journal of Therapeutics* 2003; 10:341-347. | Yes | NA | NA |
| 8. Truitt T et al. *Chest* 2003; 123, 1:128-135. | Yes | Lev > Rac | Yes |
| TOTALS | | LEV > RAC = 6 **Lev = Rac = 1** **NA = 1** | YES = 5 **No = 2** **NA = 1** |

|  |  | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|---|
|  | **ABSTRACTS** |  |  |  |
| 1. | Datta D et al. *Chest*; 2002: 44S. | Yes | Lev = Rac | No |
| 2. | Davies J et al. *Respiratory Care*; October 2001: 1083. | Yes | Lev > Rac | Yes |
| 3. | Emerman C et al. *American Journal of Respiratory Critical Care Med 2004*; 169:A310. | Yes | Lev > Rac | Yes |
| 4. | Haider D. *Respiratory Care*; October 2001; Vol. 46, No. 10:1081. | Yes | Lev > Rac | Yes |
| 5. | Hanania N et al. *Chest*; 2004; 126(4):722S. | Yes | Lev > Rac | Yes |
| 6. | Nowak R et al. *American Journal of Respiratory Critical Care Medicine*; 2004; 169:A310. | Yes | Lev > Rac | Yes |
| 7. | Schreck DM et al. Abstract presented to *ACEP 2001*, Chicago, IL. | Yes | Lev > Rac | Yes |
|  | TOTALS |  | LEV > RAC = 6 **Lev = Rac = 1** | YES = 6 **No = 1** |

| | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|
| **Opinions/Review** | | | |
| 1. Ahrens R, Weinberger M. *Journal of Allergy and Clinical Immunology*; 2001;108:681-684. | Yes Editorial | NA | No |
| 2. Asmus M et al. *Journal of Allergy and Clinical Immunology*;, 2002, Volume 110, Number 2. | No LTE | NA | No |
| 3. Chowdhury B. *Journal of Allergy and Clinical Immunology*; 2002, Volume 110, No. 2. | No LTE | NA | No |
| 4. Crater, Jr G. *Chest*; 2003, 124:1175-76 | No LTE | NA | No |
| 5. Hendeles L, Hartzema A. *Chest* 2003; 124:1176 | No LTE | NA | No |
| 6. Weinberger M. *Clinical Pulmonary Medicine* 2004; Vol. 11, No. 3:129-134. | Yes Review | NA | No |
| 7. Quinn C. *The American Journal of Managed Care* 2004;10:S153-S157. | Yes Report | NA | Yes |
| TOTALS | | NA | YES = 1 No = 6 |

This review clearly demonstrates that the citations summarizing clinical research studies (both manuscripts and abstracts) are strongly supportive of a clinical advantage of levalbuterol over albuterol.  Among the manuscripts, the overall weight of clinical evidence demonstrates that levalbuterol had better outcomes than albuterol and the authors concluded that levalbuterol was differentiated from albuterol and provided a clinical advantage.  Other studies found no difference in outcomes and concluded that there was no advantage to levalbuterol versus albuterol.  Importantly, none of these authors concluded that albuterol was better than levalbuterol.

This difference between the DME PSCs' decision and the data is even more striking when one examines the findings for the abstracts cited. In this case, almost all abstracts present findings demonstrating that levalbuterol treatment resulted in better outcomes and concluded clinical differentiation, while only one found no difference between levalbuterol and albuterol (the manuscript describing this study was also included by the DME PSCs).

Among the papers the DME PSCs cited that present results of clinical research studies, the overwhelming majority present outcomes favoring levalbuterol and concluding that levalbuterol provides a clinical advantage compared to albuterol. Of course, this stands in marked contrast to the "opinions" that are cited.

### 3.  Flaws In The DME PSCs' Choice Of Opinions Supporting The LCD

It would appear that the DME PSCs chose to selectively rely on less rigorous forms of medical opinions rather than an objective analysis of the clinical data. In the case of opinions, most are in the form of Letters to the Editor, two of which are overtly negative in tone and point out study limitations that already had been presented and discussed in the manuscripts. Two of these Letters refer to a paper cited by the DME PSCs, while the others comment on a pediatric study by Milgrom that was not included in the Sources of Information. The DME PSCs' reason for utilizing the latter two letters is unclear; the letters refer to a paper that the DME PSCs did not use in their consideration process and could not have been expected to provide insight into data they assessed.[9]

Based on the Sources of Information, it is unclear how the DME PSCs reached their conclusion. Many other robust studies demonstrate the benefits of levalbuterol and the strong preclinical and clinical pharmacokinetic rationale as to why these differences might be observed in the clinical setting. Some studies, however, show no difference. If there was no difference, then we should expect to see a number of neutral studies showing no difference, and an equal number of studies favoring levalbuterol or favoring albuterol. However, there are few, if any, studies that demonstrate that albuterol is more effective than levalbuterol. Indeed, the clear weight of evidence indicates that levalbuterol provides clinical benefits, and that levalbuterol is clinically differentiated from albuterol. The following sections demonstrate the strength of the clinical support behind Xopenex.

We are concerned that the DME PSCs simply assert by *ipse dixit* that levalbuterol is not clinically differentiated from albuterol, and then cite a list of medical references. Moreover, we are worried that the DME PSCs have simply ignored not only positive

---

[9] One of these letters regarding the Milgrom paper, authored by the FDA Medical Officer responsible for the review of the pediatric study, subsequently published by Milgrom et al., that was the basis for levalbuterol's indication in pediatric patients, was very balanced and made appropriate comments on the paper. The other Letter by Asmus, Hendeles, Weinberger, Ahrens, Bisgaard, Lötvall, O'Byrne, and Cockroft, "Levalbuterol has not Been Established to Have Therapeutic Advantage over Albuterol", was not balanced. The other two Letters were criticisms of the Truitt study, which the DME PSCs did cite, and could have helped the DME PSCs in their review.

studies but important new studies that more clearly show differentiation (which are addressed in the following section).

## B. Summary Of Clinical And Pre-Clinical Data Supporting Differentiation of Levalbuterol Compared With Albuterol

In addressing the question of differentiation between levalbuterol and albuterol, it is important to consider the available preclinical and clinical pharmacokinetic data. An extensive body of evidence clearly and convincingly demonstrates that in a wide variety of in-vitro and in-vivo models (including studies conducted with several human cell lines), (S)-albuterol is not pharmacologically inert. Rather, (S)-albuterol consistently exhibits pro-inflammatory and pro-bronchoconstrictory properties.

It is well established that (S)-albuterol is metabolized much more slowly than (R)-albuterol in humans. Consequently, the lungs may be exposed unopposed to the effects of (S)-albuterol for up to several hours following a single dose of inhaled albuterol, notwithstanding the exposure that occurs following administration of repeated doses of albuterol. These preclinical and clinical pharmacokinetic data provide a scientific foundation to explain the clinical differences observed between levalbuterol and albuterol in many robust clinical studies. There is an extensive amount of literature available for review relating to the differences between levalbuterol and albuterol.

The preclinical and clinical research summarized below, while not intended to be an exhaustive review, supports the therapeutic distinction between the two products. Not all studies have demonstrated a difference between these two distinct molecules. However, many of the studies conducted were designed to demonstrate differences between levalbuterol and placebo and were neither powered nor designed to demonstrate differences between active treatments (and despite this, the majority of the clinical trials reviewed do in fact demonstrate differences between the compounds). More to the point, if there was truly no difference between levalbuterol and albuterol, then one would expect to see several neutral studies, some studies that favor levalbuterol and some studies that favor albuterol. Critical review of the literature does not support this position. [10]

New studies published within the last year further support the differentiation. These include the publication of two large emergency department studies (Schreck 2005; Nowak 2006) and one six-week study in patients with COPD (Donohue 2005, Donohue 2006, in press).

### 1. Clinical Pharmacokinetic Characteristics

Levalbuterol and (S)-albuterol also exhibit differential pharmacokinetics. The absorption and disposition of (R)-albuterol is similar when administered alone or as albuterol in healthy volunteers and in patients with mild-to-moderate asthma (Gumbhir-

---

[10] In this submission, Sepracor emphasizes that the clear weight of clinical evidence supports the argument for clinical differentiation. However, the Company acknowledges that some studies do not show differentiation.

17

Shah 1999, Gumbhir-Shah 1998). Over time, plasma concentrations of (S)-albuterol remain several-fold higher than levalbuterol (Figure 1). Several studies have documented that (R)-albuterol is a more natural substrate for the metabolic arylsulfatase enzymes, and therefore is more rapidly eliminated than (S)-albuterol (Eaton 1996; Walle 1996). Thus, the maximum concentration and the area under the curve (AUC) for (S)-albuterol are four times higher than those of (R)-albuterol, and the elimination half-life of (S)-albuterol is approximately 50% longer than that of (R)-albuterol (Gumbhir-Shah 1998; Boulton 1997; Boulton 1996; Lipworth 1997). The inhalation of albuterol results in a five to seven-fold greater exposure to (S)-albuterol. In addition, Dhand et al. (Dhand 1999) showed that (S)-albuterol was preferentially retained in the lungs after metered-dose inhaler administration. Taken together, these pharmacokinetic data indicate that the preferential deposition of (S)-albuterol compared with (R)-albuterol in the lung could lead to accumulation of the potentially detrimental (S)-albuterol after long-term use of albuterol.

**Figure 1.  Pharmacokinetic profile of levalbuterol and (S)-albuterol after administration of 2.5 mg of albuterol**



a.   Review of Clinical Studies

The clinical studies discussed below detail clinical efficacy, health outcomes, and pharmacoeconomic differences between albuterol and levalbuterol suggesting that the preclinical findings (reviewed later in this document) do translate into pharmacologic and clinical differences between the two treatments. *See* Attachment G, Bibliography. In particular, clinical research studies have shown that:

18

1. Levalbuterol 1.25 mg has greater efficacy, produces accelerated improvement in $FEV_1$, and has a longer duration of action in some patients, reducing the need for rescue or ancillary therapies (resulting in cost savings).

2. Levalbuterol reduces the number of hospital admissions, shortens hospital stays, and, as a result, demonstrates cost savings.

3. Levalbuterol offers efficacy comparable to that of albuterol at lower doses, thus offering physicians dosing flexibility and the potential for fewer side effects.

   i. Levalbuterol 1.25 mg has greater efficacy, produces accelerated improvement in $FEV_1$, and has a longer duration of action in some patients, reducing the need for rescue or ancillary therapies

Levalbuterol is bronchoprotective and protects asthmatic patients from the bronchoconstriction induced by methacholine during airway reactivity testing (Perrin-Fayolle 1995; Ramsay 1999; Cockcroft 1997). In one study, the protection with levalbuterol was greater and lasted longer than that observed with albuterol (Perrin-Fayolle 1995), while other studies have demonstrated similar bronchoprotective effects for levalbuterol and albuterol (Ramsay 1999; Cockcroft 1997).

The pivotal phase III study by Nelson demonstrated the clinical advantages of levalbuterol over albuterol in terms of bronchodilation, therapeutic index, side effects, effects in severe asthmatics, and baseline resting lung function (Nelson 1998). This large, randomized, double blind, placebo-controlled study compared the efficacy of levalbuterol and albuterol to placebo control in a total of 362 subjects (mean age, 36.5 years; age range, 12-80 years) with moderate-to-severe asthma (screening $FEV_1$ 45%-70% of predicted) who received nebulized levalbuterol (0.63 mg or 1.25 mg) or albuterol (1.25 mg or 2.5 mg) three times per day for 4 weeks. At weeks 0, 2, and 4, serial pulmonary function testing was performed for 8 hours post dose.

The results indicated that, after the first dose and after 4 weeks of treatment, the greatest peak improvement and longest duration of improvement in $FEV_1$ occurred with levalbuterol 1.25 mg (Figure 2). There was also a greater percentage of subjects with $\geq$ 15% improvement in $FEV_1$ immediately following initial dosing with either levalbuterol 0.63 mg or 1.25 mg versus albuterol 2.5 mg. In addition, the bronchodilation effect for albuterol dropped below a 15% change in $FEV_1$ from baseline (the clinical definition of bronchodilation) at 5 hours whereas levalbuterol continued to achieve greater than 15% $FEV_1$ improvement up to 8 hours, the last time point measured (Figure 2) (Nelson, 1998).

**Figure 2.    Mean percent change in FEV₁ after the first dose: *P*=0.03 for mean peak change FEV₁, levalbuterol vs albuterol; *P*=0.023 for overall AUC, levalbuterol vs albuterol**



Day 0 (Week 0)

The primary intent of the study published by Nelson et al. (Nelson 1998) was to compare levalbuterol with placebo; albuterol was included as an active control. Therefore, the study was neither designed nor powered to determine statistical differences between levalbuterol and albuterol. However, a post-hoc analysis conducted to compare the active treatment groups indicated that levalbuterol 1.25 mg provided statistically significantly greater improvements compared with albuterol 2.5 mg in lung function (Pleskow 2004). Both the mean peak change in FEV₁ and the area under the change in FEV₁ vs time curves (AUC FEV₁, a measure of bronchodilation over time) were statistically significantly greater for levalbuterol 1.25 mg compared with albuterol 2.5 mg after the first dose in the overall study population (Figures 3a and 3b). The mean peak change in FEV₁ for all patients and the severe subset are presented in Figures 2 and 3, respectively. By contrast to both doses of levalbuterol, albuterol 1.25 mg was not significantly different from placebo for mean AUC FEV₁ after 4 weeks of dosing (Pleskow 2004). Levalbuterol 0.63 mg produced bronchodilation comparable to a standard dose of albuterol, a dose that contains twice the amount of (R)-albuterol as the

0.63 mg dose of levalbuterol. These data suggest that the (S)-albuterol component of albuterol compromises the efficacy of levalbuterol.

**Figure 3a.  Mean peak change in $FEV_1$ for all patients following the first dose (Week 0) and the last dose (Week 4) of treatment**



*$P < 0.001$ vs placebo;
+$P < 0.03$ vs placebo and RAC 1.25 mg;
#$P < 0.03$ vs placebo, RAC 1.25 mg, and RAC 2.5 mg

**Figure 3b.  Mean AUC FEV$_1$ for all patients following the first dose (Week 0) and the last dose (Week 4) of treatment**



*$P < 0.011$ vs placebo;
+$P < 0.031$ vs placebo and RAC 1.25 mg;
@$P < 0.014$ vs placebo, Lev 0.63 mg, RAC 1.25 mg, and RAC 2.5 mg

In a sub-set analysis of severe asthmatics (baseline FEV$_1 \leq 60\%$ predicted), 1.25 mg of levalbuterol achieved significantly greater maximal bronchodilation than 2.5 mg of albuterol (Figure 4 ) (Nelson, 1998).  This translated into a 51% maximal improvement in FEV$_1$ for levalbuterol, compared to with a 31% improvement in FEV$_1$ for albuterol. Levalbuterol 1.25 mg produced the largest peak change in FEV$_1$ after the first dose, which was significantly greater than placebo, albuterol 2.5 mg, and levalbuterol 0.63 mg (Figure 5a) (Pleskow 2004).  The FEV$_1$ AUC was also significantly greater for levalbuterol 1.25 mg compared with placebo and all active treatments in the subset of patients with more severe disease (Figure 5b) (Pleskow 2004).

**Figure 4**    **Mean percent change in FEV$_1$ after the first dose in Severe Patients (Baseline FEV$_1$ ≤60% predicted)**



**Figure 5a. Mean peak change in FEV$_1$ for severe patients (baseline FEV$_1 \leq 60\%$ predicted) following the first dose (Week 0) and the last dose (Week 4) of treatment**



*$P < 0.04$ vs placebo;
@ $P < 0.05$ vs placebo, Lev 0.63 mg, RAC 1.25 mg, and RAC 2.5 mg

**Figure 5b. Mean AUC FEV$_1$ for severe patients (baseline FEV$_1$≤60% predicted) following the first dose (Week 0) and the last dose (Week 4) of treatment**



*P < 0.026 vs placebo;
& P < 0.046 vs placebo, Lev 0.63 mg, and RAC 2.5 mg

Whether or not levalbuterol has an improved therapeutic index compared with albuterol, as purported by some (Nelson 1998, Milgrom 2001) is the subject of recent study (Lotvall 2001) and debate (Ahrens & Weinberger 2001; Asmus & Hendeles 2002; Chowdhury 2002; Milgrom, 2002). Lotvall et al. (Lotvall 2001) conducted a randomized, double-blind, placebo controlled cross-over study conducted in mild asthmatics and randomized patients to receive cumulative doses of (R)-albuterol, (S)-albuterol, albuterol, or placebo every 20 minutes on 4 separate days. Pulmonary function testing was completed following each dose. The investigators confirmed that all bronchodilation was achieved by (R)-albuterol and did not observe any effects on airway function from (S)-albuterol. The bronchodilation observed during the ascending, consecutive dose regimen was similar for (R)-albuterol and albuterol, and systemic effects were dependent on (R)-albuterol, whether delivered as a single isomer or as a racemate. However, this study design and its methodology have been criticized because the cumulative dose model confounds the effect of time and dosing (Ahrens & Weinberger 2001; Milgrom 2002). Guidelines that were established by the International Conference on Harmonization suggest that, for immediate, acute, reversible responses (such as bronchodilation), a cross-over, fixed dose model is more appropriate. 60 Fed. Reg. 55,872-976 (Nov. 9, 1994.)

Studies conducted in acute settings, such as emergency departments and hospitals, validate this approach. Nowak et al. conducted an open-label consecutive cohort dose escalation study of patients with acute asthma who presented in the emergency department (ED) with FEV$_1$ 20-55% of predicted normal values (Nowak 2004).

Nebulized doses of levalbuterol (0.63 mg, 1.25 mg, 2.5 mg, 3.75 mg, and 5.0 mg) and albuterol (2.5 mg and 5 mg) were administered every 20 minutes for one hour. The mean percentage change in $FEV_1$ was significantly greater for levalbuterol 1.25 mg (91%) compared with albuterol 2.5 mg and levalbuterol 0.63 mg (49% and 42% respectively; p < 0.05; Figure 6). In a subset of patients with baseline $FEV_1 \leq 35\%$, the mean percent change in $FEV_1$ was significantly greater for the 1.25 mg dose of levalbuterol (133%) compared with both 2.5 mg and 5 mg of albuterol (59% and 36%; p<0.05) and levalbuterol 0.63 mg (44%; p<0.05) following three treatments. The mean $FEV_1$ continued to improved after each dose of 1.25 mg levalbuterol and continued to improve 60 minutes after the last dose (max % change 52-113%) compared to subjects treated with either a 2.5 mg or 5 mg dose of albuterol, who reached plateaus in their response over time (Nowak 2004).

**Figure 6.  Mean percent change in $FEV_1$ in the emergency department**



*p<0.05 vs. RAC 2.5 mg;  #p<0.05 vs. RAC 5.0 mg;  ^p<0.05 vs. LEV 0.63 mg;  +p<0.05 vs LEV 3.75 mg

A post-hoc analysis of data from this study showed a significant inverse relationship (p ≤0.004) between baseline presenting concentrations of the (S)-albuterol component of albuterol (denoting previous albuterol use) and $FEV_1$ at presentation and improvements in $FEV_1$ 60-minutes post-dose. The higher the concentration of (S)-albuterol, the lower the $FEV_1$ was at presentation and the lower the subsequent improvement in $FEV_1$, suggesting that this component of albuterol may interfere with the benefit of the (R)-isomer (Nowak 2004).

In addition, after administration of matched doses of levalbuterol and albuterol,

median (R)-albuterol concentrations increased in a dose-dependent fashion and were similar. Therefore, the differential response was not due to differential exposure to the active isomer. By contrast, patients treated with albuterol had additional and substantial accumulation of (S)-albuterol, which continued to increase 60 minutes after the last dose of albuterol in patients who received albuterol 5.0 mg. (Nowak 2004).

Further evidence of the deleterious effect of (S)-albuterol is found in the results of a double-blind, multicenter trial of 627 adults with acute asthma exacerbation (mean $FEV_1$ % predicted 37.9 ± 10.3 on presentation) (Nowak 2006). This trial was not included in the DME PSC drafting policy. Patients were randomized to levalbuterol 1.25 mg (n=315) or albuterol 2.5 mg (n=312), nebulized every 20 minutes in the first hour, and every 40 minutes thereafter up to 3 hours as clinically indicated. To determine if pre-dose levels of the (S)-albuterol component of albuterol, which was used by 83.3% of patients prior to going to the emergency department, would be related to subsequent bronchodilation and admission, a subset of 160 patients had blood drawn for determination of (S)-albuterol concentrations. The results showed that, among all patients, $FEV_1$ improvements were greater following levalbuterol, and were statistically significantly greater in patients treated with levalbuterol compared with albuterol after the first dose (Figure 7). This finding was even more pronounced among patients who did not report concomitant steroids use at baseline (approximately 65% of patients in each treatment group; Figure 8), consistent with the pre-clinical findings of Ameredes et al. (Ameredes 2004). Time to event analysis using FEV1 of 50% predicted (the threshold for admission based on NAEPP guidelines) and 70% predicted (threshold for discharge) analyses were conducted to examine the performance of treatments in attaining values between 40% and 70% of predicted. These results demonstrated faster improvement in more patients for those randomized to levalbuterol (Figure 9) (Nowak 2006).

**Figure 7.  Change in FEV$_1$ after the over the 3-hour treatment period in patients with acute asthma (all patients)**



**Figure 8.  Change in FEV$_1$ over the 3-hour treatment period in patients with acute asthma (steroid naïve patients)**



**Figure 9.  Time to event analysis for time to achieve an FEV1 of either 50% or 70% predicted.**



29

To determine if pre-dose levels of the (S)-albuterol component of albuterol, which was used by 83.3% of patients prior to going to the emergency department, would be related to subsequent bronchodilation and admission, a subset of 160 patients had blood drawn for determination of (S)-albuterol concentrations. High plasma concentrations of (S)-albuterol at admission were associated with a greater likelihood of hospital admission (p=0.01), with 2.5% vs 22.5% of patients requiring admission in the lowest and highest quartiles of (S)-albuterol concentrations, respectively. Among patients in the highest quartile of (S)-albuterol concentrations, 28% of albuterol-treated patients required admission compared with 16% of levalbuterol-treated patients. Levalbuterol provided significantly greater and more rapid improvement in $FEV_1$ compared with albuterol in this high (S)-albuterol concentration group (Figure 10) (Nowak 2006).

**Figure 10.  Mean change in FEV1 in patients with the highest pre-dose levels of (S)-albuterol in patients with acute asthma**





In most hospitals, albuterol is administered every 4-6 hours, with standing orders provided "as needed" to cover periods between doses when patients may require additional doses, termed breakthrough or prn treatments. Other evidence to support the impact of a longer duration of action in some patients is also available in a number of observational studies conducted independently at hospitals. One of these studies,

conducted at Duke University Medical Center, sought to determine whether hospitalized patients could be controlled on levalbuterol 1.25 mg administered TID. The study findings indicated that the total number of treatments decreased from 3,835 during the control period to 2,613 when levalbuterol was used (3.5 treatments per patient day and 2.8 treatments per patient day; p < 0.05). The number of PRN (*i.e.,* as needed) treatments declined from 540 during the control period (albuterol) to 375 during the levalbuterol period (0.5 prn treatments and 0.4 prn treatments per patient day respectively; p < 0.05) (Davies 2001).

In a prospective, open label study published as an abstract in Chest 2002, hospitalized patients were treated with either levalbuterol 1.25 mg q8, levalbuterol 0.63 mg q6, or racemic 2.5 mg q4. The number of treatments, overall number of breakthrough treatments, and Respiratory Therapist (RT) cost and FTE resources were measured. Over the course of the study, 54% of patients were converted to levalbuterol. This was accompanied by a 24% reduction in total treatments of levalbuterol compared with albuterol, which was a reduction of 5,176 treatments. When they evaluated rates of breakthrough treatments, it found that the breakthrough rate for albuterol was significantly greater than for both levalbuterol groups (5.29 for albuterol, 2.29 levalbuterol 1.25 mg q8, and 2.43 for levalbuterol 0.63 q 6; p<0.001 for each levalbuterol dose vs albuterol). Because omitted treatments secondary to the RT being unavailable is currently a concerning issue in most hospitals, this was also evaluated. The investigators found that omitted treatments decreased from 1.79% when albuterol was used 100% of the time, to 1.40% after partial conversion to levalbuterol (p<0.001). Lastly, when they performed a pharmacoeconomic analysis, they found that the conversion to levalbuterol led to an annualized savings of 1.40 Respiratory Therapist FTE, or $59,000. <u>Relative to the increased drug utilization costs of $17,000 for levalbuterol at their institution, this led to a total savings of $42,000, when accounting for Respiratory Therapist FTE cost savings alone (Pikarsky 2003).</u>

Truitt et al. undertook a retrospective chart review at Halifax Hospital to determine the impact of levalbuterol on outcomes (Truitt 2003). Hospitalized patients with asthma or COPD (n=231) were administered only albuterol 2.5 mg (during 1998) or levalbuterol 1.25 mg (during 1999). Patients who received levalbuterol required significantly fewer treatments with beta-agonists (19.0 vs. 30.8 for albuterol; p<0.001) and concomitant ipratropium bromide (9.4 vs 23.2 for albuterol; p<0.001) than patients who received albuterol. <u>Thus, the use of levalbuterol led to a statistically significant reduction in the number of total doses of albuterol per day, the number of break through episodes, the number of rescue drug beta-agonist medications, and the need for adjunctive therapy (*e.g.*, ipratropium) (Truitt 2004).</u>

## ii. New COPD Data Shows Clinical Advantages

To confirm these results, a large, randomized, prospective, open-label, multi-centered study was conducted to determine if inpatients with asthma or COPD who received levalbuterol required fewer nebulizations compared with albuterol. This study was completed in 2006 and the data has been submitted to the 2006 Chest Annual Meeting. This study is also not part of the DME PSCs' draft policy record.

Upon admission to the hospital, almost 500 patients were randomly assigned to treatment with levalbuterol 1.25 mg every 8 hours or albuterol, administered as per the standing orders at the institution (typically every 4 or 6 hours). Standing orders were provided to cover breakthrough treatments. Levalbuterol patients required significantly fewer nebulizations compared with albuterol patients (10 vs 12; p=0.031), with no difference in the number of rescue nebulizations (Sepracor data on file, Study 051-921). This supports the use of levalbuterol administered every 8 hours in a hospital setting.

The aforementioned study is consistent with the chronic dosing study in patients with stable asthma, where the patients who received levalbuterol (1.25 mg) had a significant reduction in the use of reduced the need for MDI rescue medication. There was no significant reduction in rescue medication use in the albuterol treated patients. (Nelson 1998).

While a number of outpatient studies have been conducted in patients with asthma to evaluate the effects of chronic dosing with levalbuterol, similar studies in patients with COPD are limited. Notably, COPD is mostly a fixed airways disease, despite the fact that many patients report feeling better on beta-agonists. Therefore, in this patient population, chronic treatment is much more frequent and longer studies are required to determine if changes are apparent in other measures of disease control, such as rescue medication use and COPD exacerbations.

To determine the effect of levalbuterol in the treatment of bronchospasm in patients with chronic, stable COPD, a recent study was commissioned to examine patients with COPD (including chronic bronchitis and/or emphysema). Patients were treated with either levalbuterol 0.63 mg or 1.25 mg, albuterol 2.5 mg, or placebo three time a day for 6 weeks. Over 200 people were included in this randomized, double-blind, multi-center, placebo-controlled study. All active treatments demonstrated improvements in $FEV_1$ over the double-blind period and at each visit compared with placebo (p<0.05). In addition, levalbuterol was associated with greater disease control than placebo and albuterol, as noted by less rescue/supplemental medication use, fewer withdrawals due to COPD exacerbations (Figure 11), and better patient global evaluations (Figure 12). The use of rescue medication was increased in the placebo and albuterol treatment groups, while rescue medication use was relatively unchanged for the levalbuterol 0.63 mg group and was significantly decreased (p=0.02) versus placebo in the levalbuterol 1.25 mg group (Figure 13). Almost half of the patients who received either dose of levalbuterol reported much or moderately better quality of life (levalbuterol 0.63 mg = 48.8%; levalbuterol 1.25 mg = 47.5%), whereas only one quarter of patients who received albuterol reported better quality of life (RAC 2.5 mg = 27.7%). In addition, there were significantly more patients who withdrew due to COPD exacerbation in the albuterol 2.5 mg group compared to the placebo group (p= 0.0103). The levalbuterol 0.63 mg group resulted in the lowest frequency of beta-mediated adverse events of any treatment group. Combination levalbuterol 1.25 mg and ipratropium was the only treatment arm associated with marginally significant improvement in bronchodilation (p=0.07) compared with ipratropium alone. In addition, 6 weeks of treatment with both doses of levalbuterol were safe and well-tolerated in patients with COPD (Donohue 2005, Donohue 2006 in press).

**Figure 11.  Percentage of patients with each group with protocol-defined COPD exacerbations and withdrawals due to COPD exacerbations; *p<0.01 vs placebo**



**Figure 12. Patient Global Evaluations: Percent of patients reporting much or moderately better at week 6**



**Figure 13. Change in rescue medication at the end of the study period**



*p<0.04 vs placebo; **p=0.02 vs Rac; +p<0.05 vs Rac, baseline, and placebo

### iii. Levalbuterol reduces the number of hospital admissions, shortens hospital stays, and, as a result, demonstrates cost savings

Several studies demonstrate that levalbuterol reduces the number of hospital admissions and reduces the length of hospital stays. In the Truitt, et al. study described previously (Truitt 2003), the overall mean LOS for all patients treated with levalbuterol (4.7 $\pm$ 2.9 days) was 16 percent less than for all patients treated with albuterol (5.6 $\pm$ 4.2 days; p=0.058; Figure 14). COPD patients who received levalbuterol had 1 day decrease in the LOS compared with patients treated with albuterol (5.1 days for levalbuterol compared with 6.1 days for albuterol, p=0.07); asthma patients also had a 1.1 day decrease (p=0.1). COPD patients treated with levalbuterol also had a significant decrease in 30-day readmission (5.8% vs. 23.0%, p<0.05). Fewer nebulizations were administered to both COPD and asthma patients treated with levalbuterol (19.0 vs. 30.8 for albuterol; p<0.05).

**Figure 14. Average length of stay in the hospital**



For patients treated with levalbuterol, this resulted in a significantly lower cost of nebulization therapy for both COPD and asthma patients ($65 vs. $116 and $44 vs. $99, respectively; p<0.05), significantly lower total hospital costs for COPD patients ($3043 vs. $3656, p<0.05) and a $659 lower cost for asthma patients ($1986 vs. $2645) (Truitt 2003).

Similarly, a retrospective analysis of hospitalization and discharge rates among patients who presented to the ED of a community hospital for the treatment of asthma was conducted in patients who were at least 1 year in age and had a primary or secondary diagnosis of acute asthma. A total of 736 consecutive cases (608 albuterol and 128 levalbuterol) were reviewed over a 9-month period to evaluate potential differences in hospital admission rates between those patients treated with levalbuterol and those treated with albuterol. The hospitalization rate was significantly lower among patients who received levalbuterol versus those who received albuterol in the ED (4.7% vs. 15%, respectively; p<0.002) (Schreck 2005).

The absolute reduction in hospital admissions was confirmed by a large, prospective, randomized, double blind trial of pediatric patients (age 1-18 years) with acute asthma who presented to the ED. Patients received nebulized treatments of levalbuterol 1.25 mg (n=248 patients) or albuterol 2.5 mg (n=234 patients) every 20 minutes up to a maximum of 6 doses. A standardized, assessment-driven algorithm was used in the treatment of all patients. Patients who were admitted to the hospital continued on blinded therapy. The hospitalization rate was significantly lower for patients treated with levalbuterol (36%) than albuterol (45%; p<0.02; Figure 15). In addition, fewer patients treated with levalbuterol required intensification therapy. Lastly, the authors concluded that the significant reduction in admissions in the levalbuterol group would result in an annualized savings of $180,000, after adjusting for the increase in drug acquisition costs for levalbuterol. (Carl 2003)

**Figure 15. Percent of patients admitted following standardized, blinded treatment with levalbuterol or albuterol**



A three month prospective analysis conducted by Graves *et al.* showed that patients treated for severe respiratory illness in the ED with levalbuterol (n=299) were discharged at a rate of 90% compared to patients treated with albuterol (n=157) who were discharged at a rate of 38%. In addition, patients treated with levalbuterol received fewer total treatments than patients treated with albuterol in both the ED (3 vs. 5) and the hospital (7 vs. 16). The average length of stay was reduced for those treated with levalbuterol (ED 1.8 vs. 2.8 hours and hospital 2.3 vs. 3.2 days.), and hospital admissions were also lower with levalbuterol than albuterol (10% vs. 60) (Graves 2000).

An open-label study evaluated the treatment of patients diagnosed with asthma in the ED. Patients at least 12 years of age received either levalbuterol 1.25 mg (N=24) or albuterol up to 5.0 mg (N=30), with or without ipratropium bromide. The study compared levalbuterol and albuterol for the treatment of acute bronchoconstriction from primary asthma in the ED. Levalbuterol resulted in greater improvements in both $FEV_1$ and PEF compared with albuterol. Levalbuterol lowered the hospital admission rate compared with albuterol (12% vs. 20%, respectively) (Haider 2001).

In a review of the cost effectiveness of levalbuterol compared with albuterol

37

published in the July 2004 Supplement to the American Journal of Managed Care, the author concluded that levalbuterol offers a clinically important advance over albuterol. He further states that the greater improvement noted in pulmonary function observed with levalbuterol in clinical trials and clinical effectiveness studies is paired with an advantage in cost effectiveness, as noted by the reduction in need for hospitalization, one of the most costly components of health care (Table 1). The author notes that a drug's cost effectiveness must include an assessment of the overall costs to the medical facility and, possibly, to the insurer, and that these costs may be more strongly affected by clinical outcomes such as the need for hospitalization than by the drug's acquisition costs (Quinn 2004).

**Table 1. Key Cost Effectiveness Trials of Xopenex versus albuterol**

| Investigators | Conclusions |
|---|---|
| Milgrom 2001 | Levalbuterol was as effective as 4-fold to 8-fold higher doses of albuterol |
| Nowak 2004 | Less need for hospital admissions with levalbuterol than with albuterol |
| Carl 2003 | Fewer hospitalizations and calculated substantial cost savings with levalbuterol versus albuterol |
| Truitt 2003 | Shorter hospital stay, lesser risk of readmission, and lower cost with levalbuterol versus albuterol |

Adapted from Quinn 2004

In addition, a number of acute studies have completed analysis to evaluate the number of patients who would need to be treated with levalbuterol to prevent one hospital admission. These studies indicate that, in order to prevent one admission, between 10 and 20 patients would need to be treated with levalbuterol (Carl 2003, Schreck 2005, Nowak 2006) supporting the use of levalbuterol when one considers total cost of hospital admission. This is consistent with other studies, which have estimated cost savings of $4000 for each asthma admission that is prevented (Schreck 2005) and have reported large overall cost benefits for emergency department (Schreck 2005; Carl 2003) and hospital use of levalbuterol (Truitt 2003).

Based on the 9% reduction in hospital admissions noted in the pediatric emergency department (Carl et al, 2003), the authors concluded that the hospital would save $180,000 at their institution each year. They also stated that this cost savings, secondary to improved outcomes from the use of levalbuterol in these patients, would far

outweigh the increased drug acquisition cost of levalbuterol, which they calculated would be $5000.

Another investigator-initiated study found an absolute reduction of 10% for patients who received levalbuterol compared with those who received albuterol (Schreck et al, 2005). The pharmacoeconomic analysis demonstrated that the relative decrease in hospital admission rate for the patients treated with levalbuterol would translate into a cost savings of $400,000 for the 1000 patient visits to the ED at their institution, which again outweighed the relative increase in drug acquisition costs for levalbuterol.

These cost savings have been noted for in-patients as well. The study by Truitt found that patients treated with levalbuterol had a significantly lower cost of nebulization therapy for both COPD and asthma patients ($65 vs. $116 and $44 vs. $99, respectively; p<0.05), significantly lower total hospital costs for COPD patients ($3043 vs. $3656, p<0.05) and a $659 lower cost for asthma patients ($1986 vs. $2645) (Truitt et al, 2003).

To confirm these findings, a multicentered study (referenced above, Sepracor study 051-921) was commissioned utilizing a randomized, prospective, open-label design in patients hospitalized for acute asthma or COPD. This study evaluated whether treatment of bronchospasm with levalbuterol resulted in significantly fewer nebulizer treatments and/or decreased total cost of care versus treatment with albuterol (Sepracor data on file). Upon admission to the hospital, patients were randomly assigned to treatment with levalbuterol 1.25 mg Q8h (N=241) or albuterol, administered per routine standing hospital orders (usually Q4-6h; N=238). Standing orders with matching beta-agonist were provided for rescue treatments. Patients randomized to receive levalbuterol required significantly fewer total nebulizations (median 10 vs 12; p=0.031) and scheduled nebulizations compared with albuterol (median 9 vs 11; p=0.009). No significant differences in the number of rescue nebulizations, median length of hospital stay, median time to discharge, or total hospital costs ($3,676 for levalbuterol vs $3,841 for albuterol) were noted. The primary pharmacoeconomic analysis using Subject General Well-Being as the measure of efficacy showed use of levalbuterol was $165 less costly with an increase of ~2 units in effectiveness compared with albuterol. Bootstrap re-sampling methodology showed levalbuterol to be cost-effective in approximately 67% of the 10,000 simulations. Compared with albuterol, levalbuterol resulted in administration of significantly fewer total and scheduled nebulizations without an increase in rescue nebulizations, supporting its use every 8 hours. Levalbuterol 1.25mg Q8h in hospitalized patients with asthma or COPD reduced total and scheduled nebulizer treatments without increasing the cost of therapy and may be cost effective when compared with use of albuterol. An abstract summarizing this study has been submitted to the 2006 Chest Annual meeting for consideration.

Thus, despite the opinions of some (Asmus 2002; Ahrens 2001; Weinberger 2004), a number of studies have demonstrated that the improvements in clinical outcomes that lead to pharmacoeconomic improvements and overall cost savings exceeded the relatively greater drug acquisition cost for levalbuterol.

iv. Levalbuterol offers efficacy comparable to that of albuterol at lower doses, thus offering physicians dosing flexibility and the potential for fewer side effects

In the adult study conducted by Nelson et al, levalbuterol 0.63 mg provided comparable efficacy to that of albuterol 2.5 mg (Nelson 1998). Since the beta-mediated side-effects that are common with albuterol are due to the (R)-isomer, the levalbuterol group, at half the dose of (R)-albuterol, produced fewer side effects.

A more recent out-patient study demonstrated the efficacy and safety of lower doses of levalbuterol (Milgrom 2001). The study was a large multicenter, double blind, randomized, placebo-controlled clinical trial involving 338 asthmatic children aged 4 to 11 years ($FEV_1$ 40-85% predicted) who received 21 days of three times per day (TID) therapy of either nebulized levalbuterol (0.31 or 0.63 mg), albuterol (1.25 or 2.5 mg), or placebo. The results indicated that, while all active treatments significantly improved $FEV_1$ (peak percent change) compared with placebo ($p<0.001$) after the first dose and after 21 days of dosing, levalbuterol 0.31 mg had the fastest onset of response and time to peak response ($p<0.05$ vs. albuterol 2.5 mg) after the first dose. There were also more responders in the levalbuterol groups compared with the albuterol groups. Although this study was conducted in pediatric patients, the data are applicable to the Medicare population because the pathophysiology and treatments of chronic respiratory disease in these populations is the same. The results of the Milgrom study are summarized in Figure 16 below.

**Figure 16.    Mean change in FEV$_1$ after the first dose in pediatric patients**



Levalbuterol 0.31 mg had the fewest side effects of all of the other active treatments. Only levalbuterol 0.31 mg was not different from placebo for changes in ventricular heart rate, QTc interval, and glucose (p>0.05). All active treatments decreased serum potassium (range –0.3 to –0.6; p < 0.002 vs. placebo), with albuterol 2.5 mg producing the largest change (p < 0.005 vs. other actives).

Side effects of medications are always an important issue to patients as well as their caregivers (White 1999). Several studies have demonstrated that the use of the 0.63 mg dose of levalbuterol resulted in reduced beta-mediated side effects. Portnoy *et al.* (Portnoy 2001) reported that beta-mediated side effects, including racing heart, nervousness, jitters, difficulty concentrating and tremors, were lower following treatment with 0.63 mg of levalbuterol than with albuterol 2.5 mg. Patients with stable asthma (n=331 enrolled, 276 complete; mean age=28.3 yrs) were switched from 2.5 mg albuterol to levalbuterol 0.63 mg via nebulization up to three times a day for 6-12 weeks in this open-label study. At baseline, 99% of patients were concerned about side effects from asthma treatment with albuterol. Patients reported a significant reduction in side effects after switching to levalbuterol 0.63 mg (Figure 17), suggesting that a reduction in beta-mediated side effects can be achieved using 0.63 mg dose of levalbuterol without

compromising efficacy (Portnoy 2001).

**Figure 17. Patient reports of beta-mediated side effects associated with treatment of albuterol or levalbuterol**



An open-label, 12 week, multi-center assessment of the efficacy and side effects of nebulized levalbuterol (0.63 mg or 1.25 mg) compared to albuterol therapy in patients (n = 363 asthmatics, 276 with COPD) with reversible bronchospasm was recently presented (Ohar 2002). Eighty percent of asthma patients were categorized as moderate or severe and 67% of COPD patients had peak expiratory flow rate (PEFR) <50% predicted. The percentage of patients experiencing wheezing decreased from 78% while on albuterol to 55% while on levalbuterol; shortness of breath from 90% to 71%; and nocturnal awakenings from 58% to 38%. Overall, 44% of patients and 53% of physicians described disease improvement following levalbuterol. The percentage of patients using albuterol metered dose inhaler (MDI) decreased from 74% on albuterol to 60% on levalbuterol (p<0.0001) and those using concomitant nebulized Atrovent decreased from 36% on albuterol to 26% on levalbuterol. For patients treated with levalbuterol 0.63 and 1.25 mg, reductions were noted in beta-mediated side effects included palpitations (51% decrease), nervousness and agitation (56% decrease), shaky hands (54% decrease), poor concentration (38% decrease), and difficulty sleeping (43% decrease). These data suggest that regular treatment with both doses of levalbuterol improved asthma and COPD symptoms. This was accompanied by a decrease in beta-mediated side effects and a decrease in concomitant bronchodilators. Sixty-two percent of physicians believed that patients' side effects had improved with levalbuterol, 71% preferred levalbuterol over to albuterol, and 69% stated they would continue to prescribe levalbuterol.

b.  Differential Pre-Clinical Effects of Levalbuterol and (S)-albuterol

Levalbuterol is a $\beta_2$-agonist drug that relaxes the smooth muscles of all airways, from the trachea to the terminal bronchioles, regardless of the bronchoconstrictor challenge.  Levalbuterol has an approximately 2-fold greater binding affinity than albuterol for the beta$_2$-adrenergic receptor and approximately 100-fold greater binding affinity than (S)-albuterol (Penn 1996; Canning 2002).  Levalbuterol activates the beta$_2$-adrenergic receptors on airway smooth muscle, which activates adenylcyclase, increasing intracellular concentration of cyclic-3', 5'-adenosine monophosphate (cyclic-AMP).  The increase in cyclic-AMP activates protein kinase A, which inhibits the phosphorylation of myosin and lowers intracellular ionic calcium concentrations, resulting in relaxation of smooth muscles of all airways, from the trachea to the terminal bronchioles irrespective of the spasmogen involved.  Increased cyclic-AMP concentrations are also associated with the inhibition of release mediators from mast cells in the airway, which may reduce bronchospasm, reactivity to spasmogens, release of secondary inflammatory cytokines, cellular infiltration and mucosal edema.

(S)-albuterol has been shown to impart adverse physiologic effects and to oppose the beneficial action of levalbuterol (Table 2).  *In vitro*, (S)-albuterol promoted intracellular $Ca^{++}$ influx of airway smooth muscle cells in a cholinergic-dependent and beta$_2$-adrenergic-independent manner, and it augmented cholinergic activation of airway smooth muscle (Mitra 1998).  (S)-albuterol facilitated acetylcholine release when pre-junctional muscarinic $M_2$ receptors were blocked, but was unable to relax contracted airway smooth muscle.  This suggested that, in the absence of induction of smooth muscle relaxation by levalbuterol, (S)-albuterol has the potential to induce bronchoconstriction in asthmatics (Zhang 1998).  (S)-Albuterol increased total lung resistance *in vivo* following exposure to bradykinin and thus may mediate the development of airway hyperresponsiveness to certain spasmogens that is often observed in patients who use albuterol on a chronic basis (Keir 1999a).  *In vivo*, albuterol and (S)-albuterol increased airway hyperresponsiveness to certain spasmogens, suggesting that the effect of albuterol on airway hyperresponsiveness may not be solely related to beta-adrenergic receptor activation (Keir 1999b).

**Table 2.    Comparison of (S)-albuterol vs Xopenex**

| (S)-albuterol | Levalbuterol |
|---|---|
| Binds with low affinity to the beta2-receptor | Selective and high affinity binding to the beta2-receptor |
| Increases airway smooth muscle intracellular calcium and proliferation | Decreases airway smooth muscle intracellular calcium and proliferation |
| Increases IL-2, IL-4, IL-8, IL-13, MCP-1, RANTES, gmCSF, VEGF, cysLT1R, eotaxin, mucin secretion and activates NFkB | Decreases or no change for IL-2, IL-4, IL-8, IL-13, MCP-1, RANTES, gmCSF, VEGF, cysLT1R and eotaxin |
| Increases airway tissue response to spasmogens | Decreases airway tissue response to spasmogens |
| Increases eosinophil activation; superoxide formation | Decreases eosinophil activation; superoxide formation |
| Increases eosinophils influx and IL-13 in BAL fluid | No increases in inflammatory markers in BAL fluid |
| Difficult to metabolize, unnatural molecule | Easy to metabolize, more natural (R)-epinephrine analogue |
| Decreases steroid effects on gmCSF secretion and NFkB activation | Increases steroid inhibition of cytokine release |
| High pulmonary tissue levels with regular dosing | No evidence of accumulation |

Airway inflammation is another important feature of asthma, and the inappropriate and consistent activation of T lymphocytes is known to produce the inflammatory component of asthma. (S)-Albuterol promoted the synthesis and/or release of numerous proinflammatory mediators from eosinophils, mast cells, T-lymphocytes, airway smooth muscle cells and airway epithelial cells, including histamine, IL-2, IL-4, IL-8, IL-13, gmCSF, eotaxin, RANTES, VEGF, mucin and cysLT1R (Volchek 2005, Cho 2001, Baramki 2002, Frieri 2000). Baramki et al. found that levalbuterol inhibited human antigen-specific (i.e., tetanus) T lymphocyte proliferation. In addition, levalbuterol also inhibited the inflammatory cytokines produced by these T cells (i.e., IL-2, IL-13, IL-5, and INFγ). The investigators also found that albuterol significantly stimulated the production of the inflammatory cytokine, IL-2. In the presence of concentrations of (S)-albuterol that exceeded those of levalbuterol, the inhibition of T cell proliferation was abrogated, and the cytokines produced by these T cells were increased (Baramki 2002). This finding may be particularly relevant clinically, because when

44

albuterol is metabolized, (S)-albuterol is metabolized 10-fold more slowly than levalbuterol and has been found to achieve concentrations that are 2-4 fold higher than levalbuterol in the blood and lung tissue (Giri 2002, Dhand 1999). Amplification of the $T_h2$ response can lead to enhanced airway hyperresponsiveness and airway remodeling, a phenomenon present even in mild asthmatics.

While (R)-albuterol and albuterol were equally effective in inhibiting eosinophil peroxidase secretion from eosinophils, (S)-albuterol had no augmenting effect (Leff 1997). When eosinophils were exposed to (R)-albuterol or albuterol, a reduction in the amount of superoxide release after stimulation with interleukin (IL)-5 was noted. However, eosinophil exposure to (S)-albuterol significantly enhanced superoxide production. When human granulocytes were treated with (R)- albuterol, granulocyte-induced cytotoxicity was inhibited (Volcheck 2005). In contrast, (S)- albuterol induced granulocyte chemotaxis and did not reduce cytotoxicity (Frieri 2001). Exposure to (S)-albuterol for 6 or 24 hours increased the release of histamine and IL-4 from murine mast cells compared with (R)-albuterol and controls (Cho 2001). Human lung mast cells exposed to (R)- albuterol inhibits IgE-mediated IL-8 expression. In contrast, overnight exposure to (S)- albuterol resulted in a loss of the (R)-albuterol-mediated inhibition of IL-8 (Schulman 2006). In an asthma murine model, eosinophils, mast cells and lymphocytes were recruited to the lung in increased numbers when the animals were exposed to (S)-albuterol but not with (R)- albuterol, and the bronchial alveolar fluid from these animals also contained elevated levels of IL-4 and IL-13 (Cho 2001; Finn 2006). Mast cells, eosinophils and granulocytes are important inflammatory cells involved in airway inflammation. Recruitment and activation of these cells, as seen with (S)- albuterol treatment, could contribute to airway tissue damage.

Several resident airway cells contribute to airway pathophysiology in asthma and COPD including airway epithelial cells, airway smooth muscle cells and myofibroblasts. Inhaled medications like albuterol are known to have direct effects on these airway tissues, e.g. bronchodilation through smooth muscle cell relaxation. Airway epithelial cells secreted increased levels of mucin when treated with (S)- albuterol while (R)-albuterol did not stimulate mucin secretion (Chang 2001). The pattern of gene expression in epithelial cells is quite different for the isomers of albuterol indicating different pathways being stimulated. When cultured with antigen, (S)-albuterol increased IL-8 secretion in small-airway epithelial cells, in contrast to (R)-albuterol, which suppressed IL-8 production (Frieri 2006). In an animal model of acute lung injury, alveolar fluid clearance (AFC) is important to the repair process in the lung and AFC is known to be stimulated by beta agonists like (R)- albuterol. However, when animals were exposed to (S)- albuterol, AFC was significantly reduced (Harris 2006). This inhibition of lung repair could lead to worsening airway disease. Pretreatment with (R)-albuterol in an isolated human bronchus model protected against histamine-induced contractions, but (S)-albuterol enhanced the contractile response to histamine. The authors concluded that because (R)-albuterol relaxes human isolated bronchus, the capacity of (S)-albuterol to enhance contractile responses to histamine or LTC4 cannot be attributed to activation of beta2 receptors (Templeton 1998). Taken together, the results suggest that (S)-albuterol may have proinflammatory effects on airway tissues and cells in vivo, while providing no

therapeutic benefit.

Agrawal et al (Agrawal 2004) examined the effect of the isomers of albuterol on intracellular transmembrane signaling pathways involved in the activation of the $\beta_2$-adrenergic receptor. These researchers demonstrated that in human bronchial smooth muscle cells incubated in either levalbuterol, (S)-albuterol, or albuterol ((S)/(R) albuterol) for 8 hours, only (S)-albuterol and albuterol up-regulated expression and activation of the $G_{\alpha I-1}$ subunit of the G-protein coupled $\beta_2$-adrenergic receptor. This particular subunit of the G-protein contributes to the constrictive response of bronchial smooth muscle. Only (S)-albuterol and albuterol also down-regulated expression of the $G_{s\alpha}$ subunit of this receptor. The $G_{s\alpha}$ subunit contributes to relaxation of bronchial smooth muscle. The relaxation of bronchial smooth muscle during an acute bronchospasm attack is a goal of pharmacologic therapy. These data suggest that (S)-albuterol is capable of desensitizing the intracellular pathway involved with bronchodilation and of hyper-sensitizing the pathway for bronchoconstriction. Findings of increased intracellular $Ca^{2+}$ in the presence of (S)-albuterol also support this hypothesis (increased intracellular calcium is necessary for muscle constriction, which leads to bronchoconstriction). Finally, only (S)-albuterol and albuterol increased activity of phosphatidylinositol 3'-OH-kinase (PI3 kinase) and transcriptional nuclear factor (NF)-κB in human bronchial smooth muscle cells. NF-κB is a critical intracellular mediator of the inflammatory cascade and has been implicated in the pathogenesis of lung disease including asthma, ARDS, respiratory viral infections, and cystic fibrosis. The pathogenesis of asthma appears to involve a broad range of inflammatory proteins that are regulated by NF-κB, including cytokines, enzymes, and adhesion molecules (Christman 2000). PI3 kinase has also been implicated in several inflammatory pathways (Finan 2004).

Ibe and Raj (Ibe 2006) also examined the effects of albuterol components on airway smooth muscle and corroborated these findings. They found that (S)-albuterol appeared to stimulate cell growth by activating PI3 kinase and inhibiting the cAMP-Protein kinase A pathway. Smooth muscle cell growth is a contributing factor to airway remodeling observed in patients with asthma. They concluded that, *in vivo*, human airway smooth muscle proliferation, induced by growth factors and cytokines in their experiments, was inhibited by levalbuterol, and that this effect was opposed by (S)-albuterol (Ibe 2006).

Ameredes et al (Ameredes 2006) stimulated human airway smooth muscle cells with cytomix (a mixture of inflammatory cytokines) and lipopolysaccharide (an inflammatory component of bacterial cell walls) and found an increase in production of GM-CSF (an inflammatory cell growth factor). Dexamethasone reduced GM-CSF production by 25%-30%; addition of levalbuterol further reduced GM-CSF by 12%. In contrast, (S)-albuterol increased GM-CSF 16% over the reduction produced by dexamethasone. These data demonstrate that the sole component of levalbuterol, the (R)-albuterol isomer, may have additive anti-inflammatory effects when administered with glucocorticoids and that (S)-albuterol, found only in albuterol, can reverse this effect (Ameredes 2006). Corticosteroids are thought to act by inhibiting NF-κB activation (Christman 2000). The finding that only albuterol and (S)-albuterol increase activity of

NF-κB may explain why (S)-albuterol negated the anti-inflammatory effect of dexamethasone observed.

In is important to note that, in the levalbuterol Summary Basis of Approval, the FDA Medical Reviewer stated "(S)-albuterol not only fails to relax airway smooth muscle but under certain circumstances may augment bronchoconstriction; ...increased intracellular calcium in airway smooth muscle and bronchial hyperresponsiveness; ...activates phospholipase C and induces calcium influx into airway smooth muscle, changes that could lead to bronchial hyperresponsiveness" (CDER 1999).

## C. Summary of Clinical and Pre-Clinical Research

Levalbuterol is a unique chemical moiety.  At a molecular level, the differences between levalbuterol and albuterol are visually distinct.  Its chemical structure results in distinct pharmacodynamic actions, which makes levalbuterol a chemical entity unlike any other bronchodilators available. Albuterol contains a unique structural component known as (S)-albuterol.  Pre-clinical evidence indicates that (S)-albuterol may not be inert and is clinically active and has pharmacologic properties that differ from (R)-albuterol, a structural component that is common to both products.  The research summarized here indicates that (S)-albuterol may have deleterious pharmacologic effects that are not desired in patients with bronchoconstrictive diseases, further supporting the uniqueness of both molecules therapeutic distinction between the two products.

The pre-clinical and clinical data presented supports the clinical differential effects (and, by inference, the lack of therapeutic or pharmacologic equivalence) between Xopenex and albuterol.  These data suggest that the (S)-albuterol component of albuterol interferes with the therapeutic effect of (R)-albuterol, has pro-inflammatory and pro-constrictive effects, and may also have a detrimental effect on the anti-inflammatory impact of other concomitant medications taken to treat acute bronchospasm.

These differences in pharmacology may explain the differences in response seen in clinical studies comparing levalbuterol with albuterol.  At equivalent doses of the (R)-isomer, levalbuterol provides more rapid and greater improvement in $FEV_1$ compared with albuterol.

With lower doses of levalbuterol, side effects are fewer compared with a standard dose of albuterol or a 1.25 mg dose of levalbuterol.  Fewer side effects and more rapid and greater $FEV_1$ improvement may provide greater satisfaction with treatment, enhanced compliance with therapy and, therefore, improved patient outcomes.  The weight of these studies supports the position that Xopenex is clinically differentiated from albuterol and possesses clinical advantages that can be documented in reputable trials.

## IV. Conclusion

For all of the reasons stated above, we urge the DME PSCs to withdraw the LCA and to work with CMS to develop a compromise solution that provides significant

savings to the Medicare Program while preserving access to Xopenex for Medicare beneficiaries.

Instituting an LCA is inappropriate clinically under these circumstances, violative of Medicare law and a major intrusion into physicians' ability to practice medicine. It is simply unreasonable to take steps to eliminate access to this important product used by many tens of thousands of Medicare beneficiaries.

We appreciate the need for the government to control excessive Medicare costs. However, this can be accomplished without effectively eliminating access to Xopenex for Part B patients. Therefore, we ask you to remain open to solutions that recognize the importance of Xopenex to Medicare beneficiaries with COPD and asthma. Furthermore, we ask that you closely review all of the attached clinical studies and focus on the manuscripts and abstracts, as well as the new evidence not included in your previous literature review, in order to articulate a fair and appropriate final local coverage determination policy.

We remain interested in meeting with you anytime to discuss any of the clinical, legal or policy issues raised in this letter. A costly fight is not in the interest of Medicare beneficiaries, physicians and taxpayers especially when a reasonable alternative is available that will permanently resolve this matter.

Sincerely,

Mark J. Wanda
Vice President, Legal Affairs

James M. Roach, M.D.,
Senior Vice President, Medical Affairs

cc:    Michael O. Leavitt, Secretary, Department of Health and Human Services
Mark B. McClellan, M.D., Ph.D., Administrator, Centers for Medicare and Medicaid Services
Senator Edward Kennedy
Senator Michael Crapo
Senator Blanche Lambert Lincoln
Congressman Cliff Stearns
Congressman John Lewis
Patrick Morrisey, Sidley Austin LLP
Dan Troy, Sidley Austin LLP

# ATTACHMENT B
# TO SEPRACOR COMMENTS

## HCPCS NATIONAL PANEL

**Business Address:**                                    **Cooperating Parties:**

Centers for Medicare & Medicaid Services        Centers for Medicare and Medicaid Services
C5-08-27                                Blue Cross/Blue Shield Association
7500 Security Boulevard                              and
Baltimore, MD  21244-1850                America's Health Insurance Plans

**0 1 NOV 2004**

Mark J. Wanda
Sepracor Inc.
84 Waterford Drive
Marlborough, MA  01752

Re:  Request # 04.58
Request to establish a code for levalbuterol HCl Inhalation Solution, trade name: Xopenex®
Inhalation Solution.

Dear Mr. Wanda:

On behalf of the Healthcare Common Procedure Coding System (HCPCS) National Panel, I
would like to thank you for your application to modify the HCPCS Level II code set.  The
HCPCS Level II code set is available for use by all payers, and maintained by the HCPCS
National Panel, a tripartite, non-government entity comprised of members representing the
private insurance industry and Medicare and Medicaid.  The HCPCS National Panel reserves
final decision-making authority for approving modifications to the HCPCS Level II code set.

The HCPCS National Panel has reviewed this product category and made a consensus decision to
make the following modifications to the HCPCS Level II standard, national code set:

**Discontinue** codes J7618, J7619 and J7621.

**Establish** code J7611  Albuterol, inhalation solution, administered through DME, concentrated
form, 1mg.

**Establish** code J7612  Levalbuterol, inhalation solution, administered through DME,
concentrated form, 0.5mg

**Establish** code J7613  Albuterol, inhalation solution, administered through DME, unit dose, 1mg

**Establish** code J7614  Levalbuterol, inhalation solution, administered through DME, unit dose,
0.5 mg

**Establish** code J7616  Albuterol, up to 5 mg and ipratropium bromide, up to 1 mg. compounded inhalation solution, administered through DME

**Establish** code J7617  Levalbuterol, up to 2.5 mg and ipratropium bromide, up to 1 mg, compounded inhalation solution, administered through DME

All changes to the code set are effective January 1, 2005, unless an earlier effective date is specified in the 2005 Annual HCPCS Update. The entire 2005 HCPCS Annual Update is available and can be downloaded free of charge at: www.cms.hhs.gov/medicare/hcpcs/default.asp. The code set is searchable using the edit function and key words or code numbers.

The HCPCS Level II codes describe categories of like items. The code set is not intended to be an exhaustive listing of all products on the market. As a general rule, the National Panel does not classify individual products under code categories on behalf of insurers. Individual insurance contractors have the necessary flexibility to classify specific products into HCPCS Level II code categories and establish their own coding instructions in accordance with their policies and program operating needs. Questions regarding classification of products into HCPCS Level II code categories should be submitted to the contractor in whose jurisdiction a claim would be filed. For private sector health insurance systems, please contact the individual private insurance contractor. For Medicaid systems, please contact the Medicaid Agency in the state in which the claim is being filed. For confirmation of appropriate coding for Medicare, you may contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) toll free at 877-735-1326.

Sincerely,

Cynthia Hake
Chairperson
HCPCS National Panel

04decisionltr1.doc

# EXHIBIT G

**HCPCS LEVEL II CODE MODIFICATION REQUEST PROCESS**
**RE: The 2010 HCPCS Update**

The Healthcare Common Procedure Coding System (HCPCS) Level II contains alpha-numeric codes used to identify items (and sometimes, services) that are  not included in the HCPCS Level I (American Medical Association's CPT) code set.

As a preliminary step in the process for recommending a modification to the HCPCS Level II coding system, it may be helpful for you to contact 3rd party payers for Medicare, Medicaid and private insurers to determine if, in their determination, existing HCPCS codes identify the item.

You may submit a recommendation to establish, revise or discontinue a code, using the attached, standard format. Please prepare a cover letter outlining your code request and a brief summary of why the code modification is needed. In addition to providing the information according to the format, please include descriptive material, which you think would be helpful in furthering our understanding of the medical benefits of the item for which a coding modification is being recommended. Submit the original request with supporting documentation and, to expedite distribution and review, please also include 35 complete copies of your recommendation information packet. At this time, we are not able to accommodate electronic requests, and all originals requests and copies must be submitted on paper.

In order to ensure timely review of your materials, it is necessary to limit your recommendations to no more than 40 pages.  **PLEASE INCLUDE BOTH QUESTIONS AND ANSWERS ON YOUR APPLICATION** Applications exceeding 40 page will not be accepted and must be trimmed to no more than 40 pages and resubmitted by the applicant by the application deadline.  Applicants making a claim of significant therapeutic distinction to distinguish a product from an existing code category may find a need to exceed the 40-page limit in order to submit relevant substantiating clinical information.  In these cases only, the applicant may provide one reference copy of each article in addition to 35 copies of the application.  Each side of a page, including brochures, booklets and any other inclusions, counts as page in calculating the 40 page limit.  The completed, signed and dated format, FDA (approval letter or explanation of exemption), supporting documentation, product brochures and/or booklets should be bundled securely to ensure that all the information submitted is distributed intact to all reviewers.  Please note that FDA approval for drug coding applications may be submitted after the initial application but no later than March 31st.  Please **do not use** bulky materials, such as 3-ring binders, to fasten recommendation materials, as this may result in difficulties distributing materials to reviewers.  To ensure that applications are not overlooked, separate applications should be  submitted in different packages.

We do not require or ask for samples.  However, many applicants ask if they can send product samples, video tapes or compact discs as a supplement to their application.  If it is practical and feasible for an applicant to submit a sample with their application, they may voluntarily do so, however, it becomes the property of CMS to keep or dispose of as the

agency sees fit.  If the applicant chooses to send samples, video tapes, or compact discs, please send no more than 3.

When the recommendation is received, it is distributed to all reviewers. The items are placed on HCPCS Meeting Agendas and reviewed at regularly scheduled meetings by a panel whose membership includes representatives of Medicaid, Medicare, and Private Insurers.

All external requests, (e.g. requests not generated internally) that are completed by the applicable deadline will be placed on a Public Meeting Agenda.  The HCPCS Public Meetings provide an open forum for interested parties to make oral presentations or to submit written comments in response to published preliminary coding decisions.  A Federal Register notice will be published to announce dates, times and the location of the public meetings.  We will also post on CMS' official HCPCS website at www.cms.hhs.gov/medicare/hcpcs the dates, times, agendas, preliminary coding recommendations, registration information and guidelines for participation in HCPCS Public Meetings.  Although the Public Meetings are not decision-making meetings, they provide an opportunity for applicants and the general public to react to preliminary coding decisions and share additional information with decision makers, prior to final decisions.

All applicants will be notified, in writing, of the final decision on their application by mid-November 2009, and all modifications to the HCPCS codes set will be incorporated into the 2010 HCPCS Level II Annual update.  The Update will be published on the official HCPCS worldwide website@www.cms.hhs.gov/medicare/hcpcs by mid November, 2009.

To be considered for inclusion in the year 2010 HCPCS update, completed recommendation packets must be received no later than close of business (COB) Monday, January 5, 2009. The HCPCS coding review process is an ongoing, continuous process. Requests may be submitted at anytime throughout the year 2008, and up to January 5, 2009. Early submissions are strongly encouraged. Requests that are complete are reviewed and processed on a first come, first served basis.  At CMS' discretion, incomplete recommendations may be returned or held until required information, as notified, is provided and the request is completed. Only complete code requests are entered into the review cycle. Applications for products/services that are not yet available on the U.S. market will be considered incomplete.  **Recommendations received or completed on or after COB January 6, 2009 and those requiring additional review will be considered for inclusion in a later HCPCS update.  Applications exceeding the 40-page limit are not acceptable with the single exception as noted on page 1 of these instructions and in question 7c of this application.**

For additional information regarding the HCPCS coding process or the application process, you may: 1) review documents on website at www.cms.hhs.gov/medhcpcsgeninfo ; 2) submit an inquiry to HCPCS@cms.hhs.gov; or 3) contact CMS HCPCS staff Felicia Eggleston, at (410) 786-9287; Jennifer Carver at (410) 786-6610; or Gloria Knight at (410) 784-4598.

Healthcare Common Procedure Coding System (HCPCS)

Alpha-Numeric Coding Recommendation Format for the 2010 Update

Instructions:

1. Please **sign and date** each recommendation. Be certain to provide the name, complete address and direct telephone number of the person to be contacted regarding this recommendation. We use this information to contact applicants regarding upcoming meetings, questions regarding applications, and to make notifications of the status of applications.

2. Please provide documentation of the item's current classification by the Food and Drug Administration (FDA). Include a copy of the cover page from the initial FDA application and **a copy of the FDA's determination, notification/approval letter.** If the item identified in this recommendation is a drug or biological, identify the drug category, active ingredient and generic name of the drug or biological. If the item identified in this recommendation is a health care device or product, identify the specific device(s)/product(s) that have been determined by the FDA to be substantially equivalent. If this item is not classified by the FDA, please explain the basis for exemption. If the drug/biological/product/service has been subject to an assessment by any other agency or recognized medical body, provide a copy of the results of that assessment. Note: Documentation of FDA approval of a drug or biological may be submitted after the coding application but no later than March 31[st,] provided all other requested information is complete and submitted by the deadline.

3. Please note: **All requested information must be supplied before your recommendation for modifications to the HCPCS coding system can be considered.** The following questions may be transferred to a word processor/computer to allow space to respond fully and completely. All questions must be answered. "N/A" is not an acceptable response. If the question does not appear to apply, provide a detailed explanation as to why it doesn't apply. Applications for products/services that are not yet available on the U.S. market will be considered incomplete. Incomplete submittals will not be accepted.

4. Submit Coding Recommendations to:

Felicia Eggleston, CMS HCPCS Workgroup Coordinator
Centers for Medicare and Medicaid Services
C5-08-27
7500 Security Blvd
Baltimore, Maryland 21244-1850

## Alpha-Numeric HCPCS Coding Recommendation Format

<u>INFORMATION SUPPORTING CODING MODIFICATION RECOMMENDATION</u>

1. For the purpose of publication on our request list and public meeting agenda on the HCPCS website, please provide a brief summary of your request (not to exceed **300 words**). In this summary, please specify your request to modify the HCPCS code set: (e.g. number of new codes requested, recommended language; revise a code (provide old language and recommended language), discontinue a code). Include the name of the product, description, function, and the reason why existing codes do not adequately describe your product. For drugs, include the indications for use, action, dosage and route of administration, and how supplied. Text that exceeds the 300-word limit may be truncated and not appear on our published summary, therefore, it is important to provide a concise summary within the 300-word limit. CMS may edit your summary prior to publication.

2. Identify the Item (product or drug/biological) for which a Level II HCPCS Code is being requested.

A) Trade or Brand Name:
B) General Product Name or Generic Drug Name (active ingredient):
C) FDA classification:
<u>D) Drug or Biological Y/N</u>

3. Please check one HCPCS category from the following list, which most accurately describes the item identified in question #1:

__ A) Medical/Surgical Supplies
__ B) Dialysis Supplies and Equipment
__ C) Ostomy/Urological Supplies
__ D) Surgical Dressing
__ E) Prosthetic
__ F) Orthotic
__ G) Enteral/Parenteral Nutrition
__ H) Durable Medical Equipment
__ I) Blood/Blood Products
__ J) Drug/Biological
__ K) Radiopharmaceutical
__ L) Vision
__ M) Hearing
__ N) Other (please indicate/provide category)_____

4. Is the item durable, if so, explain how it can withstand repeated use?

5. Describe the item fully in general terminology. What is it? What does it do? How is it used? Describe the patient population for whom the product is clinically indicated. Descriptive booklets, brochures, package inserts, as well as copies of published peer-reviewed articles on the item may be included in the information packet submitted for review, but they do not replace the requirement to fully respond to this question and fully describe the item.

For drugs and biologicals, include: A) indications for use, B) action, C) dosage and route of administration, D) package insert and, E) how supplied.

6. Describe how the item/product is primarily and customarily used to serve a medical purpose.

7A) Identify similar products and their manufacturers.
(If a drug - list other drugs by trade name marketed under the same active ingredient category/generic name.)

7B) Identify significant differences between this item and other products listed above. (Include differences in item cost; material; product design; how it is used; different mechanism of operation, differences in function/treatment provided to a patient; clinical indication; and clinical outcome.)

7C) Complete item 7C only if you are making a claim of significant therapeutic distinction). Claims of significant therapeutic distinction when compared to the use of other, similar items, must be described in detail.  Articulate the clinical theory behind the claim, including differences in the product or its operation as it compares to currently coded products.  Specify how the product results in a significantly improved medical outcome or significantly superior clinical outcome.  (Please refer to the HCPCS decision tree for additional information.)  Provide the best available information related to your claim.  Include copies of all articles that result from your systematic analysis of the available literature.  Information submitted should be as complete as possible. Unfavorable articles should be provided with any appropriate rebuttal or explanation.   If the articles submitted cause you to exceed the overall 40-page limit, then submit one reference copy of each article and 35 copies of the application.

8. Answer each of the questions A), B), and C) below:
A) List any 3rd party payers that pay for this product
B)  List any codes that are currently being billed to those payers for this product.
C) Explain why existing code categories are inadequate to describe the item.

9. A) Is this product prescribed by a health care professional?
   B) If yes - who prescribes the product and in what setting(s) is the product prescribed?

10. A) Is the item useful in the absence of an illness or injury?
    B) Explain:

11. Provide the date that the item/product was approved for marketing by the FDA. Attach copy of the FDA approval letter including the 510K summary for those items that are approved using the 510K process.  If the product is exempt from FDA review and classification, please explain the basis for the exemption. Note: For drugs and biologicals only: FDA approval documentation may be submitted after the code application, but no later than March 31, 2010, provided all other application materials are complete and submitted by the deadline, and provided the application for marketing approval has been submitted to the FDA by March 31, 2009.  Applicants awaiting FDA approval for drugs or biologicals at the January 3rd submission deadline must submit with the application documentation evidencing submission for FDA approval, along with the date the application was submitted to the FDA.  For all non-drug and biological items, the applicant must submit 3 months of marketing experience following the FDA approval date.

12. When was the item/product marketed in the United States?
**Note** Marketing data is not required for drugs and biologicals, however; the date of first sale is required.  Prior to submitting this coding recommendation, what is the total number of units sold in the U.S. and the total dollar amount in sales (Medicare, Medicaid and private insurance)?  Do not estimate or provide projections - the information provided must represent actual volume of sales for the product for the period of time indicated.

13. Identify the percent of use of the item across the following settings for all non-drugs/biologicals.

Physician's Office: _____
Freestanding Ambulatory Care Clinics: _____
Patient's Home by patient: _____
Patient's Home by Health Care Provider: _____
Nursing Home/Skilled Nursing Facility: _____
Hospital Inpatient Facilities: _____
Hospital Outpatient Facility: _____
Other- (identify): _____
TOTAL VOLUME OF USE ACROSS ALL SETTINGS SHOULD EQUAL 100%

14. What is the Manufacturer's Suggested Retail Price (MSRP) or list price of the item? This question must be answered for all items, except drugs/biologicals.

**HCPCS Coding Recommendation submitted by**:

\* Please provide a **complete** mailing address and **direct dial** phone number. We use this information to contact applicants regarding upcoming meetings, questions regarding applications, and to make notifications of the status of applications.

Name:
Name of Corporation/Organization:
Mailing Address (street):
City, State, Zip
Telephone Number and extension:
FAX Number:
E-Mail Address:

I attest that the information provided in this HCPCS coding recommendation is accurate and correct to the best of my knowledge.

_____Date:_____
        Signature of Applicant

Is applicant the manufacturer? Y/N  If not, the manufacturer must sign the following attestation:

I attest that the information describing the product is accurate.

_____Date:_____
        Signature of Manufacturer

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.  The valid OMB control number for this information collection is **0938-1042**.  The time required to complete this information collection is estimated to average 11 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.  If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.

# EXHIBIT H

Page 1 of 22
March 24, 2006
DRAFT LCD

## LCD for Nebulizers - Draft (DL11499)



**Please note:** **This is a Draft policy.**
Draft LCDs are works in progress that are available on the Medicare Coverage
Database site for public review. Draft LCDs are not necessarily a reflection of the
current policies or practices of the contractor.

| Contractor Information |
|---|



**Contractor Name**

TriCenturion

**Contractor Number**

77011

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

AdminaStar Federal, Inc., Tricenturion

| LCD Information |
|---|



Page 2 of 22
March 24, 2006
DRAFT LCD



**LCD ID Number**

DL11499

**LCD Title**

Nebulizers - Draft

**Contractor's Determination Number**

NEB20060324

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2005 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1

**Primary Geographic Jurisdiction**

Connecticut
District of Columbia
Delaware
Illinois
Indiana
Massachusetts
Maryland
Maine
Michigan
Minnesota
New Hampshire
New Jersey
New York - Entire State
Ohio
Pennsylvania

March 24, 2006
DRAFT LCD

Rhode Island
Virginia
Vermont
Wisconsin
West Virginia

**Oversight Region**

Central Office

**DME Region LCD Covers**

Jurisdiction A/B

**Projected Determination Effective Date**

**Original Determination Ending Date**

**Revision Effective Date**

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes: 416.0 or 416.8) who meet the

following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 **(A7006, A7014)**

E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**


This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation on the patient's medical record which must be available to the DMERC upon request.
Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003))**
A7005 **(One/6 months)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**


INHALATION DRUGS AND SOLUTIONS:


The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.


Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**


Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which

justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7017 or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity

**Coverage Topic**

Durable Medical Equipment

March 24, 2006
DRAFT LCD

Prescription Drugs

| Coding Information |
|---|



**CPT/HCPCS Codes**

**The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care provider order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation.**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**
**KX - Specified required documentation on file**

**EQUIPMENT**

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

**ACCESSORIES**

March 24, 2006
DRAFT LCD

| | |
|---|---|
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |
| **INHALATION DRUGS** | |
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |

| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A7018 | WATER, DISTILLED, USED WITH LARGE VOLUME NEBULIZER, 1000 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG, ADMINISTERED THROUGH A DME |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7611 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7612 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7613 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7614 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7633 | BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED |

| | THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
|---|---|
| J7638 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7648 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7668 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

March 24, 2006
DRAFT LCD

| | |
|---|---|
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

**The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**

**For HCPCS codes A4619, E0565, E0572:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |
| **For HCPCS codes A7013, A7014, A7015, A7525:** | |

March 24, 2006
DRAFT LCD

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |
| **For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:** | |
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| **For HCPCS codes A7006, J2545:** | |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |

| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes J7608:**

| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:**

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

**For HCPCS code J7639:**

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**For HCPCS code J7682:**

March 24, 2006
DRAFT LCD

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| **For HCPCS codes K0730, Q4080:** | |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.**

**For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680 and J7681, all ICD-9 codes.**

**For all other HCPCS codes, ICD-9 codes are not specified.**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, A7016, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

## General Information



### Documentation Requirements

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current usage.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer, the model name/number if applicable. When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.


**Appendices**


**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.


**Sources of Information and Basis for Decision**

<u>Levalbuterol</u>

Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" *The Journal of Allergy and Clinical Immunology*; November 2001, Volume 108:681-684.

Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, Number 2.

Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and

Levalbuterol for Treatment of Acute Asthma". *The Journal of Pediatrics*; December 2003, 143:731-736.

Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, No. 2.

Crater, Jr G. "Levalbuterol vs Racemic Albuterol". *Chest*; September 2003, 124, 3:3.

Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". *Chest*; 2002: 44S.

Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". *Chest*; September 2003; 124, 3:844-849.

Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". *Respiratory Care*; October 2001; Vol. 46, No. 10:1083.

Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". *American Journal of Respiratory Critical Care Med 2004*; 169:A310.

Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". *Respiratory Care*; October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". *Chest* 2004; 126(4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". *Chest* September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". *The Journal of Clinical Immunology* November 2001:726-731.

Nelson H, Bensch G, Pleskow W, Disantostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". *The Journal of Allergy and Clinical Immunology* December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". *American Journal of Respiratory Critical Care Medicine* 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". *American Journal of Emergency Medicine* January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". *Allergy and Asthma Proc.* November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", *The American Journal of Managed Care* July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to *ACEP* 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for Adverse Events in Patients With Acute Airflow Obstruction". *American Journal of Therapeutics* 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic Albuterol: Efficacy and Outcomes in Patients Hospitalized with COPD or Asthma". *Chest* 2003; 123, 1:128-135.

Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?" *Clinical Pulmonary Medicine* May 2004; Vol. 11, No. 3:129-134.

**Advisory Committee Meeting Notes**

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

**Revision History Number**

March 24, 2006
DRAFT LCD

**Revision History Explanation**

Revision Effective Date : To be determined
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.
Added statement that levalbuterol will be paid comparable to albuterol.
Added statement that non-compounded combinations of albuterol and ipratropium will be paid comparable to separate unit dose vials.
HCPCS Codes:
Added J7640
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.
ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.
SOURCES OF INFORMATION:
Added bibliography for levalbuterol.


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriately.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

March 24, 2006
DRAFT LCD

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater
quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an
MDI prior to prescribing a nebulizer. Added pneumocystosis and complications
of organ transplants as coverage criteria for E0565 or E0572 compressor used
with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used
for treatment of cystic fibrosis. Removed grandfathering language for aerosol
compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an
order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim
via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and
not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1).
Expansion of indications for use of pentamidine with added ICD-9 codes.

Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).

**Last Reviewed On Date**

**Related Documents**

This LCD has no Related Documents.

**LCD Attachments**

There are no attachments for this LCD

**Draft Contact**

Paul Hughes, MD - draftrmrpfeedback@tricenturion.com
TriCenturion
PO Box 100282, Mail Code ZA190
Columbia, SC 29202-3282

# EXHIBIT I

# Draft

**LCD for Nebulizers (DL5007)**

**Please note:** **This is a Draft policy.**
Draft LCDs are works in progress that are available on the Medicare Coverage Database site for
public review. Draft LCDs are not necessarily a reflection of the current policies or practices of the
contractor.

## Contractor Information

**Contractor Name**

TrustSolutions

**Contractor Number**

77012

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

Palmetto GBA

## LCD Information

**LCD ID Number**

DL5007

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2005 American Medical
Association (or such other date of publication of CPT). All Rights Reserved. Applicable
FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes,
nomenclature, descriptors and other data contained therein) is copyright by the American
Dental Association. © 2002, 2004 American Dental Association. All rights reserved.
Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Kentucky
Louisiana
Mississippi
North Carolina
New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virgin Islands

**Oversight Region**

Central Office

**DME Region LCD Covers**

Jurisdiction C

**Projected Determination Effective Date**

**Original Determination Ending Date**

**Revision Effective Date**

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below), will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003)**
A7005 **(One/6 months)**
A7005 **(one /3 months only with K0730)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **( One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month))**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month)**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month)**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18**

**liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative − 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Nebulizer

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

999x                          Not Applicable

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

**The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care provider order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**
**KX - Specified required documentation on file**

**HCPCS CODES:**

**EQUIPMENT**

E0565   COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF-
        CONTAINED OR CYLINDER DRIVEN

E0570   NEBULIZER, WITH COMPRESSOR

E0571   AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME
        NEBULIZER

E0572   AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR
        INTERMITTENT USE

E0574   ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME

NEBULIZER

E0575  NEBULIZER, ULTRASONIC, LARGE VOLUME

E0585  NEBULIZER, WITH COMPRESSOR AND HEATER

K0730  CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM

**ACCESSORIES**

A4619  FACE TENT

A7003  ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC
NEBULIZER, DISPOSABLE

A7004  SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE

A7005  ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC
NEBULIZER, NON-DISPOSABLE

A7006  ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER

A7007  LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL
COMPRESSOR

A7008  LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL
COMPRESSOR

A7009  RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME
ULTRASONIC NEBULIZER

A7010  CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER,
100 FEET

A7011  CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME
NEBULIZER, 10 FEET

A7012  WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER

A7013  FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR

A7014  FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC
GENERATOR

A7015  AEROSOL MASK, USED WITH DME NEBULIZER

A7016  DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER

A7017  NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT
USED WITH OXYGEN

A7525  TRACHEOSTOMY MASK, EACH

E0580  NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR
USE WITH REGULATOR OR FLOWMETER

E1372  IMMERSION EXTERNAL HEATER FOR NEBULIZER

**INHALATION DRUGS**

A4216  STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML

A4217  STERILE WATER/SALINE, 500 ML

A4218   STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML

G0333   PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY
SUPPLY AS A BENEFICIARY

J2545   PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG,
ADMINISTERED THROUGH A DME

J7608   ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
DOSE FORM, PER GRAM

J7611   ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME,
CONCENTRATED FORM, 1 MG

J7612   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME,
CONCENTRATED FORM, 0.5 MG

J7613   ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT
DOSE, 1 MG

J7614   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT
DOSE, 0.5 MG

J7620   ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-
COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME

J7622   BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
UNIT DOSE FORM, PER MILLIGRAM

J7624   BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
UNIT DOSE FORM, PER MILLIGRAM

J7626   BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED
THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7627   BUDESONIDE, POWDER, COMPOUNDED FOR INHALATION SOLUTION,
ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7628   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH
DME, CONCENTRATED FORM, PER MILLIGRAM

J7629   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH
DME, UNIT DOSE FORM, PER MILLIGRAM

J7631   CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME,
UNIT DOSE FORM, PER 10 MILLIGRAMS

J7633   BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
CONCENTRATED FORM, PER 0.25 MILLIGRAM

J7635   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
CONCENTRATED FORM, PER MILLIGRAM

J7636   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE
FORM, PER MILLIGRAM

J7637   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
CONCENTRATED FORM, PER MILLIGRAM

J7638   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
UNIT DOSE FORM, PER MILLIGRAM

J7639    DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, PER MILLIGRAM

J7640    FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, 12 MICROGRAMS

J7641    FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE, PER MILLIGRAM

J7642    GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7643    GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7644    IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER MILLIGRAM

J7648    ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7649    ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7658    ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7659    ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7668    METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, CONCENTRATED FORM, PER 10 MILLIGRAMS

J7669    METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7680    TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, CONCENTRATED FORM, PER MILLIGRAM

J7681    TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER MILLIGRAM

J7682    TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION,
         ADMINISTERED THROUGH DME

J7683    TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7684    TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, PER MILLIGRAM

J7699    NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME

Q0513    PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS

Q0514    PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS

Q4080    ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20
         MICROGRAMS

**ICD-9 Codes that Support Medical Necessity**

**The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**

**For HCPCS codes A4619, E0565, E0572:**

011.50 - 011.56    TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS)

042    HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE

136.3    PNEUMOCYSTOSIS

277.02    CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

494.0    BRONCHIECTASIS WITHOUT ACUTE EXACERBATION

494.1    BRONCHIECTASIS WITH ACUTE EXACERBATION

519.1    OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED

748.61    CONGENITAL BRONCHIECTASIS

996.80 - 996.89    COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN

V44.0    TRACHEOSTOMY STATUS

V55.0    ATTENTION TO TRACHEOSTOMY

**For HCPCS codes A7013, A7014, A7015, A7525:**

011.50 - 011.56    TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS)

042    HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE

136.3    PNEUMOCYSTOSIS

277.02    CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

480.0 - 508.9    PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT

519.1    OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED

748.61    CONGENITAL BRONCHIECTASIS

786.4    ABNORMAL SPUTUM

996.80 - 996.89    COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN

V44.0    TRACHEOSTOMY STATUS

V55.0    ATTENTION TO TRACHEOSTOMY

**For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

996.80 -     COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN -
996.89       COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN

**For HCPCS code J7608:**

480.0 -      PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO
508.9        UNSPECIFIED EXTERNAL AGENT

786.4        ABNORMAL SPUTUM

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:**

491.0 -      SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO
508.9        UNSPECIFIED EXTERNAL AGENT

**For HCPCS code J7639:**

277.02       CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

**For HCPCS code J7682**

011.50 -     TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION -
011.56       TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY
             BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS
             CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS)

277.02       CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

494.0        BRONCHIECTASIS WITHOUT ACUTE EXACERBATION

494.1        BRONCHIECTASIS WITH ACUTE EXACERBATION

748.61       CONGENITAL BRONCHIECTASIS

**For HCPCS codes K0730, Q4080**

416.0        PRIMARY PULMONARY HYPERTENSION

416.8        OTHER CHRONIC PULMONARY HEART DISEASES

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.**

**For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all ICD-9 codes.**

**For all other HCPCS codes, ICD-9 codes are not specified.**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**

**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.


## Appendices


## Utilization Guidelines

Refer to Indications and Limitations of Coverage and/or Medical Necessity


## Sources of Information and Basis for Decision

Levalbuterol

Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" The Journal of Allergy and Clinical Immunology; November 2001, Volume 108:681-684.

Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". The Journal of Allergy and Clinical Immunology; August 2002, part 1, Volume 110, Number 2.

Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and Levalbuterol for Treatment of Acute Asthma". The Journal of Pediatrics; December 2003, 143:731-736.

Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". The Journal of Allergy and Clinical Immunology; August 2002, part 1, Volume 110, No. 2.

Crater, Jr G. "Levalbuterol vs Racemic Albuterol". Chest; September 2003, 124, 3:3.

Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". Chest; 2002: 44S.

Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". Chest September 2003; 124, 3:844-849.

Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". Respiratory Care October 2001; Vol. 46, No. 10:1083.

Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". American Journal of Respiratory Critical Care Med 2004; 169:A310.

Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". Respiratory Care October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". Chest 2004; 126 (4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". Chest September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". The Journal of Clinical Immunology November 2001:726-731.

Nelson H, Bensch G, Pleskow W, DiSnatostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". The Journal of Allergy and Clinical Immunology December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". American Journal of Respiratory Critical Care Medicine 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". American Journal of Emergency Medicine January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". Allergy and Asthma Proc. November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", The American Journal of Managed Care July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to ACEP 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for

Adverse Events in Patients With Acute Airflow Obstruction". American Journal of
Therapeutics 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic Albuterol: Efficacy and
Outcomes in Patients Hospitalized with COPD or Asthma". Chest 2003; 123, 1:128-135.

Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?"
Clinical Pulmonary Medicine May 2004; Vol. 11, No. 3:129-134.


**Advisory Committee Meeting Notes**



**Start Date of Comment Period**

03/24/2006


**End Date of Comment Period**

05/08/2006


**Start Date of Notice Period**



**Revision History Number**



**Revision History Explanation**

Revision Effective Date : To be determined
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol,
dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.
Added statement that levalbuterol will be paid comparable to albuterol.
Added statement that non-compounded combinations of albuterol and ipratropium will be
paid comparable to separate unit dose vials.
HCPCS CODES:
Added: J7640
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642,
J7643, J7680, and J7681.
ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642,
J7643, J7680, and J7681.
SOURCES OF INFORMATION:
Added bibliography for levalbuterol.

Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where

appropriately.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted
J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific
ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.

Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626

INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006). Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Advisory for a detailed report of the revision.

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A24623 - Nebulizers - Policy Article - Effective - January 2006

**LCD Attachments**

There are no attachments for this LCD

**Draft Contact**

Michelle Moscato - michelle.moscato@trustsolutionsllc.com
TrustSolutions, LLC
8720 Castle Creek Parkway Suite 300
Indianapolis, IN 46250

**Article for Nebulizers - Policy Article - Effective - January 2006 (A24623)**

## Contractor Information

**Contractor Name**

TrustSolutions

**Contractor Number**

77012

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

Palmetto GBA

## Article Information

**Article ID Number**

A24623

**Article Type**

Article

**Key Article**

Yes

**Article Title**

Nebulizers - Policy Article - Effective - January 2006

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Kentucky
Louisiana
Mississippi
North Carolina

New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virgin Islands

## DME Region Article Covers

Jurisdiction C

## Original Article Effective Date

04/01/2005

## Article Revision Effective Date

03/01/2006

## Article Text

### NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES

A large volume pneumatic nebulizer (E0580) and water or saline (A4217 or A7018) are not separately payable and should not be separately billed when used for patients with rented home oxygen equipment.

If a large volume nebulizer, related compressor/generator, and water or saline are used predominantly to provide room humidification it will be denied as noncovered.

A prefilled disposable large volume nebulizer (A7008) is noncovered under the DME benefit because it is a convenience item. An unfilled nebulizer (A7007, A7017, or E0585) filled with water or saline (A4217 or A7018) by the patient/caregiver is an acceptable alternative.

Kits and concentrates for use in cleaning respiratory equipment will be denied as noncovered.

DISPENSING FEE:

An initial dispensing fee (G0333) is payable to a pharmacy for the initial 30 day supply of covered inhalation drug(s) regardless of the number of drugs dispensed, the number of shipments, or the number of pharmacies used by the beneficiary during that time. This initial 30-day dispensing fee is a once in a lifetime fee and only applies to beneficiaries who are using inhalation drugs for the first time as a Medicare beneficiary on or after 01/01/2006.

Medicare will only pay for one of the following for covered inhalation drugs regardless of the number of drugs dispensed, the number of shipments, or the number of pharmacies used by the beneficiary during that time period-an initial dispensing fee (G0333), a 30 day dispensing fee (Q0513), or a 90 day dispensing fee (Q0514).

If code G0333 is billed for a 30 day supply of covered inhalation drugs and criteria for payment of G0333 are not met but criteria for payment of Q0513 are met, it will be payable based on the allowance for code Q0513.

For a refill prescription, payment of a dispensing fee will be allowed no sooner than 7 days before the end of usage for the current 30 day or 90 day period for which a dispensing fee

was previously paid. Medicare will not pay for more than 12 months of dispensing fees per beneficiary per 12 month period.

If the dispensing fee is billed sooner than the interval specified above, it will be denied as not separately payable. For example, if a 90 day fee (Q0514) is billed on 1/30/06 and is covered and there is a subsequent claim for a 30 day fee (Q0513) on 4/20/06, the dispensing fee on 4/20/06 will be denied as not separately payable.

Both a Q0513 and a Q0514 dispensing fee are not covered on the same date of service. If a supplier dispenses a 90 day supply of one drug and a 30 day supply of another drug on the same day, code Q0514 (90 day fee) must be billed.

The dispensing fee must be billed on the same claim as the inhalation drug(s). If it is not, it will be denied as incorrect billing.

A dispensing fee is not separately billable or payable for saline, whether used as a diluent or for humidification therapy.

Medicare will not pay for a separate fee for the compounding of inhalation drug(s).

**CODING GUIDELINES**

EQUIPMENT

In this policy, the actual equipment (i.e., electrical device) will generally be referred to as either a compressor (when nebulization of liquid is achieved by means of air flow) or as a generator (when nebulization of liquid is achieved by means of ultrasonic vibrations). The term nebulizer is generally used for the actual chamber in which the nebulization of liquid occurs and is an accessory to the equipment. The nebulizer is attached to an aerosol compressor or an ultrasonic generator in order to achieve a functioning delivery system for aerosol therapy.

Code E0565 describes an aerosol compressor, which can be set for pressures above 30 psi at a flow of 6-8 L/m and is capable of continuous operation.

A nebulizer with compressor (E0570) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It is only AC powered.

A portable compressor (E0571) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It must have battery or DC power capability and may have an AC power option.

A light duty adjustable pressure compressor (E0572) is a pneumatic aerosol compressor which can be set for pressures above 30 psi at a flow of 6-8 L/m, but is capable only of intermittent operation.

Code E0574 describes an ultrasonic/electronic generator used with a small volume chamber for medication delivery, which is capable only of intermittent operation.

Code E0575 describes a large volume ultrasonic nebulizer system which is used for medication and humidification delivery, and which is capable of continuous operation.

Code K0730 describes a controlled dose inhalation drug delivery system. Aerosol is delivered in pulses during the inspiration. The duration of each pulse is adapted according to the breathing pattern.

ACCESSORIES

Code A7003, A7005, and A7006 include the lid, jar, baffles, tubing, T-piece and mouthpiece. In addition, code A7006 includes a filter.

Code A7004 includes only the lid, jar and baffles.

Code A7012 describes a device to collect water condensation, which is placed in line with the corrugated tubing, used with a large volume nebulizer.

Code E0585 is used when a heavy-duty aerosol compressor (E0565), durable bottle type large volume nebulizer (A7017), and immersion heater (E1372) are provided at the same time. If all three items are not provided initially, the separate codes for the components would be used for billing. Code A7007 or A7017 is billed when an unfilled large volume nebulizer is used with a E0572 compressor or a separately billed E0565 compressor. Code A7007 or A7017 would not be separately billed when an E0585 system was also being billed. Code E0580 (Nebulizer, durable, glass or autoclavable plastic, bottle type, for use with regulator or flow meter) describes the same piece of equipment as A7017, but should only be billed when this type of nebulizer is used with a beneficiary-owned oxygen system.

INHALATION DRUGS

The following instructions apply to claims billed using J codes. When claims are billed in NCPDP format using NDC numbers, different instructions may apply. Refer to the NCPDP Companion Document available through the CMS website.

Unit dose form of an inhalation drug or a combination of drugs is one in which the medication is dispensed to a patient (1) in a bottle/vial/ampule which contains the dose usually used for a single inhalation treatment, and (2) in a concentration which is dilute enough that it may be administered to a patient without adding any separate diluent.

Concentrated form of a drug used for inhalation is one in which the drug is dispensed to a patient in a concentration which requires that a separate diluent (usually saline) be added to the nebulizer when the drug is administered to a patient.

The coding of a unit dose form or a concentrated form of an inhalation drug is determined by the formulation of the drug as it is dispensed to the patient. For example, if a pharmacist takes a concentrated form of a single inhalation drug (e.g., 0.5% albuterol) and dilutes it to a ready-to-use concentration (e.g., 0.083% albuterol), which is then dispensed to the patient in a single-dose bottles/vials/ampules, the inhalation solution is billed as the unit dose form not the concentrated form.

The billing unit for inhalation drug codes varies. Suppliers must be sure that they use the correct billing unit or the code when calculating the number of units of service to enter on the claim,. The following is guidance on a few codes where errors are commonly seen:

- Code J7620 is used for manufactured combinations of albuterol and ipratropium (DuoNeb) and other similar products which contain 3.0 mg of albuterol sulfate (which is 2.5 mg of albuterol base) and 0.5 mg of ipratropium bromide in each unit dose vial. For these products, 1 unit of service of J7620 equals 1 unit dose vial.

- For code J7626 (budesonide, unit dose) bill one unit of service for each vial dispensed, regardless of whether a 0.25 mg vial or a 0.5 mg vial is dispensed.

The concentration of the drug in the dispensed solution can be converted to mg or gm as follows: A solution with a labeled concentration of 1% has ten (10) mg of drug in each milliliter (ml) of solution. Therefore, a 0.083% standard formulation albuterol solution has 0.83 mg of standard formulation albuterol in each ml of solution. Since albuterol 0.083% solution typically comes in a 3 ml vial/ampule, each vial/ampule contains 2.5mg of albuterol (3X.83 equals 2.5). If a pharmacist provides 120 ampules of 0.83% albuterol solution each containing 3 ml, the billed units of service would be 300 (2.5 X120) units (1 unit equals 1 mg) of code J7613KO.

Pharmacists should note that the correct concentration figure must be used to determine the number of mg of drug dispensed. For example, if a pharmacist takes 0.5 ml of a concentrated 0.5% albuterol solution and dilutes it with 2.5 ml of saline to give a 3 ml unit dose solution which is dispensed to the patient, each vial contains 2.5 mg of albuterol (0.5 mg x 5.0 mg/ml equals 2.4 mg), not 15 mg (3 x 5.0).

Code J7620 may only be used when albuterol and ipratropium are provided in combination by a manufacturer or repackager in a vial with a single NDC number. DuoNeb is one example. Code J7620 must not be used for compounded inhalation solutions of these drugs. For compounded combination unit dose preparations and for situation in which these drugs are provided in separate unit dose vials, supplier should bill using code J7613 for albuterol, and J7644 for ipratropium with the appropriate modifier – KO, KP or KQ.

When there is a single drug in a unit dose container, the KO modifier is added to the unit form code.

Except for code J7620, when two or more drugs are combined and dispensed to the patient in the same unit dose container, each of the drugs is billed using its unit dose form code. The KP modifier is added to only one of the unit dose form codes and the KQ modifier is added to the other unit dose code(s). When two or more drugs are combined, the use of the KP and KQ modifiers should result in a combination that yields the lowest Medicare allowance. There should be no separate billing for the saline diluent.

Whenever a unit dose form code is billed, it must have either a KO, KP or KQ modifier. (Exception: The KO, KP and KQ modifiers should not be used with code J7620.) If a unit dose code does not have one of these modifiers, it will be denied as an invalid code. The KO, KP, and KQ modifiers are not used with the concentrated form codes.

When a drug is provided in a concentration which is dilute enough that it may be administered to the patient without adding any separate diluent and is dispensed in a multidose container, use J7699.

A4218 is used for metered dose sterile saline products that are used to dilute the concentrated form of inhalation drugs.

Code J7699 is also used for an inhalation drug administered by a nebulizer , which does not have a valid specific code. If two or more drugs are combined in the same unit dose container, bill specific codes when possible and the J7699 only for individual drugs which do not have a specific code. Claims for drugs that are incorrectly coded J7699 instead of the appropriate codes will be denied for invalid coding.

Suppliers should contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) for guidance on the correct coding of these items

## Coverage Topic

Nebulizer

## Coding Information

**No Coding Information has been entered in this section of the article.**

## Other Information

### Revision History Explanation

Revision Effective Date: 01/01/2006
NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES
Deleted A7007 from statement that this code would be denied as a convenience item.
Replaced deleted G0371 and G0374 with new dispensing fee HCPCS codes Q0513 and
Q0514.
Revised guidelines for dispensing fees.
CODING GUIDELINES:
Added A7007 as equipment that would not be used with oxygen.
Deleted J7616 and replaced with new HCPCS code J7620.
Added A4118 to replace J7699 for metered dose dispenser of sterile saline or water.

Revision Effective Date: 10/01/2005
CODING GUIDELINES:
Added definition of K0730
Deleted KP/KQ modifier instructions for albuterol/ipratropium and albuterol/cromolyn.
Updated revised instructions regarding dispensing fee

Effective Date 04/01/2005
LMRP converted to LCD and Policy Article
NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES
Added coverage statements relating to dispensing fees and compounding fees.
CODING GUIDELINES
Added statement about claims filed in NCPDP format.
Updated HCPCS codes. Added guidelines for dispensing fee for 30 and 90 days.

03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003,
this article was transitioned to DME PSC TrustSolutions (77012) from DMERC Palmetto
GBA (00885).

### Related Documents

**LCD(s)**
 DL5007 - Nebulizers

# EXHIBIT J

March 24, 2006

Dear Physician, Supplier, Specialty Group:

The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Program Safeguard Contractors (DME PSCs) the task of developing and updating medical policies for the purpose of processing and reviewing Medicare claims for Durable Medical Equipment, Prostheses, Orthoses and Supplies (DMEPOS) and other selected items. The DME PSCs are proposing a revision of the Nebulizers policy. Four changes are proposed which require an opportunity for public comment. They are:

1. Payment for levalbuterol will be based on the allowance for albuterol.
2. Payment for DuoNeb will be based on the allowance for separate unit dose vials of albuterol and ipratropium.
3. Coverage for the following nebulizer drugs is eliminated because there is inadequate support in the medical literature for administration using a DME nebulizer: amikacin, atropine, beclomethasone, betamethasone, bitolerol, dexamethasone, flunisolide, formoterol, gentamicin, glycopyrrolate, terbutaline and triamcinalone. Coverage will therefore be limited to these drugs: acetylcysteine, albuterol, budesonide, cromolyn, dornase alpha, iloprost, ipratropium, isoetharine, isoproterenol, levalbuterol, metaproterenol, pentamidine, and tobramycin.
4. Maximum milligrams/month for budesonide is defined.

We are soliciting comments from physicians, manufacturers, suppliers and other professionals involved in the treatment of Medicare beneficiaries with chronic lung diseases. We recommend that you send this draft policy to selected members of your organization for review and comment. If you disagree with any aspect of these four changes, you should be very specific and, if possible, offer an alternative indication, guideline, etc. You should provide a clinical rationale for your position including references from the published clinical literature (e.g. standard textbooks, peer-reviewed journals, etc.). We would also encourage a written response if you agree with these changes in the policy. Note that the **only** aspects of the policy that are open for comment are the four that are listed above. The remainder of the policy is not open for comment.

When comments of this policy have been received, they will be reviewed and revisions to the policy will be considered. The revised policy will be published in future DMERC Supplier Manual updates, allowing for adequate notice before the policy's effective date.

**Please submit your comments to the appropriate Regional DME PSC medical director by mail at the addresses below no later than May 8, 2006**. Comments may also be submitted via e-mail (see draft policy below for e-mail address contact information). In addition, a public meeting will be held by each of the three PSCs to receive comments on the draft policy. Suppliers from any region may attend any PSC's public meeting. Information regarding this meeting may be obtained from the DME PSC web sites.

Thank you for your participation in our policy revision process.

Sincerely,

| | |
|---|---|
| Paul J. Hughes, M.D.<br>Medical Director, DME PSC Regions A&B<br>TriCenturion<br>7909 Parklane Road, Suite 190<br>Columbia, SC  29223<br>www.tricenturion.com | Mark D. Pilley, M.D.<br>Medical Director, DME PSC Region D<br>IntegriGuard, LLC<br>2121 North 117 Ave.<br>Suite 200<br>Omaha, NE 68164<br>www.edssafeguardsolutions.eds-gov.com |
| Adrian M. Oleck, M.D.<br>Medical Director, DME PSC Region C<br>TrustSolutions, LLC<br>8720 Castle Creek Pkwy<br>Suite 300<br>Indianapolis, IN 46250<br>www.trustsolutionsllc.com | |

# Nebulizers - Draft

## Electronic Data Systems Corp.

| Contractor Information | |
|---|---|
| **Contractor Name** back to top | Electronic Data Systems Corp. |
| **Contractor Number** back to top | 77006 |
| **Contractor Type** back to top | DME PSC |
| **DME MAC this DME PSC is affiliated with** back to top | CIGNA Government Services |
| **LCD Information** | |
| **LCD Database ID Number** back to top | DL11488 |
| **LCD Version Number** back to top | 5 |
| **LCD Title** back to top | Nebulizers - Draft |
| **Contractor's Determination Number** back to top | NEB - 2006 - 03/24 |
| **AMA CPT / ADA CDT** | CPT codes, descriptions and other data only are copyright 2005 |

| | |
|---|---|
| **Copyright Statement** back to top | American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply. |
| **CMS National Coverage Policy** back to top | CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1 |
| **Primary Geographic Jurisdiction** back to top | AK<br>AS<br>AZ<br>CA<br>GU<br>HI<br>IA<br>ID<br>KS<br>MO<br>MT<br>ND<br>NE<br>NV<br>OR<br>SD<br>UT<br>WA<br>WY<br>CNMI |
| **Oversight Region** back to top | Central Office |
| **DME Region LCD Covers** back to top | Jurisdiction D |
| **Projected Determination Effective Date** back to top | |
| **Original Determination Ending Date** back to top | |
| **Revision Effective Date** back to top | |
| **Revision Ending Date** back to top | |
| **Indications and Limitations of Coverage and/or Medical Necessity** back to top | For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory |

requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below), will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes: 416.0 or 416.8) who meet the following criteria.

Iloprost Q4080 is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal

medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.


ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**


This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation on the patient's medical record which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003))**
A7005 **(One/6 months)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

|  | When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017 or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity. |
| **Coverage Topic** [back to top] | Nebulizer |

| Coding Information | |
|---|---|
| **Bill Type Codes** back to top | |
| **Revenue Codes** back to top | |
| **CPT/HCPCS Codes** back to top | The appearance of a code in this section does not necessarily indicate coverage.<br><br>HCPCS MODIFIERS:<br><br>EY - No physician or other licensed health care provider order for this item or service.<br>KO - Single drug unit dose formulation.<br>KP - First drug of a multiple drug unit dose formulation.<br>KQ - Second or subsequent drug of a multiple drug unit dose formulation.<br>KX — Specified required documentation on file.<br><br>EQUIPMENT: |

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES:

| | |
|---|---|
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |

| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

INHALATION DRUGS:

| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |

| | |
|---|---|
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG, ADMINISTERED THROUGH A DME |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7611 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7612 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7613 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7614 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, POWDER, COMPOUNDED FOR INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7633 | BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |

| | |
|---|---|
| J7635 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7648 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7668 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED |

| | | |
|---|---|---|
| | | FORM, PER 10 MILLIGRAMS |
| | J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| | J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7682 | TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| | J7683 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7684 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| | Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| | Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| | Q4080 | ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20 MICROGRAMS |
| **Does the CPT 30% Coding Rule Apply?** back to top | No | |
| **ICD-9 Codes that Support Medical Necessity** back to top | The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information. For HCPCS codes A4619, E0565, E0572: | |
| | 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY |

|  | BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |
| For HCPCS codes A7013, A7014, A7015, A7525: | |
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

| | |
|---|---|
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |

| | |
|---|---|
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS code J7608:

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

For HCPCS code J7639:

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

For HCPCS code J7682:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |

| | |
|---|---|
| | **748.61** CONGENITAL BRONCHIECTASIS |
| | For HCPCS code K0730, Q4080: |
| | **416.0** PRIMARY PULMONARY HYPERTENSION |
| | **416.8** OTHER CHRONIC PULMONARY HEART DISEASES |
| **Diagnoses that Support Medical Necessity** back to top | Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information. |
| **ICD-9 Codes that DO NOT Support Medical Necessity** back to top | For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.<br><br>For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all ICD-9 codes.<br><br>For all other HCPCS codes, ICD-9 codes are not specified. |
| **Non-Medical Necessity ICD-9 Codes Asterisk Explanation** back to top | |
| **Diagnoses that DO NOT Support Medical Necessity** back to top | For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.<br><br>For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680 and J7681, all diagnoses.<br><br>For all other HCPCS codes, diagnoses are not specified. |
| **General Information** | |
| **Documentation Requirements** back to top | Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.<br><br>An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier |

must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution

|  | dispensed. |
|  | Refer to the Supplier Manual for more information on documentation requirements. |
| **Appendices** back to top |  |
| **Utilization Guidelines** back to top | Refer to Indications and Limitations of Coverage and/or Medical Necessity. |
| **Sources of Information and Basis for Decision** back to top | Levalbuterol |
|  | Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" *The Journal of Allergy and Clinical Immunology*; November 2001, Volume 108:681-684. |
|  | Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, Number 2. |
|  | Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and Levalbuterol for Treatment of Acute Asthma". *The Journal of Pediatrics*; December 2003, 143:731-736. |
|  | Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, No. 2. |
|  | Crater, Jr G. "Levalbuterol vs Racemic Albuterol". *Chest*; September 2003, 124, 3:3. |
|  | Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". *Chest*; 2002: 44S. |
|  | Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". *Chest*; September 2003; 124, 3:844-849. |
|  | Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". *Respiratory Care*; October 2001; Vol. 46, No. 10:1083. |
|  | Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". *American Journal of Respiratory Critical Care Med* 2004; 169:A310. |
|  | Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost |

Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". *Respiratory Care* October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". *Chest* 2004; 126(4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". *Chest* September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". *The Journal of Clinical Immunology* November 2001:726-731.

Nelson H, Bensch G, Pleskow W, DiSnatostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". *The Journal of Allergy and Clinical Immunology* December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". *American Journal of Respiratory Critical Care Medicine* 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". *American Journal of Emergency Medicine* January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". *Allergy and Asthma Proc.* November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", *The American Journal of Managed Care* July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to *ACEP* 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for Adverse Events in Patients With Acute Airflow Obstruction". *American Journal of Therapeutics* 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic

| | |
|---|---|
| | Albuterol: Efficacy and Outcomes in Patients Hospitalized with COPD or Asthma". *Chest* 2003; 123, 1:128-135.<br><br>Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?" *Clinical Pulmonary Medicine* May 2004; Vol. 11, No. 3:129-134. |
| **Advisory Committee Meeting Notes** back to top | |
| **Start Date of Comment Period** back to top | 03/24/2006 |
| **End Date of Comment Period** back to top | 05/08/2006 |
| **Start Date of Notice Period** back to top | |
| **Revision History Number** back to top | |
| **Revision History Explanation** back to top | Revision Effective Date : To be determined<br>INDICATIONS AND LIMITATIONS OF COVERAGE:<br>Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.<br>Added statement that levalbuterol will be paid comparable to albuterol.<br>Added statement that non-compounded combinations of albuterol and ipratropium will be paid comparable to separate unit dose vials.<br>HCPCS CODES:<br>Added J7640<br>ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:<br>Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.<br>ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:<br>Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.<br>SOURCES OF INFORMATION:<br>Added bibliography for levalbuterol.<br><br>Revision Effective Date: 01/01/2006<br>INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:<br>Inserted new HCPCS Codes A4216, A4218 and deleted codes J7051 and J7699 where appropriate.<br>Added coverage statement for code A7007.<br>Added A7007 to the related code table for E0565.<br>Added A7007 to usual maximum amount.<br>Added usual maximum amount for A4216 and A4218. |

HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code
491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring
specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of
HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.

Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier.
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR
MEDICAL NECESSITY:
Added criterion for K0730 and Q4080.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730
and Q4080.
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added references to new HCPCS codes.
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and
ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633

Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in

| | |
|---|---|
| | the March 1997 DMERC Advisory for a detailed report of the revision.<br><br>03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC Electronic Data Systems Corp. (77006) from DMERC CIGNA Government Services (05655). |
| **Last Reviewed on Date** back to top | |
| **Notes** back to top | |
| **Does this LCD contain a "Least Costly Alternative" provision?** back to top | Yes |
| **Related Documents** back to top | **Article(s)**<br>A24942 - Nebulizers - Policy Article - Effective January 2006 |
| **LCD Attachments** back to top | There are no attachments for this LCD |
| **Draft Contact** back to top | Mark Pilley, MD - draftlcdfeedback@integriguard.org<br>IntegriGuard, LLC<br>2121 North 117 Avenue, Suite 200<br>Omaha, NE 68164 |
| **Draft Approved for Display to Public on Front End** back to top | No |
| **Saved By** back to top | Missy Addison |
| **Saved On** back to top | 03/21/2006 12:25:08 |
| **Other Versions** back to top | Version 4 - Updated on 03/21/2006 12:20:42, by Missy Addison, with effective dates N/A - N/A.<br>Version 3 - Updated on 03/21/2006 12:12:13, by Missy Addison, with effective dates N/A - N/A.<br>Version 2 - Updated on 03/17/2006 10:39:58, by Missy Addison, with effective dates 04/01/1997 - N/A.<br>Version 1 - Updated on 03/17/2006 09:23:24, by Mark Pilley, with effective dates 03/01/2006 - N/A. |

**THIS IS A DRAFT LCD**

This website is an official service of the Centers for Medicare & Medicaid Services.

# EXHIBIT K

April 2008

## NEBULIZERS – RESPONSE TO COMMENTS

### Least Costly Alternative Determinations – General

Least costly alternative policy is a payment determination, not a coverage determination and violates drug pricing methodology in the MMA.

**Response:  A least costly alternative (LCA) determination is <u>not</u> a pricing methodology, it is a medical necessity determination.  Fee schedule allowances will continue to be established for inhalation drugs in compliance with the MMA.**

In December 2005 Final Rule on inherent reasonableness, CMS said it would not be applied to Part B drugs.  LCA seems to contradict this.

**Response:  Inherent reasonableness is a pricing methodology.  An LCA determination is not a pricing determination, it is a medical necessity determination.**

PSCs are precluded from using economic factors (cost) as the basis for a coverage determination.

**Response:  The cost of an item does not enter into a benefit category determination or into the overall determination of medical necessity.  However, LCA determinations are a subset of medical necessity decisions and by their very nature take into account the relative costs of different items that may be appropriate for the treatment of the same condition.**

There is no statutory/regulatory basis for least costly alternative.

**Response:  Program Safeguard Contractors (PSCs) follow instructions outlined in the Medicare Program Integrity Manual (PIM) when developing local coverage determinations (LCDs).  Use of LCA determinations in LCDs is described in the PIM, Chapter 13, Section 13.4.**

The proposed policy is not consistent with the general instructions concerning LCA in the Benefit Policy Manual, Chapter 15, Section 110.1.

**Response:  We disagree.  The Benefit Policy Manual, Chapter 15, Section 110.1(C)(2) says:  "The following considerations should enter into the determination of reasonableness: …(2)  Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?"  And in Section 110.1(C)(3) it says: "…where there exists a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished, the amount payable is based on the rate for the equipment or alternative treatment which meets the patient's medical needs."**

Because the cost of Xopenex and DuoNeb is more than the amount that would be paid under an LCA determination, implementation of the policy would make them unavailable to Medicare beneficiaries.

**Response:  The policy is based on a determination that there is a less costly medically appropriate alternative to those drugs.   Beneficiaries will have access to those alternatives.**

Elimination of full payment for Xopenex and DuoNeb will create administrative burdens for suppliers – e.g., education of physicians and beneficiaries, time to get a prescription for a different drug.
Patients may go without medications during the transition causing increased symptoms, ER visits, hospitalizations, etc.

**Response:  Sufficient time is being given between the publication of the LCD and the implementation date of the LCA policy to allow for changes that a physician may decide to make to the inhalation drugs ordered for a particular beneficiary.**

If the beneficiary wanted to continue to receive the ordered medication, suppliers would obtain an ABN and beneficiaries would be required to pay additional costs.

**Response:  Yes, that is an option for the beneficiary.**


**Levalbuterol**

There are no clinical advantages for use of levalbuterol compared to albuterol.

**Response:  We agree.**

There is limited peer reviewed literature to support use of levalbuterol vs albuterol in over 65 population.

**Response:  We agree.**

Studies don't establish lack of medical necessity of Xopenex; they are equivocal.

**Response:  It is the responsibility of the manufacturer to provide evidence to show that a particular drug is more effective than the alternative which is proposed in the draft LCD.**

There is insufficient literature in patients with COPD. PSCs should postpone changes until additional scientific studies are completed.

**Response:  We agree that there is insufficient literature concerning use in patients with COPD.  Most of the published studies focused on use of levalbuterol in patients with asthma.  Our policy is based on the currently available evidence.  If future studies provide additional information concerning use in patients with COPD, an LCD reconsideration may be requested.**

Literature supports the therapeutic advantage of levalbuterol compared to albuterol.

**Response:  We disagree.**

**The following comments relate to complete articles (i.e., not abstracts) which describe prospective clinical studies comparing inhalation solutions of levalbuterol and albuterol.  These articles are listed in the Sources of Information section of the LCD.**
- **Several studies dealt exclusively with pediatric patients and were therefore not applicable to the Medicare patient population – Carl, Gawchik, Milgrom, Ralston, Skoner**
- **Several studies were limited to patients in emergency rooms or inpatient hospitals and were therefore not applicable to the DME MAC policy which addresses chronic use by patients in the home setting – Carl, Davies, Nowak (2004), Nowak (2006), Ralston, Schreck, Scott, Truitt**

- **The following five studies are relevant to the patient population and clinical setting addressed in the policy:**

- **Datta et al, Chest 2003**
  - **Randomized, double-blind, placebo-controlled trial comparing levalbuterol to racemic albuterol, combined racemic albuterol and ipratropium, and placebo**
  - **30 patients with COPD; mean age 69; standard deviation +/- 15 years**
  - **Studied effects of single doses administered on separate days in an outpatient clinic setting**
  - **Author's conclusion: "For single-dose, as-needed use in COPD, there appears to be no advantage in using levalbuterol over conventional nebulized bronchodilators."**

- **Donohue et al, COPD: Journal of Chronic Obstructive Pulmonary Disease, 2006**
  - **Randomized, double-blind, placebo-controlled, parallel-group trial comparing levalbuterol, racemic albuterol, and placebo**
  - **209 patients with COPD $\geq$ 35 y.o.; mean age 65 years**
  - **Patients received study drug three times per day for 6 weeks; pulmonary function tests were performed on day 1 and at weeks 2, 4, and 6.**
  - **Results comparing levalbuterol 1.25 mg to racemic albuterol 2.5 mg**
    - **Statistically significant difference in area under the curve $FEV_1$ at week 6, but not at week 0, 2, or 4.  When baseline percent reversibility was factored in, there was no significant difference at any week.**

3

- **No statistically significant differences in COPD exacerbations or in COPD exacerbations leading to study withdrawal**
- **Subjects in the racemic albuterol group required a mean of 1.81 more doses/day of rescue/supplemental medications than subjects in the levalbuterol 1.25 mg group (p=0.02).**
- **Among subjects randomized to levalbuterol 1.25 mg, rescue supplemental medication use decreased significantly when compared to baseline (…p=0.02), placebo (…p=0.0006), and racemic albuterol (p=0.048).**
- **No statistically significant difference in percentage of COPD control days**
- **No statistically significant difference in dyspnea index scores or respiratory questionnaire responses**
- **"Adverse events were generally self-limited, mild to moderate in intensity, and occurred in similar percentage of subjects across treatment groups."**
- **Author's conclusion:  The study demonstrated that nebulized levalbuterol provided effective bronchodilation and disease control compared with placebo in subjects with COPD and was generally well tolerated. Levalbuterol was associated with a significant reduction in rescue/supplemental medication use compared with placebo or racemic albuterol.**
- **The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol.  Our reasons are:**
  - **The author states that the "study was powered to detect a difference between the levalbuterol groups and placebo in the primary endpoint, but was not designed or powered to detect differences between active treatment groups."  It is inappropriate to draw conclusions from a study that was not designed to address the comparison between levalbuterol and albuterol.**
  - **Although there were some differences in the use of rescue/supplemental medication use between levalbuterol and albuterol, other clinical measures in the study showed no clinically significant differences.**
    - **In addition, the study protocol set the baseline frequency of administration of the drugs at three times per day.  Albuterol is typically used four to six times per day.  Therefore, the study design fostered the use of rescue/supplemental medication, thus making it inappropriate to draw conclusions about clinical superiority.**
- **This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.**

- **Lotvall et al, Journal of Allergy and Clinical Immunology, 2001**
  - **Randomized, double-blind, placebo-controlled, 4-way crossover study comparing levalbuterol to S-albuterol, racemic albuterol, and placebo**
  - **12 patients with asthma who were non-smokers; mean age 50 years; range, 24-70 years**

- **Studied effects of a single drug given in sequential escalating doses administered on separate days in an outpatient clinic setting**
- **Author's conclusion:  The results suggest that there is "…a comparable therapeutic ratio for R-albuterol (levalbuterol) and RS (racemic)-albuterol in asthmatic subjects"**

- **Nelson et al, Journal of Allergy and Clinical Immunology, 1998**
  - **Randomized, double-blind, placebo-controlled, parallel-group trial comparing levalbuterol, racemic albuterol, and placebo**
  - **362 patients with asthma who were non-smokers;  mean age 36.5 years**
  - **Patients received study drug 3 times per day for 4 weeks; pulmonary function tests were performed on day 1 and at weeks 2 and 4**
  - **Results**
    - **The combined levalbuterol treatment group had a significantly greater improvement in mean peak $FEV_1$ than the combined racemic albuterol group after the first dose.  However, at week 4, there was no statistically significant difference in improvement of mean peak $FEV_1$ when comparing the combined levalbuterol treatment group to the combined albuterol treatment group.**
    - **The combined levalbuterol treatment group had a significantly better $FEV_1$ area under the curve (AUC) analysis than the racemic albuterol group after the first dose,  However, at week 4 there was no statistically significant difference in mean AUC values when comparing the combined levalbuterol treatment group to the combined albuterol treatment group.**
    - **There were no significant differences in potentially drug-related adverse events across the treatment groups.**
  - **Author's conclusion:  "….this study suggests that there may be a better therapeutic index for levalbuterol than racemic albuterol."**
  - **The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol in the Medicare patient population.  Our reasons are:**
    - **The study population is young and is limited to non-smokers and a diagnosis of asthma.  It is inappropriate to draw conclusions from a study whose patients are very different than the typical Medicare user of inhalation solutions – who is much older, has a smoking history, and has a diagnosis of COPD.**
    - **The study protocol set the baseline frequency of administration of the drugs at three times per day.  Albuterol is typically used four to six times per day.  It is inappropriate to draw conclusions about the clinical superiority of levalbuterol when the typical dose of albuterol is not administered.**
    - **Most of the comparisons in the article were between the combined levalbuterol treatment group (0.63 mg and 1.25 mg doses) and the combined albuterol treatment group (1.25 mg and 2.5 mg doses).  Statistically significant differences were not noted when comparing the**

most common doses – 2.5 mg of racemic albuterol and 1.25 mg of levalbuterol.
- The relevant results were those obtained at the end of the study (i.e., at 4 weeks) because they approximated the use of these drugs in the Medicare population – i.e., daily use on a chronic basis.  Some difference between levalbuterol and albuterol were noted after the first dose.  However, these differences disappeared by week 4.
- The author states that the "study was powered to determine differences between active treatments and was not designed to detect intertreatment differences."  It is inappropriate to draw conclusions from a study that was not designed to address the comparison between levalbuterol and albuterol.
- This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.

- **Pleskow et al, Allergy and Asthma Proceedings, 2004**
  - This paper was a further analysis of the data obtained in the Nelson study.
  - **Results**
    - At week 4, considering all patients, there was no statistically significant difference in $FEV_1$ area under the curve when comparing chemically equivalent doses of (R)-albuterol (e.g., levalbuterol 1.25 mg and racemic albuterol 2.5 mg).  This was also true when comparing results in the subgroup of patients with more severe disease.
  - At week 4, there was no statistically significant differences between area under the curve $FEV_1$ when comparing chemically equivalent doses of drugs
  - Author's conclusion:  "Levalbuterol in the absence of the (S)-isomer provided greater bronchodilation that the same quantity of (R)-albuterol delivered as a racemate.  These data suggest that (S)-albuterol may compromise the efficacy of (R)-albuterol."
  - The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol in the Medicare patient population.
    - All of the comments made regarding the Nelson study also apply to this study – except for the comment about use of combined treatment groups in reporting the results.  This study was performed to provide a pairwise comparison between chemically equivalent doses of (R)-albuterol.
  - This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.


**Other literature was reviewed but did not provide evidence to support the therapeutic advantages of levalbuterol for one or more of the following reasons. These articles are <u>not</u> listed in the Sources of Information section of the LCD.**
- **Retrospective analysis of data**
- **Review articles**
- **Abstracts**

- **Letters to the editor**
- **Clinical studies not involving levalbuterol**
- **Animal studies**
- **In vitro studies**
- **Studies in healthy volunteers**

**Conclusion:  Considering all of the above, the literature does not document a significant clinical benefit for levalbuterol compared to albuterol for adult patients in the home setting.**

Comparing package inserts of levalbuterol and albuterol, side effects are similar.

**Response:  We agree.**

Levalbuterol has less of an effect on heart rate, glucose, and potassium than albuterol.

**Response:  We disagree.  The Donohue paper says: "Changes in serum potassium, glucose, and heart rate were similar in all active treatment groups."**

Cover levalbuterol in selected patients:
- Symptomatic tachycardia
- Tremor
- Underlying cardiac conditions
- Diagnoses which suggest susceptibility to racemic albuterol's negative side effects
- Resistance to/intolerance of albuterol

**Response:  The package insert for levalbuterol inhalation solution documents no difference between levalbuterol and albuterol in the percentage of patients with tachycardia. It does indicate that the percentage of patients with tremor is greater for levalbuterol than albuterol.  At this time, the literature does not define clinical subgroups of patients who benefit from levalbuterol compared to albuterol.**

Because levalbuterol can be given every 8 hours, there would be better compliance compared to albuterol which is given every 4-6 hours. It would also save administration costs in the hospital.

**Response:  The package insert for albuterol inhalation solution describes its administration as three to four times daily.  The clinical studies described above do not document that levalbuterol has a longer duration of action than albuterol.  This policy does not address use of these of drugs in a hospital setting.**

Pay for levalbuterol in full if the physician doesn't authorize the substitution of albuterol.

**Response:  The physician's order is not the determinant of whether full payment is made for levalbuterol.  Coverage and payment are based on the criteria in the medical policy.**

7

If Medicare decides not to pay in full, the levalbuterol should be denied completely rather than using LCA.

**Response:  Since levalbuterol is an effective treatment, it would not be appropriate to deny it in full.  Partial payment is made based on a determination that there is a less costly alternative that is also an effective treatment.**

CMS should pursue a compromise for the reimbursement of Xopenex.

**Response:  The DME PSC does not determine the pricing of Xopenex.**


## DuoNeb

DuoNeb LCA language is different than that of levalbuterol/albuterol.  It doesn't phrase it as a comparison to separate unit dose vials of albuterol and ipratropium.

**Response:  The wording in the LCD has been revised so that is similar to that for levalbuterol/albuterol.**

PIM requires "strong clinical justification" for an absolute policy statement.

**Response:  Actually, the Program Integrity Manual, Chapter 13, Section 13.7.1 says: "Less stringent evidence is needed …when reducing to the least costly alternative."**

Studies don't establish lack of medical necessity of DuoNeb; they are equivocal.

**Response:  It is the responsibility of the manufacturer to provide evidence to show that a particular drug is more effective than the alternative which is proposed in the draft LCD.**

Therapeutic effectiveness of DuoNeb is established in a number of studies: Campbell et al (1999), Chriselles et al (2002), Combivent Inhalation Study Group (1997), Dorinsky et al (1999), Friedman et al (1999), Gross et al (1998), and Levin et al (1996) .

**Response:  All of the studies, except that of Chriselles, compare use of a combination preparation of albuterol and ipratropium to single drug administration of either albuterol or ipratropium.  We agree that DuoNeb is clinically effective.  We agree that DuoNeb is more effective than either single agent albuterol or ipratropium used alone.  The draft LCD does not dispute these conclusions.**

**Even though the Chriselles paper compares patients using a combination preparation of albuterol and ipratropium to those using separate preparations of both albuterol and ipratropium, it does not provide evidence to support full payment for DuoNeb for reasons including but not limited to the following:**

- o **It is not a clinical study conducted by physicians, but rather an economic analysis authored by non-physicians.**
- o **It is a retrospective study.**
- o **The study subjects used metered dose inhalers (MDIs), not inhalation solutions.**

**Therefore, the literature does not provide evidence to support the superiority of DuoNeb to separate unit dose vials of albuterol and ipratropium inhalation solutions.**

Draft policy provides no studies to support its conclusion.

**Response: As noted above, there is only one paper that addresses the issue in the draft LCD – i.e., the comparison of DuoNeb to separate unit dose vials of both albuterol and ipratropium. That paper is not a clinical study but rather a retrospective economic analysis by non-physicians. However, the final policy does list the papers that were provided by the manufacturer and reviewed by the PSCs.**

Using separate unit dose vials would take longer to administer.

**Response: There is no proven therapeutic difference that is related to the time of administration. However, if a physician or patient would like to shorten the administration time, there is a manufactured unit dose preparation of albuterol that contains 2.5 mg in a 0.5 ml vial. If that is combined with the standard 2.5 ml unit dose vial of ipratropium, the total volume (3.0 ml) is the same as in one vial of DuoNeb.**

For patients with dexterity problems, opening a second vial poses additional challenges.

**Response: If a beneficiary can open one vial a few times per day, they should be able to open an additional vial with each administration.**

Combination of factors may reduce patient compliance, thus worsening the clinical outcome.

**Response: There are no studies that document an improved clinical outcome when DuoNeb is used compared to separate unit dose vials of albuterol and ipratropium.**

Cost avoidance of an exacerbation (e.g., ER visit) makes up for the cost savings achieved by an LCA policy.

**Response: There is no conclusive evidence that proves that using separate unit dose vials of albuterol and ipratropium in place of DuoNeb results in an increase in exacerbations.**

DuoNeb is more effective and has a longer effect than either drug alone.

**Response: We agree – but that is not the issue addressed in the draft policy. The policy is based on a determination that DuoNeb is not more effective than separate vials of both albuterol and ipratropium administered at the same time.**

Use of separate unit dose vials would lead to medication errors:
- Writing two prescriptions instead of one increases chance for error
- Labeling (esp. replacing paper labels with a clear raised plastic imprint) makes individual vials difficult to distinguish
- Beneficiaries might inadvertently use two vials of the same medication
- Would require the beneficiary to correctly mix two drugs

**Response: Although an increase in medication errors is theoretically possible, before the approval of DuoNeb, albuterol and ipratropium had been provided in separate vials for many years. We have seen no documentation to indicate that use of separate vials caused significant toxicity.**

It would be difficult to educate beneficiaries on a new regimen involving separate unit dose vials

**Response: We disagree. Many patients currently use separate unit dose vials of albuterol and ipratropium or vials of DuoNeb and a separate vial of another inhalation solution – e.g., budesonide. Furthermore, it is not uncommon for there to be changes in a patient's therapeutic regimen such as the addition or substitution of a new drug. Physicians and suppliers have provided effective education to beneficiaries in these situations.**

Albuterol is available in a unit dose vial containing 0.5 ml of a 0.5% solution. Combining that with 2.5 ml of an ipratropium unit dose results in the same volume as DuoNeb and therefore the same administration time.

**Response: We agree.**

# EXHIBIT L

## 200 - Pharmacology
**(Rev. 1, 10-03-03)**

No coverage determinations

## 200.1 - Nesiritide for Treatment of Heart Failure Patients (Effective March 2, 2006)
**(Rev. 51, Issued: 04-07-06, Effective: 03-02-06, Implementation: 05-22-06)**

### A.  General

Nesiritide (Natrecor®) is Food and Drug Administration (FDA) approved for the intravenous treatment of patients with acutely decompensated congestive heart failure (CHF) who have dyspnea (shortness of breath) at rest or with minimal activity. Nesiritide is not self-administered.

### B.  Nationally Covered Indications

N/A

### C.  Nationally Non-covered Indications

Effective for dates of service on or after March 2, 2006, the Centers for Medicare & Medicaid Services (CMS) has determined that there is sufficient evidence to conclude that the use of Nesiritide for the treatment of chronic heart failure is not reasonable and necessary for Medicare beneficiaries in any setting.

### D.  Other

Effective for dates of service on or after March 2, 2006, this determination applies only to the treatment of chronic heart failure and does not change contractor discretion to cover other off-label uses of Nesiritide or use consistent with the current FDA indication for intravenous treatment of patients with acutely decompensated congestive heart failure who have dyspnea at rest or with minimal activity.

(This NCD last reviewed March 2006.)

## 200.2 - Nebulized Beta Adrenergic Agonist Therapy for Lung Diseases – (Effective September 10, 2007)
**(Rev. 79; Issued:  12-21-07; Effective:  09-10-07; Implementation:  01-22-08)**

### A.  General

Lung diseases such as chronic obstructive pulmonary disease (COPD) and asthma are characterized by airflow limitation that may be partially or completely reversible. Pharmacologic treatment with bronchodilators is used to prevent and/or control daily

*symptoms that may cause disability for persons with these diseases. These medications are intended to improve the movement of air into and from the lungs by relaxing and dilating the bronchial passageways. Beta adrenergic agonists are a commonly prescribed class of bronchodilator drug. They can be administered via nebulizer, metered dose inhaler, orally, or dry powdered inhaler.*

*Nebulized beta adrenergic agonist with racemic albuterol has been used for many years. More recently, levalbuterol, the (R) enantiomer of racemic albuterol, has been used in some patient populations. There are concerns regarding the appropriate use of nebulized beta adrenergic agonist therapy for lung disease.*

*B. Nationally Covered Indications*

*N/A*

*C. Nationally Non-Covered Indications*

*N/A*

*D. Other*

*After examining the available medical evidence, the Centers for Medicare & Medicaid determines that no national coverage determination (NCD) is appropriate at this time. Section 1862(a)(1)(A) of the Social Security Act decisions should be made by local contractors through a local coverage determination process or case-by-case adjudication. See Heckler v. Ringer, 466 U.S. 602, 617 (1984) (Recognizing that the Secretary has discretion to either establish a generally applicable rule or to allow individual adjudication.). See also, 68 Fed. Reg. 63692, 63693 (November 7, 2003).*

*(This NCD last reviewed September 2007.)*

## 210 - Prevention
**(Rev. 1, 10-03-03)**

## 210.1 - Prostate Cancer Screening Tests
**(Rev. 48, Issued:  03-17-06; Effective/Implementation Dates:  06-19-06)**

**CIM 50-55**

Covered

**A.  General**

Section 4103 of the Balanced Budget Act of 1997 provides for coverage of certain prostate cancer screening tests subject to certain coverage, frequency, and payment limitations.  Medicare will cover prostate cancer screening tests/procedures for the early

# EXHIBIT M

April 24, 2007

As announced earlier this year, after a careful examination of Section 1847A of the Social Security Act, as established in the MMA of 2003, CMS has been working to ensure that accurate and separate payment is made for single source drugs and biologicals as required by this section of the Act. As part of this effort, we have also reviewed how we have operationalized the terms "single source drug," "multiple source drug," and "biological product" in the context of payment under section 1847A.

For the purposes of identifying "single source drugs" and "biological products" subject to payment under section 1847A, generally CMS will utilize a multi-step process. CMS will consider:
- The FDA approval,
- Therapeutic equivalents as determined by the FDA, and
- The date of first sale in the United States.

Therefore, if a biological product (as evidenced by a new FDA Biologic License Application or other relevant FDA approval) or a single source drug (that is not a drug for which there are two or more drug products that are rated as therapeutically equivalent in the most recent FDA Orange Book) was first sold in the United States after October 1, 2003, as appropriate a unique HCPCS code will be assigned to facilitate separate payment.

# EXHIBIT N

As announced in late 2006, after carefully examining Section 1847A of the Social Security Act, as added by the Medicare Modernization Act of 2003, CMS has been working further to ensure that more accurate and, as appropriate, separate payment is made for single source drugs and biologicals under Section 1847A. As part of this effort, we have also reviewed how we have operationalized the terms "single source drug," "multiple source drug," and "biological product" in the context of payment under section 1847A. For the purposes of identifying "single source drugs" and "biological products" subject to payment under section 1847A, generally CMS (and its contractors) will utilize a multi-step process. We will consider:

- The FDA approval,
- Therapeutic equivalents as determined by the FDA, and
- The date of first sale in the United States.

For a biological product (as evidenced by a new FDA Biologic License Application or other relevant FDA approval) or a single source drug (that is, not a drug for which there are two or more drug products that are rated as therapeutically equivalent in the most recent FDA Orange Book) first sold in the United States after October 1, 2003, the payment limit under Section 1847A for that biological product or single source drug will be based on the pricing information for products produced or distributed under the applicable FDA approval. As appropriate, a unique HCPCS code will be assigned to facilitate separate payment. Separate payment may also be operationalized through use of existing specific HCPCS codes or "not otherwise classified" HCPCS codes. Examples of how we are operationalizing this approach using unique HCPCS codes include: (1) the Q codes for Euflexxa[TM], Orthovisc®, and Synvisc® effective January 1, 2007, and (2) the series of Q codes for immune globulin and the new Q code for Reclast® effective July 1, 2007.

Section 1847A requires single source drugs or biologicals that were within the same billing and payment code as of October 1, 2003, be treated as multiple source drugs, so the payment under Section 1847A for these drugs and biologicals is based on the volume weighted average of the pricing information for all of the products within the billing and payment code. We are working to ensure that payments accurately reflect this "grandfathering" provision. Examples of how we are operationalizing this provision include: (1) Q4083 for Hyalgan and Supartz effective January 1, 2007, and (2) Q4094 for albuterol and levalbuterol and Q4093 for concentrated forms of albuterol and levalbuterol effective July 1, 2007.

In addition, appropriate modifications of the NDC to HCPCS crosswalk used to calculate the payment limits for purposes of Section 1847A will be made to ensure that payment will be based on the pricing information for all products produced or distributed under an FDA approval for the drug or biological. One result is the same payment limit for J0885 (injection, epoetin alfa, (for non-ESRD use)) and J0886 (injection, epoetin alfa, (for ESRD on dialysis)).

We will continue to work to identify and implement payment and coding changes as necessary to ensure more accurate payments under Section 1847A. So that we can implement any further necessary changes during 2007, we will continue to use our internal process for modifying the HCPCS code set and for adjusting the NDC to HCPCS crosswalk.

A full list of the July 2007 quarterly updates to the HCPCS is available at http://www.cms.hhs.gov/HCPCSReleaseCodeSets/02_HCPCS_Quarterly_Update.asp#TopOfPage

Pricing information for Part B drugs and biologicals for the third quarter of 2007 (July 1 – September 30) will be posted on or after June 15th at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/01a_2007aspfiles.asp#TopOfPage

The announcement for the Q codes for Euflexxa[TM], Orthovisc®, and Synvisc® effective January 1, 2007 and Q4083 for Hyalgan and Supartz also effective January 1, 2007, was posted on December 22, 2006 and is available at http://www.cms.hhs.gov/Transmittals/downloads/R1152CP.pdf

# EXHIBIT O

| HCPCS Code | Short Description | HCPCS Code Dosage | Payment Limit | Vaccine AWP% | Vaccine Limit | Infusion AWP% | DME Infusion Limit | Blood AWP% | Blood Limit |
|---|---|---|---|---|---|---|---|---|---|
| J7520 | Sirolimus, oral | 1 MG | $7.931 | | | | | | |
| J7525 | Tacrolimus injection | 5 MG | $140.026 | | | | | | |
| J7605 | Arformoterol non-comp unit | 15 mcg | $4.739 | | | | | | |
| J7608 | Acetylcysteine inh sol u d | 1 GM | $1.729 | | | | | | |
| J7611 | Albuterol non-comp con[1] | 1 MG | $0.070 | | | | | | |
| J7612 | Levalbuterol non-comp con[1] | 0.5 MG | $0.121 | | | | | | |
| J7613 | Albuterol non-comp unit dose[1] | 1 MG | $0.044 | | | | | | |
| J7614 | Levalbuterol non-comp unit dose[1] | 0.5 MG | $0.280 | | | | | | |
| J7620 | Albuterol ipratrop non-comp | 2.5 MG/0.5 MG | $0.830 | | | | | | |
| J7626 | Budesonide non-comp unit dose | 0.5 MG | $5.017 | | | | | | |
| J7631 | Cromolyn sodium inh sol u d | 10 MG | $0.062 | | | | | | |
| J7639 | Dornase alpha inhal sol u d | 1 MG | $20.865 | | | | | | |
| J7644 | Ipratropium bromide non-comp | 1 MG | $0.202 | | | | | | |
| J7669 | Metaproterenol non-comp unit dose | 10 MG | $0.255 | | | | | | |
| J7674 | Methacholine chloride, neb | 1 MG | $0.410 | | | | | | |
| J7682 | Tobramycin non-comp unit dose | 300 MG | $59.754 | | | | | | |
| J8501 | Oral aprepitant | 5 MG | $5.267 | | | | | | |
| J8510 | Oral busulfan | 2 MG | $2.502 | | | | | | |
| J8515 | Cabergoline, oral 0.25mg | 0.25 MG | $17.270 | | | | | | |
| J8520 | Capecitabine, oral, 150 mg | 150 MG | $4.610 | | | | | | |
| J8521 | Capecitabine, oral, 500 mg | 500 MG | $15.289 | | | | | | |
| J8530 | Cyclophosphamide oral 25 MG | 25 MG | $0.822 | | | | | | |
| J8540 | Oral dexamethasone | 0.25 MG | $0.248 | | | | | | |
| J8560 | Etoposide oral 50 MG | 50 MG | $29.545 | | | | | | |
| J8610 | Methotrexate oral 2.5 MG | 2.5 MG | $0.162 | | | | | | |
| J8700 | Temozolomide | 5 MG | $7.665 | | | | | | |
| J9000 | Doxorubic hcl 10 MG vl chemo | 10 MG | $4.750 | | | | | | |
| J9001 | Doxorubicin hcl liposome inj | 10 MG | $413.493 | | | 95 | $393.480 | | |
| J9010 | Alemtuzumab injection | 10 MG | $551.070 | | | | | | |
| J9015 | Aldesleukin/single use vial | 1 EA | $767.398 | | | | | | |
| J9017 | Arsenic trioxide | 1 MG | $34.478 | | | | | | |
| J9020 | Asparaginase injection | 10000 UNITS | $57.017 | | | | | | |
| J9025 | Azacitidine injection | 1 MG | $4.477 | | | | | | |
| J9027 | Clofarabine injection | 1 MG | $115.171 | | | | | | |
| J9031 | Bcg live intravesical vac | 1 EA | $113.748 | | | | | | |
| J9035 | Bevacizumab injection | 10 MG | $57.436 | | | | | | |
| J9040 | Bleomycin sulfate injection | 15 UNITS | $29.020 | | | 95 | $289.370 | | |
| J9041 | Bortezomib injection | 0.1 MG | $34.427 | | | | | | |
| J9045 | Carboplatin injection | 50 MG | $6.306 | | | | | | |
| J9050 | Carmus bischl nitro inj | 100 MG | $156.827 | | | | | | |
| J9055 | Cetuximab injection | 10 MG | $49.807 | | | | | | |
| J9060 | Cisplatin 10 MG injection | 10 MG | $2.265 | | | | | | |
| J9062 | Cisplatin 50 MG injection | 50 MG | $11.324 | | | | | | |
| J9065 | Inj cladribine per 1 MG | 1 MG | $30.626 | | | 95 | $61.720 | | |
| J9070 | Cyclophosphamide 100 MG inj | 100 MG | $1.871 | | | | | | |
| J9080 | Cyclophosphamide 200 MG inj | 200 MG | $3.743 | | | | | | |
| J9090 | Cyclophosphamide 500 MG inj | 500 MG | $9.356 | | | | | | |
| J9091 | Cyclophosphamide 1.0 grm inj | 1 GM | $18.713 | | | | | | |
| J9092 | Cyclophosphamide 2.0 grm inj | 2 GM | $37.425 | | | | | | |
| J9093 | Cyclophosphamide lyophilized | 100 MG | $1.859 | | | | | | |
| J9094 | Cyclophosphamide lyophilized | 200 MG | $3.717 | | | | | | |
| J9095 | Cyclophosphamide lyophilized | 500 MG | $9.294 | | | | | | |

# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEANETTE K. COAKLEY et al.,
           Plaintiffs,

       v.                             Civil Action No._____

CIGNA GOVERNMENT SERVICES, LLC
et al.,

           Defendants.

**DECLARATION OF WILLIAM W. HEWLETT**

      I, William W. Hewlett, do hereby state and affirm as follows:

1. I am over the age of 21 years. I am of sound mind and capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, and they are true and accurate to the best of my knowledge and belief.

2. I am employed as the President and Chief Pharmacist of Soporex Respiratory, Inc. d/b/a Independence Home Pharmacy ("IHP"), in Murray, Kentucky, a nationwide provider of home healthcare products and services. IHP participates in the Medicare program and accepts assignment from Medicare for products and services reimbursed under the Medicare Part B benefit, including inhalation drug products administered through durable medical equipment.

3. IHP currently supplies an inhalation product with the generic name levalbuterol, under the brand name Xopenex® (levalbuterol) Inhalation Solution, to Medicare beneficiaries across the United States. IHP also supplies generic albuterol to Medicare beneficiaries.

4.  The current reimbursement rate IHP receives from Medicare for Xopenex, published for the Second Quarter of 2008, is $ 0.28 per half milligram.

5.  The current reimbursement rate IHP receives from Medicare for generic albuterol is $ 0.045 per milligram.

6.  IHP's current acquisition cost for Xopenex is $ 0.236 per half milligram.

7.  Unless IHP is reimbursed for Xopenex at a rate that exceeds its acquisition cost to a sufficient degree, it will be unable to continue supplying Xopenex to Medicare beneficiaries.

8.  Reimbursement for Xopenex at the current reimbursement rate for generic albuterol ($ 0.045/mg) is significantly below IHP's current acquisition cost for Xopenex $ 0.236 per half milligram.

9.  If, effective July 1, 2008, the reimbursement rate for Xopenex is equal to the rate for generic albuterol, IHP will no longer be able to supply Xopenex to Medicare beneficiaries.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 5, 2008.

William W. Hewlett
1306 South 12th Street
Murray, KY 42071

# EXHIBIT Q

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEANETTE K. COAKLEY et al.,
        Plaintiffs,

        v.                                        Civil Action No. _____

CIGNA GOVERNMENT SERVICES, LLC
et al.,

        Defendants.

### DECLARATION OF MARK J. WANDA

        I, MARK J. WANDA, do hereby state and affirm as follows:

1. I am over the age of 21 years. I am of sound mind and capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, and they are true and accurate to the best of my knowledge and belief.

2. I am employed as Senior Vice President, Legal Affairs and Deputy General Counsel at Sepracor Inc. ("Sepracor"), the manufacturer of the drug Xopenex® (levalbuterol) Inhalation Solution. Sepracor sells Xopenex to Medicare suppliers throughout the United States, who then provide Xopenex to Medicare beneficiaries.

3. Sepracor's market data shows that utilization of Xopenex increased after the Centers for Medicare and Medicaid Services awarded Xopenex a unique J-code in January 2005.

4. Since 2005, the acquisition cost of Xopenex to Medicare suppliers has exceeded the acquisition cost of the generic drug racemic albuterol.

5. Sepracor's market data shows that, in the first quarter 2008 time period, approximately 48,000 Medicare beneficiaries took Xopenex.

6. Sepracor sells Xopenex to Reliant Pharmacy Services in Clearwater, Florida, and Independence Home Pharmacy in Murray, Kentucky at a price of $ 0.236 per half milligram.

7. The current reimbursement rate Medicare suppliers receive from Medicare for Xopenex, published for the Second Quarter of 2008, is $ 0.28 per half milligram.

8. The current reimbursement rate Medicare suppliers receive from Medicare for generic albuterol is $ 0.045 per milligram.

9. If the nebulizer LCDs take effect July 1, 2008 and the reimbursement rate for Xopenex is equal to the rate for generic albuterol, it will no longer be profitable for suppliers to supply Xopenex to Medicare beneficiaries, because the current reimbursement for generic albuterol ($ 0.045/mg) is significantly below their cost for acquiring Xopenex ($ 0.236/0.5mg).

10. Many suppliers have already notified physicians that they will cease supplying Xopenex to Medicare beneficiaries as of July 1, 2008, the date the nebulizer LCDs take effect.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 5, 2008.

Name: Mark J. Wanda
Address: 84 Waterford Drive
Marlborough, MA 01752

# EXHIBIT R

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JEANETTE K. COAKLEY et al.,
   Plaintiffs,

   v.        Civil Action No._____

CIGNA GOVERNMENT SERVICES, LLC et
al.,

    Defendants.


## DECLARATION OF JEANETTE K. COAKLEY

  I, Jeanette K. Coakley, do hereby state and affirm as follows:

1. I am 63 years old and reside at 1880 Chantilly Court, Virginia Beach, Virginia, 23451.

2. I am currently a Medicare beneficiary and have been enrolled in Medicare on the basis of a

  disability since 2000.

3. I suffer from both asthma and chronic obstructive pulmonary disease (COPD). My physician,

  Dr. William Cooper, has prescribed Xopenex Inhalation Solution ("Xopenex") to me in order

  to treat my conditions. In accordance with my prescription, I take a 1.25 mg dose of Xopenex

  three times per day, administered through the use of a nebulizer. As a Medicare beneficiary, I

  receive coverage for Xopenex through Medicare Part B.

4. I receive Xopenex from Reliant Pharmacy Services in Clearwater, Florida.

5. I have been taking Xopenex for approximately five and a half years, prior to which I was

  taking racemic albuterol. Dr. Cooper prescribed Xopenex because of negative side effects I

was experiencing with the use of racemic albuterol, including nausea, elevated blood pressure, shortness of breath, and physical tremors. Switching to Xopenex has substantially eliminated the occurrence of such side effects and has made a marked improvement in my quality of life.

6. Were the negative side effects to recur because I had to take racemic albuterol again instead of Xopenex, it would cause me pain and discomfort.

7. I live on social security disability income. Because of my limited economic means, if I were unable to obtain Xopenex through Medicare, I would be unable to pay out of pocket the cost of my Xopenex prescription.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 29, 2008.

Jeanette K. Coakley
1880 Chantilly Court
Virginia Beach, VA 23451

2

# EXHIBIT S

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEANETTE K. COAKLEY et al.,
      Plaintiffs,

     v.                           Civil Action No._____

CIGNA GOVERNMENT SERVICES, LLC et
al.,

      Defendants.


**DECLARATION OF FRANCES W. ROYSTER**

    I, Frances W. Royster, do hereby state and affirm as follows:

1. I am 77 years old.  I am of sound mind and capable of making this declaration.  I have

    personal knowledge of the facts set forth in this declaration, and they are true and accurate to

    the best of my knowledge and belief.

2. I reside at 175 Royster Lane, Randolph, Virginia 23962.

3. I am currently a Medicare beneficiary and have been enrolled in Medicare since I turned 65 in

    1996.

4. I suffer from both asthma and chronic obstructive pulmonary disease (COPD).  To treat these

    conditions, my physician, Dr. Terrence Truitt, currently prescribes Xopenex Inhalation

    Solution ("Xopenex").  I take a 1.25 mg dose of Xopenex two to four times per day,

    administered through the use of a nebulizer, as prescribed.  As a Medicare beneficiary, I

    receive coverage for Xopenex through Medicare Part B.

5. I receive Xopenex from Independence Home Pharmacy in Murray, Kentucky.

6. I have been taking Xopenex for approximately three years, prior to which I was taking racemic albuterol. Dr. Truitt prescribed Xopenex because racemic albuterol was not effectively treating my conditions. Specifically, I continued to have serious difficulty breathing while taking racemic albuterol. It was providing very little benefit to my breathing, and I had to take it often to achieve any benefit at all. Since switching to Xopenex, I can breathe much better, and I can take fewer doses than when I was taking racemic albuterol. Xopenex has substantially improved my quality of life.

7. I need Xopenex in order to breathe. If I had to take racemic albuterol again instead of Xopenex, my ability to breathe would significantly decrease.

8. I live on social security income supplemented by my husband's pension. Because of my limited economic means, if I were unable to obtain Xopenex through Medicare, it would cause me significant hardship.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2008.

Frances W. Royster
175 Royster Lane
Randolph, VA 23962

2

# EXHIBIT T

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEANETTE K. COAKLEY et al.,
      Plaintiffs,

         v.                      Civil Action No._____

CIGNA GOVERNMENT SERVICES, LLC et
al.,

      Defendants.

**DECLARATION OF EUNICE L. KOZIRESKI**

    I, Eunice L. Kozireski, do hereby state and affirm as follows:

1. I am 73 years old. I am of sound mind and capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, and they are true and accurate to the best of my knowledge and belief.

2. I reside at 6032 Swanson Creek, Hughesville, Maryland 20637.

3. I am currently a Medicare beneficiary and have been enrolled in Medicare since 1997.

4. I suffer from chronic obstructive pulmonary disease (COPD) and have undergone surgery for lung cancer. To treat my COPD, my physician, Dr. Bahram Redjaee, currently prescribes Xopenex Inhalation Solution ("Xopenex"). I take a 1.25 mg dose of Xopenex three to five times per day, administered through the use of a nebulizer. As a Medicare beneficiary, I receive coverage for Xopenex through Medicare Part B.

5. I receive Xopenex from Independence Home Pharmacy in Murray, Kentucky.

6. I have been taking Xopenex for approximately one year, prior to which I was taking racemic albuterol. Dr. Redjaee prescribed Xopenex in part because racemic albuterol was causing negative side effects. Specifically, racemic albuterol caused me to have significant physical tremors. Switching to Xopenex has substantially eliminated the occurrence of this side effect and has made my life better.

7. I prefer Xopenex to racemic albuterol because it allows me to breathe without the side effects associated with racemic albuterol. Were the negative side effects to recur because I had to take racemic albuterol again instead of Xopenex, it would cause me discomfort.

8. I live on social security income. Because of my limited economic means, if I were unable to obtain Xopenex through Medicare, I would be unable to afford it otherwise.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 5, 2008.

Eunice L. Kozireski
6032 Swanson Creek
Hughesville, MD 20637

2

# EXHIBIT U

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEANETTE K. COAKLEY et al.,
       Plaintiffs,

      v.                       Civil Action No._____

CIGNA GOVERNMENT SERVICES, LLC et
al.,

       Defendants.

**DECLARATION OF THERESA A. TORRISI**

    I, Theresa A. Torrisi, do hereby state and affirm as follows:

1. I am 81 years old. I am of sound mind and capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, and they are true and accurate to the best of my knowledge and belief.

2. I reside at 690 Lowell Street, Lawrence, Massachusetts 01841.

3. I am currently a Medicare beneficiary and have been enrolled in Medicare since I turned 62 in 1989.

4. I suffer from chronic obstructive pulmonary disease (COPD). My physician, Dr. Glenn Newsome, currently prescribes Xopenex Inhalation Solution ("Xopenex") to treat my COPD. I take a 1.25 mg dose of Xopenex three to four times per day, administered through the use of a nebulizer. As a Medicare beneficiary, I receive coverage for Xopenex through Medicare Part B.

5. I receive Xopenex from Independence Home Pharmacy in Murray, Kentucky.

6. I have been taking Xopenex for approximately five years, prior to which I was taking racemic albuterol. Dr. Newsome prescribed Xopenex in part because racemic albuterol was causing negative side effects. Specifically, racemic albuterol caused me to have significant physical tremors. Switching to Xopenex has substantially eliminated the occurrence of this side effect. Moreover, Xopenex helps me to breathe much better than racemic albuterol and has improved my quality of life.

7. Were the negative side effects to recur because I had to take racemic albuterol again instead of Xopenex, it would impair my quality of life.

8. I live on social security income. Because of my limited economic means and the numerous other prescription medications that I take, if I were unable to obtain Xopenex through Medicare, it would be a hardship for me to pay for it out of pocket.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 5, 2008.

Theresa A. Torrisi
690 Lowell St.
Lawrence, MA 01841

2

# EXHIBIT V

responsibilities DME PSCs and DME MACs will delineate in order for the DME MACs to adopt or reject LCDs recommended by the DME PSCs.

*Effective March 1, 2008, DME PSCs will no longer develop, revise or recommend LCDs to the DME MACs.  In accordance to this chapter, the DME MACs will have full responsibility for developing and revising LCDs, maintaining the LCD record, and responsibility for LCD challenges.  CMS requires that LCDs developed and revised by the DME MACs be identical for each jurisdiction to ensure uniformity for DMEPOS suppliers that operate nationally*

## 13.3 - Individual Claim Determinations
**(Rev. 71, 04-09-04)**

Contractors may review claims on either a prepayment or postpayment basis regardless of whether a NCD, coverage provision in an interpretive manual, or LCD exists for that service. However, automated denials can be made only when clear policy or certain other conditions (see chapter 3, §3.5.1) exist. When making individual claim determinations, the contractor shall determine whether the service in question is covered based on an LCD or the clinical judgment of the medical reviewer. A service may be covered by a contractor if it meets all of the conditions listed in §3.5.1, Reasonable and Necessary Provisions in LCDs below.

## 13.4 - When To Develop New/Revised LCDs
**(Rev. 71, 04-09-04)**

The use of a LCD helps avoid situations in which claims are paid or denied without a provider having a full understanding of the basis for payment and denial.

A.  Contractors Shall Develop New/Revised LCDs

Contractors shall develop LCDs when they have identified a service that is never covered under certain circumstances and wish to establish automated review in the absence of an NCD or coverage provision in an interpretive manual that supports automated review.

Contractors shall implement new Least Costly Alternative (LCA) determinations through an LCD. "Least Costly Alternative" is a national policy provision that shall be applied by contractors when determining payment for all durable medical equipment (DME).  Contractors have the discretion to apply this principle to payment for non-DME services as well.

When revising an existing policy to include an LCA determination the entire LCD should be posted, but only the new LCA determination will be subject to comment.  You should highlight the new LCA determination that is subject to comment.

The requirement to go through the LCD process does not apply to LCA determinations for individual claims, existing LCA determinations, or to the current moratorium on issuing LCA policy on Vitamin D analogues.

B.  Contractors May Develop New/Revised LCD

Contractors have the option to develop LCDs when any of the following occur:

- A validated widespread problem demonstrates a significant risk to the Medicare trust funds (identified or potentially high dollar and/or high volume services); See Chapter 3,§ 3.2A, Error Validation Review, for an explanation of the problem validation process. Multi-state contractors may develop uniform LCDs across all its jurisdictions even if data analysis indicates that the problem exists only in one state.

- A LCD is needed to assure beneficiary access to care.

- A contractor has assumed the LCD development workload of another contractor and is undertaking an initiative to create uniform LCDs across its multiple jurisdictions; or is a multi-state contractor undertaking an initiative to create uniform LCDs across its jurisdiction; or

- Frequent denials are issued (following routine or complex review) or frequent denials are anticipated.

C.  Contractors Shall Review LCD

**Contractors shall ensure that the LCDs appearing on the contractor's LCD Web site and the LCDs appearing in the Medicare Coverage Database are identical.  Contractors are encouraged to make use of the Medicare Coverage Database "Save as HTML" feature to assist in keeping the LCDs on their contractor Web sites current.**

Within 90 Days

Contractors shall review and appropriately revise affected LCD within 90 days of the publication of program instruction (e.g., Program Memorandum, manual change) containing:

- A new or revised NCD;
- A new or revised coverage provision in an interpretive manual; or
- A change to national payment policy.

Within 120 Days

The Medicare Coverage Database will notify contractors of each LCD that is affected by an update to a HCPCS code or ICD-9-CM code.

The database automatically incorporates code deletions into revised LCDs (and LMRPs and articles) that are placed in "to be reviewed" status.  In all cases (code deletions, code insertions, and code description changes) a new version of the LCD (and LMRP and article) is automatically made to incorporate the change, and the new version is placed in the "to be reviewed" status.

Contractors shall review and approve and/or appropriately revise affected LCD within 120 days of the date of this notification.  Contractors shall revise the effective date, revision number, and the revision history on all revisions due to major HCPCS and ICD-9-CM changes.  Contractors need not revise the effective date, revision number and revision history on revisions due to minor HCPCS changes.  Contractors shall ensure that corresponding changes are made to the LCD appearing on the contractor's LCD Web sites.

**NOTE:** The Medicare Coverage Database will only alert contractors to the existence of new codes if the new code falls within a code range listed in the LCD.

Annually

To ensure that all LCDs remain accurate and up-to-date at all times, at least annually, contractors shall review and appropriately revise LCDs based upon CMS NCD, coverage provisions in interpretive manuals, national payment policies and national coding policies. If an LCD has been rendered useless by a new/revised national policy, the LCD shall be retired. This process shall include a review of the LCDs in the Medicare Coverage Database and on the contractor's Web site.

Contractors should consider retiring LCDs that are no longer being used for prepay review, post pay review or educational purposes.  For example, contractors should consider retiring LCDs for outdated technology with no claims volume.

## 13.5 - Content of an LCD
**(Rev. 71, 04-09-04)**

Contractors shall ensure that LCDs are developed for services only within their jurisdiction.

The LCD shall be clear, concise, properly formatted and not restrict or conflict with NCDs or coverage provisions in interpretive manuals. If an NCD or coverage provision in an interpretive manual states that a given item is "covered for diagnoses/conditions A, B and C," contractors should not use that as a basis to develop LCD to cover only "diagnoses/conditions A, B and C." When an NCD or coverage provision in an interpretive manual does not exclude coverage for other diagnoses/conditions, contractors shall allow for individual consideration unless the LCD supports automatic denial for some or all of those other diagnoses/conditions.

## 13.5.1 - Reasonable and Necessary Provisions in LCDs
**(Rev. 71, 04-09-04)**

A service may be covered by a contractor if:

- It is reasonable and necessary under 1862(a)(1)(A) of The Act.

Only reasonable and necessary provisions are considered part of the LCD.

Reasonable and Necessary

In order to be covered under Medicare, a service shall be reasonable and necessary. When appropriate, contractors shall describe the circumstances under which the proposed LCD for the service is considered reasonable and necessary under 1862(a)(1)(A). Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:

- Safe and effective;

- Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000 which meet the requirements of the Clinical Trials NCD are considered reasonable and necessary); and

- Appropriate, including the duration and frequency that is considered appropriate for the service, in terms of whether it is:

  o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

  o Furnished in a setting appropriate to the patient's medical needs and condition;

  o Ordered and furnished by qualified personnel;

  o One that meets, but does not exceed, the patient's medical need; and

  o At least as beneficial as an existing and available medically appropriate alternative.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury. The exceptions appear in the full text of §1862(a)(1)(A) and include but are not limited to:

- Pneumococcal, influenza and hepatitis B vaccines are covered if they are reasonable and necessary for the prevention of illness;

- Hospice care is covered if it is reasonable and necessary for the palliation or management of terminal illness;

- Screening mammography is covered if it is within frequency limits and meets quality standards;

- Screening pap smears and screening pelvic exam are covered if they are within frequency limits;

- Prostate cancer screening tests are covered if within frequency limits;

- Colorectal cancer screening tests are covered if within frequency limits; and

- One pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an interlobular lens.

## 13.5.2 - Coding Provisions in LCDs
**(Rev. 71, 04-09-04)**

Only codes describing what is covered and what is not covered can be part of the LCD. This includes, for example, lists of HCPCs codes that spell out which services the LCD applies to, lists of ICD-9 codes for which the service is covered, lists of ICD-9 codes for which the service is not considered reasonable and necessary, etc.

# EXHIBIT W

*The* NEW ENGLAND JOURNAL *of* MEDICINE

# Why Medicare Has Not Established Criteria for Coverage Decisions

Sean R. Tunis, M.D.

Decisions about medical coverage by Medicare specify the forms of technology and services that the program will pay for on behalf of its 42 million beneficiaries. These decisions often have far-reaching effects through their influence on the policies of other public and private payers in determining medical necessity. For the nearly four decades since Medicare was created in 1965, coverage decisions have been based on section 1862(a)(1)(A) of the statute that enacted the program: "Notwithstanding any other provision of this title, no payment may be made . . . for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." No additional language from Congress explaining "reasonable and necessary" accompanied the 1965 law, and no documents providing any interpretation were issued until 1977. There is a common understanding among federal officials who participated in drafting the legislation that the "reasonable and necessary" provision was modeled on language from an Aetna health insurance policy for federal employees. Although there was concern at the time that services of unknown value would sometimes be used, payers generally accepted the judgments of physicians at face value.[1] Therefore, a precise definition of medical necessity would not be required.

Much has changed in health care since 1965, including a vast expansion in the available technological procedures and services, an increase in health care spending to greater than 15 percent of the gross domestic product, and a substantially broader role for public and private payers in making decisions about coverage. Despite several efforts over the years by Medicare to specify the criteria for "reasonable and necessary," the particulars have never been defined in regulatory language. In this issue of the *Journal*, Gillick reviews the process by which three recent decisions about national coverage were made by Medicare, highlights the clinical and economic effects of these decisions, and proposes congressional action to establish explicit coverage criteria that would include cost effectiveness.[2] In this editorial, I discuss past efforts to develop regulatory language, why these may have failed, and whether it would be useful to have explicit criteria.

The failure to issue regulations defining "reasonable and necessary" reflects, in part, the inability of the primary stakeholders — employers, drug and device manufacturers, private payers, patient advocates, and organizations representing medical professionals — to reach a consensus. Among the most controversial issues addressed in past discussions has been the potential role of cost effectiveness in coverage decisions.[3] Although the lack of consensus is the proximate reason that rule making has not been completed, the more fundamental obstacle has been that every attempt to define "reasonable and necessary" triggers new debates about several challenging health policy dilemmas.

First, reaching agreement on the criteria that should be applied to determinations of medical necessity presupposes a level of stakeholder confidence in the process through which those criteria would be applied. In fact, the process by which Medicare and other payers make coverage decisions has not inspired great confidence on the part of stakeholders.[4] Until the past several years, few payers provided clear descriptions in their contracts or elsewhere of how coverage decisions were made, and there were no systematic mechanisms for gathering input from clinicians, experts, consumers, or other stakeholders as decisions were formulated. Once a decision was reached, the underlying analysis was generally considered proprietary information or simply not made available.[5] Given stakeholders' doubts about the coverage process, it is understandable that there would be limited enthusiasm for working toward a consensus on which criteria should be used in that process.

A second important policy issue provoked by the discussion of criteria for coverage is the pervasive and persistent discomfort with clinical decisions that are influenced by an entity other than the patient and the patient's clinician. Coverage decisions concerning medical necessity made by payers are inevitably resented when they prevent payment for a medical service that a patient and a physician have concluded is desirable. There is little question that clinical decisions should be made by an educated patient in consultation with an informed clinician whose advice is influenced solely by what is best for the patient. It is also generally accepted that clinical

Downloaded from www.nejm.org at EAST CAROLINA UNIV on June 6, 2008 .
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

decisions may be influenced by factors other than reliable evidence of clinical effectiveness.[6] The tension between the population-at-large perspective inherent in coverage decisions and the individual-patient perspective intrinsic to clinical practice is highlighted in each discussion of the criteria to be applied to coverage policy.[7]

The third fundamental challenge to the development of criteria for determining what is reasonable and necessary is the potential impact on innovation. The Medicare program is the largest single payer of health care in the world. Furthermore, many private payers adopt coverage policies from the Medicare program, amplifying the importance of these decisions. There is justifiable concern that the criteria guiding the decision-making process may have a considerable effect on the overall economic vitality of the pharmaceutical, biotechnology, and medical-device industries. In particular, the availability of investment capital for medical technology might be affected, perhaps resulting in fewer forms of technology, losses in employment, and reduced exports.

One of the most difficult policy issues confronted in any discussion of coverage criteria is the role of cost-effectiveness analysis in deciding what is to be considered reasonable and necessary.[8] The Medicare statute is silent on the role of costs, and Medicare has not explicitly considered costs in making coverage decisions. Health care services are generally covered when there is adequate evidence that they improve health outcomes, irrespective of the unit or aggregate cost. However, technology that is associated with very high costs is also very likely to have substantial clinical ramifications for the Medicare population and, therefore, these forms of technology receive comparatively greater scrutiny than other devices, procedures, and services.

There are several important difficulties to considering economic factors in decisions about medical necessity. Although notable progress has been made in developing and standardizing methods of cost-effectiveness analysis, economic models are inherently more complex and less transparent than studies of clinical effectiveness. The use of economic analyses in decisions about medical coverage will be challenging to defend whenever a specific patient is denied care as a result.[9] Using cost-effectiveness analysis for such decisions implies that a clinical benefit will not be available because of cost, which is considerably more difficult to justify than a decision not to provide a service because the risks are expected to outweigh the benefits.

These complicated health policy issues suggest that it will continue to be extremely difficult to develop criteria to define "reasonable and necessary," even if the task were undertaken by Congress. It would, however, be valuable for Medicare to work with stakeholders to develop a consistently applied, evidence-based, and widely understood framework for decisions about medical necessity. The development of guidance documents for specific categories of disease or technology would provide stakeholders with a more detailed understanding of the requirements for obtaining Medicare coverage. Specific guidance, rather than general criteria, would inform the design of clinical studies and provide a greater degree of consistency and predictability in the coverage process.[10]

In addition to guidance documents, ongoing changes to the coverage process should help to improve confidence in and the predictability of the process. In April 1999, Medicare published a notice in the *Federal Register* describing for the first time the steps followed in the coverage process. The agency also established an independent committee of experts and stakeholders, the Medicare Coverage Advisory Committee, which meets in public to consider complex and controversial coverage-related topics. On the Centers for Medicare and Medicaid Services Web site, the progress of all national coverage decisions can be tracked (www.cms.gov/coverage), and detailed documents are posted that summarize all scientific evidence, expert input, and other information that was considered during the policymaking process.[11] The fact that Gillick was able to obtain detailed information about the three Medicare coverage decisions reviewed in her article is a good indication that the process has become highly transparent. Further procedural improvements currently being implemented include a mechanism for appeals of national coverage policies, better-defined timelines, and the opportunity for the public to comment on a draft decision before a final policy is issued.

Whether coverage decisions and other Medicare policy decisions should be influenced by economic factors remains an important and controversial issue. Given the trend in health care costs and the accelerating pace of medical discovery, policymaking should focus on getting good value from health care spending. At a minimum, there should be public dialogue about how to ensure a system of high-quality and safe health care that gives patients freedom of choice in making health care decisions,

Downloaded from www.nejm.org at EAST CAROLINA UNIV on June 6, 2008 .
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

expands access to care, encourages innovation, and is affordable. Finding a robust and acceptable approach to evaluating costs in decisions about coverage and payment would increase the likelihood that patients will receive the greatest total health care benefit from any given level of Medicare spending.

From the Office of Clinical Standards and Quality, Centers for Medicare and Medicaid Services, Baltimore.

*Editor's note:* The views expressed in this editorial are those of the author and not necessarily those of the Centers for Medicare and Medicaid Services.

**1.** Eddy DM. Benefit language: criteria that will improve quality while reducing costs. JAMA 1996;275:650-7.
**2.** Gillick MR. Medicare coverage for technological innovations — time for new criteria? N Engl J Med 2004;350:2199-203.
**3.** Foote SB. Why Medicare cannot promulgate a national coverage rule: a case of regula mortis. J Health Polit Policy Law 2002;27:707-30.
**4.** Our lives in whose hands? In: Daniels N, Sabin J. Setting limits fairly. New York: Oxford University Press, 2002:1-12.
**5.** Medical necessity, coverage decisions and medical policy. In: Pearson SD, Sabin JE, Emanuel EJ. No margin, no mission: health-care organizations and the quest for ethical excellence. New York: Oxford University Press, 2003:67-95.
**6.** Fisher ES, Wennberg DE, Stukel TA, Gottlieb DJ, Lucas FL, Pinder EL. The implications of regional variations in Medicare spending. 2. Health outcomes and satisfaction with care. Ann Intern Med 2003; 138:288-98.
**7.** Redelmeier DA, Tversky A. Discrepancy between medical decisions for individual patients and for groups. N Engl J Med 1990;322: 1162-4.
**8.** Power EJ, Eisenberg JM. Are we ready to use cost-effectiveness analysis in health care decision making? A health services research challenge for clinicians, patients, health care systems, and public policy. Med Care 1998;36:Suppl:MS10-MS147.
**9.** Eddy DM. Cost-effectiveness analysis: a conversation with my father. JAMA 1992;267:1669-75.
**10.** Tunis SR, Stryer DB, Clancy CM. Practical clinical trials: increasing the value of clinical research for decision making in clinical and health policy. JAMA 2003;290:1624-32.
**11.** Tunis SR, Kang JL. Improvements in Medicare coverage of new technology. Health Aff (Millwood) 2001;20(5):83-5.
*Copyright © 2004 Massachusetts Medical Society.*

**RECEIVE IMMEDIATE NOTIFICATION WHEN A *JOURNAL* ARTICLE IS RELEASED EARLY**

To be notified when an article is released early on the Web and to receive the table of contents of the *Journal* by e-mail every Wednesday evening, sign up through our Web site at
**www.nejm.org**

Downloaded from www.nejm.org at EAST CAROLINA UNIV on June 6, 2008 .
Copyright © 2004 Massachusetts Medical Society. All rights reserved.

# EXHIBIT X

Case 1:08-cv-00076-ECS    Document 2-27    Filed 06/09/2008

## Contractor Information

**Contractor Name**

NHIC, Corp.

**Contractor Number**

31140

**Contractor Type**

Carrier

## LCD Information

**LCD ID Number**

L22520

**LCD Title**

Gonadotropin-Releasing Hormone Analogs - Revised

**Contractor's Determination Number**

06-02.4 R1

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

Title XVIII of the Social Security Act (SSA), Section 1862(a)(1)(A), states that no Medicare payment shall be made for items or services, which "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Title XVIII of the Social Security Act, Section 1862(a)(7) and 42 Code of Federal Regulations (CFR) 411.15, exclude routine physical examinations.

Title XVIII of the Social Security Act, Section 1833(e), prohibits Medicare payment for any claim, which lacks the necessary documentation to process the claim.

Title XVIII of the Social Security Act Section 1842 (p)(1)states that each claim submitted by a physician or §1842(b)(18)(C) of the Act practitioner "shall include the appropriate diagnosis code (or codes)...". For services from physicians and §1842(b)(18)(C) of the Act practitioners submitted with an ICD-9 code that is missing, invalid, or truncated, contractors must return the billed service to the provider as unprocessable in accordance with MCM §3005.4(p) or MIM §3605.3.

42 CFR 411.15(k), excludes particular services from coverage.

**LCD Information**

**LCD ID Number**


CMS Manual System, Publication 100-08, Program Integrity Manual, Chapter 3, Section 3.4.1.1,4, states that contractors may require ICD-9 diagnosis codes to be submitted by all providers, with every claim for a targeted service if such a requirement appears in an LCD for that service.

CMS Manual System, Publication 100-02, Medicare Benefit Policy Manual, Chapter 15, Sections 50.0, 50.1 and 50.2 define drugs and biologicals and describe how to determine self administration.

Change Request 4319, dated February 24, 2006, effective April 1, 2006, describes updated quarterly payment allowance limits (106% of Average Sales Price, or ASP) for Medicare Part B drugs, effective April 1, 2006 through June 30, 2006 as well as revised payment files for the January 2005, April 2005, July 2005, October 2005 and January 2006 Quarterly ASP Medicare Part B Drug Pricing Files.


**Primary Geographic Jurisdiction**

California - Northern


**Oversight Region**

Region IX


**Original Determination Effective Date**

For services performed on or after 02/19/2007


**Original Determination Ending Date**


**Revision Effective Date**

For services performed on or after 01/01/2008


**Revision Ending Date**


**Indications and Limitations of Coverage and/or Medical Necessity**

Goserelin acetate (J9202), leuprolide acetate (J9217, J9218, J9219, and J1950), triptorelin (J3315), histrelin implant (J9225), histrelin implant [Supprelin LA] (J9226)and histrelin acetate J1675 are synthetic luteinizing hormone-releasing hormone (LHRH) agonists. These peptides have slight variances from each other, but all are close analogs of the naturally occurring gonadotropin releasing hormone (GnRH). When administered chronically, they cause an initial burst of FSH and LH hormones, followed in 2-4 weeks by deep suppression of FSH/LH hormones and sex hormones (estrogen, testosterone). Additional GnRH analogs are currently seeking approval. This LCD applies to this family of drugs and similar new FDA-approved compounds that may be added to this policy.

**LCD Information**

**LCD ID Number**

Major FDA or compendium indications for this drug family include:

    1. Palliative treatment of advanced carcinoma of the prostate. (Not required to be metastatic; may be asymptomatic)
    2. Carcinoma of the breast
    3. Multiple gynecologic indications
    4. Precocious puberty

For prostatic carcinoma, these compounds may be used in lieu of orchiectomy. Usage may be adjunctive, neo-adjunctive, or even primary in appropriate clinical circumstances. Uses include cytoreductive treatment, in preparation for potentially curative management of localized prostate cancer with interstitial brachytherapy and external beam radiation therapy. These drugs may also be used as adjunctive or neoadjunctive therapy in conjunction with other curative or palliative therapies for prostate cancer or as primary therapy alone in appropriate patients. For gynecologic conditions, these compounds may be used to prepare leiomyomas for surgical excision or as palliative treatment of clinically significant symptoms. They may also ameliorate anemia in patients unresponsive to a trial of iron supplementation. They may treat menometrorrhagia.

For depot implants/injections, subsequent implantation should be delayed until the therapeutic span of the earlier implant has ended.

Goserelin acetate is administered by a different delivery system than triptorelin and leuprolide acetate. The former is given by injecting drug-containing beads just below the abdominal skin, but the latter two are given as an intramuscular injection. NHIC, Corp. notes that the differences in administration methods may cause a preference or even, rarely, a specific need to use one drug rather than the other. However, clinical evidence and FDA indications do not support differential effectiveness of any member of this drug class. Medicare contractors may implement Least Costly Alternative (LCA) policies either on case-by-case review or by LCDs. Because members of this drug class lack differential effectiveness, the cost component of a higher-priced drug over the lower-priced drug is not medically reasonable and necessary. Therefore, Medicare will pay for the dosage administered for any of these drugs only at the rate set for the lowest-priced drug approved for the given indication. For regulatory guidance see the Appendix section of this LCD.

Some patients requiring an LHRH agonist may prefer one form of administration (delivery system) over the other. If the patient desires the more expensive medication, and if the patient signs an appropriate advanced beneficiary notice (ABN) explaining the partial payment of the more expensive drug, and the claim is submitted with the appropriate modifier (currently "GA"), then the patient may be charged for the difference between the LCA reimbursement and the scheduled price of the more expensive medication. Deductible and co-insurance still apply.

LCDs are normally binding on first-level appeal (redetermination) by the contractor. This policy may be overridden at the first-appeal level if a bona fide clinical necessity argument for the more expensive drug is accepted. Experience with existing LHRH agonist LCA policies in many jurisdictions has found this to be rare.

**Implementation**

(1) CMS prices are released quarterly in a CMS National Drug Pricing Schedule.
(2) In some cases, the ASP-based price of an established drug may be the LCA for the AWP-based price of a recently introduced drug.

**LCD Information**

# LCD ID Number

(3) Pricing for LHRH drugs designed as one-year implants (typically 50-65 mg) will be crosswalked among each other as a single pricing pool. Remaining drugs will form the other pricing pool. This method is chosen because we believe it is clinically reasonable. This method was preferred by the Medicare Payment Advisory Commission (MEDPAC, 2007). In addition, this method avoids the need to factor (or to exclude) numerous monthly injection fees when comparing monthly and annual drug forms as to the net "least costly" method of care.

(4) NHIC recognizes that market anomalies could occur, particularly as more smaller entrants join the market. The ramp-up for manufacturing biotechnology drugs can require several years. For example, the lowest-cost drug could be one released initially only in the Southeastern US or Midwest or some other limited distribution. Such a drug, although placed on the fee schedule, could not be the least costly "alternative" if it is not an available "alternative" for the clinician/patient. NHIC would deal with such situations on a case by case basis.

**J9202** (Goserelin acetate implant, per 3.6 mg)
The indication of dysfunctional uterine bleeding is valid only when J9202 is used as a <u>single injection</u> prior to endometrial ablation.

The 10.8 mg implant for goserelin is not approved for palliative treatment of advanced breast cancer nor for the management of endometriosis, although the 3.6-mg implants are (2004 USP DI).

# Coverage Topic

Chemotherapy (Outpatient)
Doctor Office Visits

# Coding Information

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

 0                                                        TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

99999                                                    Not Applicable

Coding Information

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

**CPT/HCPCS Codes**

HCPCS code J9226 is valid as of 1/1/2008.

| | |
|---|---|
| 11981 | INSERTION, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 11982 | REMOVAL, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 11983 | REMOVAL WITH REINSERTION, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 96402 | CHEMOTHERAPY ADMINISTRATION, SUBCUTANEOUS OR INTRAMUSCULAR; HORMONAL ANTI-NEOPLASTIC |
| J1675 | INJECTION, HISTRELIN ACETATE, 10 MICROGRAMS |
| J1950 | INJECTION, LEUPROLIDE ACETATE (FOR DEPOT SUSPENSION), PER 3.75 MG |
| J3315 | INJECTION, TRIPTORELIN PAMOATE, 3.75 MG |
| J9202 | GOSERELIN ACETATE IMPLANT, PER 3.6 MG |
| J9217 | LEUPROLIDE ACETATE (FOR DEPOT SUSPENSION), 7.5 MG |
| J9218 | LEUPROLIDE ACETATE, PER 1 MG |
| J9219 | LEUPROLIDE ACETATE IMPLANT, 65 MG |
| J9225 | HISTRELIN IMPLANT (VANTAS), 50 MG |
| J9226 | HISTRELIN IMPLANT (SUPPRELIN LA), 50 MG |

**ICD-9 Codes that Support Medical Necessity**

J1950 (Injection, leuprolide acetate (for depot suspension), per 3.75 mg)

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

| | |
|---|---|
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| V10.3 | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

J3315 (Injection, triptorelin pamoate, 3.75 mg)

| | |
|---|---|
| 185 | MALIGNANT NEOPLASM OF PROSTATE |

J9202 (Goserelin acetate implant, per 3.6 mg)

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 185 | MALIGNANT NEOPLASM OF PROSTATE |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| 626.8 | OTHER DISORDERS OF MENSTRUATION AND OTHER ABNORMAL BLEEDING FROM FEMALE GENITAL TRACT |

V10.3

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

|  |  |
|---|---|
|  | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

J9217 (Leuprolide acetate (for depot suspension), 7.5 mg)

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 185 | MALIGNANT NEOPLASM OF PROSTATE |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| V10.3 | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

J9219 (Leuprolide acetate implant, 65 mg)
J9225 (Histrelin implant, 50 mg), J9226 (Histrelin implant (Supprelin LA, 50 MG)

| | |
|---|---|
| 185 | MALIGNANT NEOPLASM OF PROSTATE |

J9226 (Histrelin Implant (Supprelin LA), 50 MG)

| | |
|---|---|
| 259.1 | PRECOCIOUS SEXUAL DEVELOPMENT AND PUBERTY NOT ELSEWHERE CLASSIFIED |

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

**Diagnoses that Support Medical Necessity**

Any diagnosis consistent with those specified in the *Indications and Limitations of Coverage and/or Medical Necessity* section or the *ICD-9-CM descriptors in the ICD-9-CM Codes That Support Medical Necessity* section.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

Any diagnosis inconsistent with the *Indications and Limitations of Coverage and/or Medical Necessity* section, or the ICD-9-CM descriptors in the *ICD-9-CM Codes That Support Medical Necessity* section.

**General Information**

**Documentation Requirements**

Any administration of the drugs addressed in this policy, in the absence of an acceptable clinical diagnosis, will be denied as not reasonable and necessary.

In cases where the provider indicates the more costly agent is medically necessary, the medical record must indicate why it was medically necessary to administer the more costly drug.

Documentation must be available to Medicare upon request.

**Appendices**

Regulatory guidance for Least Costly Alternative policies

1. LCA policies are justified by SSA 1862(a); excessive cost without incremental effectiveness is not reasonable and necessary, and a cost which is not reasonable and necessary is not payable. (See 70 FR 39039, 7/6/2005).

2. Components of a single service can, in principle, be segregated in pricing determinations (CMS Ruling 2005-01).

3. See also SSA 1861(v), "..cost…excluding therefrom any part found to be unnecessary in the delivery of the health service."

**General Information**

**Documentation Requirements**

4. The House draft (621c) of the Medicare Modernization Act (2003) appeared to bar LCA pricing in Part A or Part B for functionally equivalent drugs. Final MMA 622 barred the use of 'functional equivalence" only for hospital outpatient drug pricing.

5. CMS has instructed providers and contractors that this principle overrides pricing schedules e.g. the ASP-based pricing schedule implemented in January 2005 (Final Rule for 2005, 11/15/2004, 69 FR 66299).

6. LCA policies and their implementation and ramifications were extensively discussed in the context of the 2005 Final Rule regarding Competitive Acquisition Program for Part B drugs (11/21/2005, 70 FR 70243, also 7/6/2005, 70 FR 39039).

7. LCA policies are explicitly allowed for laboratory test pricing as well (Claims Processing Manual, Pub. 100-04, Chapter 23, Section 40.4)

8. The Office of the Inspector General has discussed LCA pricing at length (Medicare Reimbursement for Lupron, 1/2004; Office of the Inspector General Report, OEI-03-03-00250.)

CMS has provided limited guidance as to exactly what rules circumscribe a set of services or drugs for which LCA pricing applies. However, by convention, nearly all Part B contractors have determined that LHRH agonists constitute a single drug family for LCA pricing purposes.

**Utilization Guidelines**

Coverage of annual single-implant forms for treatment of prostate cancer, is considered medically appropriate only for patients having a reasonable expectation of surviving at least 12 months.

Annual implant forms must be removed after twelve months. When an implant is removed, another implant may be inserted to continue therapy.

GnRH analogs are covered for the indicated diagnosis, with frequency of administration governed by the duration of action of the previously administered GnRH analog.

Drugs discussed within this LCD are paid at the price of the least costly alternative for approved diagnoses.

Diagnostic restrictions do not apply to the following CPT/HCPCS codes;

**11982** - Removal, non-biodegradable drug delivery implant

**11983** - Removal, with reinsertion, non-biodegradable drug delivery implant

**96402** - Chemotherapy administration, subcutaneous or intra-muscular; Hormonal antineoplastic

If a patient has previously received a GnRH analog, a subsequent injection or implantation should be delayed until the therapeutic span of the earlier GnRH analog has ended. If the patient has had a bilateral orchiectomy, he does not need and should not receive, any form of GnRH.

**Sources of Information and Basis for Decision**

**General Information**

**Documentation Requirements**

Noridian Administrative Services, National Heritage Insurance Company, Palmetto GBA, Trailblazers Health Enterprises, and other Medicare Part B contractors.

ICD-9-CM for 2006, copyright 2005, Ingenix, Inc. (This LCD is updated annually based on the most current year ICD-9-CM revision.)

CPT 2006, Professional Edition, copyright 2005, American Medical Association (This LCD is updated annually based on the most current year CPT revision.)

Ingenix 2006 HCPCS Level II book, copyright 2005 (This LCD is updated annually based on the most current year HCPCS revision.)

MEDPAC (2007) - Impact of Medicare Changes in Pricing of Part B Drugs. www.medpac.gov, accessed 1/30/2007.

**Advisory Committee Meeting Notes**

The Local Coverage Determination was presented at the April 19, 2006, Contractor Advisory Committee (CAC) Meeting.

This policy does not reflect the sole opinion of the contractor or Contractor Medical Director. Although the final decision rests with the contractor, this policy was developed in cooperation with advisory groups, which includes representatives from a variety of medical specialty groups.

Medical policies are written based on the available medical scientific literature and current standards of practice. For some policies, there may be unique circumstances that require special consideration. In those circumstances, providers may submit relevant clinical information for payment consideration.

**Start Date of Comment Period**

04/19/2006

**End Date of Comment Period**

06/03/2006

**Start Date of Notice Period**

01/04/2007

**Revision History Number**

06-02.4R1

**General Information**

**Documentation Requirements**

**Revision History Explanation**

<u>**Northern and Southern California**</u>

**Number:** 06-02.4R1
**Date:** 12/12/2007
**Effective Date:** 1/1/2008
**Change:**

The following changes were implemented due to the CMS annual 2008 HCPCS/CPT coding update:

- Added HCPCS code J9226;
- Description changes only – HCPCS code J9225

Added references to the Source of Information Section.

**Reason for Change**

HCPCS Addition/Deletion
HCPCS/ICD9 Descriptor Change

**Last Reviewed On Date**

12/30/2007

**Related Documents**

This LCD has no Related Documents.

**LCD Attachments**

Public Comments - Gonadotropin Releasing Hormone Analogs (a comment and response document) (ZIP - 5,492 bytes)

**Other Versions**

Updated on 12/30/2007 with effective dates 01/01/2008 - N/A

Updated on 11/10/2007 with effective dates 02/19/2007 - 12/31/2007

Updated on 02/09/2007 with effective dates 02/19/2007 - N/A

Updated on 12/31/2006 with effective dates 02/19/2007 - N/A

# EXHIBIT Y

## Contractor Information

**Contractor Name**

NHIC, Corp.

**Contractor Number**

31146

**Contractor Type**

Carrier

## LCD Information

**LCD ID Number**

L22520

**LCD Title**

**GONADOTROPIN-RELEASING** Hormone Analogs - Revised

**Contractor's Determination Number**

06-02.4 R1

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

Title XVIII of the Social Security Act (SSA), Section 1862(a)(1)(A), states that no Medicare payment shall be made for items or services, which "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Title XVIII of the Social Security Act, Section 1862(a)(7) and 42 Code of Federal Regulations (CFR) 411.15, exclude routine physical examinations.

Title XVIII of the Social Security Act, Section 1833(e), prohibits Medicare payment for any claim, which lacks the necessary documentation to process the claim.

Title XVIII of the Social Security Act Section 1842 (p)(1)states that each claim submitted by a physician or §1842(b)(18)(C) of the Act practitioner "shall include the appropriate diagnosis code (or codes)...". For services from physicians and §1842(b)(18)(C) of the Act practitioners submitted with an ICD-9 code that is missing, invalid, or truncated, contractors must return the billed service to the provider as unprocessable in accordance with MCM §3005.4(p) or MIM §3605.3.

42 CFR 411.15(k), excludes particular services from coverage.

**LCD Information**

**LCD ID Number**


CMS Manual System, Publication 100-08, Program Integrity Manual, Chapter 3, Section 3.4.1.1,4, states that contractors may require ICD-9 diagnosis codes to be submitted by all providers, with every claim for a targeted service if such a requirement appears in an LCD for that service.

CMS Manual System, Publication 100-02, Medicare Benefit Policy Manual, Chapter 15, Sections 50.0, 50.1 and 50.2 define drugs and biologicals and describe how to determine self administration.

Change Request 4319, dated February 24, 2006, effective April 1, 2006, describes updated quarterly payment allowance limits (106% of Average Sales Price, or ASP) for Medicare Part B drugs, effective April 1, 2006 through June 30, 2006 as well as revised payment files for the January 2005, April 2005, July 2005, October 2005 and January 2006 Quarterly ASP Medicare Part B Drug Pricing Files.


**Primary Geographic Jurisdiction**

California - Southern


**Oversight Region**

Region IX


**Original Determination Effective Date**

For services performed on or after 02/19/2007


**Original Determination Ending Date**


**Revision Effective Date**

For services performed on or after 01/01/2008


**Revision Ending Date**


**Indications and Limitations of Coverage and/or Medical Necessity**

Goserelin acetate (J9202), leuprolide acetate (J9217, J9218, J9219, and J1950), triptorelin (J3315), histrelin implant (J9225), histrelin implant [Supprelin LA] (J9226)and histrelin acetate J1675 are synthetic luteinizing hormone-releasing hormone (LHRH) agonists. These peptides have slight variances from each other, but all are close analogs of the naturally occurring gonadotropin releasing hormone (GnRH). When administered chronically, they cause an initial burst of FSH and LH hormones, followed in 2-4 weeks by deep suppression of FSH/LH hormones and sex hormones (estrogen, testosterone). Additional GnRH analogs are currently seeking approval. This LCD applies to this family of drugs and similar new FDA-approved compounds that may be added to this policy.

**LCD ID Number**

Major FDA or compendium indications for this drug family include:

1. Palliative treatment of advanced carcinoma of the prostate. (Not required to be metastatic; may be asymptomatic)
2. Carcinoma of the breast
3. Multiple gynecologic indications
4. Precocious puberty

For prostatic carcinoma, these compounds may be used in lieu of orchiectomy. Usage may be adjunctive, neo-adjunctive, or even primary in appropriate clinical circumstances. Uses include cytoreductive treatment, in preparation for potentially curative management of localized prostate cancer with interstitial brachytherapy and external beam radiation therapy. These drugs may also be used as adjunctive or neoadjunctive therapy in conjunction with other curative or palliative therapies for prostate cancer or as primary therapy alone in appropriate patients. For gynecologic conditions, these compounds may be used to prepare leiomyomas for surgical excision or as palliative treatment of clinically significant symptoms. They may also ameliorate anemia in patients unresponsive to a trial of iron supplementation. They may treat menometrorrhagia.

For depot implants/injections, subsequent implantation should be delayed until the therapeutic span of the earlier implant has ended.

Goserelin acetate is administered by a different delivery system than triptorelin and leuprolide acetate. The former is given by injecting drug-containing beads just below the abdominal skin, but the latter two are given as an intramuscular injection. NHIC, Corp. notes that the differences in administration methods may cause a preference or even, rarely, a specific need to use one drug rather than the other. However, clinical evidence and FDA indications do not support differential effectiveness of any member of this drug class. Medicare contractors may implement Least Costly Alternative (LCA) policies either on case-by-case review or by LCDs. Because members of this drug class lack differential effectiveness, the cost component of a higher-priced drug over the lower-priced drug is not medically reasonable and necessary. Therefore, Medicare will pay for the dosage administered for any of these drugs only at the rate set for the lowest-priced drug approved for the given indication. For regulatory guidance see the Appendix section of this LCD.

Some patients requiring an LHRH agonist may prefer one form of administration (delivery system) over the other. If the patient desires the more expensive medication, and if the patient signs an appropriate advanced beneficiary notice (ABN) explaining the partial payment of the more expensive drug, and the claim is submitted with the appropriate modifier (currently "GA"), then the patient may be charged for the difference between the LCA reimbursement and the scheduled price of the more expensive medication. Deductible and co-insurance still apply.

LCDs are normally binding on first-level appeal (redetermination) by the contractor. This policy may be overridden at the first-appeal level if a bona fide clinical necessity argument for the more expensive drug is accepted. Experience with existing LHRH agonist LCA policies in many jurisdictions has found this to be rare.

**Implementation**

(1) CMS prices are released quarterly in a CMS National Drug Pricing Schedule.
(2) In some cases, the ASP-based price of an established drug may be the LCA for the AWP-based price of a recently introduced drug.

**LCD Information**

# LCD ID Number

(3) Pricing for LHRH drugs designed as one-year implants (typically 50-65 mg) will be crosswalked among each other as a single pricing pool. Remaining drugs will form the other pricing pool. This method is chosen because we believe it is clinically reasonable. This method was preferred by the Medicare Payment Advisory Commission (MEDPAC, 2007). In addition, this method avoids the need to factor (or to exclude) numerous monthly injection fees when comparing monthly and annual drug forms as to the net "least costly" method of care.

(4) NHIC recognizes that market anomalies could occur, particularly as more smaller entrants join the market. The ramp-up for manufacturing biotechnology drugs can require several years. For example, the lowest-cost drug could be one released initially only in the Southeastern US or Midwest or some other limited distribution. Such a drug, although placed on the fee schedule, could not be the least costly "alternative" if it is not an available "alternative" for the clinician/patient. NHIC would deal with such situations on a case by case basis.

**J9202** (Goserelin acetate implant, per 3.6 mg)
The indication of dysfunctional uterine bleeding is valid only when J9202 is used as a <u>single injection</u> prior to endometrial ablation.

The 10.8 mg implant for goserelin is not approved for palliative treatment of advanced breast cancer nor for the management of endometriosis, although the 3.6-mg implants are (2004 USP DI).

## Coverage Topic

Chemotherapy (Outpatient)
Doctor Office Visits

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                           TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

99999                                       Not Applicable

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

**CPT/HCPCS Codes**

HCPCS code J9226 is valid as of 1/1/2008.

| | |
|---|---|
| 11981 | INSERTION, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 11982 | REMOVAL, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 11983 | REMOVAL WITH REINSERTION, NON-BIODEGRADABLE DRUG DELIVERY IMPLANT |
| 96402 | CHEMOTHERAPY ADMINISTRATION, SUBCUTANEOUS OR INTRAMUSCULAR; HORMONAL ANTI-NEOPLASTIC |
| J1675 | INJECTION, HISTRELIN ACETATE, 10 MICROGRAMS |
| J1950 | INJECTION, LEUPROLIDE ACETATE (FOR DEPOT SUSPENSION), PER 3.75 MG |
| J3315 | INJECTION, TRIPTORELIN PAMOATE, 3.75 MG |
| J9202 | GOSERELIN ACETATE IMPLANT, PER 3.6 MG |
| J9217 | LEUPROLIDE ACETATE (FOR DEPOT SUSPENSION), 7.5 MG |
| J9218 | LEUPROLIDE ACETATE, PER 1 MG |
| J9219 | LEUPROLIDE ACETATE IMPLANT, 65 MG |
| J9225 | HISTRELIN IMPLANT (VANTAS), 50 MG |
| J9226 | HISTRELIN IMPLANT (SUPPRELIN LA), 50 MG |

**ICD-9 Codes that Support Medical Necessity**

J1950 (Injection, leuprolide acetate (for depot suspension), per 3.75 mg)

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

| | |
|---|---|
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| V10.3 | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

J3315 (Injection, triptorelin pamoate, 3.75 mg)

| | |
|---|---|
| 185 | MALIGNANT NEOPLASM OF PROSTATE |

J9202 (Goserelin acetate implant, per 3.6 mg)

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 185 | MALIGNANT NEOPLASM OF PROSTATE |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| 626.8 | OTHER DISORDERS OF MENSTRUATION AND OTHER ABNORMAL BLEEDING FROM FEMALE GENITAL TRACT |

V10.3

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

|  |  |
|---|---|
|  | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

**J9217 (Leuprolide acetate (for depot suspension), 7.5 mg)**

| | |
|---|---|
| 174.0 - 174.6 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF FEMALE BREAST - MALIGNANT NEOPLASM OF AXILLARY TAIL OF FEMALE BREAST |
| 174.8 - 174.9 | MALIGNANT NEOPLASM OF OTHER SPECIFIED SITES OF FEMALE BREAST - MALIGNANT NEOPLASM OF BREAST (FEMALE) UNSPECIFIED SITE |
| 175.0 | MALIGNANT NEOPLASM OF NIPPLE AND AREOLA OF MALE BREAST |
| 175.9 | MALIGNANT NEOPLASM OF OTHER AND UNSPECIFIED SITES OF MALE BREAST |
| 185 | MALIGNANT NEOPLASM OF PROSTATE |
| 218.0 - 218.2 | SUBMUCOUS LEIOMYOMA OF UTERUS - SUBSEROUS LEIOMYOMA OF UTERUS |
| 218.9 | LEIOMYOMA OF UTERUS UNSPECIFIED |
| 617.0 - 617.6 | ENDOMETRIOSIS OF UTERUS - ENDOMETRIOSIS IN SCAR OF SKIN |
| 617.8 - 617.9 | ENDOMETRIOSIS OF OTHER SPECIFIED SITES - ENDOMETRIOSIS SITE UNSPECIFIED |
| V10.3 | PERSONAL HISTORY OF MALIGNANT NEOPLASM OF BREAST |

**J9219 (Leuprolide acetate implant, 65 mg)**
**J9225 (Histrelin implant, 50 mg), J9226 (Histrelin implant (Supprelin LA, 50 MG)**

| | |
|---|---|
| 185 | MALIGNANT NEOPLASM OF PROSTATE |

**J9226 (Histrelin Implant (Supprelin LA), 50 MG)**

| | |
|---|---|
| 259.1 | PRECOCIOUS SEXUAL DEVELOPMENT AND PUBERTY NOT ELSEWHERE CLASSIFIED |

**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

**Diagnoses that Support Medical Necessity**

Any diagnosis consistent with those specified in the *Indications and Limitations of Coverage and/or Medical Necessity* section or the *ICD-9-CM descriptors in the ICD-9-CM Codes That Support Medical Necessity* section.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

Any diagnosis inconsistent with the *Indications and Limitations of Coverage and/or Medical Necessity* section, or the ICD-9-CM descriptors in the *ICD-9-CM Codes That Support Medical Necessity* section.

**General Information**

**Documentation Requirements**

Any administration of the drugs addressed in this policy, in the absence of an acceptable clinical diagnosis, will be denied as not reasonable and necessary.

In cases where the provider indicates the more costly agent is medically necessary, the medical record must indicate why it was medically necessary to administer the more costly drug.

Documentation must be available to Medicare upon request.

**Appendices**

Regulatory guidance for Least Costly Alternative policies

1. LCA policies are justified by SSA 1862(a); excessive cost without incremental effectiveness is not reasonable and necessary, and a cost which is not reasonable and necessary is not payable. (See 70 FR 39039, 7/6/2005).

2. Components of a single service can, in principle, be segregated in pricing determinations (CMS Ruling 2005-01).

3. See also SSA 1861(v), "..cost…excluding therefrom any part found to be unnecessary in the delivery of the health service."

**General Information**

## Documentation Requirements

4. The House draft (621c) of the Medicare Modernization Act (2003) appeared to bar LCA pricing in Part A or Part B for functionally equivalent drugs. Final MMA 622 barred the use of 'functional equivalence" only for hospital outpatient drug pricing.

5. CMS has instructed providers and contractors that this principle overrides pricing schedules e.g. the ASP-based pricing schedule implemented in January 2005 (Final Rule for 2005, 11/15/2004, 69 FR 66299).

6. LCA policies and their implementation and ramifications were extensively discussed in the context of the 2005 Final Rule regarding Competitive Acquisition Program for Part B drugs (11/21/2005, 70 FR 70243, also 7/6/2005, 70 FR 39039).

7. LCA policies are explicitly allowed for laboratory test pricing as well (Claims Processing Manual, Pub. 100-04, Chapter 23, Section 40.4)

8. The Office of the Inspector General has discussed LCA pricing at length (Medicare Reimbursement for Lupron, 1/2004; Office of the Inspector General Report, OEI-03-03-00250.)

CMS has provided limited guidance as to exactly what rules circumscribe a set of services or drugs for which LCA pricing applies. However, by convention, nearly all Part B contractors have determined that LHRH agonists constitute a single drug family for LCA pricing purposes.

## Utilization Guidelines

Coverage of annual single-implant forms for treatment of prostate cancer, is considered medically appropriate only for patients having a reasonable expectation of surviving at least 12 months.

Annual implant forms must be removed after twelve months. When an implant is removed, another implant may be inserted to continue therapy.

GnRH analogs are covered for the indicated diagnosis, with frequency of administration governed by the duration of action of the previously administered GnRH analog.

Drugs discussed within this LCD are paid at the price of the least costly alternative for approved diagnoses.

Diagnostic restrictions do not apply to the following CPT/HCPCS codes;

**11982** - Removal, non-biodegradable drug delivery implant

**11983** - Removal, with reinsertion, non-biodegradable drug delivery implant

**96402** - Chemotherapy administration, subcutaneous or intra-muscular; Hormonal antineoplastic

If a patient has previously received a GnRH analog, a subsequent injection or implantation should be delayed until the therapeutic span of the earlier GnRH analog has ended. If the patient has had a bilateral orchiectomy, he does not need and should not receive, any form of GnRH.

## Sources of Information and Basis for Decision

**General Information**

## Documentation Requirements

Noridian Administrative Services, National Heritage Insurance Company, Palmetto GBA, Trailblazers Health Enterprises, and other Medicare Part B contractors.

ICD-9-CM for 2006, copyright 2005, Ingenix, Inc. (This LCD is updated annually based on the most current year ICD-9-CM revision.)

CPT 2006, Professional Edition, copyright 2005, American Medical Association (This LCD is updated annually based on the most current year CPT revision.)

Ingenix 2006 HCPCS Level II book, copyright 2005 (This LCD is updated annually based on the most current year HCPCS revision.)

MEDPAC (2007) - Impact of Medicare Changes in Pricing of Part B Drugs. www.medpac.gov, accessed 1/30/2007.

## Advisory Committee Meeting Notes

The Local Coverage Determination was presented at the April 19, 2006, Contractor Advisory Committee (CAC) Meeting.

This policy does not reflect the sole opinion of the contractor or Contractor Medical Director. Although the final decision rests with the contractor, this policy was developed in cooperation with advisory groups, which includes representatives from a variety of medical specialty groups.

Medical policies are written based on the available medical scientific literature and current standards of practice. For some policies, there may be unique circumstances that require special consideration. In those circumstances, providers may submit relevant clinical information for payment consideration.

## Start Date of Comment Period

04/19/2006

## End Date of Comment Period

06/03/2006

## Start Date of Notice Period

01/04/2007

## Revision History Number

06-02.4R1

**General Information**

**Documentation Requirements**

**Revision History Explanation**

<u>**Northern and Southern California**</u>

**Number:** 06-02.4R1
**Date:** 12/12/2007
**Effective Date:** 1/1/2008
**Change:**

The following changes were implemented due to the CMS annual 2008 HCPCS/CPT coding update:

- Added HCPCS code J9226;
- Description changes only – HCPCS code J9225

Added references to the Source of Information Section.

**Reason for Change**

HCPCS Addition/Deletion
HCPCS/ICD9 Descriptor Change

**Last Reviewed On Date**

12/30/2007

**Related Documents**

This LCD has no Related Documents.

**LCD Attachments**

Public Comments - Gonadotropin Releasing Hormone Analogs (a comment and response document) (ZIP - 5,492 bytes)

**Other Versions**

Updated on 12/30/2007 with effective dates 01/01/2008 - N/A

Updated on 11/10/2007 with effective dates 02/19/2007 - 12/31/2007

Updated on 02/09/2007 with effective dates 02/19/2007 - N/A

Updated on 12/31/2006 with effective dates 02/19/2007 - N/A