# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEANETTE K. COAKLEY et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-cv-00976 (EGS) |
| | ) | |
| CIGNA GOVERNMENT SERVICES, LLC et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Stephen B. Kinnaird
D.C. Bar No. 454271
Patrick Morrisey
D.C. Bar No. 459399
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
Email: skinnaird@sidley.com
        pmorrisey@sidley.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................2

    A.    Statutory Background ...................................................................2

    B.    Factual Background .....................................................................6

    C.    Procedural Background ...............................................................12

ARGUMENT .........................................................................................................13

    I.    MOTION TO DISMISS STANDARD .......................................13

    II.    THIS COURT HAS SUBJECT MATTER JURISDICTION TO REVIEW THE CHALLENGED LCDS BECAUSE BOTH STATUTORY AND ARTICLE III JURISDICTION EXISTED AT THE TIME THE COMPLAINT WAS FILED AND MAY NOT BE DIVESTED BY POST-FILING EVENTS. ....................................................14

        A.    This Court Has Subject Matter Jurisdiction Because Plaintiffs' Complaint Challenged Existing LCDs .......................14

        B.    Plaintiffs Have Standing To Bring This Challenge Because They Allege Injury In Fact At The Time The Complaint Was Filed. ...............17

    III.    THIS COURT HAS SUBJECT MATTER JURISDICTION BECAUSE THE COMPLAINT ALLEGES THAT NO MATERIAL ISSUES OF FACT ARE IN DISPUTE. .....................................................21

    IV.    DEFENDANTS' VOLUNTARY CESSATION OF THEIR CHALLENGED ACTION DOES RENDER THIS CASE MOOT. ....................24

    V.    NO DEFENDANT IS ENTITLED TO DISMISSAL OF THE SUIT ..................30

CONCLUSION .......................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)............................................................................................19

*ASARCO v. Kadish*,
490 U.S. 605 (1989)............................................................................................20

*AT&T Corp. v. FCC*,
86 F.3d 242 (D.C. Cir. 1996)............................................................................23

*Atlantic Richfield Co. v. United States*,
774 F.2d 1193 (D.C. Cir. 1985)........................................................................25

*Baggett v. First Nat'l Bank of Gainesville*,
117 F.3d 1342 (11th Cir. 1997) ........................................................................15

*Bailey v. Mutual of Omaha Ins. Co.*,
534 F. Supp. 2d 43 (D.D.C. 2008) ..............................................................16, 17

*Becker v. Fed. Election Comm'n*,
230 F.3d 381 (1st Cir. 2000)..............................................................................17

*Caesar v. United States*,
258 F. Supp. 2d 1 (D.D.C. 2003) ......................................................................13

*Carr v. Alta Verde Indus., Inc.*,
931 F.2d 1055 (5th Cir. 1991) .....................................................................15, 16

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)..........................................................................30

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..............................................................................................18

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283, 289 (1982)...................................................................................26

*Cleveland Branch, NAACP v. City of Parma*,
263 F.3d 513 (6th Cir. 2001) ............................................................................17

*Consol. Rail Corp. v. United States*,
896 F.2d 574 (D.C. Cir. 1990)..........................................................................24

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
    344 F.3d 1263 (11th Cir. 2003) ...................................................................17

\*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
    528 U.S. 167 (2000)......................................................1, 17, 18, 24, 25, 30

*Greenwell v. Aztar Ind. Gaming Corp.*,
    268 F.3d 486 (7th Cir. 2001) ....................................................................15

*Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49 (1987)....................................................................................15

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ...............................................................14

*Keene Corp. v. United States*,
    508 U.S. 200 (1993)..................................................................................15

*Kitty Hawk Aircargo, Inc. v. Chao*,
    418 F.3d 453 (5th Cir. 2005) ....................................................................17

*Lake Pilots Ass'n, Inc. v. U.S. Coast Guard*,
    257 F. Supp. 2d 148 (D.D.C. 2003) ....................................................26, 28

*Larsen v. U.S. Navy*,
    525 F.3d 1 (D.C. Cir. 2008) ......................................................................25

*Los Angeles County v. Davis*,
    440 U.S. 625 (1979)...............................................................................1, 25

\*Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)......................................................................15, 20, 22

*McBryde v. Comm. to Review*,
    264 F.3d 52 (D.C. Cir. 2001) ....................................................................30

*Monmouth Med. Ctr. v. Thompson*,
    257 F.3d 807 (D.C. Cir. 2001) ....................................................................3

*Nader v. Volpe*,
    475 F.2d 916 (D.C. Cir. 1973) ..................................................................25

*Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*,
    263 F. Supp. 2d 82 (D.D.C. 2003) ...........................................................14

*Natural Res. Def. Council v. Texaco Ref. and Mktg., Inc.,*
  2 F.3d 493 (3d Cir. 1993) ....................................................................15, 16

*Nova Health Sys. v. Gandy,*
  416 F.3d 1149 (10th Cir. 2005) .....................................................................17

*Park v. Forest Serv. of the United States,*
  205 F.3d 1034 (8th Cir. 2000) .......................................................................17

*Perry v. Village of Arlington Heights,*
  186 F.3d 826 (7th Cir. 1999) ........................................................................17

*Philadelphia Co. v. Stimson,*
  223 U.S. 605 (1912)........................................................................................30

*Price v. Socialist People's Libyan Arab Jamahiriya,*
  294 F.3d 82 (D.C. Cir. 2002).........................................................................13

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)..........................................................................................19

*Teva Pharm., USA, Inc. v. FDA,*
  182 F.3d 1003 (D.C. Cir. 1999) ....................................................................14

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) .......................................................................17

*\*Worth v. Jackson,*
  451 F.3d 854 (D.C. Cir. 2006) ...................................................15, 17, 18, 19

## STATUTES AND REGUALTIONS

Social Security Act Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286...................................2

Consolidated Appropriations Act, Pub. L. No. 106-554, 114 Stat. 2763 (2000)...........................2

Medicare Prescription Drug, Improvement and Modernization Act of 2003,
  Pub. L. No. 108-173, 117 Stat. 2066 ..............................................................2

Medicare, Medicaid, and SCHIP Extension Act of 2007,
  Pub. L. No. 110-173, 121 Stat. 2492 ..........................................................2, 11

5 U.S.C. § 702 .........................................................................................30, 31

5 U.S.C. § 704.................................................................................................31

42 U.S.C. §§ 1395-1395ccc .............................................................................2

42 U.S.C. § 1395j..........................................................................................3

42 U.S.C. § 1395k.......................................................................................3, 4

42 U.S.C. § 1395*l*......................................................................................4, 5

42 U.S.C. § 1395m...........................................................................................5

42 U.S.C. § 1395n...........................................................................................6

42 U.S.C. § 1395u...........................................................................................3

42 U.S.C. § 1395w-3a........................................................................5, 8, 11, 27

42 U.S.C. § 1395x.......................................................................................3, 5

42 U.S.C. § 1395y...........................................................................................4

*42 U.S.C. § 1395ff...............................................................4, 6, 14, 20, 21, 22, 31

42 U.S.C. § 1395ddd.....................................................................................3, 9

42 C.F.R. § 400.202.........................................................................................4

## RULE

Fed. R. Civ. P. 19 ..........................................................................................31

## LEGISLATIVE HISTORY

H.R. Rep. No. 110-284 (2007)..........................................................................11

## OTHER AUTHORITIES

33 C. Wright & C. Koch, Jr., *Federal Practice and Procedure* § 8404 (2006) ...........................30

CMS, Pub. 100-02, *Medicare Benefit Policy Manual* (rev. Oct. 1, 2003), *available at*
     http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf .................................................3

CMS, *Medicare National Coverage Determinations Manual* (eff. Sept. 21, 2007),
     *available at* http://www.cms.hhs.gov/manuals/ downloads/ncd103c1_Part4.pdf .........10, 27

CMS, *Medicare Program Integrity Manual* (rev. Apr. 9, 2004), *available at*
        http://www.cms.hhs.gov/manuals/downloads/pim83c13.pdf .......................................23, 28

CMS, *Update to Information Regarding Medicare Payment and Coding for Drugs &*
        *Biologics* (Apr. 24, 2007), *available at*
        http://www.cms.hhs.gov/MedHCPCSGenInfo/downloads/Code_Def.pdf..........................10

CMS, *Update to Information Regarding Medicare Payment and Coding for Drugs and*
        *Biologics* (May 18, 2007), *available at* http://www.cms.hhs.gov/
        MedHCPCSGenInfo/ downloads/051807_coding_annoucement.pdf ...........................10, 27

CMS, *Medicare Part B Average Sales Price Drug Pricing File for Third Quarter 2008*,
        *available at* http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/
        01a_2008aspfiles.asp ........................................................................................................11

CMS, Pub 100-04, *Medicare Claims Processing* (June 6, 2008), *available at*
        http://www.cms.hhs.gov/transmittals/downloads/ R1529CP.pdf ........................................29

This Court should deny Defendants' motion to dismiss Plaintiffs' complaint challenging the lawfulness of certain local coverage determinations ("LCDs") related to the drug Xopenex® (levalbuterol HC1) Inhalation Solution ("Xopenex").  Defendants erroneously contend that their withdrawal of the challenged LCDs pending further "review" deprives this Court of subject matter jurisdiction and Plaintiffs of standing.  Both standing and statutory jurisdiction are measured from the time of the complaint, and neither is affected by Defendants' subsequent acts.  Other than a frivolous contention that the complaint raises a factual challenge to the LCDs (despite Plaintiffs' express disavowal of any such challenge), Defendants do not contest the existence of either statutory jurisdiction or standing at the time of the complaint.

The only question now is mootness, and it is black letter law that a defendant's voluntary cessation of illegal conduct does not moot an action unless (1) "'subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 203 (1968)) (emphasis added); *and* (2) "interim relief or events have *completely and irrevocably* eradicated the effects of the alleged violation." *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (emphasis added).  Defendants do not remotely meet that high standard.  Defendants have, on multiple occasions, attempted to inappropriately reduce access to Xopenex and to reduce the Agency's cost of reimbursing Xopenex to the cost of the generic drug racemic albuterol.  Defendants have repeatedly sought to limit Xopenex's access through the local coverage determination process.  Most recently, Defendants attempted this action even after Congress passed special legislation about the specific drugs involved in these LCDs.  Furthermore, when the government finally agreed to "review" their policy and postpone further

action until at least January 1, 2009, their original publication left no doubt that the resolution of the least costly alternative ("LCA") policy with respect to Xopenex was far from concluded. With consistent personnel changes at the Agency and with a new Administration scheduled to take office shortly after the expiration of the Defendants' most recent notice, Plaintiffs are at great risk that illegal action will be pursued again. Even an avowedly permanent withdrawal of the LCA policy would not moot this case; *a fortiori*, a withdrawal that expressly allows for further "review" by the Agency cannot satisfy the stringent standard for allowing a defendant's unilateral action to moot a case. This Court should adjudicate the legality of the LCDs and give Plaintiffs the relief that will settle this question finally, once and for all. The motion should be denied.

## BACKGROUND

### A.     Statutory Background

Medicare was established as part of the Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286.[1] Medicare covers certain medical care costs for those 65 years of age or older, as well as individuals under 65 years of age who are disabled or have other specified medical conditions. The Centers for Medicare and Medicaid Services ("CMS") is charged with administering the Medicare program on behalf of the Secretary of the Department of Health and Human Services (collectively "the Agency").[2] The Agency also employs independent contractors to develop and revise Medicare coverage policies, as well as to process

---

[1] The 1965 Amendments to the Social Security Act created the Medicare system, and are set forth in Title XVIII of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 1395-1395ccc (Social Security Act §§ 1801-1892) (2008). The Medicare, Medicaid, and Benefits Improvement and Protection Act of 2000 ("BIPA"), which was enacted as part of the Consolidated Appropriations Act for fiscal year 2001, added numerous amendments to the Medicare provisions of the SSA. *See* Pub. L. No. 106-554, app. F, § 1(a), 114 Stat. 2763, 2763A-463 (2000). The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") and the Medicare, Medicaid, and SCHIP Extension Act of 2007 further amended Title XVIII of the SSA. Pub. L. No. 108-173, 117 Stat. 2066 (2003); Pub. L. No. 110-173, 121 Stat. 2492 (2007).

[2] The Centers for Medicare and Medicaid Services ("CMS") are part of the Department of Health and Human Services. For ease of reference, "Agency" refers to either CMS, the Department, or both.

reimbursements for Medicare-covered services or products. *See* 42 U.S.C. § 1395ddd (§ 1893)[3].

Those contractors, who are agents of the Secretary in performing their contractual functions,

*Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001), each serve different

geographic regions.

Medicare consists of multiple parts, each of which are set forth under different sections of

the Social Security Act. Part A, for example, covers certain care furnished to inpatients at

hospitals and other facilities. Relevant here is Part B, a supplementary medical insurance

program that covers certain services of physicians, outpatient hospital care, and other medical

professionals; a number of outpatient drugs and biologicals used to treat patients; and the rental

or purchase of durable medical equipment ("DME") for use in the patient's home. *See* 42 U.S.C.

§§ 1395j (§ 1831), 1395k(a) (§ 1832(a)), 1395x(s) (§ 1861(s)). Reimbursement for Part B drugs

may also be made when drugs are placed into DME if the drugs are necessary to achieve the

equipment's therapeutic effect and the drug is administered incident to such equipment. *See id.* §

1395u(o)(1)(G)(ii) (§ 1842(o)(1)(G)(ii)); CMS, Pub. 100-02, Medicare Benefit Policy Manual,

ch. 15, § 110.3 (rev. Oct. 1, 2003) ("Policy Manual"), *available at*

http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf. The Agency's contractors

specifically charged with administering the Medicare Part B DME program are the DME

Medicare Administrative Contractors ("DME MACs"). Defendants Cigna Government Services,

LLC and NHIC, Corp. are two of the four DME MACs that administer the DME program under

the direction of the Secretary. Compl. ¶¶ 14-15.

For purposes of determining the coverage and reimbursement of a drug under Part B, the

Program is administered in two separate and distinct steps. First, the Agency and its contractors

must evaluate whether a particular item or service is covered. The statute defines the categories

---

[3] Parallel citations to the Social Security Act are included in parentheses for citations to the United States Code.

of items and services that are covered, *see* 42 U.S.C. § 1395k (§ 1832) (describing the scope of the benefits covered under Part B), but excludes from coverage (among other things) services and items that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.* § 1395y(a)(1)(A) (§ 1862(a)(1)(A)).  The Agency is authorized to make "national coverage determinations" ("NCDs") with respect to whether an item or service is covered nationally under the Medicare program.  *See id.* § 1395ff(f)(1)(B) (§ 1869(f)(1)(B)). Significantly, though, NCDs are not vehicles for determining the amount of payment for the item or service.  *Id*.  In addition, the Agency's contractors are authorized to make "local coverage determinations" with respect to whether an item or service is covered within the jurisdiction that the contractor services.  *See id.* § 1395ff(f)(2)(B) (§ 1869(f)(2)(B)).  As in the case of NCDs, payment decisions are similarly excluded from LCDs.  *See* 42 C.F.R. § 400.202.  Finally, the Agency is authorized to make initial determinations about whether individual claims for certain items or services are reimbursable under the Medicare program.  *See* 42 U.S.C. § 1395ff(a)(1)(c) (§ 1869(a)(1)(c)).

    After coverage is established for an item or a service, the Medicare program must then calculate the amount of payment that will be made on behalf of the beneficiary for items or services that are covered under step one.  *See id.* § 1395*l*(a) (§ 1833(a)) (providing the methodologies for determining the reimbursement or payment amount "in the case of each individual who is covered under [Medicare Part B] and incurs expenses for services covered with respect to which benefits are payable under this part").  As described above, the Agency or its contractors must first determine whether "benefits are payable" under Medicare before they may pay for expenses incurred by a beneficiary according to statutory payment levels.

In general, for medical and other health services, unless provided otherwise, Medicare will reimburse "80 percent of the reasonable charges for the services" that are covered and not subject to exclusion. *Id.* § 1395*l*(a)(1) (§ 1833(a)(1)). Durable medical equipment ("DME") (other than drugs delivered thereby) is reimbursed at statutorily prescribed rates. *Id.* § 1395m (§ 1834). For drugs covered under Part B, including drugs administered incident to DME, such as Xopenex, the statute mandates a detailed payment methodology. *See id.* § 1395w-3a (§ 1847A). These payment provisions generally distinguish between "multiple-source" or generic drugs and "single-source" or "innovator" drugs, but they also have special rules and clearly delineated exceptions which allow Medicare to treat certain single-source drugs the same as multiple-source drugs.

For single-source drugs covered under Part B, the statute provides that they shall be reimbursed, with certain exceptions, at 106 percent of the volume-weighted average of the Average Sales Price ("ASP") for that single-source drug, which is effectively a measure of the drug's net acquisition price. *See id.* § 1395w-3a(b)(1), (4), (6) (§ 1847A(b)(1), (4), (6)). The ASP is the manufacturer's total sales to all qualified purchasers divided by the total number of units sold in a calendar quarter. *Id.* § 1395w-3a(c) (§ 1837A(c)). For multiple-source or generic drugs, the reimbursement rate is 106 percent of the volume-weighted average of all the ASPs for the generic drugs in a particular billing code. *Id.* § 1395w-3a(b)(1), (6) (§ 1847A(b)(1), (6)). In other words, the ASPs for generic drugs supplied by multiple labelers are blended together to determine the reimbursement rate.

Many Medicare claims for drug reimbursement are filed by suppliers (such as a home health care supplier, *see id.* § 1395x (§ 1861)). A supplier purchases the drug directly from the drug's manufacturer or a wholesaler and then dispenses the drug to the patient, a Medicare

beneficiary.  Next, the supplier submits a claim for reimbursement directly to Medicare.  *See id.*

§ 1395n (§ 1835) (procedure for payment of claims).

The Medicare statute provides a means by which Medicare beneficiaries may challenge

coverage decisions by the Agency or its contractors.  42 U.S.C. § 1395ff(f) (§ 1869(f)).  Relevant

here, § 1395ff(f)(3) authorizes a Medicare beneficiary to challenge an LCD in federal court

without exhausting administrative remedies if the challenge is strictly legal and if no material

issues of fact are in dispute.  *See id.* §§ 1395ff(f)(3), (5) (§ 1869(f)(3), (5)).

### B.    Factual Background

Plaintiffs are Medicare beneficiaries who take Xopenex, a drug used to treat or prevent

symptoms arising from respiratory conditions such as asthma and chronic obstructive pulmonary

disease ("COPD").  Compl. ¶¶ 2, 23.  When delivered through a nebulizer, Xopenex works by

relaxing the muscles surrounding the airways, thus permitting patients to breathe more easily.

Xopenex is a single-source drug, meaning that its manufacturer, Sepracor Inc. ("Sepracor"), has

demonstrated the product's safety and efficacy to the U.S. Food and Drug Administration

("FDA") through the approval process for a new drug application.  Compl. ¶ 23.

Another drug used to treat asthma and COPD is racemic albuterol ("albuterol"), a

competitor of Xopenex.  Ignoring the rule that allegations in the complaint must be taken as true

at the motion to dismiss stage, *see infra* Section I, Defendants mischaracterize Xopenex as "a

form of albuterol."  Defs.' Mem. 8.  To the contrary, "[a]lbuterol is a multiple-source, or generic,

drug that differs chemically from Xopenex."  Compl. ¶ 24.[4]

---

[4] Defendants make a number of self-serving assertions that are not alleged in the complaint nor established by documentary evidence, such as that DME contractors have no financial incentives to institute least costly alternative ("LCA") policies, Defs.' Mem. 21, and that they were in the process of withdrawing the LCA voluntarily prior to this suit, Defs.' Mem 10.  Those contentions are improper on a motion to dismiss and should be disregarded.

Plaintiffs are Medicare beneficiaries whose doctors have prescribed Xopenex to treat their various medical conditions. Specifically, Plaintiffs Jeanette Coakley and Frances Royster take Xopenex to treat asthma and COPD, and Plaintiffs Theresa Torrisi and Eunice Kozireski take Xopenex to treat COPD. All of the Plaintiffs have taken racemic albuterol to treat their conditions in the past, and they each have experienced negative side effects from that drug. Compl. ¶¶ 3-10.

*Xopenex's Reimbursement History.* Xopenex is covered under Part B pursuant to the provisions governing DME.[5] Those provisions apply because Xopenex is delivered to a patient through a nebulizer, equipment that converts the drug solution into a spray that a patient inhales. Compl. ¶¶ 21-22.

Prior to January 2005, the Agency did not differentiate between Xopenex and albuterol for reimbursement and billing purposes. The Agency included both Xopenex and albuterol in the same billing and payment code (or "J-code"), in effect treating Xopenex as a multiple-source (generic) drug for reimbursement purposes. *See* Sepracor Comments to Regions A & B's Draft LCD for Nebulizers Dated March 24, 2006, at 3 (May 8, 2006) ("Sepracor Comments") (Ex. A).[6] In that time period, Medicare reimbursed Part B drugs based on a calculation called the Average Wholesale Price ("AWP"), which was determined based on list prices published for manufacturer products rather than actual sales. The reimbursement paid for Xopenex and generic albuterol was based on the AWP for albuterol, which was significantly higher than the acquisition cost for albuterol and significantly lower than the acquisition cost for Xopenex. This reimbursement created a substantial artificial incentive for Medicare suppliers to provide albuterol rather than Xopenex to patients, even if Xopenex was the drug of choice for the patient,

---

[5] Most outpatient drugs, and in certain other circumstances, Xopenex, are covered under Part D, the Medicare Prescription Drug Program, which is not at issue here.
[6] All exhibits attached to this memorandum are part of the agency record underlying the challenged LCDs.

because suppliers would receive the same reimbursement whether they provided Xopenex (which had a high net cost to the supplier relative to albuterol) or albuterol (which had a much lower net cost).

The same reimbursement disincentives would have continued under the ASP regime that was signed into law on December 8, 2003, and went into effect on January 1, 2005, if Xopenex had continued to be grouped with albuterol in the same J-code (and thus effectively treated as a multiple-source drug). *Cf.* 42 U.S.C. § 1395w-3a(b)(3) (§ 1847A(b)(3)) (ASP for multiple-source drugs based on a volume-weighted average of the sales prices of the different products). Instead, Sepracor requested that the Agency assign Xopenex its own unique J-code. Requests to modify a J-code are evaluated under a number of factors, including factors that call for differentiation from other products. *See* HCPCS Level II Code Modification Request Process Re: The 2010 HCPCS Update, *available at* http://www.cms.hhs.gov/MedHCPCS GenInfo/Downloads/2008_ALPHA.pdf. These factors include examining codes used by commercial insurers that pay for the product and identifying significant differences between the product at issue and similar products made by other manufacturers. *See id.* In November 2004, the Agency announced it would assign Xopenex its own J-code, effective January 2005. *See* Sepracor Comments Attach. B.

*The Proposed Local Coverage Determinations.* Within months of receiving notice about the awarding of a new J-code, Defendants developed their first least costly alternative policy for Xopenex. In early 2005, Defendants made known that they would soon publish an LCA policy for Xopenex. *See* Sepracor Comments Attach. D. This action was not instituted, however, until March, 2006.

Once the new J-code took effect, Medicare utilization of Xopenex increased in part because the artificial barrier to Xopenex utilization described above was lifted. *See* Sepracor Comments 5. With increased utilization of Xopenex by Medicare patients, Medicare expenditures for Xopenex also increased. In March 2006, the contractors, who were charged with developing and revising coverage policies for the geographical regions they serve, *see* 42 U.S.C. § 1395ddd (§ 1893), followed up on the LCA proposal originally circulated in early 2005 and simultaneously issued draft local coverage determinations that would reimburse Xopenex suppliers at a small fraction of that drug's price. Exs. B, C, D.

The draft LCDs announced the Medicare contractors' intention to apply an LCA policy to Xopenex.[7] Specifically, the draft LCDs provided as follows: "The medical necessity for levalbuterol [Xopenex] compared to albuterol has not been established. Therefore, when codes J7612 or J7614 [for Xopenex] are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively." Exs. B, C, D.

The contractors then solicited comments on the draft LCDs and received responses challenging both the legality of the LCA policy and the medical basis for the contractors' decision, *i.e.*, that Xopenex was not clinically differentiated from albuterol. *See, e.g.*, Sepracor Comments; Nebulizers - Response to Comments (April 2008) ("Response to Comments") (Ex. E). In the wake of the substantial negative responses to the proposed LCA policy, the contractors' LCDs were put on hold. In December 2006, the Agency itself initiated a national coverage determination process to address coverage issues for drugs administered through a nebulizer to treat lung diseases. Ultimately, the Agency concluded in September 2007 that "no

---

[7] The Medicare contractors who announced the draft LCDs here are different from the contractors who finalized the LCDs being challenged, but their authority is the same.

9

national coverage determination (NCD) is appropriate at this time." CMS, Medicare National

Coverage Determinations Manual § 200.2 (eff. Sept. 21, 2007) (Nebulized Beta Adrenergic

Agonist Therapy for Lung Diseases), *available at* http://www.cms.hhs.gov/manuals/

downloads/ncd103c1_Part4.pdf.

    *The Agency's Reimbursement Change and the Legislative Response.* On July 1, 2007, the

Agency instituted, as part of its ongoing effort to limit utilization for Xopenex, another change in

policy designed to reduce the reimbursement rate for Xopenex. From the time the Agency had

assigned Xopenex its own billing code, Xopenex had been reimbursed using the payment

methodology for a single-source drug, *i.e.*, at 106 percent of its own ASP. However, in early

2007, the Agency sought to exploit a grandfathering provision in the statute to treat Xopenex as a

multiple-source drug and thereby reduce its reimbursement rate. *See* CMS, Update to

Information Regarding Medicare Payment and Coding for Drugs & Biologics (Apr. 24, 2007),

*available at* http://www.cms.hhs.gov/MedHCPCSGenInfo/downloads/Code_Def.pdf.

    Effective July 1, 2007, the Agency assigned Xopenex and albuterol to the same billing

and payment codes. Thereafter, Xopenex was reimbursed using the methodology for multiple-

source drugs, *i.e.*, at 106 percent of the blended average of the ASPs for Xopenex and albuterol.

*See* CMS, Update to Information Regarding Medicare Payment and Coding for Drugs and

Biologics (May 18, 2007), *available at* http://www.cms.hhs.gov/MedHCPCSGenInfo/

downloads/051807_coding_annoucement.pdf. The change also meant that albuterol was

reimbursed at this same rate. *Id.* Accordingly, while the reimbursement rate for Xopenex

decreased significantly, the reimbursement rate for albuterol dramatically increased—once again

creating the same artificial incentive that had existed before Xopenex received its own billing

code in 2005. Suppliers would be much more likely to supply albuterol over Xopenex (due to

the increased profit margin they received as a result of the low acquisition cost of generic albuterol) and thereby receive a reimbursement rate many times the price of acquiring albuterol. This change threatened to drive Xopenex completely out of the Medicare market and to deny access to Xopenex to Medicare beneficiaries who had been prescribed that drug.

Recognizing the problem created by the Agency's reimbursement decision, Congress provided a legislative fix in the Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. 110-173, 121 Stat. 2492. This legislation added a special reimbursement rule for Part B inhalation drugs affected by the grandfathering provision. 42 U.S.C. § 1395w-3a(b)(7) (§ 1847A(b)(7). Under the special rule, Xopenex is reimbursed at the lesser of (1) 106 percent of its own ASP, or (2) 106 percent of the blended average of the ASPs for Xopenex and the various generic forms of albuterol. *Id.* In the case of Xopenex, the lesser of these two rates is 106 percent of the blended ASPs of Xopenex and albuterol. In contrast, pursuant to the same statutory provisions, albuterol is reimbursed at the lesser of (1) 106 percent of the average of the ASPs of albuterol, or (2) 106 percent of the blended average of the ASPs for Xopenex and albuterol. *Id.* For albuterol, therefore, the lower rate is 106 percent of the ASPs for albuterol.

The practical effect of this provision was to maintain a higher payment rate for Xopenex (currently set at twenty-three cents per one half milligram) than for albuterol (currently set at four cents per milligram). *See* CMS, Medicare Part B Average Sales Price Drug Pricing File for Third Quarter 2008, *available at* http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/ 01a_2008aspfiles.asp. In passing the new special rule, Congress was "concerned that the profit spread created by increasing reimbursement for generic albuterol will cause physicians to use only albuterol even if levalbuterol may be more clinically appropriate." H.R. Rep. No. 110-284, pt.1, at 227-28 (2007).

11

Through this legislative reimbursement rule, which took effect on April 1, 2008, Congress provided an explicit statutory directive for establishing the reimbursement rate for Xopenex: it must be reimbursed at 106 percent of its own ASP or at 106 percent of the blended average of the ASPs for Xopenex and albuterol, whichever is lower.[8] This legislation did not foresee any scenario where Xopenex could be reimbursed at the "historic rate" of albuterol, which the LCDs' new LCA rule would accomplish.

*Contractors Finalize Their Local Coverage Determinations.* Notwithstanding congressional action to ensure the supply of Xopenex to Medicare beneficiaries as well as the the Agency's active participation in the legislative process that established the special payment rule, within months of the legislation taking effect, the DME MACs issued final LCDs, the operative provisions of which are identical to those proposed in the draft LCDs issued over two years earlier. The LCDs provide, namely, that "when codes J7612 or J7614 [for Xopenex] are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – J7611 or J7613 [for albuterol] respectively." Compl. ¶ 27. This LCA policy determination that Xopenex would be reimbursed at the much lower rate of generic albuterol meant that Medicare suppliers would be providing Xopenex to Medicare beneficiaries at a significant financial loss. *See* Sepracor Comments 5.

C.    **Procedural Background**

Faced with the imminent threat of losing access to Xopenex as a result of the final LCDs, Plaintiffs brought this action on June 6, 2008, challenging the legality of the LCA policy contained in the LCDs and seeking preliminary injunctive relief to prevent the LDCs from going into effect. At the June 11, 2008, status hearing on the application for a preliminary injunction, counsel for Defendants stated that the Agency had made a decision to withdraw the LCA policy

---

[8] Following the enactment of the legislation, the Agency returned Xopenex to its old billing and payment codes.

in the LCDs as it applied to Xopenex but added that the decision had not received final approval.

That same day, the Agency issued a joint signature memorandum directing the DME MACs "in

the interim" to "withdraw the least costly alternative (LCA) policy" for Xopenex pending further

"review" by the Agency.  Defs.' Ex. A.  At the status hearing on June 13, 2008, Plaintiffs'

counsel represented that the June 11, 2008, memorandum would not allow them to withdraw

their preliminary injunction motion because it failed to provide notice to Medicare suppliers that

the LCA policy could not be reinstituted at any time.  The Court then brokered an agreement

between the parties, whereby Plaintiffs would withdraw their application for a preliminary

injunction if Defendants would alter their direction to the DME MACs to make clear that they

"shall take no further action before December 31, 2008."  Defs.' Ex. B.  The Agency issued the

revised memorandum the same day.  And on June 16, 2008, Plaintiffs moved to withdraw their

application for a preliminary injunction.  The Court granted the motion on June 17, 2008.  On

June 27, 2008, Defendants brought this motion to dismiss.

## ARGUMENT

### I.    MOTION TO DISMISS STANDARD

Defendants move to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction

pursuant to Federal Rule of Civil Procedure 12(b)(1).  "The standard of review for a motion to

dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is virtually identical to

that used for 12(b)(6) motions."  *Caesar v. United States*, 258 F. Supp. 2d 1, 2 (D.D.C. 2003).

Accordingly, "dismissal is warranted if no plausible inferences can be drawn from the facts

alleged that, if proven, would provide grounds for relief."  *Price v. Socialist People's Libyan

Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).  "While the district court may consider

materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of

jurisdiction, the court must still 'accept all of the factual allegations in [the] complaint as true.'" *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)). In the context of Rule 12(b)(1), "the plaintiff bears the burden of establishing the Court's jurisdiction." *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 263 F. Supp. 2d 82, 100 (D.D.C. 2003). The parties "may rely on, and the Court may consider, materials outside of the pleadings without converting a motion to dismiss to one for summary judgment." *Id.* at 100-01; *see also Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003, 1008 (D.C. Cir. 1999).

II.    **THIS COURT HAS SUBJECT MATTER JURISDICTION TO REVIEW THE CHALLENGED LCDS BECAUSE BOTH STATUTORY AND ARTICLE III JURISDICTION EXISTED AT THE TIME THE COMPLAINT WAS FILED AND MAY NOT BE DIVESTED BY POST-FILING EVENTS.**

Within the complex statutory scheme that governs claims brought under the Medicare Act, Congress expressly granted federal district courts subject matter jurisdiction to hear legal challenges to LCDs where certain criteria have been met. 42 U.S.C. § 1395ff(f)(3). Specifically, § 1395ff(f)(3) allows a plaintiff-beneficiary to bypass administrative review and challenge an LCD directly in federal district court where: (1) the complaint is otherwise reviewable by an administrative law judge under § 1395ff(f)(2)(A)(i); (2) the moving party alleges that there are no material issues of fact in dispute; and (3) the moving party raises a purely legal challenge to the Secretary's authority to make a particular determination. Plaintiffs have properly brought suit pursuant to this statutory grant of subject matter jurisdiction. *See* Compl. ¶ 17.

A.    **This Court Has Subject Matter Jurisdiction Because Plaintiffs' Complaint Challenged Existing LCDs.**

Defendants' contention that this Court does not have subject matter jurisdiction is based on a faulty premise of law. Defendants' primary argument is that the Court "no longer" has subject matter jurisdiction because CMS directed the DME MACs to withdraw the challenged

LCA policy.  Defs.' Mem. 13.  The underlying presumption on which this argument is based –

that a court, properly exercising jurisdiction over a case at the time it is filed, may subsequently

be stripped of subject matter jurisdiction by external events – is flatly contrary to Supreme Court

precedent.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (referring to "our

longstanding rule" that "jurisdiction is to be assessed under the facts existing when the complaint

is filed"); *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987)

(Scalia, J., concurring) ("Subject-matter jurisdiction 'depends on the state of things at the time of

the action brought'; if it existed when the suit was brought, 'subsequent events' cannot 'ous[t]'

the court of jurisdiction." (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)) (alteration in

original)); *see also Keene Corp. v. United States*, 508 U.S. 200, 207-08 (1993) (holding that

application of a statutory provision limiting the subject matter jurisdiction of the U.S. Court of

Federal Claims over breach of contract actions filed against the United States depends on the

facts existing at the time the complaint was filed).

    Moreover, the federal courts of appeals (including the D.C. Circuit) that have addressed

this issue are in agreement that subject matter jurisdiction is determined "with respect to the

circumstances at the time the complaint is filed."  *Natural Res. Def. Council v. Texaco Ref. and*

*Mktg., Inc.*, 2 F.3d 493, 502 (3d Cir. 1993); *Worth v. Jackson*, 451 F.3d 854, 859-60 (D.C. Cir.

2006) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when

the complaint is filed"); *accord Greenwell v. Aztar Ind. Gaming Corp.*, 268 F.3d 486, 492 (7th

Cir. 2001) (same); *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir.

1997) (same); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) (events

subsequent to the date the complaint was filed may moot the case but cannot deprive the court of

jurisdiction).  Defendants cite no authority to support their position that subject matter

jurisdiction, properly conferred at the outset of a case, can be unsettled by events that occur

subsequent to the filing of the complaint.

Defendants' assertion that subject matter jurisdiction is "no longer" proper in light of the

Agency's post-filing instruction to the DME MACs ignores this substantial body of caselaw.

Moreover, it conflates subject matter jurisdiction with the doctrine of mootness. As the Third

Circuit explained in *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.*,

*supra*, while principles of mootness may preclude a court from adjudicating claims that "no

longer" present an Article III case or controversy, "[p]ost-filing events are . . . incapable of

stripping a court of its properly conferred jurisdiction." 2 F.3d at 502. *See also Carr*, 931 F.2d

at 1061 ("subsequent events do not deprive the court of jurisdiction").[9]

Analyzing the facts as they existed when the complaint was filed, this Court has subject

matter jurisdiction to decide Plaintiffs' claims. Plaintiffs filed their complaint on June 6, 2008.

At that time, the LCA policy that is the subject of this action was set to take effect on July 1,

2008. CMS did not instruct the DME MACs to withdraw the LCA policy until June 11, 2008 –

five days *after* Plaintiffs' complaint was filed and *after* § 1395ff(f)(3) conferred subject matter

jurisdiction on this Court. Defendants' subsequent act of withdrawing the LCA policy cannot

strip the Court of jurisdiction. *See Carr*, 931 F.2d at 1061 (stating that a defendant's post-filing

compliance with the Clean Water Act does not deprive the court of jurisdiction over plaintiffs'

citizen suit).

Defendants' citation to *Bailey v. Mutual of Omaha Insurance Co.,* 534 F. Supp. 2d 43

(D.D.C. 2008), *see* Defs.' Mem. 13-14, is unavailing because *Bailey* is distinguishable in at least

one critical respect. In *Bailey*, a Medicare beneficiary filed a complaint in federal district court

on December 15, 2006, asserting that continued enforcement of a retired LCD violated the

---

[9] Plaintiffs address Defendants' mootness arguments *infra* at Section IV of this memorandum.

Medicare Act. 534 F. Supp. 2d at 46-47. Significantly, the challenged LCD had been retired by

CMS on August 11, 2006, four months *before* plaintiff filed her complaint. *Id.* at 51. The *Bailey*

court did not have jurisdiction because at the time plaintiff filed her complaint in district court,

an administrative law judge could not have reviewed the claim. *Id.* In sharp contrast, this Court

obtained subject matter jurisdiction over Plaintiffs' action when the complaint was filed on June

6, 2008, five days before CMS directed the DME MACs to withdraw the challenged LCA policy.

Accordingly, *Bailey* does not control here and this Court's continued exercise of subject matter

jurisdiction is proper despite Defendants' post-filing actions.

**B.      Plaintiffs Have Standing To Bring This Challenge Because They Allege
         Injury In Fact At The Time The Complaint Was Filed.**

As with subject matter jurisdiction, the Supreme Court has focused its standing analysis

on the facts as they existed at the time the complaint was filed. *See, e.g.*, *Friends of the Earth,*

*Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-85 (2000) ("[W]e have an obligation

to assure ourselves that [plaintiffs] had Article III standing *at the outset of the litigation*.")

(emphasis added). Moreover, nearly every federal court of appeals, including the D.C. Circuit,

has held that Article III standing is determined as of the time the complaint is filed. *Worth*, 451

F.3d at 859-60; *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154-55 (10th Cir. 2005); *Kitty*

*Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005); *Focus on the Family v. Pinellas*

*Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003); *Becker v. Fed. Election Comm'n*,

230 F.3d 381, 386-87 & n.3 (1st Cir. 2000); *Cleveland Branch, NAACP v. City of Parma*, 263

F.3d 513, 525-26 & n.11 (6th Cir. 2001); *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000);

*Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037-38 (8th Cir. 2000); *Perry v.*

*Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999).

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, *supra*, the Supreme Court held that environmental groups had standing to bring a citizen suit against the owner of a wastewater treatment plant under the Clean Water Act. 528 U.S. at 184-85. In reaching this decision, the Court distinguished the facts of that case from an earlier Supreme Court standing decision, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), in which the Court held that plaintiff lacked standing. *Id.* Significantly, the Court noted that the *Lyons* plaintiff lacked standing to enjoin enforcement of a police chokehold policy because he could not show that he faced a realistic threat of future injury based on that policy. *Id.* In contrast, the plaintiff environmental groups in *Friends of the Earth* had standing because the defendant was discharging pollutants in excess of permit limits "*at the time the complaint was filed*," such that the plaintiffs reasonably refrained from using the affected waters and suffered "economic and aesthetic harms" as a result. 528 U.S. at 184 (emphasis added).

Moreover, the D.C. Circuit has expressly concluded that standing is determined at the time the complaint is filed and such precedent is binding on this Court. In *Worth v. Jackson*, *supra*, the plaintiff brought a Title VII claim against his employer, the Department of Housing and Urban Development ("HUD"), alleging that he was turned down for at least four open positions within HUD because of a discriminatory "affirmative employment plan." 451 F.3d at 856. After plaintiff filed his complaint, the Equal Employment Opportunity Commission replaced the challenged employment plan with a new policy. *Id.* The District of Columbia Circuit concluded, nevertheless, that plaintiff had standing to challenge the withdrawn plan, stating: "To be sure, the [affirmative employment plan] has now lapsed, but it was in place when [the defendant] filed suit and [t]he existence of federal jurisdiction ordinarily depends on the

facts as they exist when the complaint is filed." *Id.* at 859-60 (internal quotations and citation omitted) (third alteration in original).

Ignoring this binding precedent, Defendants argue that Plaintiffs lack standing under *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Both of these cases, however, address standing in the context of allegations of wholly <u>past</u> illegal conduct. Because Plaintiffs' complaint alleges an active and continuing violation of the law, these cases are inapposite. In *Steel Co. v. Citizens for a Better Environment*, *supra*, the plaintiff environmental organization sought injunctive relief against a manufacturing company for "past violations" of the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"). 523 U.S. at 86. In response to an argument that plaintiffs could demonstrate standing based on the possibility that defendant would commit the same violation in the future, the Supreme Court first noted that this argument confuses the voluntary cessation doctrine applicable to mootness analysis with the concept of standing. The Court then concluded that, as to standing, "[b]ecause respondent *alleges only past infractions of EPCRA, and not a continuing violation* or the likelihood of a future violation, injunctive relief will not redress its injury." *Id.* at 109 (emphasis added); *see also Adarand Constructors, Inc.*, 515 U.S. at 210-12 (subcontractor who sued *after* losing a contract could challenge a federal provision favoring disadvantaged subcontractors because plaintiff alleged that it would bid on another project in which the challenged provision would apply in the near future). Here, by contrast, Plaintiffs' complaint was filed when the LCDs were pending and alleges that the pending LCDs, upon taking effect, constituted an active and continuing violation of the Secretary's legal authority. Accordingly, Defendants' reliance on these cases is without merit.

19

Defendants do not suggest that Plaintiffs lacked standing when they filed their complaint. To establish Article III standing, a plaintiff must demonstrate injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 559-61. In addition, plaintiff-beneficiaries who bring a purely legal challenge to an LCD under § 1395ff(f)(3) must meet the statutory standing requirements of subsection (f)(5) of that provision, which requires that plaintiffs be entitled to Medicare benefits and "in need of the items or services that are the subject of the coverage determination." 42 U.S.C. § 1395ff(f)(5). Plaintiffs have adequately alleged facts sufficient to establish both Article III and statutory standing here. At the time Plaintiffs filed their complaint on June 6, 2008, the LCDs were scheduled to take effect on July 1, 2008, such that the injury to Plaintiffs was not speculative, but was concrete and imminent. Compl. ¶ 28. Furthermore, Plaintiffs have alleged in their complaint that they are Medicare beneficiaries entitled to benefits under Part B, that they receive coverage for Xopenex through Medicare Part B, that their doctors prescribe Xopenex, and that they need Xopenex to treat their medical conditions. Compl. ¶¶ 2-10. Taking these factual allegations as true as the Court must on a motion to dismiss, *see Lujan*, 504 U.S. at 561 (stating that, at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice"), at the time the complaint was filed, Plaintiffs properly alleged that the LCDs, upon their effective date, would injure them by unlawfully depriving them of benefits to which they were entitled as Medicare beneficiaries, and by subjecting them to the risk of adverse physical effects that they had previously suffered on albuterol. Accordingly, Plaintiffs have standing to bring this legal challenge.[10]

---

[10] Defendants misconceive the rule that standing must be established at every stage of the litigation; that rule refers to the different proof necessary to establish standing on a motion to dismiss vis-à-vis a motion for summary judgment or trial. *See Lujan*, 504 U.S. at 561. Similarly, a party must have Article III standing after judgment to file an appeal, *ASARCO v. Kadish*, 490 U.S. 605, 617-18 (1989), but an appeal is a separate proceeding in a different court.

III.    **THIS COURT HAS SUBJECT MATTER JURISDICTION BECAUSE THE COMPLAINT ALLEGES THAT NO MATERIAL ISSUES OF FACT ARE IN DISPUTE.**

Congress has authorized a beneficiary to file an immediate action for judicial review where "the moving party alleges that …there are no material issues of fact in dispute" and contests the validity of a determination by the Secretary.  42 U.S.C. § 1395ff(f)(3).  The Plaintiffs have raised a purely legal challenge to the Secretary's authority to issue LCA policies through LCDs.  Indeed, Plaintiffs expressly allege that "there are no material facts in dispute," Compl. ¶ 18, and that allegation must be taken as true.  This challenge does not turn on any disputed material facts, and  Defendants' argument to the contrary plainly mischaracterizes Plaintiffs' claims.

Plaintiffs' complaint raises five substantive counts, none of which turn on whether Xopenex is clinically superior to albuterol to treat Plaintiffs' medical conditions.  Rather, the complaint asserts that (1) the LCDs are arbitrary and capricious and contrary to law, Compl. ¶¶ 29-30; (2) the LCDs are invalid because they exceed the proper scope of an LCD, as defined by statute and regulation, Compl. ¶¶ 31-35; (3) the LCDs are invalid because they contravene the statutory payment methodology for Xopenex, as prescribed by Congress, Compl. ¶¶ 36-41; (4) the Program Integrity Manual authorizing DME MACs to establish LCA policies in LCDs is contrary to law, Compl. ¶¶ 42-44; and (5) there is no statutory provision authorizing DME MACs to issue LCA policies, Compl. ¶¶ 45-46.  Resolution of these claims will require the Court to engage in statutory construction and analysis of particular provisions of the Medicare Act to determine whether the Secretary exceeded the scope of his authority, as defined and limited by Congress, by issuing the LCA policy in the LCDs.  Even assuming, for purposes of this action, that Xopenex is not clinically superior to albuterol, Plaintiffs maintain that the LCA policy exceeds the Secretary's statutory authority, necessitating this Court's review of the same legal

21

issues.  In short, any factual dispute that may exist is not material to the resolution of Plaintiffs' legal claims.

The mere fact that Plaintiffs' complaint contains some factual allegations does not vitiate subject matter jurisdiction under § 1395ff(f)(3).  Indeed, § 1395ff(f)(5) expressly requires plaintiff-beneficiaries to plead facts sufficient to establish standing to bring their claims. Standing is a jurisdictional requirement for every Article III case or controversy and can be demonstrated only by pleading facts that demonstrate injury, causation, and redressability.  *See Lujan*, 504 U.S. at 559-61.  Moreover, the constitutional requirement of standing is expressly reflected in subsection (5) of the Medicare Act provision that governs review of coverage determinations.  42 U.S.C. § 1395ff(f)(5).  This subsection requires plaintiff-beneficiaries to show that:  (1) they are entitled to Medicare benefits, and (2) they are "in need of the items or services that are the subject of the coverage determination."  *Id.*  Far from creating a factual dispute relevant to Plaintiffs' substantive claims, s*ee* Defs.' Mem. 17, the factual allegations in paragraph 22 (which is specifically identified by Defendants) and in other paragraphs of Plaintiffs' complaint are necessary to establish that Plaintiffs have standing to bring this challenge.  *See* Compl. ¶¶ 2-10, 16-28.

Defendants attempt to manufacture a material factual dispute where none exists in an effort to defeat subject matter jurisdiction.  They claim that the allegation that "Xopenex is necessary to achieve the nebulizers' therapeutic effect *for these Plaintiffs*," Compl. ¶ 22 (emphasis added), in effect disputes the DME contractors' determination in the LCD that there is insufficient documentation in the medical literature to establish significant clinical benefits for the Medicare population of levalbuterol (Xopenex) compared to racemic albuterol.  Their claim is groundless on many dimensions.  First, review of agency factfinding is conducted on the

agency record, *see AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996), and reference to

issues of disputed facts in subsection (f)(3) refers to a dispute of the record basis on which the

LCDs were based. The complaint is crystal clear that Plaintiffs do not contest the factual basis

for the LCDs, and allegations regarding the Plaintiffs' personal experience with levalbuterol and

albuterol cannot create an issue of fact regarding the adequacy of the record on which the LCDs

were based. Second, the allegations must be read in favor of the Plaintiffs as the nonmoving

party. Here, not only can the allegations of the complaint be read in harmony, but there is also

no colorable contrary reading. The experience of a single patient (or even a handful of patients)

cannot be invoked to prove the clinical benefits of one drug relative to another. The CMS

Program Integrity Manual states that LCDs shall preferably be based on "[p]ublished

authoritative evidence derived from definitive randomized clinical trials or other definitive

studies," or "[g]eneral acceptance by the medical community" as evidenced by peer-reviewed

studies, expert consensus, or consultation with medical associations or other experts. Medicare

Program Integrity Manual § 13.7.1 (rev. Apr. 9, 2004) ("PIM"), *available at*

http://www.cms.hhs.gov/manuals/downloads/pim83c13.pdf. "Acceptance by individual health

care providers" – such as plaintiffs' doctors – does not establish general acceptance. *Id.* Indeed,

the LCDs never took the absolute position that *no* patient had superior results with Xopenex

(levalbuterol). Rather, the LCDs merely identified flaws and/or limitiations of certain studies

favoring levalbuterol, and concluded that "[c]onsidering all of the above, the literature does not

document a significant clinical benefit for levalbuterol compared to albuterol for adult patients in

the home setting." Response to Comments 7. Plaintiffs have alleged no issues of material fact

regarding the LCDs that would deprive this Court of jurisdiction.

In fact, taken to its logical conclusion, acceptance of Defendants' argument would render judicial review of purely legal challenges under 1395ff(f)(3) utterly ineffectual. Plaintiffs must always plead facts to demonstrate that they are "in need of" an item or service in order to establish standing under subsection (f)(5). If any allegation of a patient's need for an item were tantamount to a factual dispute with a local coverage determination that the item is not reasonable and necessary, defendants could routinely evade federal district court review. Surely, Congress did not intend this result when it expressly provided for federal district court review of purely legal challenges to LCDs and simultaneously required plaintiff-beneficiaries to establish standing. *See Consol. Rail Corp. v. United States*, 896 F.2d 574, 579 (D.C. Cir. 1990) (employing rule of statutory construction that "effect must be given, if possible, to every word, clause and sentence of a statute . . . so that no part will be inoperative or superfluous, void or insignificant" (internal quotation and citation omitted)).

## IV.   DEFENDANTS' VOLUNTARY CESSATION OF THEIR CHALLENGED ACTION DOES RENDER THIS CASE MOOT.

Defendants also move to dismiss the complaint on mootness grounds. Defendants' suspension of the challenged portion of the LCDs after the initiation of this lawsuit, however, does not render the case moot. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth,* 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "[I]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways." *Id.* (alterations in original) (internal quotation and citation omitted). The Supreme Court has thus adopted the following "stringent" standard for determining whether a defendant's voluntary conduct has rendered a case moot: a case is moot only if (1) "'subsequent events made it *absolutely clear* that the allegedly wrongful behavior

could not reasonably be expected to recur,'" *id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (emphasis added); *and* (2) if "interim relief or events have *completely and irrevocably* eradicated the effects of the alleged violation," *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (emphasis added).  This standard applies to government agency actors just as to other defendants.  *See Larsen v. U.S. Navy,* 525 F.3d 1, 4 (D.C. Cir. 2008) (applying this standard to action by the U.S. Navy); *Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1198 (D.C. Cir. 1985) ("[I]t is well-established that an agency's voluntary cessation of allegedly illegal conduct does not moot a case."); *Nader v. Volpe*, 475 F.2d 916, 917 (D.C. Cir. 1973) ("Where a court is asked to adjudicate the legality of an agency order, it is not compelled to dismiss the case as moot whenever the order expires or is withdrawn.").  Moreover, "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189 (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203).

Defendants have completely failed to carry their "heavy burden."  The joint signature memoranda, issued by CMS the week following Plaintiffs' initiation of this suit and directing the DME MACs to withdraw the imminent LCA policy for Xopenex, do not make "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U.S. at 189.

First, by their plain terms, the memoranda suggest that the withdrawal of the LCA policy is not permanent.  The first memorandum provides as follows:  "CMS would like to review this provision [*i.e.*, the statutory special rule for the payment of Xopenex and albuterol] further.  In the interim, contractors shall withdrawal the least costly alternative policies for levalbuterol until

25

receipt of further guidance from CMS." Defs.' Ex. A. Only after a compromise brokered by this Court at the June 13, 2008, hearing did CMS agree to provide some assurance that the LCA policy could not be reinstituted in the immediate future. Thus, the revised memorandum states: "CMS would like to review this provision further. Contractors shall withdraw the least costly alternative policies for levalbuterol and shall take no further action before December 31, 2008. Contractors shall take no further action thereafter, until receipt of further guidance from CMS." Defs.' Ex. B. The revised memorandum makes clear, however, that CMS is still "review[ing]" the statutory special rule, and that in the new year it may allow the LCA policy to go forward after providing "further guidance" to the DME MACs. *Id.*

Nothing in the memorandum provides the required absolute clarity to the Court that the LCA policy will never be reinstituted. Indeed, CMS nowhere calls into question the authority of the contractors to issue the LCA policy (one of Plaintiffs' primary contentions in their complaint, Compl. ¶¶ 42-46). CMS only hints at the possibility that the LCA policy might not be permitted by the statutory special rule, by stating that it wants to "review this provision further." *Id.* This stated need for further review shows why Defendants' mootness argument fails: if the Agency truly had no intention of reinstating the LCA policy, further review would be unnecessary. *See Lake Pilots Ass'n, Inc. v. U.S. Coast Guard*, 257 F. Supp. 2d 148, 159 (D.D.C. 2003) (holding that the agency's "temporary final rule," which "only states that a review is being undertaken and, in the interim, the previous rates will be reinstated," did not moot plaintiff's rate challenge).

Second, the record also shows that Defendants have a rich history of repeated attempts to limit the reimbursement rate for Xopenex, a fact that makes a subsequent change of policy by Defendants here more likely. *See City of Mesquite*, 455 U.S. at 289 (noting that the defendant's history in similar situations is relevant to whether it is likely to renew its challenged action). The

Agency first initiated an LCA policy for Xopenex in early 2005.  *See* Sepracor Comments

Attach. D.  A year later, the Agency's contractors issued draft LCDs essentially identical to the

LCDs challenged here.  Exs. B, C, D.  After receiving comments challenging both the medical

basis and the legality of the LCDs (*see, e.g.*, Sepracor Comments; Response to Comments), the

contractors took no further action at that time.  Instead, CMS instituted a national coverage

analysis related to Xopenex.  But again after receiving comments, including those challenging

the legality of LCA policies, CMS decided in 2007 to take no action at the national level.  CMS,

Medicare National Coverage Determinations Manual § 200.2 (eff. Sept. 21, 2007) (Nebulized

Beta Adrenergic Agonist Therapy for Lung Diseases), *available at* http://www.cms.hhs.gov/

manuals/downloads/ncd103c1_Part4.pdf.  Then, in the spring of 2007, CMS opened up a new

front in its campaign to reduce access to Xopenex and reduce the product's reimbursement.

Under a controversial provision of the Medicare law, the Agency modified Xopenex's

reimbursement rate and tied it to generic albuterol.  *See* CMS, Update to Information Regarding

Medicare Payment and Coding for Drugs and Biologics (May 18, 2007), *available at*

http://www.cms.hhs.gov/MedHCPCSGenInfo/downloads/051807_coding_annoucement.pdf.

This action drastically reduced the reimbursement rate for Xopenex and drastically increased the

reimbursement rate for albuterol.  At this point, Congress became involved, and it passed the

special payment rule for Xopenex and albuterol, which eliminated the artificial incentive for

suppliers to furnish albuterol over Xopenex.  42 U.S.C. § 1395w-3a(b)(7).

    In April 2008, the DME MACs finalized the draft LCDs from 2006 without any

significant change, despite the fact that the new special payment law was written specifically for

Xopenex and albuterol.  Exs. F, G, H, I.  The fact that Defendants finalized the LCA policy after

an explicit Act of Congress directing the payment rates for Xopenex and albuterol provides

further evidence that Defendants are engaged in a protracted and systematic campaign to reduce access to Xopenex, through both formal and informal means.  And now, within days of Plaintiffs filing this lawsuit, and facing imminent defeat on Plaintiffs' application for preliminary injunction, CMS directed its contractors to "withdraw" the challenged portion of the LCDs and await further guidance.  Defs.' Exs. A, B.  This course of conduct shows that Defendants believe that the reimbursement rate for Xopenex is too high and should be no higher than that of albuterol.  Defendants have made various attempts over the past several years to lower the reimbursement rate for Xopenex to that of albuterol, significantly raising the likelihood that the Agency will attempt again to reinstitute the challenged LCA policy.

This likelihood is increased by the fact that the CMS Program Integrity Manual explicitly requires contractors to apply LCA policies in the context of Medicare Part B.  PIM, Pub. 100-08, § 13.4.A (rev. Apr. 9, 2004) ("Contractors shall implement new Least Costly Alternative (LCA) determinations through an LCD.  'Least Costly Alternative' is a national policy provision that shall be applied by contractors when determining payment for all durable medical equipment (DME).  Contractors have the discretion to apply this principle to payment for non-DME services as well."), *available at* http://www.cms.hhs.gov/manuals/Downloads/pim83c13.pdf (emphasis in original).  CMS has not revoked or even called into question this manual provision, a provision which Plaintiffs challenge in this lawsuit as unlawful.  Compl. ¶¶ 42-44.  The likelihood of the LCA policy being reinstituted is not remote given this agency policy.  *Cf. Lake Pilots Ass'n, Inc.*, 257 F. Supp. 2d at 158 (holding that agency's voluntary cessation did not moot the case, in part, because their action "does not address all of the issues plaintiff raised in its complaint.").

28

Finally, while Defendants suggest that they have no intent of instituting the LCA policy

again, the actions and the repeated threats by the government to implement the LCA policy

continue to threaten market access to Xopenex for Medicare beneficiaries. Each time the

government discusses the prospect of proposing an LCA policy for Xopenex, home health

suppliers are at risk of losing substantial sums of money if they continue to offer the product.

That is because home health suppliers purchase Xopenex well in advance of the actual date the

product is administered to a patient. If a supplier purchases a product for an amount that is

considerably higher than the proposed LCA payment amount, the supplier may lose money if it

continues to offer the product and the payment rate is lowered. Under Medicare practice, the

payment rate for a product is determined based upon the date that product is administered – not

the date the product is purchased by the supplier. *See* CMS, Pub 100-04, Medicare Claims

Processing (June 6, 2008), *available at* http://www.cms.hhs.gov/transmittals/downloads/

R1529CP.pdf.

Accordingly, every time the government mentions the possibility of instituting an LCA

policy, access to care for patients is put at risk and the market for Xopenex erodes. The fact that

the government has considered imposing an LCA policy or a similar action multiple times within

a three-and-a-half-year period indicates that it maintains an intent to drive Xopenex from the

Medicare market. Thus, so long as the LCA policy is under "review," the injury to Plaintiffs is

real.

In short, Defendants have not satisfied their "heavy burden" of demonstrating mootness

here in light of their voluntary suspension of the challenged policy. Because the language in the

CMS memorandum to withdraw the LCA policy shows that the decision is not permanent and is

subject to further "review," and because Defendants have in no way retreated from their

29

conviction that LCAs are lawful and that Xopenex should be priced at the level of racemic albuterol, there is a risk that in the new year Defendants (especially under the cover of a new Administration) will attempt to reinstate an LCA policy for Xopenex.  The Court should not allow Defendants to evade judicial review of this serious challenge to Defendants' authority to enact such an LCA policy by voluntarily suspending the application of the policy for a time in order to avoid the risks of litigating the challenge.  It is far from "absolutely clear" that Defendants will not "return to [their] old ways," *Friends of the Earth,* 528 U.S. at 189; the action is accordingly not moot.  This Court may still grant "meaningful relief" to Plaintiffs by ensuring that the LCA policy is not adopted after CMS completes its review.  *McBryde v. Comm. to Review*, 264 F.3d 52, 55 (D.C. Cir. 2001).

## V.     NO DEFENDANT IS ENTITLED TO DISMISSAL OF THE SUIT.

Finally, there is no merit to Defendants' argument that the claims against Defendants Weems, NHIC, and CIGNA should be dismissed because the Secretary is the real party in interest, and "the only party in whose name the government's sovereign immunity is waived under the Medicare Act."  Defs.' Mem. 20.

Sovereign immunity is a red herring.  First, sovereign immunity does not attach to claims for injunctive and declaratory relief against a government agent on the grounds that the agent's actions were *ultra vires*.  *Philadelphia Co. v. Stimson*, 223 U.S. 605, 619-20 (1912); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).  Second, even if sovereign immunity were implicated by this suit, Congress has broadly waived sovereign immunity as to all judicial review of agency action precisely to avoid technical disputes over which government parties should be named.  5 U.S.C. § 702; *Chamber of Commerce*, 74 F.3d at 1328 ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); 33 C. Wright & C. Koch, Jr., *Federal Practice and Procedure* § 8404 (2006).  Third, while the Secretary is indeed a

30

proper party, none of the cases cited by Defendants suggest that other parties responsible for unlawful agency action should be dismissed from a suit.  Plaintiffs may at their election name any and all officers responsible for the violation against whom meaningful relief can be ordered. *See* 5 U.S.C. §§ 702, 704; Fed. R. Civ. P. 19.  Finally, nothing in subsection (f)(3) purports to restrict the parties to a suit; it simply provides for judicial review where the plaintiff claims that "a regulation, determination, or ruling by the Secretary is invalid."  42 U.S.C. § 1395ff(f)(3). Here, it is undisputed that the LCDs, even though issued by Defendants NHIC and CIGNA, are nonetheless "determination[s] … by the Secretary," because the Secretary delegated authority to the Director of CMS (Defendant Weems), who in turn delegated the Secretary's power to Defendants NHIC and CIGNA.  All Defendants are responsible for the illegal actions that resulted in invalid LCDs, and thus all are proper parties.

## CONCLUSION

This Court has subject matter jurisdiction over Plaintiffs' claims, and Plaintiffs have established the requisite standing to bring this challenge.  Moreover, Defendants' post-filing, voluntary decision to instruct the DME MACs to withdraw the LCA policy until December 31, 2008, does not moot this case.  Accordingly, the motion should be denied.


Dated:  July 21, 2008                                   Respectfully submitted,


                                                        /s/ Stephen B. Kinnaird
                                                        Stephen B. Kinnaird
                                                        D.C. Bar No. 454271
                                                        Patrick Morrisey
                                                        D.C. Bar No. 459399
                                                        SIDLEY AUSTIN LLP
                                                        1501 K Street, N.W.
                                                        Washington, D.C. 20005
                                                        Telephone:  (202) 736-8000

31

Facsimile:  (202) 736-8711
Email:  skinnaird@sidley.com
            pmorrisey@sidley.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS'

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS to be served upon the following

counsel for Defendants in this matter through the Court's Electronic Filing System on this 21st

day of July, 2008:

| **Mark D. Polston** | **Jocelyn Stephanie Beer** | **Christopher Blake Harwood** |
|---|---|---|
| U.S. Department of Health & Human Services | U.S. Department of Health & Human Services | U.S. Attorney's Office |
| 330 Independence Ave., S.W. 5300 Cohen Building | 330 Independence Ave., S.W. Room 5309 | 555 Fourth Street, N.W. Suite 4220 |
| Washington, D.C. 20201 | Washington, D.C. 20201 | Washington, D.C. 20530 |
| Telephone: (202) 619-2792 | Telephone: (202) 205-3564 | Telephone: (202) 307-0372 |
| Facsimile: (202) 822-6995 | jocelyn.beer@hhs.gov | christopher.harwood@usdoj.gov |
| mark.polston@hhs.gov | | |

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird

# EXHIBIT A

<u>VIA E-MAIL AND</u>
<u>FEDERAL EXPRESS</u>

May 8, 2006

Paul J. Hughes, M.D.
Medical Director, DME PSC Regions A&B
TriCenturion
7909 Parklane Road, Suite 190
Columbia, SC 29223

RE:    Comments to Regions A&B's Draft LCD for Nebulizers Dated March 24, 2006

Dear Dr. Hughes:

The following comments are submitted by Sepracor Inc. to TriCenturion, Durable Medical Equipment Program Safeguard Contractor (DME PSC) for Regions A&B, in response to the draft nebulizer (DL11499) "Local Coverage Determination" (LCD) policy proposed by your organization on March 24, 2006. Although the draft policy proposed coverage determinations for a number of products, these comments respond solely to the "Least Costly Alternative" (LCA) reimbursement proposed for Xopenex® (levalbuterol HCl) Inhalation Solution.

If the proposed LCA is adopted, the reimbursement for Xopenex under Medicare Part B will be reduced to the level paid for albuterol sulfate (albuterol). This draconian action will effectively eliminate Medicare beneficiaries' ability to receive Xopenex, one of only two products available to treat asthma and chronic obstructive pulmonary disease (COPD). For those Medicare beneficiaries who suffer from asthma or COPD, using a product like Xopenex during an acute attack often is the difference in avoiding or limiting hospitalization and, in extreme but not uncommon situations, between living and dying.

For the following reasons, Sepracor believes that the proposed LCA should be withdrawn:

1. The clinical and pre-clinical data for Xopenex clearly establish the medical necessity of Xopenex in adult and Medicare populations;
2. The weight of the clinical and pre-clinical data clearly support the clinical differentiation between Xopenex and albuterol;
3. The Bibliography used by the DME PSCs to justify the LCA does not reflect the body of clinical information published on the differences between Xopenex and albuterol indicating that the DME PSCs failed to consider all of the relevant evidence; and
4. The proposed LCA for Xopenex is unlawful under the Medicare Modernization Act (MMA), the Social Security Act and applicable regulations.

In these comments, we emphasize that withdrawing the LCA is not Sepracor's only goal. Rather, we remain interested in following-up on our previous discussions with the Centers for Medicare and Medicaid Services (CMS) to reduce reimbursement for Xopenex in a manner that would address the government's fiscal considerations while simultaneously preserving access to this important product. Engaging in a long, costly fight over an LCA policy when a reasonable reimbursement alternative is available to the government does not serve the interests of Medicare beneficiaries, physicians, or the Medicare Program.

In summary, Sepracor's reimbursement alternative to the LCA would:

1. Reflect reasonable market pricing for Xopenex;
2. Ensure continued access to Xopenex for the tens of thousands of Medicare beneficiaries that currently benefit from taking it;
3. Honor the independent exercise of medical judgment by the healthcare professionals who treat Medicare beneficiaries, who have in a variety of circumstances determined that Xopenex is the correct treatment option for their patients; and
4. Generate significant savings for the Medicare Program.

These comments are divided into three sections. The first section provides detailed background information about Xopenex and the impact of the LCA on Medicare beneficiaries.

The second section outlines why the DME PSCs are acting outside the scope of legal authority. <u>As you consider these comments and the strong clinical evidence rebutting the draft LCA policy, we urge you to pay particular attention to the illegality of this action.</u>

Fundamentally, LCA policies are not permitted by the MMA, the Social Security Act, or the regulations published by CMS. The proposed policy, if finalized, is clearly in violation of all authoritative and binding provisions of law. Accordingly, the DME PSCs should withdraw this policy and agree to a reasonable compromise in order to avoid a legal challenge that, in our view, will undercut existing LCA policies.

Despite repeated pronouncements by the government to the contrary, use of an LCA is not permitted under these factual circumstances. Moreover, it is contrary to the plain language and the whole framework of the MMA and other Medicare laws, which clearly require single source drugs to be reimbursed through a single source payment methodology.

This action is also flatly prohibited by the applicable CMS regulations. Those regulations stipulate that an LCD is properly directed only to "whether or not a particular item or service is covered," and not with the reimbursement rate for a covered item or service. The implementing regulations state, simply and clearly, that a "LCD does <u>not</u>

include ... a determination with respect to the amount of payment to be made for the service." 42 C.F.R. § 400.202. (emphasis added.)

Unfortunately, the DME PSCs' decision to limit the reimbursement rate for Xopenex to generic racemic albuterol is in fact a "determination with respect to the amount of payment" for the drug. Id. (emphasis added.) As such, it is not permitted under the plain language of both the Medicare statute and implementing regulations.

The final and most compelling section of the submission demonstrates that the clear weight of clinical evidence supports the position that Xopenex and albuterol are clinically differentiated products. We note that many of the documents cited by the DME PSCs – which omit some of the favorable studies regarding Xopenex – do not support the draft LCA policy.

The literature cited in this submission highlights the advantages of Xopenex over albuterol. In summary, the overall weight of clinical evidence demonstrates Xopenex's clinical differentiation and advantages over albuterol. In contrast, the evidence does not suggest that Xopenex is inferior to albuterol. If the DME PSCs believe that Xopenex and albuterol are clinically undifferentiated, why wouldn't some clinical studies, as a statistical matter, show albuterol to be more advantageous than Xopenex?

We also ask that the DME PSCs pay particular attention to what is arguably the most relevant study for Medicare beneficiaries; namely, the study conducted in outpatients with COPD that was presented at Chest 2005 and will be published in the Journal of COPD later this year.

## I. Background

Sepracor is a research-based pharmaceutical company that is the exclusive manufacturer of an innovator single source product—Xopenex Inhalation Solution. Xopenex is a short-acting beta agonist approved to treat bronchospasm arising from respiratory conditions such as asthma and COPD. As previously indicated, it is one of only two products available to treat these conditions.

The product is covered under Medicare Part B because it is furnished to Medicare beneficiaries through durable medical equipment (i.e., nebulizers). This coverage is mandated by statute and by CMS regulation.

Xopenex inhalation solution (0.63 mg and 1.25 mg strengths) was approved by the Food and Drug Administration (FDA) for marketing in the United States in March, 1999. FDA approved a third, lower dose (0.31 mg) for Xopenex in January 2002 in recognition of levalbuterol's efficacy even in doses significantly lower than albuterol, its primary competition.

This development of Xopenex follows the FDA's Policy Statement on stereo isomeric drugs, which included as a guiding principle the isolation of the isomer with the desired therapeutic effect. (see FDA's Policy Statement for the Development of New

Sterioisomeric Drugs (May 1, 1992).) Today, many *new* drugs are, like Xopenex, single isomers.

As a commitment to patients with asthma and COPD, Sepracor has invested significant resources into research and development and post-market clinical trials for Xopenex. In fact, Sepracor may be one of the few entities conducting significant post-market research for short acting beta agonists.[1]

Given the product's effectiveness in all populations, Sepracor has pursued coverage and reimbursement through commercial payors, Medicaid and Medicare. Currently, based on the available data, it enjoys approximately a 26% market share in the commercial setting, 18% in Medicaid and 12% in Medicare.

An integral part of obtaining appropriate coverage of Xopenex in Medicare was the approval of its own unique J Code (J7614). Sepracor submitted a Healthcare Common Procedure Coding System (HCPCS) coding application for Xopenex on December 31, 2003. *See* Attachment A, December 31, 2003 HCPCS Coding Application for Xopenex. In November 2004, Sepracor was notified by CMS of their decision to award a unique J Code (J7614) for Xopenex.[2] *See* Attachment B, CMS J Code Notification Letter.

Sepracor believes that CMS' decision to award a unique J Code for Xopenex is important for two reasons. The decision reflects CMS' determination that Xopenex is clinically differentiated from albuterol, the class of generic drugs with which Xopenex competes.[3]

---

[1] In developing and implementing an aggressive post-marketing research program for Xopenex, Sepracor recognized that it was launching the product into a market that was dominated by a single generic product, albuterol, one that had significant acceptance among physicians. Sepracor believed that, to be successful in this market, it had to generate significant data, both clinical and pre-clinical and across populations and in different settings, that showed the effectiveness of Xopenex, not only on a stand-alone basis but in comparison to albuterol. Since the launch of Xopenex, Sepracor has invested tens of millions of dollars into these post-marketing research efforts, building a library of data that supports the use of Xopenex and a better understanding of how best to treat asthma and COPD. These studies have ultimately proven beneficial to the public because without Sepracor, few, if any studies would be pursued.

[2] At the same time, J Codes were awarded for a concentrated version of Xopenex (J7612) and a combination of Xopenex and ipratropium bromide (J7617), a code that has subsequently been revoked by CMS.

[3] Significantly, the decision occurred after Sepracor submitted the third HCPCS coding application for the product. The first two HCPCS coding applications for Xopenex resulted in: 1) the addition of Xopenex to the same J Code that already existed for albuterol (J7619) and; 2) approval of a multiplier for Xopenex that increased the level of reimbursement for the product (this level was still substantially lower than the commercial market price for Xopenex). CMS' decision to award a unique J Code for Xopenex in response to the third HCPCS coding application carries even greater weight in light of the first two actions by CMS, as it means that CMS was satisfied that Sepracor had established the clinical differentiation between Xopenex and albuterol. When the HCPCS Working Group issues a new J Code, it is a definitive statement that "significant therapeutic distinction" between the products in question have been established. *See* Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures 7 (2005) ("An

Although Medicare beneficiaries utilized Xopenex to a limited extent prior to 2005 when it was reimbursed under J7619, the decision by CMS to award a unique J Code for Xopenex has provided many additional Medicare beneficiaries who may benefit from this treatment with access to this important product. Implementing an LCA would effectively eliminate Medicare coverage because suppliers would receive reimbursement less than the acquisition cost of the product. [4]

## A. <u>Impact of the Proposed LCA</u>

If the proposed LCA for Xopenex becomes effective, Medicare beneficiaries will lose access to one of the two nebulized short-acting beta agonists approved by FDA to treat the acute exacerbations that frequently arise in patients suffering from asthma or COPD. Xopenex will effectively be unavailable to Medicare beneficiaries because the net result of the LCA is that Xopenex will be reimbursed at the level established for albuterol — approximately $0.17 per nebule (based on the Average Sales Price (ASP) information submitted for albuterol for the third quarter of 2005 and effective for the first quarter of 2006), a generic drug which is not comparable to Xopenex.

The proposed LCA will also place significant restrictions on physicians' ability to treat patients with asthma and COPD. If the policy is finalized, physicians will find themselves effectively without a choice of short-acting beta agonists for their Medicare patients, many of whom first used albuterol and then subsequently benefited from Xopenex or exhibited a sensitivity to the (S)-albuterol isomer found only in albuterol. Ironically, physicians will be able to choose between Xopenex and albuterol for <u>all</u> of their patients, except Medicare beneficiaries. Even those Medicare beneficiaries willing to pay the full cost for Xopenex will find it extremely difficult to obtain the product. In the future, suppliers will only be able to provide Xopenex to Medicare beneficiaries if they are willing to assume the "loss" on each script of Xopenex they fill.

We believe that the driving force behind the LCA policy is the savings that will be realized by the DME PSCs. Unfortunately, rather than pursue a compromise solution that saves the Medicare Program money and preserves access to this product, this LCA

---

existing code adequately describes an item in a coding request when the existing code describes procedures with the following: . . . No significant therapeutic distinctions from the item in the coding request."). Of course, Sepracor also recognizes that CMS distinguishes between coding and coverage determinations, but that does not change the fact that a "significant therapeutic distinction" between Xopenex and albuterol has been made by CMS.

[4] We note that Sepracor does not even have the option to seek coverage for its product under Medicare Part D, where it would be able to negotiate an appropriate reimbursement amount. Under Medicare law, reimbursement for Part D is prohibited when the product is otherwise available for coverage under Medicare Parts A or B. In this case, even though the product would be subject to the LCA, it would technically be covered under Medicare Part B – thus there are no opportunities for Part D coverage for this population cohort. There is one caveat to this rule: a limited number of Medicare patients do utilize Xopenex UDV under Part D because they are nursing home residents and do not otherwise have access to the product under Parts A or B.

will severely harm beneficiary access in Medicare Part B. The DME PSCs are seeking to completely eliminate market share for the product.

## B. The Xopenex Medicare Reimbursement Anomaly

Xopenex Inhalation Solution is sold at three different strengths, 0.31 mg (approved primarily for pediatric use), 0.63 mg, and 1.25 mg. As the difference in active ingredient costs is negligible across the three strengths while the manufacturing costs are identical, Sepracor has adopted a unitary pricing strategy, one that is quite common in the commercial marketplace. Accordingly, each of the three strengths of Xopenex is priced the same, currently at approximately $2.70 a nebule (wholesale acquisition cost).

This pricing practice was why Sepracor proposed J Code language for Xopenex that would have based reimbursement for Xopenex on a per unit dose vial basis. *See* Attachment A. If adopted, CMS would have paid the same level of reimbursement for each of the three strengths of Xopenex. Instead, CMS wrote the J Code for Xopenex on a per half-milligram basis, an action that, under the new ASP reimbursement methodology, has resulted in significant unintended consequences.

Paying the reimbursement for Xopenex on a per half-milligram basis has created a problem where the lower strengths of Xopenex have a disproportionate impact on the overall ASP calculation. The disproportionate impact is that the lower strengths of Xopenex have a pronounced effect on the weighted average ASP calculation resulting in a significantly higher reimbursement for the 1.25 mg strength product (as much as $1.00 higher in some quarters) than suppliers' acquisition cost for that dosage.

Sepracor identified this anomaly immediately upon its receipt of the J Code notification from CMS and proactively contacted CMS in November 2004 to make them aware of the problem. *See* Attachment C, Minutes from November 29, 2004 conference call with CMS. CMS, however, did not take any action, resulting in Medicare overpaying for this product strength.[5]

Apart from addressing the coding issue, Sepracor also sought to conserve Medicare funds in other ways. In two separate meetings with CMS (one in March 2005 and the other in April 2005), Sepracor offered to subject itself to the WAMP authority established under the MMA. Sepracor made this offer in an effort to reduce the reimbursement for Xopenex to a level more reflective of the product's acquisition cost. *See* Attachment D, Correspondence to CMS detailing Sepracor's offer. Although CMS initially expressed interest in Sepracor's offer, repeated attempts by Sepracor throughout 2005 and into 2006 to push the process along were unsuccessful.[6]

---

[5] Notably, though, the same anomaly that inflates the reimbursement of the 1.25 mg strength product also artificially places the lower strength products out of reach to Medicare beneficiaries. Suppliers lose money if they purchase the .63 mg and .31 mg strength products because the reimbursement rate is lower than the suppliers' acquisition cost.

[6] Upon request, we can document these efforts and CMS' failure to pursue these proactive requests by Sepracor to reduce its reimbursement rate.

If CMS had written the J Code for Xopenex as originally proposed by Sepracor in its December 31, 2003 HCPCS coding application and, if CMS has applied the methodology detailed by the HHS Office of Inspector General in its February 2006 report on ASP pricing, Sepracor estimates that CMS would have saved approximately $64 million in Xopenex reimbursement in 2005 (the savings to Medicare beneficiaries in terms of reduced co-pay expenditures would have been approximately $16 million). CMS could have realized even greater savings had they accepted Sepracor's offer to negotiate a reasonable WAMP.

The DME PSCs may not have realized that the 2005 Xopenex reimbursement costs would have been significantly reduced if CMS had acted within their authority to fix the coding problem and WAMP Xopenex. We think this is an important point that should influence the determination regarding whether to finalize the proposed LCA. It makes no sense for the DME PSCs to propose an action that inappropriately and unacceptably punishes the tens of thousands of Medicare patients who benefit from their Xopenex therapy.

## II. **Illegality of Proposed LCA Action**

In addition to all of the strong clinical reasons presented below, there is one overarching reason for the DME PSCs to abandon the LCA: it is unlawful under the MMA, the Social Security Act and CMS regulations. If challenged in court, Sepracor believes it would prevail, and the DME PSCs' and the Medicare Program's ability either to maintain current LCAs or to implement LCAs in the future would be compromised.

The limits of the authority of a DME PSC in establishing an LCA are clear. Significantly, those restrictions are reflected in mandatory language that is binding on the contractors. In issuing an LCD, a DME PSC "shall ensure that all LCDs are consistent with all statutes, rulings, regulations, and national coverage, payment, and coding policies." Medicare Program Integrity Manual § 13.1.3 (emphasis added). The proposed adoption of an LCA policy for levalbuterol in the draft LCD is contrary to both statute and regulation. Thus, it must be withdrawn for this reason, if for no other.

The LCA is plainly inconsistent with the reimbursement scheme established by Congress in the MMA. The MMA provides a detailed and comprehensive system for determining the reimbursement rate for drugs covered under Part B of the Medicare program.

Specifically, section 1847A of the MMA provides that the reimbursement rate for single source drugs shall be set at 106 percent of that drug's ASP. 42 U.S.C. § 1395w-3a(b). There is no dispute that levalbuterol is a single source drug. Moreover, the MMA specifically identifies inhalation drugs, such as levalbuterol, administered through durable medical equipment, as items that must be reimbursed under the ASP methodology. 42 U.S.C. § 1395u(o)(1)(G)(ii).

7

A single source drug such as levalbuterol, thus, <u>must</u> be reimbursed on the basis of its own ASP, not the ASP of other products with separate billing codes (such as here, albuterol). The only exceptions to the reimbursement rate of 106 percent of ASP were carefully delineated by Congress: the ASP may be disregarded when it exceeds the WAMP by a specified percentage, 42 U.S.C. § 1395w-3a(d)(3), in cases of public emergency, § 1395w-3a(e), or when it shared the same code with another single source product prior to October of 2003. Since the proposed LCA policy for levalbuterol does not fit within one of these exceptions, it is directly contrary to the reimbursement method mandated by Congress and is, therefore, unlawful.

Furthermore, the statutory and regulatory authority granted to CMS and its contractors does not permit an LCA policy, such as that proposed for levalbuterol, to be implemented through an LCD. Local Coverage Determinations, as the name implies, are decisions about the scope of coverage and <u>not</u> about the amount of reimbursement. This understanding is clearly laid out in the statutory provisions and the CMS regulations regarding LCDs. The statute defines an LCD as "a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A) [of the Medicare Act]." 42 U.S.C. § 1395ff(f)(2)(B).

CMS regulations clarify that an LCD is concerned with "whether or not a particular item or service is covered" and <u>not</u> with the reimbursement rate for a covered item or service. The implementing regulations specifically provide that an "LCD does <u>not</u> include . . . <u>a determination with respect to the amount of payment to be made for the service.</u>" 42 C.F.R. § 400.202 (emphasis added). The DME PSCs' decision to limit the reimbursement rate for levalbuterol to that of generic albuterol is not a determination about whether levalbuterol will be covered (it clearly is now and would remain so covered under the LCA); it is instead a "determination with respect to the amount of payment" for the drug, precisely what is prohibited by the plain language of § 400.202.[7]

Likewise, the authority provided by the statute to exclude coverage for items or services "not reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," 42 U.S.C. § 1396y(a)(1)(A), cannot support the proposed LCA policy. The text, history, and prevailing judicial construction of this provision establish that it does not permit the regulation of reimbursement. Instead, this provision only permits a determination of whether or not an item should be covered irrespective of what its reimbursement may be. *See, e.g.,* *Hultzman v. Weinberger*, 495 F.2d 1276, 1281-82 (3d Cir. 1974) (rejecting the Secretary's argument that the "reasonable and necessary" provision allowed the consideration of cost where the item or service is "admittedly reasonable and necessary

---

[7] Sepracor acknowledges that CMS has stated in certain rulemakings that DME PSCs do retain an LCA authority. *See* 70 Fed. Reg. 39,021, 39029 (July 6, 2005); 70 Fed. Reg. 70,116, 70,243-44 (Nov. 21, 2005). These cursory assertions have no effect and cannot, under applicable law, be given any deference by a reviewing court. They do not address (or withstand) the controlling statutory and regulatory analysis above. Furthermore, the DME PSCs must ensure the legal validity of any LCDs they issue.

for the treatment and diagnosis of a patient's ailments"); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 194 (D.D.C. 2005) ("All Medicare coverage is limited to services that are medically 'reasonable and necessary' for the diagnosis or treatment of illness.") (emphasis added).

The DME PSCs' LCD does not purport to make a medical determination that levalbuterol is not clinically "reasonable and necessary for the . . . treatment of illness," in this case, for the treatment of asthma or chronic obstructive pulmonary disease. Indeed, the draft LCD expressly finds that "[i]t is medically necessary to administer ... levalbuterol . . . for the management of obstructive pulmonary disease." Draft LCD, at 3. Instead, the LCD seeks to limit the reimbursement rate for levalbuterol in spite of the fact that it is a medically appropriate treatment for such illnesses. This is clearly a decision about cost and not about medical necessity. As such, the LCA policy cannot be justified even if it applied here.

Moreover, the LCA policy for levalbuterol proposed by the DME PSCs is contrary to § 1395y(a)'s use of the terms "no payment" and "any expenses." These terms give the agency only the authority to deny all payment for an item or service which is not "reasonable and necessary." Once the agency makes a clinical determination that a particular drug is not "reasonable and necessary" for the diagnosis or treatment of the patients at issue, it then can only take one action — disallow Medicare coverage for that drug entirely. In a situation where such a clinical determination has been made Medicare must make "no payment" for "any expenses incurred" for that drug. Even if § 1395y applied here, it would not permit the DME PSC to do what it attempts to do in the proposed policy — reduce, but not wholly eliminate "payment."

As the above analysis shows, the DME PSCs are without legal authority to implement through an LCD an LCA policy that would set the reimbursement rate for levalbuterol. Should the DME PSCs finalize this LCA, Sepracor is prepared to challenge the illegality of this action and strike down the contractors' ability to implement these policies in the future.

## III. Xopenex Clinical and Pre-Clinical Data

### A. Review of Sources of Information and Research Summarizing Clinical and Pre-Clinical Studies that Differentiate Levalbuterol from Albuterol

#### 1. Purpose

In the Draft LCD Policy regarding reimbursement for Xopenex, the DME PSCs provided a list indicating the sources of information upon which they based their determination that levalbuterol is not medically necessary compared with albuterol.

The purpose of this section is to briefly summarize the findings in each of the clinical studies cited, as well as the opinions of the authors, for each of the references cited by the DME PSCs. This will demonstrate that the decision reached by the DME

9

PSCs is contrary to the findings of the majority of research studies listed in the LCD's Sources of Information. This information is provided in Section III.A.2., "Review of DME PSC Sources of Information." [8]

Section III.B., "Summary Of Clinical And Pre-Clinical Data Supporting Differentiation of Levalbuterol Compared With Albuterol," summarizes in detail information clearly demonstrating the scientific and clinical differences between Xopenex and albuterol. This section also includes summaries of new clinical studies not included in the DME PSCs' review:

- A large, well-controlled, randomized, double-blind, placebo-controlled, multicenter, out-patient study in patients with COPD that evaluated the efficacy of levalbuterol treatment for six weeks (Donohue 2005; Donohue 2006).

- A large, well-controlled, double-blind, randomized, multicenter, head-to-head emergency department study comparing levalbuterol with albuterol in the treatment of acute asthma (Nowak 2006).

- A large retrospective evaluation of acute treatment of levalbuterol compared with albuterol in the emergency department (Schreck 2005).

- A large, well-controlled, randomized, multicenter, head-to-head in-patient study evaluating levalbuterol compared with albuterol in patients with asthma and COPD (Sepracor data on file).

Finally, the Appendix includes a number of additional references summarizing pre-clinical and clinical data. *See* Attachment F, Appendix.

2. Review of DME PSC Sources of Information

In the Draft LCD Policy regarding reimbursement for Xopenex, the DME PSCs provided a list indicating the sources of information upon which they based their determination that levalbuterol is not medically necessary compared with albuterol. Well over 300 references relating to levalbuterol or the isomers of albuterol were available for review: almost fifty manuscripts that summarize clinical research studies, almost 100 abstracts describing clinical studies, over 100 manuscripts and abstracts describing pre-clinical studies, over fifty review articles, and forty opinion pieces (Letters to the Editor, Editorials, or Commentary). Of these, the DME PSCs chose twenty-two references upon which to base their decision, eight of which were published, peer-reviewed manuscripts describing clinical research studies, seven abstracts describing clinical studies, two of which have been published as peer-reviewed manuscripts (however, only one of these published papers was also included in the list), and seven Letters to the Editor or other

---

[8] Attachment E analyzes each of the manuscripts, abstracts and opinions relied on by the DME PSCs.

opinion pieces. For the latter category, the DME PSCs did not cite the author replies to the Letters to the Editor.

In the field of research, published manuscripts of research studies are the gold standard and provide the most rigorous presentation of data for review by other researchers. The peer-review process is designed to provide authors with objective, often insightful comments, provided by researchers who review and comment on manuscripts being considered for publication by a journal. The peer-review process is also blinded, which is intended to give reviewers the freedom to critique fellow researchers' work in an open manner. Authors frequently revise their manuscripts and conduct other analysis of the data based on the comments that they receive from the reviewers, and they are required to respond to all of the reviewers' comments in order for their manuscript to be considered for publication. The objective of this process is to develop manuscripts that provide objective data and discuss the data in a fair and balanced manner, so that researchers and clinicians may review this information and make independent decisions on the study.

Abstracts are very brief summaries of research that are submitted for presentation at scientific meetings. The process for review and acceptance of abstracts varies greatly — many are peer-reviewed and are very selective, while others have a less restrictive review process. The very nature of an abstract, typically limited to 250 words, limits the ability to provide a detailed presentation of the study and the results. Therefore, abstracts summarize key findings from studies that have been recently completed, are often preliminary in nature, and are typically followed-up with a peer-reviewed manuscript. For example, the Sources of Information cited by the DME PSCs lists a number of abstracts that have been subsequently published as manuscripts. One of these peer-reviewed manuscripts (Datta et al.) was also included in the list, while another (Schreck et al.) was only provided in abstract form.

Letters to the Editor provide a mechanism for others to offer their opinion or personal critique of a manuscript, similar to a Letter to the Editor of a newspaper. Letters to the Editor are not peer-reviewed. However, journal editors provide the author of the manuscript that is being critiqued with an opportunity to respond, because most comments in such Letters are criticisms of the study. Doing so ensures proper balance and perspective, given that the author is privy to the entire study and database (much of which usually cannot be included in manuscripts due to the journal's restriction on the number of pages, tables, and figures), as well as knowledge of comments raised by the reviewers, which always result in changes to manuscripts by the author. Providing a Letter to the Editor without citing the response is neither objective nor fair-balanced, though that is exactly what happened in the draft policy

Letters to the Editor and Author Reply exchanges are more akin to Pro/Con debates, and these are an important part of the scientific process. In the Reply, the authors are often able to clarify issues of study design and results that are raised in the Letters to the Editor. The beneficiaries of this exchange are the readers of the journal and other researchers, who are then able to make their own decisions about the points made

by both parties. In the Letters to the Editor cited by the DME PSCs, the replies of the authors are not presented and, therefore, these negative letters may easily be taken out of context without appropriate balance and, most importantly, without appropriate scientific exchange of opinions.

Other forms of available opinion pieces are Editorials, which are similar to those found in newspapers and news magazines. In contrast to the Letters to the Editor, Editorials are typically stand-alone pieces — that is, they represent the opinion of the author of the Editorial. Most Editorials are scientific in approach and tone, and present both sides of controversial issues. They typically appear in conjunction with a paper that is noteworthy for its scientific value, its intrigue, or the potential for controversy.

As stated previously, while the decision reached by the DME PSCs is consistent with the few opinion pieces they have cited, it is contrary to the findings of the majority of research studies listed in the Sources of Information. Therefore, it does not provide justification for the draft policy decision.

The summary of the DME PSCs' studies is outlined in the tables below. The tables identify peer-reviewed documents (Yes/No) and categorize the efficacy findings of each study cited, (Lev>Rac, Lev=Rac, or Rac>Lev) along with the conclusions of the authors as supportive of levalbuterol improvement compared with albuterol (Yes/No). The last table is provided for Letters to the Editor and other opinion pieces.

We note that the tables below represents the DME PSCs' best arguments in support of their position. Focusing on the clinical evidence summarized below, however, demonstrates the weakness of the argument that the products are not differentiated. Furthermore, when the studies not examined below are factored in, the case for differentiation becomes compelling.

## DME PSCS' BEST ARGUMENTS STILL DO NOT JUSTIFY THE APPLICATION OF AN LCA

|  | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|
| **Manuscripts** | | | |
| 1. Carl J et al. *The Journal of Pediatrics*; 2003, 143:731-736. | Yes | Lev > Rac | Yes |
| 2. Datta D et al. *Chest*; 2003; 124, 3:844-849. | Yes | Lev = Rac | No |
| 3. Lötvall J et al. *Journal of* | Yes | Lev = Rac | No |

|   | | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|---|
| | *Allergy and Clinical Immunology* 2001:726-731. | | | |
| 4. | Nelson H et al. *Journal of Allergy and Clinical Immunology* 1998:943-952. | Yes | Lev > Rac | Yes |
| 5. | Nowak R et al. *American Journal of Emergency Medicine* 2004; Vol. 22, No. 1:29-36. | Yes | Lev > Rac | Yes |
| 6. | Pleskow WW et al. *Allergy and Asthma Proceedings* 2004; Vol. 25:1-8. | Yes | Lev > Rac | Yes |
| 7. | Scott V, Frazee L. *American Journal of Therapeutics* 2003; 10:341-347. | Yes | NA | NA |
| 8. | Truitt T et al. *Chest* 2003; 123, 1:128-135. | Yes | Lev > Rac | Yes |
| | TOTALS | | LEV > RAC = 6 **Lev = Rac = 1** **NA = 1** | YES = 5 **No = 2** **NA = 1** |

| | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|
| **ABSTRACTS** | | | |
| 1. Datta D et al. *Chest*; 2002. 44S. | Yes | Lev = Rac | No |
| 2. Davies J et al. *Respiratory Care*; October 2001. 1083. | Yes | Lev > Rac | Yes |
| 3. Emerman C et al. *American Journal of Respiratory Critical Care Med 2004*; 169:A310. | Yes | Lev > Rac | Yes |
| 4. Haider D. *Respiratory Care*; October 2001; Vol. 46, No. 10:1081. | Yes | Lev > Rac | Yes |
| 5. Hanania N et al. *Chest*; 2004; 126(4):722S. | Yes | Lev > Rac | Yes |
| 6. Nowak R et al. *American Journal of Respiratory Critical Care Medicine*; 2004; 169:A310. | Yes | Lev > Rac | Yes |
| 7. Schreck DM et al. Abstract presented to *ACEP* 2001, Chicago, IL. | Yes | Lev > Rac | Yes |
| TOTALS | | LEV > RAC = 6<br>**Lev = Rac = 1** | YES = 6<br>**No = 1** |

|  | | Peer Review | Efficacy Findings | Support Levalbuterol Differentiation |
|---|---|---|---|---|
| | **Opinions/Review** | | | |
| 1. | Ahrens R, Weinberger M. *Journal of Allergy and Clinical Immunology*; 2001;108:681-684. | Yes Editorial | NA | No |
| 2. | Asmus M et al. *Journal of Allergy and Clinical Immunology*;, 2002, Volume 110, Number 2. | No LTE | NA | No |
| 3. | Chowdhury B. *Journal of Allergy and Clinical Immunology*; 2002, Volume 110, No. 2. | No LTE | NA | No |
| 4. | Crater, Jr G. *Chest*; 2003, 124:1175-76 | No LTE | NA | No |
| 5. | Hendeles L, Hartzema A. *Chest* 2003; 124:1176 | No LTE | NA | No |
| 6. | Weinberger M. *Clinical Pulmonary Medicine* 2004; Vol. 11, No. 3:129-134. | Yes Review | NA | No |
| 7. | Quinn C. *The American Journal of Managed Care* 2004;10:S153-S157. | Yes Report | NA | Yes |
| | TOTALS | | NA | YES = 1 No = 6 |

  This review clearly demonstrates that the citations summarizing clinical research studies (both manuscripts and abstracts) are strongly supportive of a clinical advantage of levalbuterol over albuterol.  Among the manuscripts, the overall weight of clinical evidence demonstrates that levalbuterol had better outcomes than albuterol and the authors concluded that levalbuterol was differentiated from albuterol and provided a clinical advantage.  Other studies found no difference in outcomes and concluded that there was no advantage to levalbuterol versus albuterol.  Importantly, none of these authors concluded that albuterol was better than levalbuterol.

This difference between the DME PSCs' decision and the data is even more striking when one examines the findings for the abstracts cited. In this case, almost all abstracts present findings demonstrating that levalbuterol treatment resulted in better outcomes and concluded clinical differentiation, while only one found no difference between levalbuterol and albuterol (the manuscript describing this study was also included by the DME PSCs).

Among the papers the DME PSCs cited that present results of clinical research studies, the overwhelming majority present outcomes favoring levalbuterol and concluding that levalbuterol provides a clinical advantage compared to albuterol. Of course, this stands in marked contrast to the "opinions" that are cited.

### 3. Flaws In The DME PSCs' Choice Of Opinions Supporting The LCD

It would appear that the DME PSCs chose to selectively rely on less rigorous forms of medical opinions rather than an objective analysis of the clinical data. In the case of opinions, most are in the form of Letters to the Editor, two of which are overtly negative in tone and point out study limitations that already had been presented and discussed in the manuscripts. Two of these Letters refer to a paper cited by the DME PSCs, while the others comment on a pediatric study by Milgrom that was not included in the Sources of Information. The DME PSCs' reason for utilizing the latter two letters is unclear; the letters refer to a paper that the DME PSCs did not use in their consideration process and could not have been expected to provide insight into data they assessed.[9]

Based on the Sources of Information, it is unclear how the DME PSCs reached their conclusion. Many other robust studies demonstrate the benefits of levalbuterol and the strong preclinical and clinical pharmacokinetic rationale as to why these differences might be observed in the clinical setting. Some studies, however, show no difference. If there was no difference, then we should expect to see a number of neutral studies showing no difference, and an equal number of studies favoring levalbuterol or favoring albuterol. However, there are few, if any, studies that demonstrate that albuterol is more effective than levalbuterol. Indeed, the clear weight of evidence indicates that levalbuterol provides clinical benefits, and that levalbuterol is clinically differentiated from albuterol. The following sections demonstrate the strength of the clinical support behind Xopenex.

We are concerned that the DME PSCs simply assert by *ipse dixit* that levalbuterol is not clinically differentiated from albuterol, and then cite a list of medical references. Moreover, we are worried that the DME PSCs have simply ignored not only positive

---

[9] One of these letters regarding the Milgrom paper, authored by the FDA Medical Officer responsible for the review of the pediatric study, subsequently published by Milgrom et al., that was the basis for levalbuterol's indication in pediatric patients, was very balanced and made appropriate comments on the paper. The other Letter by Asmus, Hendeles, Weinberger, Ahrens, Bisgaard, Lötvall, O'Byrne, and Cockroft, "Levalbuterol has not Been Established to Have Therapeutic Advantage over Albuterol", was not balanced. The other two Letters were criticisms of the Truitt study, which the DME PSCs did cite, and could have helped the DME PSCs in their review.

studies but important new studies that more clearly show differentiation (which are addressed in the following section).

**B. Summary Of Clinical And Pre-Clinical Data Supporting Differentiation of Levalbuterol Compared With Albuterol**

In addressing the question of differentiation between levalbuterol and albuterol, it is important to consider the available preclinical and clinical pharmacokinetic data. An extensive body of evidence clearly and convincingly demonstrates that in a wide variety of in-vitro and in-vivo models (including studies conducted with several human cell lines), (S)-albuterol is not pharmacologically inert. Rather, (S)-albuterol consistently exhibits pro-inflammatory and pro-bronchoconstrictory properties.

It is well established that (S)-albuterol is metabolized much more slowly than (R)-albuterol in humans. Consequently, the lungs may be exposed unopposed to the effects of (S)-albuterol for up to several hours following a single dose of inhaled albuterol, notwithstanding the exposure that occurs following administration of repeated doses of albuterol. These preclinical and clinical pharmacokinetic data provide a scientific foundation to explain the clinical differences observed between levalbuterol and albuterol in many robust clinical studies. There is an extensive amount of literature available for review relating to the differences between levalbuterol and albuterol.

The preclinical and clinical research summarized below, while not intended to be an exhaustive review, supports the therapeutic distinction between the two products. Not all studies have demonstrated a difference between these two distinct molecules. However, many of the studies conducted were designed to demonstrate differences between levalbuterol and placebo and were neither powered nor designed to demonstrate differences between active treatments (and despite this, the majority of the clinical trials reviewed do in fact demonstrate differences between the compounds). More to the point, if there was truly no difference between levalbuterol and albuterol, then one would expect to see several neutral studies, some studies that favor levalbuterol and some studies that favor albuterol. Critical review of the literature does not support this position. [10]

New studies published within the last year further support the differentiation. These include the publication of two large emergency department studies (Schreck 2005; Nowak 2006) and one six-week study in patients with COPD (Donohue 2005, Donohue 2006, in press).

1. Clinical Pharmacokinetic Characteristics

Levalbuterol and (S)-albuterol also exhibit differential pharmacokinetics. The absorption and disposition of (R)-albuterol is similar when administered alone or as albuterol in healthy volunteers and in patients with mild-to-moderate asthma (Gumbhir-

---

[10] In this submission, Sepracor emphasizes that the clear weight of clinical evidence supports the argument for clinical differentiation. However, the Company acknowledges that some studies do not show differentiation.

17

Shah 1999, Gumbhir-Shah 1998). Over time, plasma concentrations of (S)-albuterol remain several-fold higher than levalbuterol (Figure 1). Several studies have documented that (R)-albuterol is a more natural substrate for the metabolic arylsulfatase enzymes, and therefore is more rapidly eliminated than (S)-albuterol (Eaton 1996; Walle 1996). Thus, the maximum concentration and the area under the curve (AUC) for (S)-albuterol are four times higher than those of (R)-albuterol, and the elimination half-life of (S)-albuterol is approximately 50% longer than that of (R)-albuterol (Gumbhir-Shah 1998; Boulton 1997; Boulton 1996; Lipworth 1997). The inhalation of albuterol results in a five to seven-fold greater exposure to (S)-albuterol. In addition, Dhand et al. (Dhand 1999) showed that (S)-albuterol was preferentially retained in the lungs after metered-dose inhaler administration. Taken together, these pharmacokinetic data indicate that the preferential deposition of (S)-albuterol compared with (R)-albuterol in the lung could lead to accumulation of the potentially detrimental (S)-albuterol after long-term use of albuterol.

**Figure 1. Pharmacokinetic profile of levalbuterol and (S)-albuterol after administration of 2.5 mg of albuterol**



a.  Review of Clinical Studies

The clinical studies discussed below detail clinical efficacy, health outcomes, and pharmacoeconomic differences between albuterol and levalbuterol suggesting that the preclinical findings (reviewed later in this document) do translate into pharmacologic and clinical differences between the two treatments. *See* Attachment G, Bibliography. In particular, clinical research studies have shown that:

18

1. Levalbuterol 1.25 mg has greater efficacy, produces accelerated improvement in FEV$_1$, and has a longer duration of action in some patients, reducing the need for rescue or ancillary therapies (resulting in cost savings).

2. Levalbuterol reduces the number of hospital admissions, shortens hospital stays, and, as a result, demonstrates cost savings.

3. Levalbuterol offers efficacy comparable to that of albuterol at lower doses, thus offering physicians dosing flexibility and the potential for fewer side effects.

      i. <u>Levalbuterol 1.25 mg has greater efficacy, produces accelerated improvement in FEV$_1$, and has a longer duration of action in some patients, reducing the need for rescue or ancillary therapies</u>

Levalbuterol is bronchoprotective and protects asthmatic patients from the bronchoconstriction induced by methacholine during airway reactivity testing (Perrin-Fayolle 1995; Ramsay 1999; Cockcroft 1997). In one study, the protection with levalbuterol was greater and lasted longer than that observed with albuterol (Perrin-Fayolle 1995), while other studies have demonstrated similar bronchoprotective effects for levalbuterol and albuterol (Ramsay 1999; Cockcroft 1997).

The pivotal phase III study by Nelson demonstrated the clinical advantages of levalbuterol over albuterol in terms of bronchodilation, therapeutic index, side effects, effects in severe asthmatics, and baseline resting lung function (Nelson 1998). This large, randomized, double blind, placebo-controlled study compared the efficacy of levalbuterol and albuterol to placebo control in a total of 362 subjects (mean age, 36.5 years; age range, 12-80 years) with moderate-to-severe asthma (screening FEV$_1$ 45%-70% of predicted) who received nebulized levalbuterol (0.63 mg or 1.25 mg) or albuterol (1.25 mg or 2.5 mg) three times per day for 4 weeks. At weeks 0, 2, and 4, serial pulmonary function testing was performed for 8 hours post dose.

The results indicated that, after the first dose and after 4 weeks of treatment, the greatest peak improvement and longest duration of improvement in FEV$_1$ occurred with levalbuterol 1.25 mg (Figure 2). There was also a greater percentage of subjects with $\geq$ 15% improvement in FEV$_1$ immediately following initial dosing with either levalbuterol 0.63 mg or 1.25 mg versus albuterol 2.5 mg. In addition, the bronchodilation effect for albuterol dropped below a 15% change in FEV$_1$ from baseline (the clinical definition of bronchodilation) at 5 hours whereas levalbuterol continued to achieve greater than 15% FEV$_1$ improvement up to 8 hours, the last time point measured (Figure 2) (Nelson, 1998).

**Figure 2.**    **Mean percent change in FEV$_1$ after the first dose: *P*=0.03 for mean peak change FEV$_1$, levalbuterol vs albuterol; *P*=0.023 for overall AUC, levalbuterol vs albuterol**



The primary intent of the study published by Nelson et al. (Nelson 1998) was to compare levalbuterol with placebo; albuterol was included as an active control. Therefore, the study was neither designed nor powered to determine statistical differences between levalbuterol and albuterol. However, a post-hoc analysis conducted to compare the active treatment groups indicated that levalbuterol 1.25 mg provided statistically significantly greater improvements compared with albuterol 2.5 mg in lung function (Pleskow 2004). Both the mean peak change in FEV$_1$ and the area under the change in FEV$_1$ vs time curves (AUC FEV$_1$, a measure of bronchodilation over time) were statistically significantly greater for levalbuterol 1.25 mg compared with albuterol 2.5 mg after the first dose in the overall study population (Figures 3a and 3b). The mean peak change in FEV$_1$ for all patients and the severe subset are presented in Figures 2 and 3, respectively. By contrast to both doses of levalbuterol, albuterol 1.25 mg was not significantly different from placebo for mean AUC FEV$_1$ after 4 weeks of dosing (Pleskow 2004). Levalbuterol 0.63 mg produced bronchodilation comparable to a standard dose of albuterol, a dose that contains twice the amount of (R)-albuterol as the

0.63 mg dose of levalbuterol.  These data suggest that the (S)-albuterol component of albuterol compromises the efficacy of levalbuterol.

**Figure 3a.  Mean peak change in $FEV_1$ for all patients following the first dose (Week 0) and the last dose (Week 4) of treatment**



*$P < 0.001$ vs placebo;
+$P < 0.03$ vs placebo and RAC 1.25 mg;
#$P < 0.03$ vs placebo, RAC 1.25 mg, and RAC 2.5 mg

**Figure 3b.  Mean AUC FEV₁ for all patients following the first dose (Week 0) and the last dose (Week 4) of treatment**



*P < 0.011 vs placebo;
+P < 0.031 vs placebo and RAC 1.25 mg;
@P < 0.014 vs placebo, Lev 0.63 mg, RAC 1.25 mg, and RAC 2.5 mg

In a sub-set analysis of severe asthmatics (baseline $FEV_1 \leq 60\%$ predicted), 1.25 mg of levalbuterol achieved significantly greater maximal bronchodilation than 2.5 mg of albuterol (Figure 4 ) (Nelson, 1998).  This translated into a 51% maximal improvement in $FEV_1$ for levalbuterol, compared to with a 31% improvement in $FEV_1$ for albuterol. Levalbuterol 1.25 mg produced the largest peak change in $FEV_1$ after the first dose, which was significantly greater than placebo, albuterol 2.5 mg, and levalbuterol 0.63 mg (Figure 5a) (Pleskow 2004).  The $FEV_1$ AUC was also significantly greater for levalbuterol 1.25 mg compared with placebo and all active treatments in the subset of patients with more severe disease (Figure 5b) (Pleskow 2004).

22

**Figure 4**    **Mean percent change in FEV$_1$ after the first dose in Severe Patients (Baseline FEV$_1$ ≤60% predicted)**



**Figure 5a. Mean peak change in FEV₁ for severe patients (baseline FEV₁≤60% predicted) following the first dose (Week 0) and the last dose (Week 4) of treatment**



*P < 0.04 vs placebo;
@P < 0.05 vs placebo, Lev 0.63 mg, RAC 1.25 mg, and RAC 2.5 mg

24

**Figure 5b. Mean AUC $FEV_1$ for severe patients (baseline $FEV_1 \leq 60\%$ predicted) following the first dose (Week 0) and the last dose (Week 4) of treatment**



*$P$ < 0.026 vs placebo;
& $P$ < 0.046 vs placebo, Lev 0.63 mg, and RAC 2.5 mg

Whether or not levalbuterol has an improved therapeutic index compared with albuterol, as purported by some (Nelson 1998, Milgrom 2001) is the subject of recent study (Lotvall 2001) and debate (Ahrens & Weinberger 2001; Asmus & Hendeles 2002; Chowdhury 2002; Milgrom, 2002). Lotvall et al. (Lotvall 2001) conducted a randomized, double-blind, placebo controlled cross-over study conducted in mild asthmatics and randomized patients to receive cumulative doses of (R)-albuterol, (S)-albuterol, albuterol, or placebo every 20 minutes on 4 separate days. Pulmonary function testing was completed following each dose. The investigators confirmed that all bronchodilation was achieved by (R)-albuterol and did not observe any effects on airway function from (S)-albuterol. The bronchodilation observed during the ascending, consecutive dose regimen was similar for (R)-albuterol and albuterol, and systemic effects were dependent on (R)-albuterol, whether delivered as a single isomer or as a racemate. However, this study design and its methodology have been criticized because the cumulative dose model confounds the effect of time and dosing (Ahrens & Weinberger 2001; Milgrom 2002). Guidelines that were established by the International Conference on Harmonization suggest that, for immediate, acute, reversible responses (such as bronchodilation), a cross-over, fixed dose model is more appropriate. 60 Fed. Reg. 55,872-976 (Nov. 9, 1994).

Studies conducted in acute settings, such as emergency departments and hospitals, validate this approach. Nowak et al. conducted an open-label consecutive cohort dose escalation study of patients with acute asthma who presented in the emergency department (ED) with $FEV_1$ 20-55% of predicted normal values (Nowak 2004).

25

Nebulized doses of levalbuterol (0.63 mg, 1.25 mg, 2.5 mg, 3.75 mg, and 5.0 mg) and albuterol (2.5 mg and 5 mg) were administered every 20 minutes for one hour. The mean percentage change in $FEV_1$ was significantly greater for levalbuterol 1.25 mg (91%) compared with albuterol 2.5 mg and levalbuterol 0.63 mg (49% and 42% respectively; p < 0.05; Figure 6). In a subset of patients with baseline $FEV_1 \leq 35\%$, the mean percent change in $FEV_1$ was significantly greater for the 1.25 mg dose of levalbuterol (133%) compared with both 2.5 mg and 5 mg of albuterol (59% and 36%; p<0.05) and levalbuterol 0.63 mg (44%; p<0.05) following three treatments. The mean $FEV_1$ continued to improved after each dose of 1.25 mg levalbuterol and continued to improve 60 minutes after the last dose (max % change 52-113%) compared to subjects treated with either a 2.5 mg or 5 mg dose of albuterol, who reached plateaus in their response over time (Nowak 2004).

**Figure 6.  Mean percent change in $FEV_1$ in the emergency department**



*p<0.05 vs. RAC 2.5 mg;  #p<0.05 vs. RAC 5.0 mg;  ^p<0.05 vs. LEV 0.63 mg;  +p<0.05 vs LEV 3.75 mg

A post-hoc analysis of data from this study showed a significant inverse relationship (p ≤0.004) between baseline presenting concentrations of the (S)-albuterol component of albuterol (denoting previous albuterol use) and $FEV_1$ at presentation and improvements in $FEV_1$ 60-minutes post-dose. The higher the concentration of (S)-albuterol, the lower the $FEV_1$ was at presentation and the lower the subsequent improvement in $FEV_1$, suggesting that this component of albuterol may interfere with the benefit of the (R)-isomer (Nowak 2004).

In addition, after administration of matched doses of levalbuterol and albuterol,

median (R)-albuterol concentrations increased in a dose-dependent fashion and were similar. Therefore, the differential response was not due to differential exposure to the active isomer. By contrast, patients treated with albuterol had additional and substantial accumulation of (S)-albuterol, which continued to increase 60 minutes after the last dose of albuterol in patients who received albuterol 5.0 mg. (Nowak 2004).

Further evidence of the deleterious effect of (S)-albuterol is found in the results of a double-blind, multicenter trial of 627 adults with acute asthma exacerbation (mean $FEV_1$ % predicted 37.9 ± 10.3 on presentation) (Nowak 2006). This trial was not included in the DME PSC drafting policy. Patients were randomized to levalbuterol 1.25 mg (n=315) or albuterol 2.5 mg (n=312), nebulized every 20 minutes in the first hour, and every 40 minutes thereafter up to 3 hours as clinically indicated. To determine if pre-dose levels of the (S)-albuterol component of albuterol, which was used by 83.3% of patients prior to going to the emergency department, would be related to subsequent bronchodilation and admission, a subset of 160 patients had blood drawn for determination of (S)-albuterol concentrations. The results showed that, among all patients, $FEV_1$ improvements were greater following levalbuterol, and were statistically significantly greater in patients treated with levalbuterol compared with albuterol after the first dose (Figure 7). This finding was even more pronounced among patients who did not report concomitant steroids use at baseline (approximately 65% of patients in each treatment group; Figure 8), consistent with the pre-clinical findings of Ameredes et al. (Ameredes 2004). Time to event analysis using FEV1 of 50% predicted (the threshold for admission based on NAEPP guidelines) and 70% predicted (threshold for discharge) analyses were conducted to examine the performance of treatments in attaining values between 40% and 70% of predicted. These results demonstrated faster improvement in more patients for those randomized to levalbuterol (Figure 9) (Nowak 2006).

**Figure 7.  Change in FEV$_1$ after the over the 3-hour treatment period in patients with acute asthma (all patients)**



**Figure 8.  Change in FEV$_1$ over the 3-hour treatment period in patients with acute asthma (steroid naïve patients)**



**Figure 9.  Time to event analysis for time to achieve an FEV1 of either 50% or 70% predicted.**



To determine if pre-dose levels of the (S)-albuterol component of albuterol, which was used by 83.3% of patients prior to going to the emergency department, would be related to subsequent bronchodilation and admission, a subset of 160 patients had blood drawn for determination of (S)-albuterol concentrations. High plasma concentrations of (S)-albuterol at admission were associated with a greater likelihood of hospital admission (p=0.01), with 2.5% vs 22.5% of patients requiring admission in the lowest and highest quartiles of (S)-albuterol concentrations, respectively. Among patients in the highest quartile of (S)-albuterol concentrations, 28% of albuterol-treated patients required admission compared with 16% of levalbuterol-treated patients. Levalbuterol provided significantly greater and more rapid improvement in $FEV_1$ compared with albuterol in this high (S)-albuterol concentration group (Figure 10) (Nowak 2006).

**Figure 10. Mean change in FEV1 in patients with the highest pre-dose levels of (S)-albuterol in patients with acute asthma**



In most hospitals, albuterol is administered every 4-6 hours, with standing orders provided "as needed" to cover periods between doses when patients may require additional doses, termed breakthrough or prn treatments. Other evidence to support the impact of a longer duration of action in some patients is also available in a number of observational studies conducted independently at hospitals. One of these studies,

conducted at Duke University Medical Center, sought to determine whether hospitalized patients could be controlled on levalbuterol 1.25 mg administered TID. The study findings indicated that the total number of treatments decreased from 3,835 during the control period to 2,613 when levalbuterol was used (3.5 treatments per patient day and 2.8 treatments per patient day; p < 0.05). The number of PRN (*i.e.,* as needed) treatments declined from 540 during the control period (albuterol) to 375 during the levalbuterol period (0.5 prn treatments and 0.4 prn treatments per patient day respectively; p < 0.05) (Davies 2001).

In a prospective, open label study published as an abstract in Chest 2002, hospitalized patients were treated with either levalbuterol 1.25 mg q8, levalbuterol 0.63 mg q6, or racemic 2.5 mg q4. The number of treatments, overall number of breakthrough treatments, and Respiratory Therapist (RT) cost and FTE resources were measured. Over the course of the study, 54% of patients were converted to levalbuterol. This was accompanied by a 24% reduction in total treatments of levalbuterol compared with albuterol, which was a reduction of 5,176 treatments. When they evaluated rates of breakthrough treatments, it found that the breakthrough rate for albuterol was significantly greater than for both levalbuterol groups (5.29 for albuterol, 2.29 levalbuterol 1.25 mg q8, and 2.43 for levalbuterol 0.63 q 6; p<0.001 for each levalbuterol dose vs albuterol). Because omitted treatments secondary to the RT being unavailable is currently a concerning issue in most hospitals, this was also evaluated. The investigators found that omitted treatments decreased from 1.79% when albuterol was used 100% of the time, to 1.40% after partial conversion to levalbuterol (p<0.001). Lastly, when they performed a pharmacoeconomic analysis, they found that the conversion to levalbuterol led to an annualized savings of 1.40 Respiratory Therapist FTE, or $59,000. Relative to the increased drug utilization costs of $17,000 for levalbuterol at their institution, this led to a total savings of $42,000, when accounting for Respiratory Therapist FTE cost savings alone (Pikarsky 2003).

Truitt et al. undertook a retrospective chart review at Halifax Hospital to determine the impact of levalbuterol on outcomes (Truitt 2003). Hospitalized patients with asthma or COPD (n=231) were administered only albuterol 2.5 mg (during 1998) or levalbuterol 1.25 mg (during 1999). Patients who received levalbuterol required significantly fewer treatments with beta-agonists (19.0 vs. 30.8 for albuterol; p<0.001) and concomitant ipratropium bromide (9.4 vs 23.2 for albuterol; p<0.001) than patients who received albuterol. Thus, the use of levalbuterol led to a statistically significant reduction in the number of total doses of albuterol per day, the number of break through episodes, the number of rescue drug beta-agonist medications, and the need for adjunctive therapy (*e.g.,* ipratropium) (Truitt 2004).

### ii.  New COPD Data Shows Clinical Advantages

To confirm these results, a large, randomized, prospective, open-label, multi-centered study was conducted to determine if inpatients with asthma or COPD who received levalbuterol required fewer nebulizations compared with albuterol. This study was completed in 2006 and the data has been submitted to the 2006 Chest Annual Meeting. This study is also not part of the DME PSCs' draft policy record.

31

Upon admission to the hospital, almost 500 patients were randomly assigned to treatment with levalbuterol 1.25 mg every 8 hours or albuterol, administered as per the standing orders at the institution (typically every 4 or 6 hours). Standing orders were provided to cover breakthrough treatments. Levalbuterol patients required significantly fewer nebulizations compared with albuterol patients (10 vs 12; p=0.031), with no difference in the number of rescue nebulizations (Sepracor data on file, Study 051-921). This supports the use of levalbuterol administered every 8 hours in a hospital setting.

The aforementioned study is consistent with the chronic dosing study in patients with stable asthma, where the patients who received levalbuterol (1.25 mg) had a significant reduction in the use of reduced the need for MDI rescue medication. There was no significant reduction in rescue medication use in the albuterol treated patients. (Nelson 1998).

While a number of outpatient studies have been conducted in patients with asthma to evaluate the effects of chronic dosing with levalbuterol, similar studies in patients with COPD are limited. Notably, COPD is mostly a fixed airways disease, despite the fact that many patients report feeling better on beta-agonists. Therefore, in this patient population, chronic treatment is much more frequent and longer studies are required to determine if changes are apparent in other measures of disease control, such as rescue medication use and COPD exacerbations.

To determine the effect of levalbuterol in the treatment of bronchospasm in patients with chronic, stable COPD, a recent study was commissioned to examine patients with COPD (including chronic bronchitis and/or emphysema). Patients were treated with either levalbuterol 0.63 mg or 1.25 mg, albuterol 2.5 mg, or placebo three time a day for 6 weeks. Over 200 people were included in this randomized, double-blind, multi-center, placebo-controlled study. All active treatments demonstrated improvements in $FEV_1$ over the double-blind period and at each visit compared with placebo (p<0.05). In addition, levalbuterol was associated with greater disease control than placebo and albuterol, as noted by less rescue/supplemental medication use, fewer withdrawals due to COPD exacerbations (Figure 11), and better patient global evaluations (Figure 12). The use of rescue medication was increased in the placebo and albuterol treatment groups, while rescue medication use was relatively unchanged for the levalbuterol 0.63 mg group and was significantly decreased (p=0.02) versus placebo in the levalbuterol 1.25 mg group (Figure 13). Almost half of the patients who received either dose of levalbuterol reported much or moderately better quality of life (levalbuterol 0.63 mg = 48.8%; levalbuterol 1.25 mg = 47.5%), whereas only one quarter of patients who received albuterol reported better quality of life (RAC 2.5 mg = 27.7%). In addition, there were significantly more patients who withdrew due to COPD exacerbation in the albuterol 2.5 mg group compared to the placebo group (p= 0.0103). The levalbuterol 0.63 mg group resulted in the lowest frequency of beta-mediated adverse events of any treatment group. Combination levalbuterol 1.25 mg and ipratropium was the only treatment arm associated with marginally significant improvement in bronchodilation (p=0.07) compared with ipratropium alone. In addition, 6 weeks of treatment with both doses of levalbuterol were safe and well-tolerated in patients with COPD (Donohue 2005, Donohue 2006 in press).

**Figure 11.  Percentage of patients with each group with protocol-defined COPD exacerbations and withdrawals due to COPD exacerbations; *p<0.01 vs placebo**



**Figure 12.  Patient Global Evaluations: Percent of patients reporting much or moderately better at week 6**



**Figure 13.  Change in rescue medication at the end of the study period**



*p<0.04 vs placebo; **p=0.02 vs Rac; +p<0.05 vs Rac, baseline, and placebo

iii. Levalbuterol reduces the number of hospital admissions, shortens hospital stays, and, as a result, demonstrates cost savings

Several studies demonstrate that levalbuterol reduces the number of hospital admissions and reduces the length of hospital stays. In the Truitt, et al. study described previously (Truitt 2003), the overall mean LOS for all patients treated with levalbuterol (4.7 $\pm$ 2.9 days) was 16 percent less than for all patients treated with albuterol (5.6 $\pm$ 4.2 days; p=0.058; Figure 14). COPD patients who received levalbuterol had 1 day decrease in the LOS compared with patients treated with albuterol (5.1 days for levalbuterol compared with 6.1 days for albuterol, p=0.07); asthma patients also had a 1.1 day decrease (p=0.1). COPD patients treated with levalbuterol also had a significant decrease in 30-day readmission (5.8% vs. 23.0%, p<0.05). Fewer nebulizations were administered to both COPD and asthma patients treated with levalbuterol (19.0 vs. 30.8 for albuterol; p<0.05).

**Figure 14. Average length of stay in the hospital**



For patients treated with levalbuterol, this resulted in a significantly lower cost of nebulization therapy for both COPD and asthma patients ($65 vs. $116 and $44 vs. $99, respectively; p<0.05), significantly lower total hospital costs for COPD patients ($3043 vs. $3656, p<0.05) and a $659 lower cost for asthma patients ($1986 vs. $2645) (Truitt 2003).

Similarly, a retrospective analysis of hospitalization and discharge rates among patients who presented to the ED of a community hospital for the treatment of asthma was conducted in patients who were at least 1 year in age and had a primary or secondary diagnosis of acute asthma. A total of 736 consecutive cases (608 albuterol and 128 levalbuterol) were reviewed over a 9-month period to evaluate potential differences in hospital admission rates between those patients treated with levalbuterol and those treated with albuterol. The hospitalization rate was significantly lower among patients who received levalbuterol versus those who received albuterol in the ED (4.7% vs. 15%, respectively; p<0.002) (Schreck 2005).

The absolute reduction in hospital admissions was confirmed by a large, prospective, randomized, double blind trial of pediatric patients (age 1-18 years) with acute asthma who presented to the ED. Patients received nebulized treatments of levalbuterol 1.25 mg (n=248 patients) or albuterol 2.5 mg (n=234 patients) every 20 minutes up to a maximum of 6 doses. A standardized, assessment-driven algorithm was used in the treatment of all patients. Patients who were admitted to the hospital continued on blinded therapy. The hospitalization rate was significantly lower for patients treated with levalbuterol (36%) than albuterol (45%; p<0.02; Figure 15). In addition, fewer patients treated with levalbuterol required intensification therapy. Lastly, the authors concluded that the significant reduction in admissions in the levalbuterol group would result in an annualized savings of $180,000, after adjusting for the increase in drug acquisition costs for levalbuterol. (Carl 2003)

**Figure 15. Percent of patients admitted following standardized, blinded treatment with levalbuterol or albuterol**



A three month prospective analysis conducted by Graves *et al.* showed that patients treated for severe respiratory illness in the ED with levalbuterol (n=299) were discharged at a rate of 90% compared to patients treated with albuterol (n=157) who were discharged at a rate of 38%. In addition, patients treated with levalbuterol received fewer total treatments than patients treated with albuterol in both the ED (3 vs. 5) and the hospital (7 vs. 16). The average length of stay was reduced for those treated with levalbuterol (ED 1.8 vs. 2.8 hours and hospital 2.3 vs. 3.2 days.), and hospital admissions were also lower with levalbuterol than albuterol (10% vs. 60) (Graves 2000).

An open-label study evaluated the treatment of patients diagnosed with asthma in the ED. Patients at least 12 years of age received either levalbuterol 1.25 mg (N=24) or albuterol up to 5.0 mg (N=30), with or without ipratropium bromide. The study compared levalbuterol and albuterol for the treatment of acute bronchoconstriction from primary asthma in the ED. Levalbuterol resulted in greater improvements in both $FEV_1$ and PEF compared with albuterol. Levalbuterol lowered the hospital admission rate compared with albuterol (12% vs. 20%, respectively) (Haider 2001).

In a review of the cost effectiveness of levalbuterol compared with albuterol

published in the July 2004 Supplement to the American Journal of Managed Care, the author concluded that levalbuterol offers a clinically important advance over albuterol. He further states that the greater improvement noted in pulmonary function observed with levalbuterol in clinical trials and clinical effectiveness studies is paired with an advantage in cost effectiveness, as noted by the reduction in need for hospitalization, one of the most costly components of health care (Table 1). The author notes that a drug's cost effectiveness must include an assessment of the overall costs to the medical facility and, possibly, to the insurer, and that these costs may be more strongly affected by clinical outcomes such as the need for hospitalization than by the drug's acquisition costs (Quinn 2004).

**Table 1.  Key Cost Effectiveness Trials of Xopenex versus albuterol**

| Investigators | Conclusions |
|---|---|
| Milgrom 2001 | Levalbuterol was as effective as 4-fold to 8-fold higher doses of albuterol |
| Nowak 2004 | Less need for hospital admissions with levalbuterol than with albuterol |
| Carl 2003 | Fewer hospitalizations and calculated substantial cost savings with levalbuterol versus albuterol |
| Truitt 2003 | Shorter hospital stay, lesser risk of readmission, and lower cost with levalbuterol versus albuterol |

Adapted from Quinn 2004

In addition, a number of acute studies have completed analysis to evaluate the number of patients who would need to be treated with levalbuterol to prevent one hospital admission. These studies indicate that, in order to prevent one admission, between 10 and 20 patients would need to be treated with levalbuterol (Carl 2003, Schreck 2005, Nowak 2006) supporting the use of levalbuterol when one considers total cost of hospital admission. This is consistent with other studies, which have estimated cost savings of $4000 for each asthma admission that is prevented (Schreck 2005) and have reported large overall cost benefits for emergency department (Schreck 2005; Carl 2003) and hospital use of levalbuterol (Truitt 2003).

Based on the 9% reduction in hospital admissions noted in the pediatric emergency department (Carl et al, 2003), the authors concluded that the hospital would save $180,000 at their institution each year. They also stated that this cost savings, secondary to improved outcomes from the use of levalbuterol in these patients, would far

outweigh the increased drug acquisition cost of levalbuterol, which they calculated would be $5000.

Another investigator-initiated study found an absolute reduction of 10% for patients who received levalbuterol compared with those who received albuterol (Schreck et al, 2005). The pharmacoeconomic analysis demonstrated that the relative decrease in hospital admission rate for the patients treated with levalbuterol would translate into a cost savings of $400,000 for the 1000 patient visits to the ED at their institution, which again outweighed the relative increase in drug acquisition costs for levalbuterol.

These cost savings have been noted for in-patients as well. The study by Truitt found that patients treated with levalbuterol had a significantly lower cost of nebulization therapy for both COPD and asthma patients ($65 vs. $116 and $44 vs. $99, respectively; $p<0.05$), significantly lower total hospital costs for COPD patients ($3043 vs. $3656, $p<0.05$) and a $659 lower cost for asthma patients ($1986 vs. $2645) (Truitt et al, 2003).

To confirm these findings, a multicentered study (referenced above, Sepracor study 051-921) was commissioned utilizing a randomized, prospective, open-label design in patients hospitalized for acute asthma or COPD. This study evaluated whether treatment of bronchospasm with levalbuterol resulted in significantly fewer nebulizer treatments and/or decreased total cost of care versus treatment with albuterol (Sepracor data on file). Upon admission to the hospital, patients were randomly assigned to treatment with levalbuterol 1.25 mg Q8h (N=241) or albuterol, administered per routine standing hospital orders (usually Q4-6h; N=238). Standing orders with matching beta-agonist were provided for rescue treatments. Patients randomized to receive levalbuterol required significantly fewer total nebulizations (median 10 vs 12; $p=0.031$) and scheduled nebulizations compared with albuterol (median 9 vs 11; $p=0.009$). No significant differences in the number of rescue nebulizations, median length of hospital stay, median time to discharge, or total hospital costs ($3,676 for levalbuterol vs $3,841 for albuterol) were noted. The primary pharmacoeconomic analysis using Subject General Well-Being as the measure of efficacy showed use of levalbuterol was $165 less costly with an increase of ~2 units in effectiveness compared with albuterol. Bootstrap re-sampling methodology showed levalbuterol to be cost-effective in approximately 67% of the 10,000 simulations. Compared with albuterol, levalbuterol resulted in administration of significantly fewer total and scheduled nebulizations without an increase in rescue nebulizations, supporting its use every 8 hours. Levalbuterol 1.25mg Q8h in hospitalized patients with asthma or COPD reduced total and scheduled nebulizer treatments without increasing the cost of therapy and may be cost effective when compared with use of albuterol. An abstract summarizing this study has been submitted to the 2006 Chest Annual meeting for consideration.

Thus, despite the opinions of some (Asmus 2002; Ahrens 2001; Weinberger 2004), a number of studies have demonstrated that the improvements in clinical outcomes that lead to pharmacoeconomic improvements and overall cost savings exceeded the relatively greater drug acquisition cost for levalbuterol.

iv. Levalbuterol offers efficacy comparable to that of albuterol at lower doses, thus offering physicians dosing flexibility and the potential for fewer side effects

In the adult study conducted by Nelson et al, levalbuterol 0.63 mg provided comparable efficacy to that of albuterol 2.5 mg (Nelson 1998). Since the beta-mediated side-effects that are common with albuterol are due to the (R)-isomer, the levalbuterol group, at half the dose of (R)-albuterol, produced fewer side effects.

A more recent out-patient study demonstrated the efficacy and safety of lower doses of levalbuterol (Milgrom 2001). The study was a large multicenter, double blind, randomized, placebo-controlled clinical trial involving 338 asthmatic children aged 4 to 11 years ($FEV_1$ 40-85% predicted) who received 21 days of three times per day (TID) therapy of either nebulized levalbuterol (0.31 or 0.63 mg), albuterol (1.25 or 2.5 mg), or placebo. The results indicated that, while all active treatments significantly improved $FEV_1$ (peak percent change) compared with placebo ($p<0.001$) after the first dose and after 21 days of dosing, levalbuterol 0.31 mg had the fastest onset of response and time to peak response ($p<0.05$ vs. albuterol 2.5 mg) after the first dose. There were also more responders in the levalbuterol groups compared with the albuterol groups. Although this study was conducted in pediatric patients, the data are applicable to the Medicare population because the pathophysiology and treatments of chronic respiratory disease in these populations is the same. The results of the Milgrom study are summarized in Figure 16 below.

**Figure 16.    Mean change in FEV$_1$ after the first dose in pediatric patients**



Levalbuterol 0.31 mg had the fewest side effects of all of the other active treatments. Only levalbuterol 0.31 mg was not different from placebo for changes in ventricular heart rate, QTc interval, and glucose (p>0.05). All active treatments decreased serum potassium (range –0.3 to –0.6; p < 0.002 vs. placebo), with albuterol 2.5 mg producing the largest change (p < 0.005 vs. other actives).

Side effects of medications are always an important issue to patients as well as their caregivers (White 1999). Several studies have demonstrated that the use of the 0.63 mg dose of levalbuterol resulted in reduced beta-mediated side effects. Portnoy *et al.* (Portnoy 2001) reported that beta-mediated side effects, including racing heart, nervousness, jitters, difficulty concentrating and tremors, were lower following treatment with 0.63 mg of levalbuterol than with albuterol 2.5 mg. Patients with stable asthma (n=331 enrolled, 276 complete; mean age=28.3 yrs) were switched from 2.5 mg albuterol to levalbuterol 0.63 mg via nebulization up to three times a day for 6-12 weeks in this open-label study. At baseline, 99% of patients were concerned about side effects from asthma treatment with albuterol. Patients reported a significant reduction in side effects after switching to levalbuterol 0.63 mg (Figure 17), suggesting that a reduction in beta-mediated side effects can be achieved using 0.63 mg dose of levalbuterol without

compromising efficacy (Portnoy 2001).

**Figure 17. Patient reports of beta-mediated side effects associated with treatment of albuterol or levalbuterol**



An open-label, 12 week, multi-center assessment of the efficacy and side effects of nebulized levalbuterol (0.63 mg or 1.25 mg) compared to albuterol therapy in patients (n = 363 asthmatics, 276 with COPD) with reversible bronchospasm was recently presented (Ohar 2002). Eighty percent of asthma patients were categorized as moderate or severe and 67% of COPD patients had peak expiratory flow rate (PEFR) <50% predicted. The percentage of patients experiencing wheezing decreased from 78% while on albuterol to 55% while on levalbuterol; shortness of breath from 90% to 71%; and nocturnal awakenings from 58% to 38%. Overall, 44% of patients and 53% of physicians described disease improvement following levalbuterol. The percentage of patients using albuterol metered dose inhaler (MDI) decreased from 74% on albuterol to 60% on levalbuterol (p<0.0001) and those using concomitant nebulized Atrovent decreased from 36% on albuterol to 26% on levalbuterol. For patients treated with levalbuterol 0.63 and 1.25 mg, reductions were noted in beta-mediated side effects included palpitations (51% decrease), nervousness and agitation (56% decrease), shaky hands (54% decrease), poor concentration (38% decrease), and difficulty sleeping (43% decrease). These data suggest that regular treatment with both doses of levalbuterol improved asthma and COPD symptoms. This was accompanied by a decrease in beta-mediated side effects and a decrease in concomitant bronchodilators. Sixty-two percent of physicians believed that patients' side effects had improved with levalbuterol, 71% preferred levalbuterol over to albuterol, and 69% stated they would continue to prescribe levalbuterol.

b.  Differential Pre-Clinical Effects of Levalbuterol and (S)-albuterol

Levalbuterol is a $\beta_2$-agonist drug that relaxes the smooth muscles of all airways, from the trachea to the terminal bronchioles, regardless of the bronchoconstrictor challenge.  Levalbuterol has an approximately 2-fold greater binding affinity than albuterol for the beta$_2$-adrenergic receptor and approximately 100-fold greater binding affinity than (S)-albuterol (Penn 1996; Canning 2002).  Levalbuterol activates the beta$_2$-adrenergic receptors on airway smooth muscle, which activates adenylcyclase, increasing intracellular concentration of cyclic-3', 5'-adenosine monophosphate (cyclic-AMP).  The increase in cyclic-AMP activates protein kinase A, which inhibits the phosphorylation of myosin and lowers intracellular ionic calcium concentrations, resulting in relaxation of smooth muscles of all airways, from the trachea to the terminal bronchioles irrespective of the spasmogen involved.  Increased cyclic-AMP concentrations are also associated with the inhibition of release mediators from mast cells in the airway, which may reduce bronchospasm, reactivity to spasmogens, release of secondary inflammatory cytokines, cellular infiltration and mucosal edema.

(S)-albuterol has been shown to impart adverse physiologic effects and to oppose the beneficial action of levalbuterol (Table 2).  *In vitro*, (S)-albuterol promoted intracellular $Ca^{++}$ influx of airway smooth muscle cells in a cholinergic-dependent and beta$_2$-adrenergic-independent manner, and it augmented cholinergic activation of airway smooth muscle (Mitra 1998).  (S)-albuterol facilitated acetylcholine release when pre-junctional muscarinic $M_2$ receptors were blocked, but was unable to relax contracted airway smooth muscle.  This suggested that, in the absence of induction of smooth muscle relaxation by levalbuterol, (S)-albuterol has the potential to induce bronchoconstriction in asthmatics (Zhang 1998).  (S)-Albuterol increased total lung resistance *in vivo* following exposure to bradykinin and thus may mediate the development of airway hyperresponsiveness to certain spasmogens that is often observed in patients who use albuterol on a chronic basis (Keir 1999a).  *In vivo*, albuterol and (S)-albuterol increased airway hyperresponsiveness to certain spasmogens, suggesting that the effect of albuterol on airway hyperresponsiveness may not be solely related to beta-adrenergic receptor activation (Keir 1999b).

43

**Table 2.    Comparison of (S)-albuterol vs Xopenex**

| (S)-albuterol | Levalbuterol |
|---|---|
| Binds with low affinity to the beta2-receptor | Selective and high affinity binding to the beta2-receptor |
| Increases airway smooth muscle intracellular calcium and proliferation | Decreases airway smooth muscle intracellular calcium and proliferation |
| Increases IL-2, IL-4, IL-8, IL-13, MCP-1, RANTES, gmCSF, VEGF, cysLT1R, eotaxin, mucin secretion and activates NFkB | Decreases or no change for IL-2, IL-4, IL-8, IL-13, MCP-1, RANTES, gmCSF, VEGF, cysLT1R and eotaxin |
| Increases airway tissue response to spasmogens | Decreases airway tissue response to spasmogens |
| Increases eosinophil activation; superoxide formation | Decreases eosinophil activation; superoxide formation |
| Increases eosinophils influx and IL-13 in BAL fluid | No increases in inflammatory markers in BAL fluid |
| Difficult to metabolize, unnatural molecule | Easy to metabolize, more natural (R)-epinephrine analogue |
| Decreases steroid effects on gmCSF secretion and NFkB activation | Increases steroid inhibition of cytokine release |
| High pulmonary tissue levels with regular dosing | No evidence of accumulation |

Airway inflammation is another important feature of asthma, and the inappropriate and consistent activation of T lymphocytes is known to produce the inflammatory component of asthma. (S)-Albuterol promoted the synthesis and/or release of numerous proinflammatory mediators from eosinophils, mast cells, T-lymphocytes, airway smooth muscle cells and airway epithelial cells, including histamine, IL-2, IL-4, IL-8, IL-13, gmCSF, eotaxin, RANTES, VEGF, mucin and cysLT1R (Volchek 2005, Cho 2001, Baramki 2002, Frieri 2000). Baramki et al. found that levalbuterol inhibited human antigen-specific (i.e., tetanus) T lymphocyte proliferation. In addition, levalbuterol also inhibited the inflammatory cytokines produced by these T cells (i.e., IL-2, IL-13, IL-5, and INFγ). The investigators also found that albuterol significantly stimulated the production of the inflammatory cytokine, IL-2. In the presence of concentrations of (S)-albuterol that exceeded those of levalbuterol, the inhibition of T cell proliferation was abrogated, and the cytokines produced by these T cells were increased (Baramki 2002). This finding may be particularly relevant clinically, because when

albuterol is metabolized, (S)-albuterol is metabolized 10-fold more slowly than levalbuterol and has been found to achieve concentrations that are 2-4 fold higher than levalbuterol in the blood and lung tissue (Giri 2002, Dhand 1999). Amplification of the $T_h2$ response can lead to enhanced airway hyperresponsiveness and airway remodeling, a phenomenon present even in mild asthmatics.

While (R)-albuterol and albuterol were equally effective in inhibiting eosinophil peroxidase secretion from eosinophils, (S)-albuterol had no augmenting effect (Leff 1997). When eosinophils were exposed to (R)-albuterol or albuterol, a reduction in the amount of superoxide release after stimulation with interleukin (IL)-5 was noted. However, eosinophil exposure to (S)-albuterol significantly enhanced superoxide production. When human granulocytes were treated with (R)- albuterol, granulocyte-induced cytotoxicity was inhibited (Volcheck 2005). In contrast, (S)- albuterol induced granulocyte chemotaxis and did not reduce cytotoxicity (Frieri 2001). Exposure to (S)-albuterol for 6 or 24 hours increased the release of histamine and IL-4 from murine mast cells compared with (R)-albuterol and controls (Cho 2001). Human lung mast cells exposed to (R)- albuterol inhibits IgE-mediated IL-8 expression. In contrast, overnight exposure to (S)- albuterol resulted in a loss of the (R)-albuterol-mediated inhibition of IL-8 (Schulman 2006). In an asthma murine model, eosinophils, mast cells and lymphocytes were recruited to the lung in increased numbers when the animals were exposed to (S)-albuterol but not with (R)- albuterol, and the bronchial alveolar fluid from these animals also contained elevated levels of IL-4 and IL-13 (Cho 2001; Finn 2006). Mast cells, eosinophils and granulocytes are important inflammatory cells involved in airway inflammation. Recruitment and activation of these cells, as seen with (S)- albuterol treatment, could contribute to airway tissue damage.

Several resident airway cells contribute to airway pathophysiology in asthma and COPD including airway epithelial cells, airway smooth muscle cells and myofibroblasts. Inhaled medications like albuterol are known to have direct effects on these airway tissues, e.g. bronchodilation through smooth muscle cell relaxation. Airway epithelial cells secreted increased levels of mucin when treated with (S)- albuterol while (R)-albuterol did not stimulate mucin secretion (Chang 2001). The pattern of gene expression in epithelial cells is quite different for the isomers of albuterol indicating different pathways being stimulated. When cultured with antigen, (S)-albuterol increased IL-8 secretion in small-airway epithelial cells, in contrast to (R)-albuterol, which suppressed IL-8 production (Frieri 2006). In an animal model of acute lung injury, alveolar fluid clearance (AFC) is important to the repair process in the lung and AFC is known to be stimulated by beta agonists like (R)- albuterol. However, when animals were exposed to (S)- albuterol, AFC was significantly reduced (Harris 2006). This inhibition of lung repair could lead to worsening airway disease. Pretreatment with (R)-albuterol in an isolated human bronchus model protected against histamine-induced contractions, but (S)-albuterol enhanced the contractile response to histamine. The authors concluded that because (R)-albuterol relaxes human isolated bronchus, the capacity of (S)-albuterol to enhance contractile responses to histamine or LTC4 cannot be attributed to activation of beta2 receptors (Templeton 1998). Taken together, the results suggest that (S)-albuterol may have proinflammatory effects on airway tissues and cells in vivo, while providing no

therapeutic benefit.

Agrawal et al (Agrawal 2004) examined the effect of the isomers of albuterol on intracellular transmembrane signaling pathways involved in the activation of the $\beta_2$-adrenergic receptor. These researchers demonstrated that in human bronchial smooth muscle cells incubated in either levalbuterol, (S)-albuterol, or albuterol ((S)/(R) albuterol) for 8 hours, only (S)-albuterol and albuterol up-regulated expression and activation of the $G_{\alpha I-1}$ subunit of the G-protein coupled $\beta_2$-adrenergic receptor. This particular subunit of the G-protein contributes to the constrictive response of bronchial smooth muscle. Only (S)-albuterol and albuterol also down-regulated expression of the $G_{s\alpha}$ subunit of this receptor. The $G_{s\alpha}$ subunit contributes to relaxation of bronchial smooth muscle. The relaxation of bronchial smooth muscle during an acute bronchospasm attack is a goal of pharmacologic therapy. These data suggest that (S)-albuterol is capable of desensitizing the intracellular pathway involved with bronchodilation and of hyper-sensitizing the pathway for bronchoconstriction. Findings of increased intracellular $Ca^{2+}$ in the presence of (S)-albuterol also support this hypothesis (increased intracellular calcium is necessary for muscle constriction, which leads to bronchoconstriction). Finally, only (S)-albuterol and albuterol increased activity of phosphatidylinositol 3'-OH-kinase (PI3 kinase) and transcriptional nuclear factor (NF)-κB in human bronchial smooth muscle cells. NF-κB is a critical intracellular mediator of the inflammatory cascade and has been implicated in the pathogenesis of lung disease including asthma, ARDS, respiratory viral infections, and cystic fibrosis. The pathogenesis of asthma appears to involve a broad range of inflammatory proteins that are regulated by NF-κB, including cytokines, enzymes, and adhesion molecules (Christman 2000). PI3 kinase has also been implicated in several inflammatory pathways (Finan 2004).

Ibe and Raj (Ibe 2006) also examined the effects of albuterol components on airway smooth muscle and corroborated these findings. They found that (S)-albuterol appeared to stimulate cell growth by activating PI3 kinase and inhibiting the cAMP-Protein kinase A pathway. Smooth muscle cell growth is a contributing factor to airway remodeling observed in patients with asthma. They concluded that, *in vivo*, human airway smooth muscle proliferation, induced by growth factors and cytokines in their experiments, was inhibited by levalbuterol, and that this effect was opposed by (S)-albuterol (Ibe 2006).

Ameredes et al (Ameredes 2006) stimulated human airway smooth muscle cells with cytomix (a mixture of inflammatory cytokines) and lipopolysaccharide (an inflammatory component of bacterial cell walls) and found an increase in production of GM-CSF (an inflammatory cell growth factor). Dexamethasone reduced GM-CSF production by 25%-30%; addition of levalbuterol further reduced GM-CSF by 12%. In contrast, (S)-albuterol increased GM-CSF 16% over the reduction produced by dexamethasone. These data demonstrate that the sole component of levalbuterol, the (R)-albuterol isomer, may have additive anti-inflammatory effects when administered with glucocorticoids and that (S)-albuterol, found only in albuterol, can reverse this effect (Ameredes 2006). Corticosteroids are thought to act by inhibiting NF-κB activation (Christman 2000). The finding that only albuterol and (S)-albuterol increase activity of

NF-κB may explain why (S)-albuterol negated the anti-inflammatory effect of dexamethasone observed.

In is important to note that, in the levalbuterol Summary Basis of Approval, the FDA Medical Reviewer stated "(S)-albuterol not only fails to relax airway smooth muscle but under certain circumstances may augment bronchoconstriction; …increased intracellular calcium in airway smooth muscle and bronchial hyperresponsiveness; …activates phospholipase C and induces calcium influx into airway smooth muscle, changes that could lead to bronchial hyperresponsiveness" (CDER 1999).

### C. Summary of Clinical and Pre-Clinical Research

Levalbuterol is a unique chemical moiety.  At a molecular level, the differences between levalbuterol and albuterol are visually distinct.  Its chemical structure results in distinct pharmacodynamic actions, which makes levalbuterol a chemical entity unlike any other bronchodilators available. Albuterol contains a unique structural component known as (S)-albuterol.  Pre-clinical evidence indicates that (S)-albuterol may not be inert and is clinically active and has pharmacologic properties that differ from (R)-albuterol, a structural component that is common to both products.  The research summarized here indicates that (S)-albuterol may have deleterious pharmacologic effects that are not desired in patients with bronchoconstrictive diseases, further supporting the uniqueness of both molecules therapeutic distinction between the two products.

The pre-clinical and clinical data presented supports the clinical differential effects (and, by inference, the lack of therapeutic or pharmacologic equivalence) between Xopenex and albuterol.  These data suggest that the (S)-albuterol component of albuterol interferes with the therapeutic effect of (R)-albuterol, has pro-inflammatory and pro-constrictive effects, and may also have a detrimental effect on the anti-inflammatory impact of other concomitant medications taken to treat acute bronchospasm.

These differences in pharmacology may explain the differences in response seen in clinical studies comparing levalbuterol with albuterol.  At equivalent doses of the (R)-isomer, levalbuterol provides more rapid and greater improvement in $FEV_1$ compared with albuterol.

With lower doses of levalbuterol, side effects are fewer compared with a standard dose of albuterol or a 1.25 mg dose of levalbuterol.  Fewer side effects and more rapid and greater $FEV_1$ improvement may provide greater satisfaction with treatment, enhanced compliance with therapy and, therefore, improved patient outcomes.  The weight of these studies supports the position that Xopenex is clinically differentiated from albuterol and possesses clinical advantages that can be documented in reputable trials.

## IV.  Conclusion

For all of the reasons stated above, we urge the DME PSCs to withdraw the LCA and to work with CMS to develop a compromise solution that provides significant

savings to the Medicare Program while preserving access to Xopenex for Medicare beneficiaries.

Instituting an LCA is inappropriate clinically under these circumstances, violative of Medicare law and a major intrusion into physicians' ability to practice medicine. It is simply unreasonable to take steps to eliminate access to this important product used by many tens of thousands of Medicare beneficiaries.

We appreciate the need for the government to control excessive Medicare costs. However, this can be accomplished without effectively eliminating access to Xopenex for Part B patients. Therefore, we ask you to remain open to solutions that recognize the importance of Xopenex to Medicare beneficiaries with COPD and asthma. Furthermore, we ask that you closely review all of the attached clinical studies and focus on the manuscripts and abstracts, as well as the new evidence not included in your previous literature review, in order to articulate a fair and appropriate final local coverage determination policy.

We remain interested in meeting with you anytime to discuss any of the clinical, legal or policy issues raised in this letter. A costly fight is not in the interest of Medicare beneficiaries, physicians and taxpayers especially when a reasonable alternative is available that will permanently resolve this matter.

Sincerely,

Mark J. Wanda
Vice President, Legal Affairs

James M. Roach, M.D.,
Senior Vice President, Medical Affairs

cc:     Michael O. Leavitt, Secretary, Department of Health and Human Services
        Mark B. McClellan, M.D., Ph.D., Administrator, Centers for Medicare and
        Medicaid Services
        Senator Edward Kennedy
        Senator Michael Crapo
        Senator Blanche Lambert Lincoln
        Congressman Cliff Stearns
        Congressman John Lewis
        Patrick Morrisey, Sidley Austin LLP
        Dan Troy, Sidley Austin LLP

# ATTACHMENT B
# TO SEPRACOR COMMENTS

## HCPCS NATIONAL PANEL

**Business Address:**

Centers for Medicare & Medicaid Services
C5-08-27
7500 Security Boulevard
Baltimore, MD  21244-1850

**Cooperating Parties:**

Centers for Medicare and Medicaid Services
Blue Cross/Blue Shield Association
and
America's Health Insurance Plans

0 1 NOV 2004

Mark J. Wanda
Sepracor Inc.
84 Waterford Drive
Marlborough, MA  01752

Re:  Request # 04.58
Request to establish a code for levalbuterol HCl Inhalation Solution, trade name: Xopenex®
Inhalation Solution.

Dear Mr. Wanda:

On behalf of the Healthcare Common Procedure Coding System (HCPCS) National Panel, I
would like to thank you for your application to modify the HCPCS Level II code set.  The
HCPCS Level II code set is available for use by all payers, and maintained by the HCPCS
National Panel, a tripartite, non-government entity comprised of members representing the
private insurance industry and Medicare and Medicaid.  The HCPCS National Panel reserves
final decision-making authority for approving modifications to the HCPCS Level II code set.

The HCPCS National Panel has reviewed this product category and made a consensus decision to
make the following modifications to the HCPCS Level II standard, national code set:

**Discontinue** codes J7618, J7619 and J7621.

**Establish** code J7611  Albuterol, inhalation solution, administered through DME, concentrated
form, 1mg.

**Establish** code J7612  Levalbuterol, inhalation solution, administered through DME,
concentrated form, 0.5mg

**Establish** code J7613  Albuterol, inhalation solution, administered through DME, unit dose, 1mg

**Establish** code J7614  Levalbuterol, inhalation solution, administered through DME, unit dose,
0.5 mg

**Establish** code J7616  Albuterol, up to 5 mg and ipratropium bromide, up to 1 mg. compounded inhalation solution, administered through DME

**Establish** code J7617  Levalbuterol, up to  2.5 mg and ipratropium bromide, up to 1 mg, compounded inhalation solution, administered through DME

All changes to the code set are effective January 1, 2005, unless an earlier effective date is specified in the 2005 Annual HCPCS Update.  The entire 2005 HCPCS Annual Update is available and can be downloaded free of charge at: www.cms.hhs.gov/medicare/hcpcs/default.asp.  The code set is searchable using the edit function and key words or code numbers.

The HCPCS Level II codes describe categories of like items.  The code set is not intended to be an exhaustive listing of all products on the market.  As a general rule, the National Panel does not classify individual products under code categories on behalf of insurers.  Individual insurance contractors have the necessary flexibility to classify specific products into HCPCS Level II code categories and establish their own coding instructions in accordance with their policies and program operating needs.  Questions regarding classification of products into HCPCS Level II code categories should be submitted to the contractor in whose jurisdiction a claim would be filed.  For private sector health insurance systems, please contact the individual private insurance contractor.  For Medicaid systems, please contact the Medicaid Agency in the state in which the claim is being filed.  For confirmation of appropriate coding for Medicare, you may contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) toll free at 877-735-1326.

Sincerely,

Cynthia Hake
Chairperson
HCPCS National Panel

04decisionltr1.doc

# ATTACHMENT D
# TO SEPRACOR COMMENTS

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

1501 K STREET, N.W.
WASHINGTON, D.C. 20005
TELEPHONE 202 736 8000
FACSIMILE 202 736 8711
www.sidley.com

FOUNDED 1866

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

WRITER'S DIRECT NUMBER
202-736-8228

WRITER'S E-MAIL ADDRESS
pmorrisey@sidley.com

April 11, 2005

Herb Kuhn
Director, Center for Medicare Management
Centers for Medicare and Medicaid Services
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

Dear Mr. Kuhn:

Thank you for speaking with me on Friday regarding the Centers for Medicare and Medicaid Services' (CMS) decision to approve a least costly alternative (LCA) determination for Xopenex, a respiratory product manufactured by Sepracor Inc. For several compelling reasons, we urge CMS to withhold the issuance of this LCA and work collaboratively with the Company on a solution to this problem. Indeed, after our productive discussion on March 4, we expected to have additional conversations with CMS regarding a resolution of this matter that recognized Sepracor's good faith approach to the issues raised by the Agency and the Durable Medical Equipment Regional Carriers (DMERCs).

Instead, CMS has suddenly decided to approve an LCA determination without any further conversations on the proposal we discussed during our meeting. CMS' decision is particularly troublesome given earlier conversations the Agency had with the Company and with Congressional offices regarding the development of a reasonable solution that balanced CMS' financial interests with the needs of Medicare beneficiaries to maintain access to this important product.

We remain hopeful that we can work through this matter and avoid a long, protracted dispute between the Agency and the Company, potential litigation concerning CMS' authority to approve LCA determinations and, most importantly, an inappropriate (and unnecessary) disruption of XOPENEX therapy to more than 100,000 Medicare beneficiaries.

SIDLEY AUSTIN BROWN & WOOD LLP            WASHINGTON, D.C.

Herb Kuhn
April 11, 2005
Page 2

## I.   Background

As you know, over two months ago, Sepracor and a number of Members of Congress asked for your assistance to halt the issuance of an LCA for Xopenex by the DMERCs. The Company made this request because implementation of an LCA would have effectively eliminated Medicare beneficiaries' continued access to this product. The DMERCs' decision would also have been inconsistent with CMS' determination in the fall of 2004 to issue a separate billing and payment code for Xopenex. Under CMS' own standards and policies, such an approval necessarily constituted an acknowledgement of the clinical differentiation between Xopenex and generic albuterol. Moreover, it is worth noting that CMS' affirmative national decision came in the wake of two previous unsuccessful efforts to obtain a new code. The Agency's approval of a separate J Code for Xopenex last year can only mean that CMS recognized that the drug had been incorrectly and inappropriately categorized previously within the same J-Code (Code 7619) as albuterol sulfate.

Given that Xopenex is a critical, innovator drug used to treat patients with chronic obstructive pulmonary disease and asthma, Sepracor urged CMS to allow the Company to present additional clinical information to the Agency supporting its contention that Xopenex is clinically differentiated from generic albuterol. Significantly, Sepracor also informed CMS that it would develop a proposal to voluntarily limit usage of the product in Medicare and to reduce Xopenex's reimbursement levels.

In response to the Company's request, CMS withheld the approval of the DMERCs' publication of an LCA determination. The Agency then agreed to meet with the Company to discuss: 1) the clinical evidence that supported Xopenex's coverage under Medicare Part B; 2) a voluntary proposal to restrict usage and reimbursement; and 3) the most appropriate pathway for resolving this problem. CMS indicated, at that time, that the Company would be given the option of proceeding with the DMERCs (where it would continue to be at risk of an LCA policy) or pursuing a National Coverage Determination (NCD). In fact, CMS encouraged the Company to pursue an NCD, which would have allowed for a fair process for review of all information and the involvement of the public in an orderly, thorough and scientifically-oriented process.

## II.   The Proposal

On March 4, 2005, CMS met with Sepracor to discuss new clinical data in the COPD patient population (never seen by the DMERC Medical Directors) and further illustrate how Xopenex differs clinically from albuterol and how the Company could be responsive to the government's cost concerns and avoid an LCA. No clinical personnel from CMS were present at the meeting.

SIDLEY AUSTIN BROWN & WOOD LLP         WASHINGTON, D.C.

Herb Kuhn
April 11, 2005
Page 3

During the meeting, in an unprecedented effort to cooperate with CMS, Sepracor proposed that the Agency institute the following price changes and place the following restrictions on its product:

First, CMS and the Office of the Inspector General (OIG) should apply a Widely Available Market Price (WAMP) determination to Xopenex. Due to anomalies in the ASP payment methodology, as established by the MMA and outside of the Company's control (and described in Sepracor's March 4, 2005 submission to CMS), Xopenex's reimbursement price has been set at a level far in excess of its suppliers' acquisition costs creating a large profit margin for pharmacy providers compared to albuterol. Sepracor voluntarily proposed that the OIG and CMS immediately change the reimbursement price by instituting a WAMP determination, thus decreasing Medicare costs for this product by 30 percent or more. It simply does not make sense to us why CMS would attempt to assert an LCA, as legally suspect as that authority is, when Sepracor has offered to help the government use its WAMP authority in a manner that would result in a mutually acceptable resolution to CMS' concerns.

Second, Sepracor proposed to impose a "script volume limit" on the number of nebules of Xopenex that Medicare beneficiaries may obtain each month. Such a step would significantly limit Xopenex's potential usage and would bring the per month script sizes to a level consistent with medical necessity determinations.

Third, Sepracor asked CMS to implement a protocol whereby Medicare beneficiaries would be treated first with albuterol before obtaining access to Xopenex. This additional step would further limit CMS' financial exposure; yet ensure that beneficiaries who truly needed the product had access to it.

Fourth, the Company offered to work with CMS to establish an "early warning system" to identify any unusual increases in utilization that might occur from inappropriate use. Sepracor would voluntarily set up a system to report its Medicare market share in "real time" to CMS to avoid significant cost outlays to the federal government. The Company stressed that it wished to maintain a transparent relationship with CMS and work collaboratively with the Agency to protect the integrity of the Trust Fund. It is important to note that current Company data indicates that Xopenex's first quarter utilization only represents seven percent of the Medicare respiratory marketplace.

Finally, Sepracor offered to go through any coverage determination process suggested by CMS (in lieu of an LCA) to obtain additional clinical data on the product.

At the meeting, CMS indicated that it would review the Company's proposal. Sepracor reiterated that it wished to have the opportunity to engage CMS' clinical staff as well and ensure that a dialogue was established between CMS, the Company and the DMERCs before any

S I D L E Y   A U S T I N   B R O W N   &   W O O D   LLP          W A S H I N G T O N ,   D . C .

Herb Kuhn
April 11, 2005
Page 4

further action was contemplated. The Company also emphasized that it sought quick resolution of this matter in order to avoid any negative Wall Street implications. [1]

Sepracor has developed a viable proposal to address the government's concerns regarding the product's reimbursement and utilization that ensures the continued availability of Xopenex to Medicare beneficiaries. Additionally, the Company remains flexible and is committed to working with the Agency on any initiatives to appropriately limit the product's reimbursement and utilization. We urge you to keep in mind that if your underlying concern is based upon costs, you can address that issue through a WAMP determination at an appropriate payment level. If CMS were to follow a reasonable course, the government would realize immediate savings and avoid a protracted dispute.

It is important to recognize that the Company <u>will never voluntarily accept an LCA</u> because it would result in an elimination of the product's access to the Medicare market. An LCA represents a death sentence for Xopenex in Medicare and will have significant negative implications for other payers as well. Given the financial implications to the Company, Sepracor would be forced to pursue every remedy available to overturn the LCA with all of its resources.

III.    **Legal Issues**

<u>Beyond the equities of engaging in a dialogue with the Company and following through on an earlier commitment of the Agency to allow the Company to pursue an NCD process in lieu of an LCA</u>, the Agency also has another compelling reason to withhold approval of the determination: implementation of an LCA is fundamentally violative of the Medicare Modernization Act (MMA).

In the upcoming days, we would be pleased to submit to you a detailed analysis of the legal reasons why LCAs are no longer permissible under the Average Sales Price (ASP) system. For purposes of this letter, though, we emphasize one critical point: under the statute, single source drugs must be paid under a specific payment methodology that cannot be modified by CMS. Under the MMA, CMS is required, subject to certain exceptions not relevant here, to reimburse single source drugs based on 106% of the Average Sales Price. The MMA specifically identifies inhalation drugs, such as Xopenex, administered through durable medical

---

[1] As you know, in January of 2005, the Company was victimized by an unknown party who provided information to a Wall Street analyst that Xopenex may soon have an LCA imposed upon it. Subsequently, several home health suppliers indicated that there was a "chilling effect" on the dispensing of Xopenex. The Company's deep concern about this inappropriate disclosure led to a conclusion that quick resolution of this matter would be advantageous for all parties.

SIDLEY AUSTIN BROWN & WOOD LLP                WASHINGTON, D.C.

Herb Kuhn
April 11, 2005
Page 5

equipment, as articles that will be reimbursed under the ASP methodology. *See* SSA § 1842(o)(1)(G)(ii).

As you know, the MMA clearly provides that the reimbursement amount for single source drugs, such as Xopenex, shall be calculated on the basis of that drug's average sales price (ASP), as reflected in the National Drug Code assigned to that drug. § 1847A(b)(4), 42 U.S.C. § 1395w-3a(b)(4)(A).[2] The statute expressly distinguishes this process from the mechanism that applies for multiple source drugs, where the reimbursement amount is calculated on the basis of the weighted averages of all drugs included within the relevant National Drug Code. § 1847(A)(b)(3), *id.* § 1395w-3a(b)(3).

Given the detailed definitions of the MMA, it is clear that Congress did not intend for CMS to use the "reasonable and necessary" provision of section 1862(a)(1)(A) to undermine the carefully-articulated and comprehensive statutorily mandated reimbursement methodology. Neither CMS nor the DMERCs may depart from the statutory mandated ASP mechanism except where the statute has so carefully enumerated the specific instances where the Agency is permitted to depart from the ASP method: CMS may disregard the ASP for a drug or biological when the ASP exceeds the widely available market price by a specified threshold percentage, § 1847(A)(d)(3), 42 U.S.C. § 1395w-3a(d)(3) or in cases of public emergency, § 1847(A)(e), *id.* § 1395w-3a(e). It also provides for another exception, which is not relevant here.

That final exception states that, "with respect to single source drugs or biologicals that are within the same billing and payment code as of October 1, 2003, the Secretary shall treat such single source drugs or biologicals as if the single source drugs or biologicals were multiple source drugs." § 1847(A)(c)(6)(C)(ii), 42 U.S.C. § 1395w-3a(c)(6)(c)(iii). However, the Conference Report language quite clearly states that this exception was only intended to be applied in instances when several "single source" drugs were included within the same billing and payment code. Accordingly, even if Xopenex were contained within its old multiple source billing and payment code, it would still not qualify for this exception.

Given how precisely the exceptions are written into the statute, it is clear that CMS must reimburse Xopenex as a single source drug and may not apply any other authorities to modify its reimbursement. As such, it is equally clear that continued use of the LCA authority is not permitted by the MMA. As a result, any action taken to use this mechanism would be violative of the statute and will likely fail in court.

---

[2] This general methodology is prescribed by section 1847A of the SSA, which addresses reimbursement payments for drugs and biologicals. Section 1842(o)(1)(G)(ii) of the SSA, as amended by section 305 of the MMA, specifically identifies inhalation drugs administered through durable medical equipment as items which will be reimbursed through the ASP methodology established by section 1847A.

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Herb Kuhn
April 11, 2005
Page 6

We do not believe it correct for CMS to approve a proposed LCA without resolving these serious legal concerns. The effect, of any proposal, whether or not it is ever implemented, will be extremely negative on Sepracor and the Medicare beneficiaries who rely on Xopenex. We urge CMS to proceed in a cautious and thoughtful manner.

Sepracor again emphasizes that it seeks to collaborate with the Agency and avoid any legal or political conflicts. As you know, the Company has always been transparent about its pricing and all the issues involved in the LCA process. Sepracor even brought the ASP payment flaw to the Agency's attention before it knew of the existence of a potential LCA. The Company has advocated for fixing the reimbursement problem that results in the excessive reimbursement for the product. Unfortunately, Sepracor doe not possess the legal power to effectuate that change. But CMS and the OIG can resolve this problem without resorting to a legally suspect, and as we contend, legally impermissible LCA.

The Company wants to continue working with the Agency as a good business partner. However, approving an LCA in these circumstances would represent a major step backwards, especially after the Company developed such a significant proposal to address the government's concerns and CMS had previously discussed other options available to the Company, including the filing of a NCD request.

Sepracor would welcome any substantive feedback to its proposal. However, we urge you to do so before approving an LCA.

For the reasons stated above, we urge you to withhold approval of the LCA today and engage the Company to resolve this matter amicably and expeditiously. Thank you for your consideration of the issues raised in this letter.

Sincerely,


Patrick Morrisey

cc:    Dr. Mark McClellan, Administrator, Center for Medicare and Medicaid Services (CMS)
       Leslie Norwalk, Deputy Administrator, CMS
       Alex Azar, General Counsel, Department of Health and Human Services (HHS)
       Tom Barker, Deputy General Counsel, HHS
       Brad Berenson, Sidley Austin Brown and Wood, LLP
       Mark Wanda, Vice President, Legal Affairs, Sepracor

DC1 765104v.1

# EXHIBIT B

Page 1 of 22
March 24, 2006
DRAFT LCD

## LCD for Nebulizers - Draft (DL11499)



**Please note:** **This is a Draft policy.**
Draft LCDs are works in progress that are available on the Medicare Coverage
Database site for public review. Draft LCDs are not necessarily a reflection of the
current policies or practices of the contractor.

### Contractor Information



**Contractor Name**

TriCenturion

**Contractor Number**

77011

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

AdminaStar Federal, Inc., Tricenturion

### LCD Information



Page 2 of 22
March 24, 2006
DRAFT LCD



**LCD ID Number**

DL11499

**LCD Title**

Nebulizers - Draft

**Contractor's Determination Number**

NEB20060324

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2005 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1

**Primary Geographic Jurisdiction**

Connecticut
District of Columbia
Delaware
Illinois
Indiana
Massachusetts
Maryland
Maine
Michigan
Minnesota
New Hampshire
New Jersey
New York - Entire State
Ohio
Pennsylvania

March 24, 2006
DRAFT LCD

Rhode Island
Virginia
Vermont
Wisconsin
West Virginia


**Oversight Region**

Central Office


**DME Region LCD Covers**

Jurisdiction A/B


**Projected Determination Effective Date**


**Original Determination Ending Date**


**Revision Effective Date**


**Revision Ending Date**


**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes: 416.0 or 416.8) who meet the

March 24, 2006
DRAFT LCD

following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 **(A7006, A7014)**

E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**


This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation on the patient's medical record which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003))**
A7005 **(One/6 months)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**


INHALATION DRUGS AND SOLUTIONS:


The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.


Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**


Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which

justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7017 or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity

**Coverage Topic**

Durable Medical Equipment

March 24, 2006
DRAFT LCD

| Prescription Drugs |
|---|

| **Coding Information** |
|---|



**CPT/HCPCS Codes**

**The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care provider order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation.**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**
**KX - Specified required documentation on file**

**EQUIPMENT**

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

**ACCESSORIES**

| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

**INHALATION DRUGS**

| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |

| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A7018 | WATER, DISTILLED, USED WITH LARGE VOLUME NEBULIZER, 1000 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG, ADMINISTERED THROUGH A DME |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7611 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7612 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7613 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7614 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7633 | BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED |

| | THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
|---|---|
| J7638 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7648 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7668 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

March 24, 2006
DRAFT LCD

| | |
|---|---|
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

**The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**

**For HCPCS codes A4619, E0565, E0572:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |
| **For HCPCS codes A7013, A7014, A7015, A7525:** | |

March 24, 2006
DRAFT LCD

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |
| **For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:** | |
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| **For HCPCS codes A7006, J2545:** | |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |

| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
|---|---|

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
|---|---|
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes J7608:**

| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:**

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|

**For HCPCS code J7639:**

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
|---|---|

**For HCPCS code J7682:**

March 24, 2006
DRAFT LCD

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080:**

| 416.0 | PRIMARY PULMONARY HYPERTENSION |
|---|---|
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

**For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.**

**For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680 and J7681, all ICD-9 codes.**

**For all other HCPCS codes, ICD-9 codes are not specified.**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, A7016, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all diagnoses.

Page 16 of 22
March 24, 2006
DRAFT LCD

For all other HCPCS codes, diagnoses are not specified.

## General Information



### Documentation Requirements

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current usage.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer, the model name/number if applicable. When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.


**Appendices**


**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.


**Sources of Information and Basis for Decision**

<u>Levalbuterol</u>

Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" *The Journal of Allergy and Clinical Immunology*; November 2001, Volume 108:681-684.

Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, Number 2.

Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and

Levalbuterol for Treatment of Acute Asthma". *The Journal of Pediatrics*; December 2003, 143:731-736.

Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, No. 2.

Crater, Jr G. "Levalbuterol vs Racemic Albuterol". *Chest*; September 2003, 124, 3:3.

Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". *Chest*; 2002: 44S.

Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". *Chest*; September 2003; 124, 3:844-849.

Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". *Respiratory Care*; October 2001; Vol. 46, No. 10:1083.

Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". *American Journal of Respiratory Critical Care Med 2004*; 169:A310.

Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". *Respiratory Care*; October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". *Chest* 2004; 126(4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". *Chest* September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". *The Journal of Clinical Immunology* November 2001:726-731.

Nelson H, Bensch G, Pleskow W, Disantostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". *The Journal of Allergy and Clinical Immunology* December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". *American Journal of Respiratory Critical Care Medicine* 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". *American Journal of Emergency Medicine* January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". *Allergy and Asthma Proc.* November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", *The American Journal of Managed Care* July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to *ACEP* 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for Adverse Events in Patients With Acute Airflow Obstruction". *American Journal of Therapeutics* 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic Albuterol: Efficacy and Outcomes in Patients Hospitalized with COPD or Asthma". *Chest* 2003; 123, 1:128-135.

Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?" *Clinical Pulmonary Medicine* May 2004; Vol. 11, No. 3:129-134.

**Advisory Committee Meeting Notes**


**Start Date of Comment Period**

03/24/2006


**End Date of Comment Period**

05/08/2006


**Start Date of Notice Period**



**Revision History Number**

March 24, 2006
DRAFT LCD

**Revision History Explanation**

Revision Effective Date : To be determined
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.
Added statement that levalbuterol will be paid comparable to albuterol.
Added statement that non-compounded combinations of albuterol and ipratropium will be paid comparable to separate unit dose vials.
HCPCS Codes:
Added J7640
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.
ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.
SOURCES OF INFORMATION:
Added bibliography for levalbuterol.


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216, A4218 and deleted codes J7051 and J7699 where appropriately.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater
quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an
MDI prior to prescribing a nebulizer. Added pneumocystosis and complications
of organ transplants as coverage criteria for E0565 or E0572 compressor used
with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used
for treatment of cystic fibrosis. Removed grandfathering language for aerosol
compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an
order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim
via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and
not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1).
Expansion of indications for use of pentamidine with added ICD-9 codes.

March 24, 2006
DRAFT LCD

Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).

**Last Reviewed On Date**


**Related Documents**

This LCD has no Related Documents.

**LCD Attachments**

There are no attachments for this LCD

**Draft Contact**

Paul Hughes, MD - draftrmrpfeedback@tricenturion.com
TriCenturion
PO Box 100282, Mail Code ZA190
Columbia, SC 29202-3282

# EXHIBIT C

# Draft

**LCD for Nebulizers (DL5007)**

**Please note:** **This is a Draft policy.**
Draft LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Draft LCDs are not necessarily a reflection of the current policies or practices of the contractor.

## Contractor Information

**Contractor Name**

TrustSolutions

**Contractor Number**

77012

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

Palmetto GBA

## LCD Information

**LCD ID Number**

DL5007

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2005 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Kentucky
Louisiana
Mississippi
North Carolina
New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virgin Islands

**Oversight Region**

Central Office

**DME Region LCD Covers**

Jurisdiction C

**Projected Determination Effective Date**

**Original Determination Ending Date**

**Revision Effective Date**

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below), will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003)**
A7005 **(One/6 months)**
A7005 **(one /3 months only with K0730)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 ( **One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month))**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month)**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18**

**liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.


**Coverage Topic**

Nebulizer


**Coding Information**

**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

999x                         Not Applicable

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

**The appearance of a code in this section does not necessarily indicate coverage.**

**HCPCS MODIFIERS:**

**EY - No physician or other licensed health care provider order for this item or service**
**KO - Single drug unit dose formulation.**
**KP - First drug of a multiple drug unit dose formulation**
**KQ - Second or subsequent drug of a multiple drug unit dose formulation.**
**KX - Specified required documentation on file**

**HCPCS CODES:**

**EQUIPMENT**

E0565   COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF-CONTAINED OR CYLINDER DRIVEN

E0570   NEBULIZER, WITH COMPRESSOR

E0571   AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER

E0572   AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE

E0574   ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME

NEBULIZER

E0575   NEBULIZER, ULTRASONIC, LARGE VOLUME

E0585   NEBULIZER, WITH COMPRESSOR AND HEATER

K0730   CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM

## ACCESSORIES

A4619   FACE TENT

A7003   ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC
        NEBULIZER, DISPOSABLE

A7004   SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE

A7005   ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC
        NEBULIZER, NON-DISPOSABLE

A7006   ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER

A7007   LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL
        COMPRESSOR

A7008   LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL
        COMPRESSOR

A7009   RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME
        ULTRASONIC NEBULIZER

A7010   CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER,
        100 FEET

A7011   CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME
        NEBULIZER, 10 FEET

A7012   WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER

A7013   FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR

A7014   FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC
        GENERATOR

A7015   AEROSOL MASK, USED WITH DME NEBULIZER

A7016   DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER

A7017   NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT
        USED WITH OXYGEN

A7525   TRACHEOSTOMY MASK, EACH

E0580   NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR
        USE WITH REGULATOR OR FLOWMETER

E1372   IMMERSION EXTERNAL HEATER FOR NEBULIZER

## INHALATION DRUGS

A4216   STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML

A4217   STERILE WATER/SALINE, 500 ML

A4218   STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML

G0333   PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY
        SUPPLY AS A BENEFICIARY

J2545   PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG,
        ADMINISTERED THROUGH A DME

J7608   ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
        DOSE FORM, PER GRAM

J7611   ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME,
        CONCENTRATED FORM, 1 MG

J7612   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME,
        CONCENTRATED FORM, 0.5 MG

J7613   ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT
        DOSE, 1 MG

J7614   LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT
        DOSE, 0.5 MG

J7620   ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-
        COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME

J7622   BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        UNIT DOSE FORM, PER MILLIGRAM

J7624   BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        UNIT DOSE FORM, PER MILLIGRAM

J7626   BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED
        THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7627   BUDESONIDE, POWDER, COMPOUNDED FOR INHALATION SOLUTION,
        ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7628   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH
        DME, CONCENTRATED FORM, PER MILLIGRAM

J7629   BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH
        DME, UNIT DOSE FORM, PER MILLIGRAM

J7631   CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        UNIT DOSE FORM, PER 10 MILLIGRAMS

J7633   BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        CONCENTRATED FORM, PER 0.25 MILLIGRAM

J7635   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        CONCENTRATED FORM, PER MILLIGRAM

J7636   ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE
        FORM, PER MILLIGRAM

J7637   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        CONCENTRATED FORM, PER MILLIGRAM

J7638   DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
        UNIT DOSE FORM, PER MILLIGRAM

J7639    DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, PER MILLIGRAM

J7640    FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, 12 MICROGRAMS

J7641    FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE, PER MILLIGRAM

J7642    GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7643    GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7644    IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER MILLIGRAM

J7648    ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7649    ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7658    ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7659    ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         UNIT DOSE FORM, PER MILLIGRAM

J7668    METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, CONCENTRATED FORM, PER 10 MILLIGRAMS

J7669    METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7680    TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, CONCENTRATED FORM, PER MILLIGRAM

J7681    TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH
         DME, UNIT DOSE FORM, PER MILLIGRAM

J7682    TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION,
         ADMINISTERED THROUGH DME

J7683    TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME,
         CONCENTRATED FORM, PER MILLIGRAM

J7684    TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT
         DOSE FORM, PER MILLIGRAM

J7699    NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME

Q0513    PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS

Q0514    PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS

Q4080    ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20
         MICROGRAMS

**ICD-9 Codes that Support Medical Necessity**

**The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.**

**For HCPCS codes A4619, E0565, E0572:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

996.80 -    COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN -
996.89      COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN

**For HCPCS code J7608:**

480.0 -     PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO
508.9       UNSPECIFIED EXTERNAL AGENT

786.4       ABNORMAL SPUTUM

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:**

491.0 -     SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO
508.9       UNSPECIFIED EXTERNAL AGENT

**For HCPCS code J7639:**

277.02      CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

**For HCPCS code J7682**

011.50 -    TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION -
011.56      TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY
            BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS
            CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS)

277.02      CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS

494.0       BRONCHIECTASIS WITHOUT ACUTE EXACERBATION

494.1       BRONCHIECTASIS WITH ACUTE EXACERBATION

748.61      CONGENITAL BRONCHIECTASIS

**For HCPCS codes K0730, Q4080**

416.0       PRIMARY PULMONARY HYPERTENSION

416.8       OTHER CHRONIC PULMONARY HEART DISEASES


**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.


**ICD-9 Codes that DO NOT Support Medical Necessity**

**For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.**

**For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all ICD-9 codes.**

**For all other HCPCS codes, ICD-9 codes are not specified.**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**

**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.


**Appendices**



**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity


**Sources of Information and Basis for Decision**

Levalbuterol

Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" The Journal of Allergy and Clinical Immunology; November 2001, Volume 108:681-684.

Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". The Journal of Allergy and Clinical Immunology; August 2002, part 1, Volume 110, Number 2.

Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and Levalbuterol for Treatment of Acute Asthma". The Journal of Pediatrics; December 2003, 143:731-736.

Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". The Journal of Allergy and Clinical Immunology; August 2002, part 1, Volume 110, No. 2.

Crater, Jr G. "Levalbuterol vs Racemic Albuterol". Chest; September 2003, 124, 3:3.

Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". Chest; 2002: 44S.

Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". Chest September 2003; 124, 3:844-849.

Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". Respiratory Care October 2001; Vol. 46, No. 10:1083.

Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". American Journal of Respiratory Critical Care Med 2004; 169:A310.

Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". Respiratory Care October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". Chest 2004; 126 (4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". Chest September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". The Journal of Clinical Immunology November 2001:726-731.

Nelson H, Bensch G, Pleskow W, DiSnatostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". The Journal of Allergy and Clinical Immunology December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". American Journal of Respiratory Critical Care Medicine 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". American Journal of Emergency Medicine January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". Allergy and Asthma Proc. November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", The American Journal of Managed Care July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to ACEP 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for

Adverse Events in Patients With Acute Airflow Obstruction". American Journal of
Therapeutics 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic Albuterol: Efficacy and
Outcomes in Patients Hospitalized with COPD or Asthma". Chest 2003; 123, 1:128-135.

Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?"
Clinical Pulmonary Medicine May 2004; Vol. 11, No. 3:129-134.


**Advisory Committee Meeting Notes**



**Start Date of Comment Period**

03/24/2006


**End Date of Comment Period**

05/08/2006


**Start Date of Notice Period**



**Revision History Number**



**Revision History Explanation**

Revision Effective Date : To be determined
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol,
dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.
Added statement that levalbuterol will be paid comparable to albuterol.
Added statement that non-compounded combinations of albuterol and ipratropium will be
paid comparable to separate unit dose vials.
HCPCS CODES:
Added: J7640
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642,
J7643, J7680, and J7681.
ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642,
J7643, J7680, and J7681.
SOURCES OF INFORMATION:
Added bibliography for levalbuterol.

Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where

appropriately.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted
J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific
ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.



Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626

INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Advisory for a detailed report of the revision.

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A24623 - Nebulizers - Policy Article - Effective - January 2006

**LCD Attachments**

There are no attachments for this LCD

**Draft Contact**

Michelle Moscato - michelle.moscato@trustsolutionsllc.com
TrustSolutions, LLC
8720 Castle Creek Parkway Suite 300
Indianapolis, IN 46250

**Article for Nebulizers - Policy Article - Effective - January 2006 (A24623)**

## Contractor Information

**Contractor Name**

TrustSolutions

**Contractor Number**

77012

**Contractor Type**

DME PSC

**DME MAC this DME PSC is affiliated with**

Palmetto GBA

## Article Information

**Article ID Number**

A24623

**Article Type**

Article

**Key Article**

Yes

**Article Title**

Nebulizers - Policy Article - Effective - January 2006

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Kentucky
Louisiana
Mississippi
North Carolina

New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virgin Islands

## DME Region Article Covers

Jurisdiction C

## Original Article Effective Date

04/01/2005

## Article Revision Effective Date

03/01/2006

## Article Text

### NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES

A large volume pneumatic nebulizer (E0580) and water or saline (A4217 or A7018) are not separately payable and should not be separately billed when used for patients with rented home oxygen equipment.

If a large volume nebulizer, related compressor/generator, and water or saline are used predominantly to provide room humidification it will be denied as noncovered.

A prefilled disposable large volume nebulizer (A7008) is noncovered under the DME benefit because it is a convenience item. An unfilled nebulizer (A7007, A7017, or E0585) filled with water or saline (A4217 or A7018) by the patient/caregiver is an acceptable alternative.

Kits and concentrates for use in cleaning respiratory equipment will be denied as noncovered.

DISPENSING FEE:

An initial dispensing fee (G0333) is payable to a pharmacy for the initial 30 day supply of covered inhalation drug(s) regardless of the number of drugs dispensed, the number of shipments, or the number of pharmacies used by the beneficiary during that time. This initial 30-day dispensing fee is a once in a lifetime fee and only applies to beneficiaries who are using inhalation drugs for the first time as a Medicare beneficiary on or after 01/01/2006.

Medicare will only pay for one of the following for covered inhalation drugs regardless of the number of drugs dispensed, the number of shipments, or the number of pharmacies used by the beneficiary during that time period-an initial dispensing fee (G0333), a 30 day dispensing fee (Q0513), or a 90 day dispensing fee (Q0514).

If code G0333 is billed for a 30 day supply of covered inhalation drugs and criteria for payment of G0333 are not met but criteria for payment of Q0513 are met, it will be payable based on the allowance for code Q0513.

For a refill prescription, payment of a dispensing fee will be allowed no sooner than 7 days before the end of usage for the current 30 day or 90 day period for which a dispensing fee

was previously paid. Medicare will not pay for more than 12 months of dispensing fees per beneficiary per 12 month period.

If the dispensing fee is billed sooner than the interval specified above, it will be denied as not separately payable. For example, if a 90 day fee (Q0514) is billed on 1/30/06 and is covered and there is a subsequent claim for a 30 day fee (Q0513) on 4/20/06, the dispensing fee on 4/20/06 will be denied as not separately payable.

Both a Q0513 and a Q0514 dispensing fee are not covered on the same date of service. If a supplier dispenses a 90 day supply of one drug and a 30 day supply of another drug on the same day, code Q0514 (90 day fee) must be billed.

The dispensing fee must be billed on the same claim as the inhalation drug(s). If it is not, it will be denied as incorrect billing.

A dispensing fee is not separately billable or payable for saline, whether used as a diluent or for humidification therapy.

Medicare will not pay for a separate fee for the compounding of inhalation drug(s).

**CODING GUIDELINES**

EQUIPMENT

In this policy, the actual equipment (i.e., electrical device) will generally be referred to as either a compressor (when nebulization of liquid is achieved by means of air flow) or as a generator (when nebulization of liquid is achieved by means of ultrasonic vibrations). The term nebulizer is generally used for the actual chamber in which the nebulization of liquid occurs and is an accessory to the equipment. The nebulizer is attached to an aerosol compressor or an ultrasonic generator in order to achieve a functioning delivery system for aerosol therapy.

Code E0565 describes an aerosol compressor, which can be set for pressures above 30 psi at a flow of 6-8 L/m and is capable of continuous operation.

A nebulizer with compressor (E0570) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It is only AC powered.

A portable compressor (E0571) is an aerosol compressor, which delivers a fixed, low pressure and is used with a small volume nebulizer. It must have battery or DC power capability and may have an AC power option.

A light duty adjustable pressure compressor (E0572) is a pneumatic aerosol compressor which can be set for pressures above 30 psi at a flow of 6-8 L/m, but is capable only of intermittent operation.

Code E0574 describes an ultrasonic/electronic generator used with a small volume chamber for medication delivery, which is capable only of intermittent operation.

Code E0575 describes a large volume ultrasonic nebulizer system which is used for medication and humidification delivery, and which is capable of continuous operation.

Code K0730 describes a controlled dose inhalation drug delivery system. Aerosol is delivered in pulses during the inspiration. The duration of each pulse is adapted according to the breathing pattern.

ACCESSORIES

Code A7003, A7005, and A7006 include the lid, jar, baffles, tubing, T-piece and mouthpiece. In addition, code A7006 includes a filter.

Code A7004 includes only the lid, jar and baffles.

Code A7012 describes a device to collect water condensation, which is placed in line with the corrugated tubing, used with a large volume nebulizer.

Code E0585 is used when a heavy-duty aerosol compressor (E0565), durable bottle type large volume nebulizer (A7017), and immersion heater (E1372) are provided at the same time. If all three items are not provided initially, the separate codes for the components would be used for billing. Code A7007 or A7017 is billed when an unfilled large volume nebulizer is used with a E0572 compressor or a separately billed E0565 compressor. Code A7007 or A7017 would not be separately billed when an E0585 system was also being billed. Code E0580 (Nebulizer, durable, glass or autoclavable plastic, bottle type, for use with regulator or flow meter) describes the same piece of equipment as A7017, but should only be billed when this type of nebulizer is used with a beneficiary-owned oxygen system.

INHALATION DRUGS

The following instructions apply to claims billed using J codes. When claims are billed in NCPDP format using NDC numbers, different instructions may apply. Refer to the NCPDP Companion Document available through the CMS website.

Unit dose form of an inhalation drug or a combination of drugs is one in which the medication is dispensed to a patient (1) in a bottle/vial/ampule which contains the dose usually used for a single inhalation treatment, and (2) in a concentration which is dilute enough that it may be administered to a patient without adding any separate diluent.

Concentrated form of a drug used for inhalation is one in which the drug is dispensed to a patient in a concentration which requires that a separate diluent (usually saline) be added to the nebulizer when the drug is administered to a patient.

The coding of a unit dose form or a concentrated form of an inhalation drug is determined by the formulation of the drug as it is dispensed to the patient. For example, if a pharmacist takes a concentrated form of a single inhalation drug (e.g., 0.5% albuterol) and dilutes it to a ready-to-use concentration (e.g., 0.083% albuterol), which is then dispensed to the patient in a single-dose bottles/vials/ampules, the inhalation solution is billed as the unit dose form not the concentrated form.

The billing unit for inhalation drug codes varies. Suppliers must be sure that they use the correct billing unit or the code when calculating the number of units of service to enter on the claim,. The following is guidance on a few codes where errors are commonly seen:

- Code J7620 is used for manufactured combinations of albuterol and ipratropium (DuoNeb) and other similar products which contain 3.0 mg of albuterol sulfate (which is 2.5 mg of albuterol base) and 0.5 mg of ipratropium bromide in each unit dose vial. For these products, 1 unit of service of J7620 equals 1 unit dose vial.

- For code J7626 (budesonide, unit dose) bill one unit of service for each vial dispensed, regardless of whether a 0.25 mg vial or a 0.5 mg vial is dispensed.

The concentration of the drug in the dispensed solution can be converted to mg or gm as follows: A solution with a labeled concentration of 1% has ten (10) mg of drug in each milliliter (ml) of solution. Therefore, a 0.083% standard formulation albuterol solution has 0.83 mg of standard formulation albuterol in each ml of solution. Since albuterol 0.083% solution typically comes in a 3 ml vial/ampule, each vial/ampule contains 2.5mg of albuterol (3X.83 equals 2.5). If a pharmacist provides 120 ampules of 0.83% albuterol solution each containing 3 ml, the billed units of service would be 300 (2.5 X120) units (1 unit equals 1 mg) of code J7613KO.

Pharmacists should note that the correct concentration figure must be used to determine the number of mg of drug dispensed. For example, if a pharmacist takes 0.5 ml of a concentrated 0.5% albuterol solution and dilutes it with 2.5 ml of saline to give a 3 ml unit dose solution which is dispensed to the patient, each vial contains 2.5 mg of albuterol (0.5 mg x 5.0 mg/ml equals 2.4 mg), not 15 mg (3 x 5.0).

Code J7620 may only be used when albuterol and ipratropium are provided in combination by a manufacturer or repackager in a vial with a single NDC number. DuoNeb is one example. Code J7620 must not be used for compounded inhalation solutions of these drugs. For compounded combination unit dose preparations and for situation in which these drugs are provided in separate unit dose vials, supplier should bill using code J7613 for albuterol, and J7644 for ipratropium with the appropriate modifier – KO, KP or KQ.

When there is a single drug in a unit dose container, the KO modifier is added to the unit form code.

Except for code J7620, when two or more drugs are combined and dispensed to the patient in the same unit dose container, each of the drugs is billed using its unit dose form code. The KP modifier is added to only one of the unit dose form codes and the KQ modifier is added to the other unit dose code(s). When two or more drugs are combined, the use of the KP and KQ modifiers should result in a combination that yields the lowest Medicare allowance. There should be no separate billing for the saline diluent.

Whenever a unit dose form code is billed, it must have either a KO, KP or KQ modifier. (Exception: The KO, KP and KQ modifiers should not be used with code J7620.) If a unit dose code does not have one of these modifiers, it will be denied as an invalid code. The KO, KP, and KQ modifiers are not used with the concentrated form codes.

When a drug is provided in a concentration which is dilute enough that it may be administered to the patient without adding any separate diluent and is dispensed in a multidose container, use J7699.

A4218 is used for metered dose sterile saline products that are used to dilute the concentrated form of inhalation drugs.

Code J7699 is also used for an inhalation drug administered by a nebulizer , which does not have a valid specific code. If two or more drugs are combined in the same unit dose container, bill specific codes when possible and the J7699 only for individual drugs which do not have a specific code. Claims for drugs that are incorrectly coded J7699 instead of the appropriate codes will be denied for invalid coding.

Suppliers should contact the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) for guidance on the correct coding of these items

## Coverage Topic

Nebulizer

## Coding Information

**No Coding Information has been entered in this section of the article.**

## Other Information

### Revision History Explanation

Revision Effective Date: 01/01/2006
NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES
Deleted A7007 from statement that this code would be denied as a convenience item.
Replaced deleted G0371 and G0374 with new dispensing fee HCPCS codes Q0513 and Q0514.
Revised guidelines for dispensing fees.
CODING GUIDELINES:
Added A7007 as equipment that would not be used with oxygen.
Deleted J7616 and replaced with new HCPCS code J7620.
Added A4118 to replace J7699 for metered dose dispenser of sterile saline or water.

Revision Effective Date: 10/01/2005
CODING GUIDELINES:
Added definition of K0730
Deleted KP/KQ modifier instructions for albuterol/ipratropium and albuterol/cromolyn.
Updated revised instructions regarding dispensing fee

Effective Date 04/01/2005
LMRP converted to LCD and Policy Article
NON-MEDICAL NECESSITY COVERAGE AND PAYMENT RULES
Added coverage statements relating to dispensing fees and compounding fees.
CODING GUIDELINES
Added statement about claims filed in NCPDP format.
Updated HCPCS codes. Added guidelines for dispensing fee for 30 and 90 days.


03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this article was transitioned to DME PSC TrustSolutions (77012) from DMERC Palmetto GBA (00885).


### Related Documents

**LCD(s)**
DL5007 - Nebulizers

# EXHIBIT D

March 24, 2006

Dear Physician, Supplier, Specialty Group:

The Centers for Medicare and Medicaid Services (CMS) assigned to the Durable Medical Equipment Program Safeguard Contractors (DME PSCs) the task of developing and updating medical policies for the purpose of processing and reviewing Medicare claims for Durable Medical Equipment, Prostheses, Orthoses and Supplies (DMEPOS) and other selected items. The DME PSCs are proposing a revision of the Nebulizers policy. Four changes are proposed which require an opportunity for public comment. They are:

1.  Payment for levalbuterol will be based on the allowance for albuterol.
2.  Payment for DuoNeb will be based on the allowance for separate unit dose vials of albuterol and ipratropium.
3.  Coverage for the following nebulizer drugs is eliminated because there is inadequate support in the medical literature for administration using a DME nebulizer: amikacin, atropine, beclomethasone, betamethasone, bitolerol, dexamethasone, flunisolide, formoterol, gentamicin, glycopyrrolate, terbutaline and triamcinalone. Coverage will therefore be limited to these drugs: acetylcysteine, albuterol, budesonide, cromolyn, dornase alpha, iloprost, ipratropium, isoetharine, isoproterenol, levalbuterol, metaproterenol, pentamidine, and tobramycin.
4.  Maximum milligrams/month for budesonide is defined.

We are soliciting comments from physicians, manufacturers, suppliers and other professionals involved in the treatment of Medicare beneficiaries with chronic lung diseases. We recommend that you send this draft policy to selected members of your organization for review and comment. If you disagree with any aspect of these four changes, you should be very specific and, if possible, offer an alternative indication, guideline, etc. You should provide a clinical rationale for your position including references from the published clinical literature (e.g. standard textbooks, peer-reviewed journals, etc.). We would also encourage a written response if you agree with these changes in the policy. Note that the **only** aspects of the policy that are open for comment are the four that are listed above. The remainder of the policy is not open for comment.

When comments of this policy have been received, they will be reviewed and revisions to the policy will be considered. The revised policy will be published in future DMERC Supplier Manual updates, allowing for adequate notice before the policy's effective date.

**Please submit your comments to the appropriate Regional DME PSC medical director by mail at the addresses below no later than May 8, 2006**. Comments may also be submitted via e-mail (see draft policy below for e-mail address contact information). In addition, a public meeting will be held by each of the three PSCs to receive comments on the draft policy. Suppliers from any region may attend any PSC's public meeting. Information regarding this meeting may be obtained from the DME PSC web sites.

Thank you for your participation in our policy revision process.

Sincerely,

| | |
|---|---|
| Paul J. Hughes, M.D.<br>Medical Director, DME PSC Regions A&B<br>TriCenturion<br>7909 Parklane Road, Suite 190<br>Columbia, SC  29223<br>www.tricenturion.com | Mark D. Pilley, M.D.<br>Medical Director, DME PSC Region D<br>IntegriGuard, LLC<br>2121 North 117 Ave.<br>Suite 200<br>Omaha, NE 68164<br>www.edssafeguardsolutions.eds-gov.com |
| Adrian M. Oleck, M.D.<br>Medical Director, DME PSC Region C<br>TrustSolutions, LLC<br>8720 Castle Creek Pkwy<br>Suite 300<br>Indianapolis, IN 46250<br>www.trustsolutionsllc.com | |

# Nebulizers - Draft

## Electronic Data Systems Corp.

| Contractor Information | |
|---|---|
| **Contractor Name** back to top | Electronic Data Systems Corp. |
| **Contractor Number** back to top | 77006 |
| **Contractor Type** back to top | DME PSC |
| **DME MAC this DME PSC is affiliated with** back to top | CIGNA Government Services |
| **LCD Information** | |
| **LCD Database ID Number** back to top | DL11488 |
| **LCD Version Number** back to top | 5 |
| **LCD Title** back to top | Nebulizers - Draft |
| **Contractor's Determination Number** back to top | NEB - 2006 - 03/24 |
| **AMA CPT / ADA CDT** | CPT codes, descriptions and other data only are copyright 2005 |

| | |
|---|---|
| **Copyright Statement** back to top | American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply. |
| **CMS National Coverage Policy** back to top | CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 280.1 |
| **Primary Geographic Jurisdiction** back to top | AK<br>AS<br>AZ<br>CA<br>GU<br>HI<br>IA<br>ID<br>KS<br>MO<br>MT<br>ND<br>NE<br>NV<br>OR<br>SD<br>UT<br>WA<br>WY<br>CNMI |
| **Oversight Region** back to top | Central Office |
| **DME Region LCD Covers** back to top | Jurisdiction D |
| **Projected Determination Effective Date** back to top | |
| **Original Determination Ending Date** back to top | |
| **Revision Effective Date** back to top | |
| **Revision Ending Date** back to top | |
| **Indications and Limitations of Coverage and/or Medical Necessity** back to top | For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory |

requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted to the DMERC. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005) and related compressor (E0570, E0571) are covered when:

a) It is medically necessary to administer albuterol, budesonide, cromolyn, ipratropium, isoetharine, isoproterenol, levalbuterol, or metaproterenol for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer dornase alpha to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

c) It is medically necessary to administer tobramycin to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

d) It is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

e) It is medically necessary to administer acetylcysteine for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Use of inhalation drugs, other than those listed above or iloprost (see below), will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the nebulizer and its accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), a tracheobronchial stent (ICD-9 diagnosis code 519.1). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) and complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic model, when a small volume ultrasonic nebulizer (E0574) is ordered, it will be reimbursed at the least costly alternative of a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternate cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If this compressor is provided without accompanying documentation, which justifies its medical necessity, and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically acceptable alternative, E0570.

A controlled dose inhalation drug delivery system K0730 is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes: 416.0 or 416.8) who meet the following criteria.

Iloprost Q4080 is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal

medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.


ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**


This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation on the patient's medical record which must be available to the DMERC upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003))**
A7005 **(One/6 months)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that would be reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)**
Budesonide: **(up to 31 mg/month (62 units/month)**
Cromolyn sodium: **(up to 2480 mg/month (248 units/month))**
Dornase alpha: **(up to 78 mg/month)**
Ipratropium bromide: **(up to 93 mg/month)**
Isoetharine: **(up to 930 mg/month)**
Isoproterenol: **(up to 450 mg/month)**
Levalbuterol: **(up to 232.5 mg/month (465 units/month))**
Metaproterenol: **(up to 2800 mg/month (280 units/month))**
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available to the DMERC upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017 or E0585).

Albuterol, isoetharine, isoproterenol, levalbuterol, and metaproterenol are all bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the
least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering albuterol and ipratropium in a non-compounded combined unit dose preparation (J7620) has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613KO and 0.5 units of J7644KO.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may bill the DMERC for nebulizer drugs. Physicians may bill the DMERC for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

| **Coverage Topic** [back to top] | Nebulizer |

| Coding Information | |
|---|---|
| **Bill Type Codes** back to top | |
| **Revenue Codes** back to top | |
| **CPT/HCPCS Codes** back to top | The appearance of a code in this section does not necessarily indicate coverage.<br><br>HCPCS MODIFIERS:<br><br>EY - No physician or other licensed health care provider order for this item or service.<br>KO - Single drug unit dose formulation.<br>KP - First drug of a multiple drug unit dose formulation.<br>KQ - Second or subsequent drug of a multiple drug unit dose formulation.<br>KX – Specified required documentation on file.<br><br>EQUIPMENT: |

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES:

| | |
|---|---|
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |

| | |
|---|---|
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

INHALATION DRUGS:

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE (DILUENT), 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |

| | |
|---|---|
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, PER 300 MG, ADMINISTERED THROUGH A DME |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7611 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7612 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7613 | ALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7614 | LEVALBUTEROL, INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, NON-COMPOUNDED INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE INHALATION SOLUTION, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, POWDER, COMPOUNDED FOR INHALATION SOLUTION, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7633 | BUDESONIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |

| | |
|---|---|
| J7635 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7648 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7649 | ISOETHARINE HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7658 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7659 | ISOPROTERENOL HCL, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7668 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED |

| | | |
|---|---|---|
| | | FORM, PER 10 MILLIGRAMS |
| | J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| | J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7682 | TOBRAMYCIN, UNIT DOSE FORM, 300 MG, INHALATION SOLUTION, ADMINISTERED THROUGH DME |
| | J7683 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| | J7684 | TRIAMCINOLONE, INHALATION SOLUTION ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| | J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| | Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| | Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| | Q4080 | ILOPROST, INHALATION SOLUTION, ADMINISTERED THROUGH DME, 20 MICROGRAMS |
| **Does the CPT 30% Coding Rule Apply?** back to top | No | |
| **ICD-9 Codes that Support Medical Necessity** back to top | The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.<br><br>For HCPCS codes A4619, E0565, E0572: | |
| | 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY |

| | | |
|---|---|---|
| | | BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| | 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| | 136.3 | PNEUMOCYSTOSIS |
| | 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| | 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| | 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| | 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| | 748.61 | CONGENITAL BRONCHIECTASIS |
| | 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| | V44.0 | TRACHEOSTOMY STATUS |
| | V55.0 | ATTENTION TO TRACHEOSTOMY |
| | For HCPCS codes A7013, A7014, A7015, A7525: | |
| | 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| | 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| | 136.3 | PNEUMOCYSTOSIS |
| | 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| | 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| | 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| | 748.61 | CONGENITAL BRONCHIECTASIS |
| | 786.4 | ABNORMAL SPUTUM |
| | 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

| | |
|---|---|
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, A7005, E0570, E0571, E0574:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |

| | |
|---|---|
| 519.1 | OTHER DISEASES OF TRACHEA AND BRONCHUS NOT ELSEWHERE CLASSIFIED |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS code J7608:

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7627, J7631, J7633, J7644, J7648, J7649, J7658, J7659, J7668, J7669, J7683, J7684:

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

For HCPCS code J7639:

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

For HCPCS code J7682:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |

| | |
|---|---|
| | 748.61    CONGENITAL BRONCHIECTASIS |
| | For HCPCS code K0730, Q4080: |
| | 416.0    PRIMARY PULMONARY HYPERTENSION |
| | 416.8    OTHER CHRONIC PULMONARY HEART DISEASES |
| **Diagnoses that Support Medical Necessity** back to top | Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information. |
| **ICD-9 Codes that DO NOT Support Medical Necessity** back to top | For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.<br><br>For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681, all ICD-9 codes.<br><br>For all other HCPCS codes, ICD-9 codes are not specified. |
| **Non-Medical Necessity ICD-9 Codes Asterisk Explanation** back to top | |
| **Diagnoses that DO NOT Support Medical Necessity** back to top | For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.<br><br>For HCPCS codes A7009, E0575, J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680 and J7681, all diagnoses.<br><br>For all other HCPCS codes, diagnoses are not specified. |
| **General Information** | |
| **Documentation Requirements** back to top | Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider" (42 U.S.C. section 13951(e)). It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available to the DMERC upon request.<br><br>An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available to the DMERC upon request. Items billed to the DMERC before a signed and dated order has been received by the supplier |

must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. Examples of (b) would be: albuterol 1.25 mg in 3 ml saline; or albuterol 2.5 mg and cromolyn 20 mg in 3 ml saline. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution

| | |
|---|---|
| | dispensed.<br><br>Refer to the Supplier Manual for more information on documentation requirements. |
| **Appendices** back to top | |
| **Utilization Guidelines** back to top | Refer to Indications and Limitations of Coverage and/or Medical Necessity. |
| **Sources of Information and Basis for Decision** back to top | Levalbuterol<br><br>Ahrens R, Weinberger M. "Levalbuterol and racemic albuterol: Are there therapeutic differences?" *The Journal of Allergy and Clinical Immunology*; November 2001, Volume 108:681-684.<br><br>Asmus M, Hendeles L, Weinberger M, Ahrens R, Bisgaard H, Lötvall J, O'Byrne P, Cockroft D. "Levalbuterol has not Been Established to Have Therapeutic Advantage over Racemic Albuterol". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, Number 2.<br><br>Carl J, Myers T, Kirchner H, Kercsmar C. "Comparison of Racemic Albuterol and Levalbuterol for Treatment of Acute Asthma". *The Journal of Pediatrics*; December 2003, 143:731-736.<br><br>Chowdhury B. "Comparative efficacy of levalbuterol and racemic albuterol in the treatment of asthma". *The Journal of Allergy and Clinical Immunology*; August 2002, part 1, Volume 110, No. 2.<br><br>Crater, Jr G. "Levalbuterol vs Racemic Albuterol". *Chest*; September 2003, 124, 3:3.<br><br>Datta D, Lahiri B, ZuWallack R. "A Randomized, Double-Blinded, Placebo-Controlled Study Comparing Single Doses of Nebulized Levalbuterol, Albuterol and Combined Ipratropium_Albuterol in Stable COPD". *Chest*; 2002: 44S.<br><br>Datta D, Vitale A, Lahiri B, ZuWallack R. "An Evaluation of Nebulized Levalbuterol in Stable COPD". *Chest*; September 2003; 124, 3:844-849.<br><br>Davies J, MacIntyre N, Ahearn G, Hudson B. Webb B. A Comparison of the Use of Levalbuterol Compared to Racemic Albuterol in the Pulmonary Stepdown Population". *Respiratory Care*; October 2001; Vol. 46, No. 10:1083.<br><br>Emerman C, Nowak R, Claus R, Roach J. Baumgartner RA, Hanrahan JP. "Clinical Response to Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Asthma: Impact of (S)-Albuterol Levels". *American Journal of Respiratory Critical Care Med* 2004; 169:A310.<br><br>Haider D, "Levalbuterol (LEV) Affords Superior Health and Cost |

Benefit Over Racemic Albuterol (RAC) in the Emergency Dept. (ED)". *Respiratory Care* October 2001; Vol. 46, No. 10:1081.

Havania N, Emerman C, Nowak R, Claus R, Roach J, McVicar W, Hanrahan J. "FEV1 Response to Levalbuterol vs Racemic Albuterol in Acute Severe Asthma". *Chest* 2004; 126(4) Suppl:722S.

Hendeles L, Hartzema A. "Levalbuterol Is Not More Cost-Effective Than Albuterol for COPD". *Chest* September 2003; 124, 3:1176-1178.

Lötvall J, Palmqvist M, Arfidsson P, Maloney A, Ventresca G, Ward J. "The Therapeutic Ratio of R-Albuterol is Comparable With That of RS-Albuterol in Asthmatic Patients". *The Journal of Clinical Immunology* November 2001:726-731.

Nelson H, Bensch G, Pleskow W, DiSnatostefano R, DeGraw S, Phil M, Reasner D, Rollins T, Rubin P. "Improved Bronchodilation with Levalbuterol Compared with Racemic Albuterol in Patients with Asthma". *The Journal of Allergy and Clinical Immunology* December 1998:943-952.

Nowak R, Emerman C, Claus R, Schaefer K, McVicar W, Hanrahan JP, Baumgartner RA. "Levalbuterol (LEV) vs Racemic Albuterol (RAC) in Acute Severe Asthma: A Prospective Trial". *American Journal of Respiratory Critical Care Medicine* 2004; 169:A310.

Nowak R, Emerman C, Schaefer K, Disantostefano R, Vaickus L, Roach J. "Levalbuterol Compared With Racemic Albuterol in the Treatment of Acute Asthma: Results of a Pilot Study". *American Journal of Emergency Medicine* January 2004; Vol. 22, No. 1:29-36.

Pleskow WW, Nelson HS, Schaefer K, Claus R, Roach JM. "Pairwise Comparison of Levalbuterol versus Racemic Albuterol in the Treatment of Moderate-to-Severe Asthma". *Allergy and Asthma Proc.* November-December 2004; Vol. 25, No. 6:1-8.

Quinn C. "The Cost Effectiveness of Levalbuterol Versus Racemic Albuterol", *The American Journal of Managed Care* July 2004, Volume 10, Number 5, Supp:S153-S157.

Schreck DM, Brotea C, Shan SP. "Comparison of Racemic Albuterol and Levalbuterol in the Treatment of Acute Asthma". Abstract presented to *ACEP* 2001, Chicago, IL.

Scott V, Frazee L. "Retrospective Comparison of Nebulized Levalbuterol and Albuterol for Adverse Events in Patients With Acute Airflow Obstruction". *American Journal of Therapeutics* 2003; 10:341-347.

Truitt T, Witko J, Halpern M. "Levalbuterol Compared to Racemic

| | |
|---|---|
| | Albuterol: Efficacy and Outcomes in Patients Hospitalized with COPD or Asthma". *Chest* 2003; 123, 1:128-135.<br><br>Weinberger M. "Is There Any Advantage to Using Levalbuterol in the Treatment of Asthma?" *Clinical Pulmonary Medicine* May 2004; Vol. 11, No. 3:129-134. |
| **Advisory Committee Meeting Notes** back to top | |
| **Start Date of Comment Period** back to top | 03/24/2006 |
| **End Date of Comment Period** back to top | 05/08/2006 |
| **Start Date of Notice Period** back to top | |
| **Revision History Number** back to top | |
| **Revision History Explanation** back to top | Revision Effective Date : To be determined<br>INDICATIONS AND LIMITATIONS OF COVERAGE:<br>Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide, glycopyrrolate, terbutaline, and triamcinolone.<br>Added statement that levalbuterol will be paid comparable to albuterol.<br>Added statement that non-compounded combinations of albuterol and ipratropium will be paid comparable to separate unit dose vials.<br>HCPCS CODES:<br>Added J7640<br>ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:<br>Removed J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.<br>ICD-9 CODES THAT DO NOT SUPPORT MEDICAL NECESSITY:<br>Added J7622, J7624, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7680, and J7681.<br>SOURCES OF INFORMATION:<br>Added bibliography for levalbuterol.<br><br>Revision Effective Date: 01/01/2006<br>INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:<br>Inserted new HCPCS Codes A4216, A4218 and deleted codes J7051 and J7699 where appropriate.<br>Added coverage statement for code A7007.<br>Added A7007 to the related code table for E0565.<br>Added A7007 to usual maximum amount.<br>Added usual maximum amount for A4216 and A4218. |

HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code
491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring
specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of
HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.

Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier.
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR
MEDICAL NECESSITY:
Added criterion for K0730 and Q4080.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730
and Q4080.
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.

Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.

Revision Effective Date: 04/01/2004
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added references to new HCPCS codes.
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and
ipratropium.
Added instructions for billing metered dose sterile saline products.

Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633

Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field

The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.

04/01/2002 - Expansion of coverage for large volume nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in

| | |
|---|---|
| | the March 1997 DMERC Advisory for a detailed report of the revision.<br><br>03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC Electronic Data Systems Corp. (77006) from DMERC CIGNA Government Services (05655). |
| **Last Reviewed on Date** back to top | |
| **Notes** back to top | |
| **Does this LCD contain a "Least Costly Alternative" provision?** back to top | Yes |
| **Related Documents** back to top | **Article(s)**<br>A24942 - Nebulizers - Policy Article - Effective January 2006 |
| **LCD Attachments** back to top | There are no attachments for this LCD |
| **Draft Contact** back to top | Mark Pilley, MD - draftlcdfeedback@integriguard.org<br>IntegriGuard, LLC<br>2121 North 117 Avenue, Suite 200<br>Omaha, NE 68164 |
| **Draft Approved for Display to Public on Front End** back to top | No |
| **Saved By** back to top | Missy Addison |
| **Saved On** back to top | 03/21/2006 12:25:08 |
| **Other Versions** back to top | Version 4 - Updated on 03/21/2006 12:20:42, by Missy Addison, with effective dates N/A - N/A.<br>Version 3 - Updated on 03/21/2006 12:12:13, by Missy Addison, with effective dates N/A - N/A.<br>Version 2 - Updated on 03/17/2006 10:39:58, by Missy Addison, with effective dates 04/01/1997 - N/A.<br>Version 1 - Updated on 03/17/2006 09:23:24, by Mark Pilley, with effective dates 03/01/2006 - N/A. |

**THIS IS A DRAFT LCD**

This website is an official service of the Centers for Medicare & Medicaid Services.

# EXHIBIT E

April 2008

## NEBULIZERS – RESPONSE TO COMMENTS

### Least Costly Alternative Determinations – General

Least costly alternative policy is a payment determination, not a coverage determination and violates drug pricing methodology in the MMA.

**Response:  A least costly alternative (LCA) determination is <u>not</u> a pricing methodology, it is a medical necessity determination.  Fee schedule allowances will continue to be established for inhalation drugs in compliance with the MMA.**

In December 2005 Final Rule on inherent reasonableness, CMS said it would not be applied to Part B drugs.  LCA seems to contradict this.

**Response:  Inherent reasonableness is a pricing methodology.  An LCA determination is not a pricing determination, it is a medical necessity determination.**

PSCs are precluded from using economic factors (cost) as the basis for a coverage determination.

**Response:  The cost of an item does not enter into a benefit category determination or into the overall determination of medical necessity.  However, LCA determinations are a subset of medical necessity decisions and by their very nature take into account the relative costs of different items that may be appropriate for the treatment of the same condition.**

There is no statutory/regulatory basis for least costly alternative.

**Response:  Program Safeguard Contractors (PSCs) follow instructions outlined in the Medicare Program Integrity Manual (PIM) when developing local coverage determinations (LCDs).  Use of LCA determinations in LCDs is described in the PIM, Chapter 13, Section 13.4.**

The proposed policy is not consistent with the general instructions concerning LCA in the Benefit Policy Manual, Chapter 15, Section 110.1.

**Response:  We disagree.  The Benefit Policy Manual, Chapter 15, Section 110.1(C)(2) says:  "The following considerations should enter into the determination of reasonableness: …(2)  Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?"  And in Section 110.1(C)(3) it says: "…where there exists a reasonably feasible and medically appropriate alternative pattern of care which is less costly than the equipment furnished, the amount payable is based on the rate for the equipment or alternative treatment which meets the patient's medical needs."**

Because the cost of Xopenex and DuoNeb is more than the amount that would be paid under an LCA determination, implementation of the policy would make them unavailable to Medicare beneficiaries.

**Response:  The policy is based on a determination that there is a less costly medically appropriate alternative to those drugs.   Beneficiaries will have access to those alternatives.**

Elimination of full payment for Xopenex and DuoNeb will create administrative burdens for suppliers – e.g., education of physicians and beneficiaries, time to get a prescription for a different drug.
Patients may go without medications during the transition causing increased symptoms, ER visits, hospitalizations, etc.

**Response:  Sufficient time is being given between the publication of the LCD and the implementation date of the LCA policy to allow for changes that a physician may decide to make to the inhalation drugs ordered for a particular beneficiary.**

If the beneficiary wanted to continue to receive the ordered medication, suppliers would obtain an ABN and beneficiaries would be required to pay additional costs.

**Response:  Yes, that is an option for the beneficiary.**


**Levalbuterol**

There are no clinical advantages for use of levalbuterol compared to albuterol.

**Response:  We agree.**

There is limited peer reviewed literature to support use of levalbuterol vs albuterol in over 65 population.

**Response:  We agree.**

Studies don't establish <u>lack</u> of medical necessity of Xopenex; they are equivocal.

**Response:  It is the responsibility of the manufacturer to provide evidence to show that a particular drug is more effective than the alternative which is proposed in the draft LCD.**

There is insufficient literature in patients with COPD. PSCs should postpone changes until additional scientific studies are completed.

**Response:  We agree that there is insufficient literature concerning use in patients with COPD.  Most of the published studies focused on use of levalbuterol in patients with asthma.  Our policy is based on the currently available evidence.  If future studies provide additional information concerning use in patients with COPD, an LCD reconsideration may be requested.**

Literature supports the therapeutic advantage of levalbuterol compared to albuterol.

**Response:  We disagree.**

**The following comments relate to complete articles (i.e., not abstracts) which describe prospective clinical studies comparing inhalation solutions of levalbuterol and albuterol.  These articles are listed in the Sources of Information section of the LCD.**
- **Several studies dealt exclusively with pediatric patients and were therefore not applicable to the Medicare patient population – Carl, Gawchik, Milgrom, Ralston, Skoner**
- **Several studies were limited to patients in emergency rooms or inpatient hospitals and were therefore not applicable to the DME MAC policy which addresses chronic use by patients in the home setting – Carl, Davies, Nowak (2004), Nowak (2006), Ralston, Schreck, Scott, Truitt**

- **The following five studies are relevant to the patient population and clinical setting addressed in the policy:**

- **Datta et al, Chest 2003**
  - **Randomized, double-blind, placebo-controlled trial comparing levalbuterol to racemic albuterol, combined racemic albuterol and ipratropium, and placebo**
  - **30 patients with COPD; mean age 69; standard deviation +/- 15 years**
  - **Studied effects of single doses administered on separate days in an outpatient clinic setting**
  - **Author's conclusion: "For single-dose, as-needed use in COPD, there appears to be no advantage in using levalbuterol over conventional nebulized bronchodilators."**

- **Donohue et al, COPD: Journal of Chronic Obstructive Pulmonary Disease, 2006**
  - **Randomized, double-blind, placebo-controlled, parallel-group trial comparing levalbuterol, racemic albuterol, and placebo**
  - **209 patients with COPD $\geq$ 35 y.o.; mean age 65 years**
  - **Patients received study drug three times per day for 6 weeks; pulmonary function tests were performed on day 1 and at weeks 2, 4, and 6.**
  - **Results comparing levalbuterol 1.25 mg to racemic albuterol 2.5 mg**
    - **Statistically significant difference in area under the curve $FEV_1$ at week 6, but not at week 0, 2, or 4.  When baseline percent reversibility was factored in, there was no significant difference at any week.**

- **No statistically significant differences in COPD exacerbations or in COPD exacerbations leading to study withdrawal**
- **Subjects in the racemic albuterol group required a mean of 1.81 more doses/day of rescue/supplemental medications than subjects in the levalbuterol 1.25 mg group (p=0.02).**
- **Among subjects randomized to levalbuterol 1.25 mg, rescue supplemental medication use decreased significantly when compared to baseline (…p=0.02), placebo (…p=0.0006), and racemic albuterol (p=0.048).**
- **No statistically significant difference in percentage of COPD control days**
- **No statistically significant difference in dyspnea index scores or respiratory questionnaire responses**
- **"Adverse events were generally self-limited, mild to moderate in intensity, and occurred in similar percentage of subjects across treatment groups."**
- **Author's conclusion:  The study demonstrated that nebulized levalbuterol provided effective bronchodilation and disease control compared with placebo in subjects with COPD and was generally well tolerated. Levalbuterol was associated with a significant reduction in rescue/supplemental medication use compared with placebo or racemic albuterol.**
- **The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol.  Our reasons are:**
  - **The author states that the "study was powered to detect a difference between the levalbuterol groups and placebo in the primary endpoint, but was not designed or powered to detect differences between active treatment groups."  It is inappropriate to draw conclusions from a study that was not designed to address the comparison between levalbuterol and albuterol.**
  - **Although there were some differences in the use of rescue/supplemental medication use between levalbuterol and albuterol, other clinical measures in the study showed no clinically significant differences.**
    - **In addition, the study protocol set the baseline frequency of administration of the drugs at three times per day.  Albuterol is typically used four to six times per day.  Therefore, the study design fostered the use of rescue/supplemental medication, thus making it inappropriate to draw conclusions about clinical superiority.**
- **This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.**

- **Lotvall et al, Journal of Allergy and Clinical Immunology, 2001**
  - **Randomized, double-blind, placebo-controlled, 4-way crossover study comparing levalbuterol to S-albuterol, racemic albuterol, and placebo**
  - **12 patients with asthma who were non-smokers; mean age 50 years; range, 24-70 years**

4

- Studied effects of a single drug given in sequential escalating doses administered on separate days in an outpatient clinic setting
- Author's conclusion: The results suggest that there is "…a comparable therapeutic ratio for R-albuterol (levalbuterol) and RS (racemic)-albuterol in asthmatic subjects"

- **Nelson et al, Journal of Allergy and Clinical Immunology, 1998**
  - Randomized, double-blind, placebo-controlled, parallel-group trial comparing levalbuterol, racemic albuterol, and placebo
  - 362 patients with asthma who were non-smokers; mean age 36.5 years
  - Patients received study drug 3 times per day for 4 weeks; pulmonary function tests were performed on day 1 and at weeks 2 and 4
  - Results
    - The combined levalbuterol treatment group had a significantly greater improvement in mean peak $FEV_1$ than the combined racemic albuterol group after the first dose. However, at week 4, there was no statistically significant difference in improvement of mean peak $FEV_1$ when comparing the combined levalbuterol treatment group to the combined albuterol treatment group.
    - The combined levalbuterol treatment group had a significantly better $FEV_1$ area under the curve (AUC) analysis than the racemic albuterol group after the first dose, However, at week 4 there was no statistically significant difference in mean AUC values when comparing the combined levalbuterol treatment group to the combined albuterol treatment group.
    - There were no significant differences in potentially drug-related adverse events across the treatment groups.
  - Author's conclusion: "….this study suggests that there may be a better therapeutic index for levalbuterol than racemic albuterol."
  - The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol in the Medicare patient population. Our reasons are:
    - The study population is young and is limited to non-smokers and a diagnosis of asthma. It is inappropriate to draw conclusions from a study whose patients are very different than the typical Medicare user of inhalation solutions – who is much older, has a smoking history, and has a diagnosis of COPD.
    - The study protocol set the baseline frequency of administration of the drugs at three times per day. Albuterol is typically used four to six times per day. It is inappropriate to draw conclusions about the clinical superiority of levalbuterol when the typical dose of albuterol is not administered.
    - Most of the comparisons in the article were between the combined levalbuterol treatment group (0.63 mg and 1.25 mg doses) and the combined albuterol treatment group (1.25 mg and 2.5 mg doses). Statistically significant differences were not noted when comparing the

most common doses – 2.5 mg of racemic albuterol and 1.25 mg of levalbuterol.
- The relevant results were those obtained at the end of the study (i.e., at 4 weeks) because they approximated the use of these drugs in the Medicare population – i.e., daily use on a chronic basis. Some difference between levalbuterol and albuterol were noted after the first dose. However, these differences disappeared by week 4.
- The author states that the "study was powered to determine differences between active treatments and was not designed to detect intertreatment differences." It is inappropriate to draw conclusions from a study that was not designed to address the comparison between levalbuterol and albuterol.
- This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.

- Pleskow et al, Allergy and Asthma Proceedings, 2004
  - This paper was a further analysis of the data obtained in the Nelson study.
  - Results
    - At week 4, considering all patients, there was no statistically significant difference in $FEV_1$ area under the curve when comparing chemically equivalent doses of (R)-albuterol (e.g., levalbuterol 1.25 mg and racemic albuterol 2.5 mg). This was also true when comparing results in the subgroup of patients with more severe disease.
  - At week 4, there was no statistically significant differences between area under the curve $FEV_1$ when comparing chemically equivalent doses of drugs
  - Author's conclusion: "Levalbuterol in the absence of the (S)-isomer provided greater bronchodilation that the same quantity of (R)-albuterol delivered as a racemate. These data suggest that (S)-albuterol may compromise the efficacy of (R)-albuterol."
  - The PSC medical directors assessment is that the results of this study do not provide sufficient evidence that levalbuterol is clinically superior to racemic albuterol in the Medicare patient population.
    - All of the comments made regarding the Nelson study also apply to this study – except for the comment about use of combined treatment groups in reporting the results. This study was performed to provide a pairwise comparison between chemically equivalent doses of (R)-albuterol.
  - This study was funded by the manufacturer (Sepracor) and some of the authors were employees of Sepracor.


Other literature was reviewed but did not provide evidence to support the therapeutic advantages of levalbuterol for one or more of the following reasons. These articles are <u>not</u> listed in the Sources of Information section of the LCD.
- Retrospective analysis of data
- Review articles
- Abstracts

- **Letters to the editor**
- **Clinical studies not involving levalbuterol**
- **Animal studies**
- **In vitro studies**
- **Studies in healthy volunteers**

**Conclusion:  Considering all of the above, the literature does not document a significant clinical benefit for levalbuterol compared to albuterol for adult patients in the home setting.**

Comparing package inserts of levalbuterol and albuterol, side effects are similar.

**Response:  We agree.**

Levalbuterol has less of an effect on heart rate, glucose, and potassium than albuterol.

**Response:  We disagree.  The Donohue paper says: "Changes in serum potassium, glucose, and heart rate were similar in all active treatment groups."**

Cover levalbuterol in selected patients:
- Symptomatic tachycardia
- Tremor
- Underlying cardiac conditions
- Diagnoses which suggest susceptibility to racemic albuterol's negative side effects
- Resistance to/intolerance of albuterol

**Response:  The package insert for levalbuterol inhalation solution documents no difference between levalbuterol and albuterol in the percentage of patients with tachycardia. It does indicate that the percentage of patients with tremor is greater for levalbuterol than albuterol.  At this time, the literature does not define clinical subgroups of patients who benefit from levalbuterol compared to albuterol.**

Because levalbuterol can be given every 8 hours, there would be better compliance compared to albuterol which is given every 4-6 hours. It would also save administration costs in the hospital.

**Response:  The package insert for albuterol inhalation solution describes its administration as three to four times daily.  The clinical studies described above do not document that levalbuterol has a longer duration of action than albuterol.  This policy does not address use of these of drugs in a hospital setting.**

Pay for levalbuterol in full if the physician doesn't authorize the substitution of albuterol.

**Response:  The physician's order is not the determinant of whether full payment is made for levalbuterol.  Coverage and payment are based on the criteria in the medical policy.**

If Medicare decides not to pay in full, the levalbuterol should be denied completely rather than using LCA.

**Response:  Since levalbuterol is an effective treatment, it would not be appropriate to deny it in full.  Partial payment is made based on a determination that there is a less costly alternative that is also an effective treatment.**

CMS should pursue a compromise for the reimbursement of Xopenex.

**Response:  The DME PSC does not determine the pricing of Xopenex.**

## DuoNeb

DuoNeb LCA language is different than that of levalbuterol/albuterol.  It doesn't phrase it as a comparison to separate unit dose vials of albuterol and ipratropium.

**Response:  The wording in the LCD has been revised so that is similar to that for levalbuterol/albuterol.**

PIM requires "strong clinical justification" for an absolute policy statement.

**Response:  Actually, the Program Integrity Manual, Chapter 13, Section 13.7.1 says: "Less stringent evidence is needed …when reducing to the least costly alternative."**

Studies don't establish <u>lack</u> of medical necessity of DuoNeb; they are equivocal.

**Response:  It is the responsibility of the manufacturer to provide evidence to show that a particular drug is more effective than the alternative which is proposed in the draft LCD.**

Therapeutic effectiveness of DuoNeb is established in a number of studies: Campbell et al (1999), Chriselles et al (2002), Combivent Inhalation Study Group (1997), Dorinsky et al (1999), Friedman et al (1999), Gross et al (1998), and Levin et al (1996) .

**Response:  All of the studies, except that of Chriselles, compare use of a combination preparation of albuterol and ipratropium to single drug administration of either albuterol or ipratropium.  We agree that DuoNeb is clinically effective.  We agree that DuoNeb is more effective than either single agent albuterol or ipratropium used alone.  The draft LCD does not dispute these conclusions.**

**Even though the Chriselles paper compares patients using a combination preparation of albuterol and ipratropium to those using separate preparations of both albuterol and ipratropium, it does not provide evidence to support full payment for DuoNeb for reasons including but not limited to the following:**

8

- o  **It is not a clinical study conducted by physicians, but rather an economic analysis authored by non-physicians.**
- o  **It is a retrospective study.**
- o  **The study subjects used metered dose inhalers (MDIs), not inhalation solutions.**

**Therefore, the literature does not provide evidence to support the superiority of DuoNeb to separate unit dose vials of albuterol and ipratropium inhalation solutions.**

Draft policy provides no studies to support its conclusion.

**Response:  As noted above, there is only one paper that addresses the issue in the draft LCD – i.e., the comparison of DuoNeb to separate unit dose vials of both albuterol and ipratropium.  That paper is not a clinical study but rather a retrospective economic analysis by non-physicians.  However, the final policy does list the papers that were provided by the manufacturer and reviewed by the PSCs.**

Using separate unit dose vials would take longer to administer.

**Response:  There is no proven therapeutic difference that is related to the time of administration.  However, if a physician or patient would like to shorten the administration time, there is a manufactured unit dose preparation of albuterol that contains 2.5 mg in a 0.5 ml vial.  If that is combined with the standard 2.5 ml unit dose vial of ipratropium, the total volume (3.0 ml) is the same as in one vial of DuoNeb.**

For patients with dexterity problems, opening a second vial poses additional challenges.

**Response: If a beneficiary can open one vial a few times per day, they should be able to open an additional vial with each administration.**

Combination of factors may reduce patient compliance, thus worsening the clinical outcome.

**Response:  There are no studies that document an improved clinical outcome when DuoNeb is used compared to separate unit dose vials of albuterol and ipratropium.**

Cost avoidance of an exacerbation (e.g., ER visit) makes up for the cost savings achieved by an LCA policy.

**Response:  There is no conclusive evidence that proves that using separate unit dose vials of albuterol and ipratropium in place of DuoNeb results in an increase in exacerbations.**

DuoNeb is more effective and has a longer effect than either drug alone.

9

**Response:  We agree – but that is not the issue addressed in the draft policy.  The policy is based on a determination that DuoNeb is not more effective than  separate vials of both albuterol and ipratropium administered at the same time.**

Use of separate unit dose vials would lead to medication errors:
- Writing two prescriptions instead of one increases chance for error
- Labeling (esp. replacing paper labels with a clear raised plastic imprint) makes individual vials difficult to distinguish
- Beneficiaries might inadvertently use two vials of the same medication
- Would require the beneficiary to correctly mix two drugs

**Response:  Although an increase in medication errors is theoretically possible, before the approval of DuoNeb, albuterol and ipratropium had been provided in separate vials for many years.  We have seen no documentation to indicate that use of separate vials caused significant toxicity.**

It would be difficult to educate beneficiaries on a new regimen involving separate unit dose vials

**Response:  We disagree.  Many patients currently use separate unit dose vials of albuterol and ipratropium or vials of DuoNeb and a separate vial of another inhalation solution – e.g., budesonide.  Furthermore, it is not uncommon for there to be changes in a patient's therapeutic regimen such as the addition or substitution of a new drug.  Physicians and suppliers have provided effective education to beneficiaries in these situations.**

Albuterol is available in a unit dose vial containing 0.5 ml of a 0.5% solution. Combining that with 2.5 ml of an ipratropium unit dose results in the same volume as DuoNeb and therefore the same administration time.

**Response:  We agree.**

# EXHIBIT F



**Please note:** This is a Future LCD.

**Contractor Information**



**Contractor Name**

NHIC

**Contractor Number**

16003

**Contractor Type**

DME MAC

**LCD Information**



**LCD ID Number**

L11499

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB20080701

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

**Primary Geographic Jurisdiction**

Connecticut
District of Columbia
Delaware
Massachusetts
Maryland
Maine
New Hampshire
New Jersey
New York - Entire State
Pennsylvania
Rhode Island
Vermont

**Oversight Region**

Region III

**DME Region LCD Covers**

Jurisdiction A

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

**LCD Information**

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator (**Related Accessories**)
E0565 (**A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372**)

**LCD Information**

E0570 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0571 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 (**A7006, A7014**)
E0574 (**A7014, A7016**)
E0585 (**A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525**)
K0730 (**A7005**)

This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory (**Usual maximum replacement**)
A4619 (**One/month**)
A7003 (**Two/month**)
A7004 (**Two/month (in addition to A7003)**)
A7005 (**One/6 months**)
A7005 (**One/3 months only with K0730**)
A7006 (**One/month** )
A7007 (**Two/month**)
A7010 (**One unit (100 ft.)/ 2 months**)
A7011 (**One/year**)
A7012 (**Two/month**)
A7013 (**Two/month**)
A7014 (**One/3 months**)
A7015 (**One/month**)
A7016 (**Two/year**)
A7017 (**One/3 years**)
A7525 (**One/month**)
E1372 (**One/3 years**)

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulized drug.

Acetylcysteine: (**up to 74 grams/month**)
Albuterol: (**up to 465 mg/month**) **- see below for exception**
Arformoterol: (**up to 930 micrograms per month (62 units per month)**)
Budesonide: (**up to 31 mg/month (62 units/month)**)
Cromolyn sodium: (**up to 2480 mg/month (248 units/month)**)
Dornase alpha: (**up to 78 mg/month**)
Formoterol: (**up to 1240 micrograms per month) (62 units per month**)
Ipratropium bromide: (**up to 93 mg/month**)
Levalbuterol: (**up to 232.5 mg/month (465 units/month)**) **- see below for exception**
Metaproterenol: (**up to 2800 mg/month (280 units/month)**) **– see below for exception**
Pentamidine: (**up to 300 mg/month**)
Sterile saline or water, 10 ml/unit (A4216, A4218): (**up to 56 units per month**)
Distilled water, sterile water, or sterile saline in large volume nebulizer: (**up to 18 liters/month**)

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month))**
Metaproterenol: **(up to 470 mg/month (47 units/month))**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to a long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**LCD Information**

**Coverage Topic**

Durable Medical Equipment
Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                            TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX –Specified required documentation on file.

HCPCS CODES:
EQUIPMENT

E0565                                    COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT
                                         WHICH IS NOT SELF- CONTAINED OR CYLINDER
                                         DRIVEN

**Coding Information**

| | |
|---|---|
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |

**Coding Information**

| | |
|---|---|
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

INHALATION DRUGS

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg

J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg

J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg

J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg

Q4099 Formoterol fumarate, inhalation solution, FDA approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | |

**Coding Information**

| | | |
|---|---|---|
| | | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
|---|---|
| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | |

**Coding Information**

|  | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
|---|---|
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

## ICD-9 Codes that Support Medical Necessity

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |

**Coding Information**

| | |
|---|---|
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7013, A7014, A7015, A7525:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, E0570, E0571, E0574:

011.50 - 011.56

**Coding Information**

| | |
|---|---|
| | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |

**Coding Information**

| | |
|---|---|
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes J7608:

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

For HCPCS code J7639:

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

For HCPCS code J7682:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

For HCPCS codes K0730, Q4080

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Coding Information**

For HCPCS code A7005:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For J7605 or Q4099:

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

Coding Information

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol)(J7605)or Perforomist (formoterol fumarate) (Q4099)and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.

**Sources of Information and Basis for Decision**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

**General Information**

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

**General Information**

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

NEB011

**Revision History Explanation**

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol.
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided.
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)

**General Information**

ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to
DME MAC NHIC (16003) LCD L11499 from DME PSC TriCenturion (77011) LCD L11499.


11/10/2007 - The description for CPT/HCPCS code J2545 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7608 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7631 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code J7639 was changed in group 3
11/10/2007 - The description for CPT/HCPCS code Q4080 was changed in group 3


09/03/2007 - This policy was updated by the ICD-9 2007-2008 Annual Update.


Revision Effective Date : 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded
inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol
when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol


Revision Effective Date : 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685

**General Information**

Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added 416.0 and 416.8 to covered codes for A7005
Removed J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


06/01/2007 - In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).


03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374

**General Information**

Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

**General Information**

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

**Reason for Change**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A24944 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**

Response to Comments-April 2008 (a comment and response document) (PDF - 76,467 bytes)

**Other Versions**



Updated on 04/04/2008 with effective dates 07/01/2008 - N/A

# EXHIBIT G



<span style="color:red">**Please note:**</span> **This is a Future LCD.**

## Contractor Information



**Contractor Name**

National Government Services, Inc.

**Contractor Number**

17003

**Contractor Type**

DME MAC

## LCD Information



**LCD ID Number**

L27226

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

**Primary Geographic Jurisdiction**

Illinois
Indiana
Kentucky
Michigan
Minnesota
Ohio
Wisconsin

**Oversight Region**

Region V

**DME Region LCD Covers**

Jurisdiction B

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

**LCD Information**

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

**LCD Information**

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator (**Related Accessories)**
E0565 (**A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372**)
E0570 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)

E0571 (**A7003, A7004, A7005, A7006, A7013, A7015, A7525**)
E0572 (**A7006, A7014**)
E0574 (**A7014, A7016**)
E0585 (**A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525**)
K0730 (**A7005**)

This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory (**Usual maximum replacement)**
A4619 (**One/month)**
A7003 (**Two/month)**
A7004 (**Two/month (in addition to A7003))**
A7005 (**One/6 months)**
A7005 (**One/3 months only with K0730)**
A7006 (**One/month )**
A7007 (**Two/month)**
A7010 (**One unit (100 ft.)/ 2 months)**
A7011 (**One/year)**
A7012 (**Two/month)**
A7013 (**Two/month)**
A7014 (**One/3 months)**
A7015 (**One/month)**
A7016 (**Two/year)**
A7017 (**One/3 years)**
A7525 (**One/month)**
E1372 (**One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulized drug.

Acetylcysteine: (**up to 74 grams/month)**
Albuterol: (**up to 465 mg/month) - see below for exception**
Arformoterol: (**up to 930 micrograms per month (62 units per month))**
Budesonide: (**up to 31 mg/month (62 units/month))**
Cromolyn sodium: (**up to 2480 mg/month (248 units/month))**
Dornase alpha: (**up to 78 mg/month)**
Formoterol: (**up to 1240 micrograms per month) (62 units per month)**
Ipratropium bromide: (**up to 93 mg/month)**
Levalbuterol: (**up to 232.5 mg/month (465 units/month)) - see below for exception**
Metaproterenol: (**up to 2800 mg/month (280 units/month)) – see below for exception**
Pentamidine: (**up to 300 mg/month)**
Sterile saline or water, 10 ml/unit (A4216, A4218): (**up to 56 units per month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: (**up to 18 liters/month)**

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:

Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month))**
Metaproterenol: **(up to 470 mg/month (47 units/month))**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available upon request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to a long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Nebulizer

## Coding Information



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                            TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX –Specified required documentation on file.

HCPCS CODES:
EQUIPMENT

E0565                                    COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT
                                         WHICH IS NOT SELF- CONTAINED OR CYLINDER
                                         DRIVEN

E0570                                    NEBULIZER, WITH COMPRESSOR

**Coding Information**

| | |
|---|---|
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | |

**Coding Information**

| | |
|---|---|
| | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

INHALATION DRUGS

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg
J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg
J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg
J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg
Q4099 Formoterol fumarate, inhalation solution, FDA approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms.

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | |

**Coding Information**

|  |  |
|---|---|
|  | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |

**Coding Information**

| | |
|---|---|
| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |

**Coding Information**

| | |
|---|---|
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

**ICD-9 Codes that Support Medical Necessity**

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |

**Coding Information**

| | |
|---|---|
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7013, A7014, A7015, A7525:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS codes A7003, A7004, E0570, E0571, E0574:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | |

**Coding Information**

|  |  |
|---|---|
|  | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A7006, J2545:

|  |  |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:

|  |  |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

For HCPCS code A4216:

|  |  |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |

**Coding Information**

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For HCPCS codes J7608:

| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|
| 786.4 | ABNORMAL SPUTUM |

For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|

For HCPCS code J7639:

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
|---|---|

For HCPCS code J7682:

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

For HCPCS codes K0730, Q4080

| 416.0 | PRIMARY PULMONARY HYPERTENSION |
|---|---|
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

For HCPCS code A7005:

011.50 - 011.56

**Coding Information**

| | |
|---|---|
| | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

For J7605 or Q4099:

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

**Coding Information**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol)(J7605)or Perforomist (formoterol fumarate) (Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.

**Sources of Information and Basis for Decision**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

**General Information**

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

## General Information

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

## Advisory Committee Meeting Notes

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

## Start Date of Comment Period

03/24/2006

## End Date of Comment Period

05/08/2006

## Start Date of Notice Period

04/10/2008

## Revision History Number

NEB011

## Revision History Explanation

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)

**General Information**

ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614,Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Added: Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to
DME MAC National Government Services (17003) LCD L27226 from DME PSC TriCenturion (77011)
LCD L11499.


Revision Effective Date : 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded
inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol
when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol


Revision Effective Date : 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637,
J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added 416.0 and 416.8 to covered codes for A7005

**General Information**

Removed J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


03/01/2006 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TriCenturion (77011) from DMERC Tricenturion (77011).


Revision Effective Date 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added references to new HCPCS codes.
CODING GUIDELINES:

**General Information**

Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision effective date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.


06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.


03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.
06/01/2007 - In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).


**Reason for Change**

**General Information**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**
A47233 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**

Neubulizers -- Response to Comments -- April 2008 (a comment and response document) (PDF - 76,467 bytes)

**Other Versions**



Updated on 02/27/2008 with effective dates 07/01/2007 - 06/30/2008

# EXHIBIT H



**Please note:** This is a Future LCD.

## Contractor Information



**Contractor Name**

CIGNA Government Services

**Contractor Number**

18003

**Contractor Type**

DME MAC

## LCD Information



**LCD ID Number**

L5007

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, Section 280.1

**Primary Geographic Jurisdiction**

Alabama
Arkansas
Colorado
Florida
Georgia
Louisiana
Mississippi
North Carolina
New Mexico
Oklahoma
Puerto Rico
South Carolina
Tennessee
Texas
Virginia
Virgin Islands
West Virginia

**Oversight Region**

Region VI

**DME Region LCD Covers**

Jurisdiction C

**Original Determination Effective Date**

For services performed on or after 04/01/1997

**Original Determination Ending Date**

**Revision Effective Date**

For services performed on or after 07/01/2008

**Revision Ending Date**

**Indications and Limitations of Coverage and/or Medical Necessity**

**LCD Information**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

**LCD Information**

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

**ACCESSORIES:**

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations but it may not be appropriate to bill any or all of them for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month (in addition to A7003)**
A7005 **(One/6 months)**
A7005 **(One/3 months only with K0730)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit (100 ft.)/ 2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

**INHALATION DRUGS AND SOLUTIONS:**

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)** See below for exception.
Arformoterol: **(up to 930 micrograms per month) (62 units per month))**
Budesonide: **(up to 31 mg/month) (62 units/month))**
Cromolyn sodium: **(up to 2480 mg/month) (248 units/month)**
Dornase alpha: **(up to 78 mg/month)**
Formoterol: **(up to 1240 micrograms per month) (62 units per month)**
Ipratropium bromide: **(up to 93 mg/month)**

**LCD Information**

Levalbuterol: **(up to 232.5 mg/month (465 units/month)** See below for exception.
Metaproterenol: **(up to 2800 mg/month) (280 units/month)** See below for exception.
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**


When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month (78 units/month)**
Metaproterenol: **(up to 470 mg/month (47 units/month))**


Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available on request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017, or E0585).

Albuterol, levalbuterol, and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to the long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively.

The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

**LCD Information**

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                                                    TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service
KO - Single drug unit dose formulation.
KP - First drug of a multiple drug unit dose formulation
KQ - Second or subsequent drug of a multiple drug unit dose formulation.

**Coding Information**

KX - Specified required documentation on file

HCPCS CODES:

## EQUIPMENT

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

## ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |

**Coding Information**

| | |
|---|---|
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

## INHALATION DRUGS

J7611 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg
J7612 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg
J7613 Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg
J7614 Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg
Q4099 Formoterol fumarate, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |

**Coding Information**

| | |
|---|---|
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7627 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |
| J7628 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |

**Coding Information**

| | |
|---|---|
| J7629 | BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7631 | CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7632 | CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7634 | BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM |
| J7635 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7636 | ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7637 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7638 | DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7639 | DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7640 | FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS |
| J7641 | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | |

Coding Information

|       |                                                                                                                                                                 |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM                                                  |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM                     |
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM                                             |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM                                              |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM                                                 |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM                                            |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM                                               |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS                                                             |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS              |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS                                      |
| J7676 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG                                            |
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM                                          |

**Coding Information**

| | |
|---|---|
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

## ICD-9 Codes that Support Medical Necessity

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

### For HCPCS codes A4619, E0565, E0572:

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |

**Coding Information**

| 136.3 | PNEUMOCYSTOSIS |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, E0570, E0571, E0574:**

011.50 - 011.56

**Coding Information**

| | |
|---|---|
| | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |

**Coding Information**

| | |
|---|---|
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS code J7608:**

| | |
|---|---|
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614 J7620, J7626, J7631, J7644, J7669:**

| | |
|---|---|
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |

**For HCPCS code J7639:**

| | |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**For HCPCS code J7682**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080**

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**Coding Information**

**For HCPCS code A7005:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For J7605 or Q4099:**

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

**ICD-9 Codes that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

**Coding Information**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



**Documentation Requirements**

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider". It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories, and/or drugs.

**General Information**

If the drug being billed is Brovana (arformoterol) (J7605) or Perforomist (formoterol fumarate)(Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity

**Sources of Information and Basis for Decision**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

**General Information**

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

**General Information**

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

010

**Revision History Explanation**

**Revision Effective Date: 07/01/2008**
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:
Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099

**General Information**

Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


**Revision Effective Date: 03/01/2008**
In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to DME
MAC CIGNA Government Services (18003) LCD L11517 from DME PSC TrustSolutions (77012) LCD
L11517.


**Revision Effective Date: 07/01/2007 (June publication)**
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added: Coverage criteria and maximum covered amount for arformoterol.
Revised: Statement about J7699 to say that it will be denied when it is used to bill for a compounded
inhalation solution.
Added: Coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol
when used in addition to arformoterol.
Substituted: Codes Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added: Covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed: J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with arformoterol.


**Revision Effective Date: 07/01/2007 (March publication)**
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated: Coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed: ICD-9 code 519.1 to 519.19.
Deleted: The statement concerning providing information on a claim about the need for a portable
compressor.
Added: Utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637,
J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed: ICD-9 code 519.1 to 519.19.
Added: 416.0 and 416.8 to covered codes for A7005.

**General Information**

Removed: J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684, J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added: A requirement for a specific statement on orders for compounded inhalation solutions.


**Revision Effective Date: 06/01/2007**
In accordance with Section 911 of the Medicare Modernization Act of 2003, Virginia and West Virginia were transitioned from DME PSC TriCenturion (77011) to DME PSC TrustSolutions (77012).


**Revision Effective Date: 03/01/2006**
In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to DME PSC TrustSolutions (77012) from DMERC Palmetto GBA (00885).


**Revision Effective Date: 01/01/2006**
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216,A4218 and deleted codes J7051 and J7699 where appropriately.
Added: Coverage statement for code A7007.
Added: A7007 to the related code table for E0565.
Added: A7007 to usual maximum amount.
Added: Usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added: HCPCS codes A4218, G0333, J7620, J7627, Q0513, Q0514
Verbiage revision to description of HCPCS codes A4216, J7626
Deleted: HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9, deleted J7616.
Added: A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added: A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised: E1399 and J7699 documentation requirements.


**Revision Effective Date: 10/01/2005**
HCPCS CODES & MODIFIERS:
Added: K0730 and Q4080 and KX modifier
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added: Criterion for K0730 and Q4080
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080
DOCUMENTATION REQUIREMENTS:
Added: KX modifier requirement for K0730 and Q4080.


**Revision Effective Date: 04/01/2005**
LMRP converted to LCD and Policy Article
HCPCS CODES & MODIFIERS:
Added: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


**Revision Effective Date: 04/01/2004**

**General Information**

HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
INDICATIONS AND LIMITATIONS:
Added: References to new HCPCS codes.
CODING GUIDELINES:
Added: References to new HCPCS codes.
Clarified: Use of J7699.
Added: Billing guidelines for J7621.
Removed: Billing guidelines for A4323.
Added: Correct coding guidelines for compounded albuterol and ipratropium.
Added: Instructions for billing metered dose sterile saline products.


**Revision Effective Date: 04/01/2003**
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added: Standard language concerning coverage of items without an order.
Added: Standard language concerning the medical necessity for use of a greater quantity and combinations of usually contraindicated drugs requirement.
Removed: Language about physician documenting having considered use of an MDI prior to prescribing a nebulizer. Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572 compressor used with filtered nebulizer (A7006).
Removed: Specific coverage criteria for dornase alpha, other than its being used for treatment of cystic fibrosis. Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added: Definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language regarding excess quantity utilization;
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative field


The revision dates listed below are the dates the revisions were published and not necessarily the effective dates for the revisions.


04/01/2002 - Expansion of coverage for large volume
nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.


04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.


06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.


03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Advisory for a detailed report of the revision.

**General Information**

**Reason for Change**

**Last Reviewed On Date**

**Related Documents**

**Article(s)**

A24623 - Nebulizers - Policy Article - Effective - July 2008

**LCD Attachments**

Nebulizers - Response to Comments - April 2008 (a comment and response document) (PDF - 76,467 bytes)

# EXHIBIT I



**Please note:** This is a Future LCD.

## Contractor Information



**Contractor Name**

Noridian Administrative Services

**Contractor Number**

19003

**Contractor Type**

DME MAC

## LCD Information



**LCD ID Number**

L11488

**LCD Title**

Nebulizers

**Contractor's Determination Number**

NEB

**AMA CPT / ADA CDT Copyright Statement**

CPT codes, descriptions and other data only are copyright 2007 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply.

**CMS National Coverage Policy**

**LCD Information**

CMS Manual System, Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 200.2, 280.1

## Primary Geographic Jurisdiction

Alaska
American Samoa
Arizona
California - Entire State
Guam
Hawaii
Iowa
Idaho
Kansas
Missouri - Entire State
Montana
North Dakota
Nebraska
Nevada
Oregon
South Dakota
Utah
Washington
Wyoming
Northern Mariana Islands

## Oversight Region

Region X

## DME Region LCD Covers

Jurisdiction D

## Original Determination Effective Date

For services performed on or after 04/01/1997

## Original Determination Ending Date

## Revision Effective Date

For services performed on or after 07/01/2008

## Revision Ending Date

**LCD Information**

**Indications and Limitations of Coverage and/or Medical Necessity**

For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements. For the items addressed in this medical policy, the criteria for "reasonable and necessary" are defined by the following indications and limitations of coverage and/or medical necessity.

For an item to be covered by Medicare, a written signed and dated order must be received by the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first receiving the completed order, the item will be denied as not medically necessary.

A small volume nebulizer (A7003, A7004, A7005), related compressor (E0570, E0571), and FDA-approved inhalation solutions of the drugs listed below are covered when:

a) It is medically necessary to administer albuterol (J7611, J7613), budesonide (J7626), cromolyn (J7631), ipratropium (J7644), levalbuterol (J7612, J7614), or metaproterenol (J7669) for the management of obstructive pulmonary disease (ICD-9 diagnosis codes 491.0–508.9), or

b) It is medically necessary to administer formoterol (Q4099) or arformoterol (J7605) for the management of chronic obstructive pulmonary disease (ICD-9 diagnosis codes 491.0-492.8, 496) and the patient has a documented history of routine use of at least four doses per day of an FDA-approved albuterol or metaproterenol inhalation solution or at least three doses per day of an FDA-approved levalbuterol inhalation solution.

c) It is medically necessary to administer dornase alpha (J7639) to a patient with cystic fibrosis (ICD-9 diagnosis code 277.02) or

d) It is medically necessary to administer tobramycin (J7682) to a patient with cystic fibrosis or bronchiectasis (ICD-9 diagnosis code 277.02, 494.0, 494.1, 748.61, 011.50-011.56) or

e) It is medically necessary to administer pentamidine (J2545) to a patient with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3), or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89), or

f) It is medically necessary to administer acetylcysteine (J7608) for persistent thick or tenacious pulmonary secretions (ICD-9 diagnosis codes 480.0-508.9, 786.4).

Compounded inhalation solutions (J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, J7685, and compounded solutions billed with J7699) will be denied as not medically necessary.

If none of the drugs used with a nebulizer are covered, the compressor, the nebulizer, and other related accessories/supplies will be denied as not medically necessary.

A large volume nebulizer (A7007, A7017), related compressor (E0565 or E0572), and water or saline (A4217 or A7018) are covered when it is medically necessary to deliver humidity to a patient with thick, tenacious secretions, who has cystic fibrosis (ICD-9 diagnosis code 277.02), bronchiectasis (ICD-9 diagnosis code 494.0, 494.1, 011.50-011.56 or 748.61), a tracheostomy (ICD-9 diagnosis code V44.0 or V55.0), or a tracheobronchial stent (ICD-9 diagnosis code 519.19). Combination code E0585 will be covered for the same indications.

**LCD Information**

An E0565 or E0572 compressor and filtered nebulizer (A7006) are also covered when it is medically necessary to administer pentamidine to patients with HIV (ICD-9 diagnosis code 042), pneumocystosis (ICD-9 diagnosis code 136.3) or complications of organ transplants (ICD-9 diagnosis codes 996.80-996.89).

Because there is no proven medical benefit to nebulizing particles to diameters smaller than achievable with a pneumatic compressor, when a small volume ultrasonic nebulizer (E0574) is ordered to administer a covered inhalation solution, payment will be based on the allowance for the least costly medically appropriate alternative, a pneumatic compressor (E0570).

Similarly, a large volume ultrasonic nebulizer (E0575) offers no proven clinical advantage over a pneumatic compressor. However, since code E0575 is in a different payment category than pneumatic compressors, payment for a least costly alternative cannot be made. Therefore, when an E0575 nebulizer is provided, it will be denied as not medically necessary as will any related accessories and supplies.

A battery-powered compressor (E0571) is rarely medically necessary. If an E0571 compressor is provided and the coverage criteria for code E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

A controlled dose inhalation drug delivery system (K0730) is covered when it is medically necessary to deliver the iloprost (Q4080) to patients with pulmonary artery hypertension (ICD-9 diagnosis codes 416.0 or 416.8) who meet the following criteria.

Iloprost (Q4080) is covered when both criteria 1 and 2 are met:

1) The pulmonary hypertension is not secondary to pulmonary venous hypertension (e.g., left sided atrial or ventricular disease, left sided valvular heart disease, etc) or disorders of the respiratory system (e.g., chronic obstructive pulmonary disease, interstitial lung disease, obstructive sleep apnea or other sleep disordered breathing, alveolar hypoventilation disorders, etc.), and

2) The patient has primary pulmonary hypertension or pulmonary hypertension which is secondary to one of the following conditions: connective tissue disease, thromboembolic disease of the pulmonary arteries, human immunodeficiency virus (HIV) infection, cirrhosis, diet drugs, congenital left to right shunts, etc. If these conditions are present, the following criteria (a-d) must be met:

a) The pulmonary hypertension has progressed despite maximal medical and/or surgical treatment of the identified condition; and

b) The mean pulmonary artery pressure is greater than 25 mm Hg at rest or greater than 30 mm Hg with exertion; and

c) The patient has significant symptoms from the pulmonary hypertension (i.e., severe dyspnea on exertion, and either fatigability, angina, or syncope); and

d) Treatment with oral calcium channel blocking agents has been tried and failed, or has been considered and ruled out.

If the above criteria are not met the controlled dose inhalation drug delivery system (K0730) and the iloprost (Q4080) will be denied as not medically necessary.

If K0730 is used to administer any other covered nebulizer drug other than iloprost and the coverage criteria for E0570 are met, payment will be based on the allowance for the least costly medically appropriate alternative, E0570.

**LCD Information**

ACCESSORIES:

Accessories are separately payable if the related aerosol compressor and the individual accessories are medically necessary. The following table lists the compressor/generator, which is related to the accessories described. Other compressor/generator/accessory combinations are considered medically unnecessary.

Compressor/Generator **(Related Accessories)**
E0565 **(A4619, A7006, A7007, A7010, A7011, A7012, A7013, A7014, A7015, A7017, A7525, E1372)**
E0570 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0571 **(A7003, A7004, A7005, A7006, A7013, A7015, A7525)**
E0572 **(A7006, A7014)**
E0574 **(A7014, A7016)**
E0585 **(A4619, A7006, A7010, A7011, A7012, A7013, A7014, A7015, A7525)**
K0730 **(A7005)**

This array of accessories represents all possible combinations, but it may not be appropriate to bill any or all of the codes for one device.

The following table lists the usual maximum frequency of replacement for accessories. Claims for more than the usual maximum replacement amount must be supported by documentation in the patient's medical record, which must be available upon request.

Accessory **(Usual maximum replacement)**
A4619 **(One/month)**
A7003 **(Two/month)**
A7004 **(Two/month [in addition to A7003])**
A7005 **(One/6 months)**
A7005 **(One/3 months - only with K0730)**
A7006 **(One/month)**
A7007 **(Two/month)**
A7010 **(One unit [100 ft.]/2 months)**
A7011 **(One/year)**
A7012 **(Two/month)**
A7013 **(Two/month)**
A7014 **(One/3 months)**
A7015 **(One/month)**
A7016 **(Two/year)**
A7017 **(One/3 years)**
A7525 **(One/month)**
E1372 **(One/3 years)**

INHALATION DRUGS AND SOLUTIONS:

The following table represents the maximum milligrams/month of inhalation drugs that are reasonably billed for each nebulizer drug.

Acetylcysteine: **(up to 74 grams/month)**
Albuterol: **(up to 465 mg/month)** – see below for exception
Arformoterol: **(up to 930 micrograms per month [62 units per month])**
Budesonide: **(up to 31 mg/month [62 units/month])**
Cromolyn sodium: **(up to 2480 mg/month [248 units/month])**
Dornase alpha: **(up to 78 mg/month)**
Formoterol: **(up to 1240 micrograms per month [62 units per month])**
Ipratropium bromide: **(up to 93 mg/month)**

**LCD Information**

Levalbuterol: **(up to 232.5 mg/month [465 units/month])** – see below for exception
Metaproterenol: **(up to 2800 mg/month [280 units/month])** – see below for exception
Pentamidine: **(up to 300 mg/month)**
Sterile saline or water, 10ml/unit (A4216, A4218): **(up to 56 units/month)**
Distilled water, sterile water, or sterile saline in large volume nebulizer: **(up to 18 liters/month)**

When albuterol, levalbuterol, or metaproterenol are prescribed as rescue/supplemental medication for patients who are taking formoterol or arformoterol, the maximum milligrams/month that are reasonably billed are:
Albuterol: **(up to 78 mg/month)**
Levalbuterol: **(up to 39 mg/month [78 units/month])**
Metaproterenol: **(up to 470 mg/month [47 units/month])**

Claims for more than these amounts of drugs will be denied as not medically necessary unless there is documentation in the patient's medical record which justifies a larger amount in the individual case. This information must be available on request.

The pharmacist is responsible for assessing how much inhalation solution a patient is actually using. Considering this information, the pharmacist is responsible for assuring that the patient has used almost all of his/her supply on hand prior to dispensing a new supply.

When a "concentrated form" of an inhalation drug is covered, separate saline solution (A4216 or A4218 [metered dose]) used to dilute it will be separately reimbursed. Saline dispensed for the dilution of concentrated nebulizer drugs must be billed on the same claim as the drug(s) being diluted. If the unit dose form of the drug is dispensed, separate saline solution (A4216 or A4218 [metered dose]), will be denied as not medically necessary. Water or saline in 500 or 1000 ml quantities (A4217 or A7018) are not appropriate for use by patients to dilute inhalation drugs and will therefore be denied as not medically necessary if used for this purpose. These codes are only medically necessary when used in a large volume nebulizer (A7007, A7017 or E0585).

Albuterol, levalbuterol and metaproterenol are all short-acting bronchodilators with beta-adrenergic stimulatory effect. It would rarely be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary unless there is documentation in the patient's medical record supporting the medical necessity. Albuterol, levalbuterol, or metaproterenol is covered if it is used as a rescue/supplemental medication in addition to the long-acting beta-adrenergic agonist drug, formoterol or arformoterol.

Formoterol and arformoterol are long-acting bronchodilators with beta-adrenergic stimulatory effect. It would not be medically necessary for a patient to be using more than one of these at a time. The use of more than one of these drugs at the same time will be denied as not medically necessary.

The medical necessity for levalbuterol compared to albuterol has not been established. Therefore, when codes J7612 or J7614 are billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative - J7611 or J7613 respectively. The medical necessity for administering an FDA-approved unit dose combination of albuterol and ipratropium (J7620) compared to separate unit dose vials of albuterol and ipratropium has not been established. Therefore, when one unit of service of code J7620 is billed, if coverage criteria are met, payment will be based on the allowance for the least costly medically appropriate alternative – 2.5 units of J7613 and 0.5 units of J7644.

**LCD Information**

Charges for the drugs, diluent, and dispensing fees may only be billed by the entity that actually dispenses the drug to the Medicare beneficiary and that entity must be permitted under all applicable federal, state, and local laws and regulations to dispense drugs. Only entities licensed in the state where they are physically located may submit a claim for nebulizer drugs. Physicians may submit a claim for drugs if all of the following conditions are met: the physician is 1) enrolled as a DMEPOS supplier with the National Supplier Clearinghouse, and 2) dispensing the drug(s) to the Medicare beneficiary, and 3) authorized by the State to dispense drugs as part of the physician's license. Claims submitted by entities not licensed to dispense drugs will be denied for lack of medical necessity.

**Coverage Topic**

Durable Medical Equipment
Nebulizer

**Coding Information**



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

0                                                        TBD

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

**CPT/HCPCS Codes**

The appearance of a code in this section does not necessarily indicate coverage.

HCPCS MODIFIERS:

EY - No physician or other licensed health care provider order for this item or service.
KO - Single drug unit dose formulation.

**Coding Information**

KP - First drug of a multiple drug unit dose formulation.
KQ - Second or subsequent drug of a multiple drug unit dose formulation.
KX – Specified required documentation on file.

## EQUIPMENT

| | |
|---|---|
| E0565 | COMPRESSOR, AIR POWER SOURCE FOR EQUIPMENT WHICH IS NOT SELF- CONTAINED OR CYLINDER DRIVEN |
| E0570 | NEBULIZER, WITH COMPRESSOR |
| E0571 | AEROSOL COMPRESSOR, BATTERY POWERED, FOR USE WITH SMALL VOLUME NEBULIZER |
| E0572 | AEROSOL COMPRESSOR, ADJUSTABLE PRESSURE, LIGHT DUTY FOR INTERMITTENT USE |
| E0574 | ULTRASONIC/ELECTRONIC AEROSOL GENERATOR WITH SMALL VOLUME NEBULIZER |
| E0575 | NEBULIZER, ULTRASONIC, LARGE VOLUME |
| E0585 | NEBULIZER, WITH COMPRESSOR AND HEATER |
| K0730 | CONTROLLED DOSE INHALATION DRUG DELIVERY SYSTEM |

## ACCESSORIES

| | |
|---|---|
| A4619 | FACE TENT |
| A7003 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7004 | SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, DISPOSABLE |
| A7005 | ADMINISTRATION SET, WITH SMALL VOLUME NONFILTERED PNEUMATIC NEBULIZER, NON-DISPOSABLE |
| A7006 | ADMINISTRATION SET, WITH SMALL VOLUME FILTERED PNEUMATIC NEBULIZER |
| A7007 | LARGE VOLUME NEBULIZER, DISPOSABLE, UNFILLED, USED WITH AEROSOL COMPRESSOR |
| A7008 | LARGE VOLUME NEBULIZER, DISPOSABLE, PREFILLED, USED WITH AEROSOL COMPRESSOR |
| A7009 | RESERVOIR BOTTLE, NON-DISPOSABLE, USED WITH LARGE VOLUME ULTRASONIC NEBULIZER |
| A7010 | CORRUGATED TUBING, DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 100 FEET |
| A7011 | |

**Coding Information**

| | |
|---|---|
| | CORRUGATED TUBING, NON-DISPOSABLE, USED WITH LARGE VOLUME NEBULIZER, 10 FEET |
| A7012 | WATER COLLECTION DEVICE, USED WITH LARGE VOLUME NEBULIZER |
| A7013 | FILTER, DISPOSABLE, USED WITH AEROSOL COMPRESSOR |
| A7014 | FILTER, NONDISPOSABLE, USED WITH AEROSOL COMPRESSOR OR ULTRASONIC GENERATOR |
| A7015 | AEROSOL MASK, USED WITH DME NEBULIZER |
| A7016 | DOME AND MOUTHPIECE, USED WITH SMALL VOLUME ULTRASONIC NEBULIZER |
| A7017 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, NOT USED WITH OXYGEN |
| A7525 | TRACHEOSTOMY MASK, EACH |
| E0580 | NEBULIZER, DURABLE, GLASS OR AUTOCLAVABLE PLASTIC, BOTTLE TYPE, FOR USE WITH REGULATOR OR FLOWMETER |
| E1372 | IMMERSION EXTERNAL HEATER FOR NEBULIZER |

## INHALATION DRUGS

J7611 - Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 1 mg

J7612 - Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, concentrated form, 0.5 mg

J7613 - Albuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 1 mg

J7614 - Levalbuterol, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose, 0.5 mg

Q4099 - Formoterol fumarate, inhalation solution, FDA-approved final product, non-compounded, administered through DME, unit dose form, 20 micrograms

| | |
|---|---|
| A4216 | STERILE WATER, SALINE AND/OR DEXTROSE, DILUENT/FLUSH, 10 ML |
| A4217 | STERILE WATER/SALINE, 500 ML |
| A4218 | STERILE SALINE OR WATER, METERED DOSE DISPENSER, 10 ML |

**Coding Information**

| | |
|---|---|
| G0333 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); INITIAL 30-DAY SUPPLY AS A BENEFICIARY |
| J2545 | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
| J7604 | ACETYLCYSTEINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7605 | ARFORMOTEROL, INHALATION SOLUTION, FDA APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 15 MICROGRAMS |
| J7607 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 0.5 MG |
| J7608 | ACETYLCYSTEINE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER GRAM |
| J7609 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 1 MG |
| J7610 | ALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, 1 MG |
| J7615 | LEVALBUTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, 0.5 MG |
| J7620 | ALBUTEROL, UP TO 2.5 MG AND IPRATROPIUM BROMIDE, UP TO 0.5 MG, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME |
| J7622 | BECLOMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7624 | BETAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7626 | BUDESONIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG |

**Coding Information**

J7627          BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, UP TO 0.5 MG

J7628          BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7629          BITOLTEROL MESYLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7631          CROMOLYN SODIUM, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7632          CROMOLYN SODIUM, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS

J7634          BUDESONIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER 0.25 MILLIGRAM

J7635          ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7636          ATROPINE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7637          DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM

J7638          DEXAMETHASONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7639          DORNASE ALPHA, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM

J7640          FORMOTEROL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 12 MICROGRAMS

J7641

**Coding Information**

|  |  |
|---|---|
|  | FLUNISOLIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE, PER MILLIGRAM |
| J7642 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7643 | GLYCOPYRROLATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7644 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7645 | IPRATROPIUM BROMIDE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7647 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7650 | ISOETHARINE HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7657 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7660 | ISOPROTERENOL HCL, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7667 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, CONCENTRATED FORM, PER 10 MILLIGRAMS |
| J7669 | METAPROTERENOL SULFATE, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7670 | METAPROTERENOL SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 10 MILLIGRAMS |
| J7676 |  |

# Coding Information

|       | PENTAMIDINE ISETHIONATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MG |
|-------|---|
| J7680 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7681 | TERBUTALINE SULFATE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7682 | TOBRAMYCIN, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, UNIT DOSE FORM, ADMINISTERED THROUGH DME, PER 300 MILLIGRAMS |
| J7683 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, CONCENTRATED FORM, PER MILLIGRAM |
| J7684 | TRIAMCINOLONE, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER MILLIGRAM |
| J7685 | TOBRAMYCIN, INHALATION SOLUTION, COMPOUNDED PRODUCT, ADMINISTERED THROUGH DME, UNIT DOSE FORM, PER 300 MILLIGRAMS |
| J7699 | NOC DRUGS, INHALATION SOLUTION ADMINISTERED THROUGH DME |
| Q0513 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 30 DAYS |
| Q0514 | PHARMACY DISPENSING FEE FOR INHALATION DRUG(S); PER 90 DAYS |
| Q4080 | ILOPROST, INHALATION SOLUTION, FDA-APPROVED FINAL PRODUCT, NON-COMPOUNDED, ADMINISTERED THROUGH DME, UNIT DOSE FORM, 20 MICROGRAMS |

## ICD-9 Codes that Support Medical Necessity

The presence of an ICD-9 code listed in this section is not sufficient by itself to assure coverage. Refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other coverage criteria and payment information.

**For HCPCS codes A4619, E0565, E0572:**

**Coding Information**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7013, A7014, A7015, A7525:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |

**Coding Information**

| | |
|---|---|
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS codes A7003, A7004, E0570, E0571, E0574:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A7006, J2545:**

| | |
|---|---|
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes A4217, A7007, A7010, A7011, A7012, A7017, A7018, E0585, E1372:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 277.02 | |

**Coding Information**

|  | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
|---|---|
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 519.19 | OTHER DISEASES OF TRACHEA AND BRONCHUS |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| V44.0 | TRACHEOSTOMY STATUS |
| V55.0 | ATTENTION TO TRACHEOSTOMY |

**For HCPCS code A4216:**

| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
|---|---|
| 136.3 | PNEUMOCYSTOSIS |
| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS code J7608:**

| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|
| 786.4 | ABNORMAL SPUTUM |

**For HCPCS codes J7611, J7612, J7613, J7614, J7620, J7626, J7631, J7644, J7669:**

| 491.0 - 508.9 | SIMPLE CHRONIC BRONCHITIS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
|---|---|

**For HCPCS code J7639:**

| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
|---|---|

**For HCPCS code J7682:**

| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
|---|---|
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |

**Coding Information**

| | |
|---|---|
| 494.0 | BRONCHIECTASIS WITHOUT ACUTE EXACERBATION |
| 494.1 | BRONCHIECTASIS WITH ACUTE EXACERBATION |
| 748.61 | CONGENITAL BRONCHIECTASIS |

**For HCPCS codes K0730, Q4080:**

| | |
|---|---|
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |

**For HCPCS code A7005:**

| | |
|---|---|
| 011.50 - 011.56 | TUBERCULOUS BRONCHIECTASIS UNSPECIFIED EXAMINATION - TUBERCULOUS BRONCHIECTASIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 042 | HUMAN IMMUNODEFICIENCY VIRUS (HIV) DISEASE |
| 136.3 | PNEUMOCYSTOSIS |
| 277.02 | CYSTIC FIBROSIS WITH PULMONARY MANIFESTATIONS |
| 416.0 | PRIMARY PULMONARY HYPERTENSION |
| 416.8 | OTHER CHRONIC PULMONARY HEART DISEASES |
| 480.0 - 508.9 | PNEUMONIA DUE TO ADENOVIRUS - RESPIRATORY CONDITIONS DUE TO UNSPECIFIED EXTERNAL AGENT |
| 748.61 | CONGENITAL BRONCHIECTASIS |
| 786.4 | ABNORMAL SPUTUM |
| 996.80 - 996.89 | COMPLICATIONS OF UNSPECIFIED TRANSPLANTED ORGAN - COMPLICATIONS OF OTHER SPECIFIED TRANSPLANTED ORGAN |

**For HCPCS codes J7605 or Q4099:**

| | |
|---|---|
| 491.0 - 492.8 | SIMPLE CHRONIC BRONCHITIS - OTHER EMPHYSEMA |
| 496 | CHRONIC AIRWAY OBSTRUCTION NOT ELSEWHERE CLASSIFIED |

**Diagnoses that Support Medical Necessity**

**Coding Information**

Refer to the previous section for the specific HCPCS code indicated. For all other HCPCS codes listed in the policy refer to the section on "Indications and Limitations of Coverage and/or Medical Necessity" for other criteria and payment information.

## ICD-9 Codes that DO NOT Support Medical Necessity

For the specific HCPCS codes indicated above, all ICD-9 codes that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all ICD-9 codes.

For all other HCPCS codes, ICD-9 codes are not specified.

## ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation

## Diagnoses that DO NOT Support Medical Necessity

For the specific HCPCS codes indicated above, all diagnoses that are not specified in the previous section.

For HCPCS codes A7009, E0575, J7604, J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7632, J7634, J7635, J7636, J7637, J7638, J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7676, J7680, J7681, J7683, J7684, and J7685, all diagnoses.

For all other HCPCS codes, diagnoses are not specified.

**General Information**



## Documentation Requirements

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider". It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

**General Information**

The order for any drug must clearly specify the type of solution to be dispensed to the patient and the administration instructions for that solution. The type of solution is described by a combination of (a) the name of the drug and the concentration of the drug in the dispensed solution and the volume of solution in each container, or (b) the name of the drug and the number of milligrams/grams of drug in the dispensed solution and the volume of solution in that container. Examples of (a) would be: albuterol 0.083% 3 ml; or albuterol 0.5% 20 ml; or cromolyn 20 mg/2 ml. An example of (b) is: albuterol 1.25 mg in 3 ml saline. For compounded inhalation solutions, the order must include the following statement prior to signature by the physician: compounded inhalation solution – not FDA-approved. Administration instructions must specify the amount of solution and frequency of use. Examples would be: 3 ml qid and prn - max 6 doses/24 hr.; or one ampule q 4 hr prn; or 0.5 ml diluted with saline to 3.0 ml tid and prn. A new order is required if there is a change in the type of solution dispensed or the administration instructions. For all inhalation drugs, a new order is required at least every 12 months even if the prescription has not changed.

An ICD-9 code describing the condition which necessitates nebulizer therapy must be included on each claim for equipment, accessories and/or drugs.

If the drug being billed is Brovana (arformoterol)(J7605) or Performist (formoterol fumarate) (Q4099) and if the coverage criteria stated in the Indications and Limitations of Coverage section have been met, a KX modifier must be added to code J7605 or Q4099.

If all the coverage criteria described in the Indications and Limitations of Coverage section have been met for K0730 and/or Q4080 a KX modifier must be added to the code(s).

Situations which the medical record must specifically address include:

1) When billing for quantities of supplies greater than those described in the policy as the usual maximum amounts, there must be clear documentation in the patient's medical records corroborating the medical necessity of the current use.

2) If more than one beta-adrenergic or more than one anticholinergic inhalation drug is billed during the same month, there must be clear documentation in the patient's medical records corroborating the medical necessity of this current use.

When code E1399 is billed for miscellaneous equipment or accessories, the claim must be accompanied by a clear description of the item including the manufacturer and the model name/number if applicable.

When Not Otherwise Classified (NOC) drug code J7699 is billed for miscellaneous inhalation drugs, the claim must be accompanied by the detailed order information described above and a clear statement of the number of ampules/bottles of solution dispensed.

Refer to the Supplier Manual for more information on documentation requirements.

**Appendices**

**Utilization Guidelines**

Refer to Indications and Limitations of Coverage and/or Medical Necessity.

**Sources of Information and Basis for Decision**

**General Information**

Phurrough S, Jacques L, Spencer F, et al. Nebulized Beta Adrenergic Agonist Therapy for Lung Disease. CMS Decision Memo, September 10, 2007 www.cms.hhs.gov/coverage

Levalbuterol

Carl J, Myers T, Kirchner H, Kercsmar C. Comparison of racemic albuterol and levalbuterol for treatment of acute asthma. Journal of Pediatrics 2003; 143:731-736.

Datta D, Vitale A, Lahiri B, et al. An evaluation of nebulized levalbuterol in stable COPD. Chest 2003; 124, 3:844-849

Donohue J, Parsey M, Andrews A, et al. Evaluation of the efficacy and safety of levalbuterol in subjects with COPD. COPD: Journal of Chronic Obstructive Pulmonary Disease 2006; 3:125-132

Gawchik S, Saccar C, Noonan M, et al. The safety and efficacy of nebulized levalbuterol compared with racemic albuterol and placebo in the treatment of asthma in pediatric patients. Journal of Allergy and Clinical Immunology 1999; 103:615-621

Lotvall J, Palmqvist M, Arvidsson P, et al. The therapeutic ratio of R-albuterol is comparable with that of RS-albuterol in asthmatic patients. Journal of Allergy and Clinical Immunology 2001; 108: 726-731

Milgrom H, Skoner D, Bensch G, et al. Low-dose levalbuterol in children with asthma: Safety and efficacy in comparison with placebo and racemic albuterol. Journal of Allergy and Clinical Immunology 2001; 108:938-945

Nelson H, Bensch G, Pleskow W, et al. Improved bronchodilation with levalbuterol compared with racemic albuterol in patients with asthma. Journal of Allergy and Clinical Immunology 1998; 102:943-952

Nowak R, Emerman C, Hanrahan J, et al. A comparison of levalbuterol with racemic albuterol in the treatment of acute severe asthma exacerbations in adults. American Journal of Emergency Medicine 2006; 24:259-267

Nowak R, Emerman C, Schaefer K, et al. Levalbuterol compared with racemic albuterol in the treatment of acute asthma: results of a pilot study. American Journal of Emergency Medicine 2004; 22:29-36

Pleskow W, Nelson H, Schaefer K, et al. Pairwise comparison of levalbuterol versus racemic albuterol in the treatment of moderate-to-severe asthma. Allergy and Asthma Proceedings 2004; 25:1-8

Ralston M, Euwema M, Knecht K, et al. Comparison of levalbuterol and racemic albuterol combined with ipratropium bromide in acute pediatric asthma: a randomized controlled trial. Journal of Emergency Medicine 2005; 29:29-35

Schreck D, Babin R. Comparison of racemic albuterol and levalbuterol in the treatment of acute asthma in the ED. American Journal of Emergency Medicine 2005; 23:842-847

Skoner D, Greos L, Kim K, et al. Evaluation of the Safety and Efficacy of Levalbuterol in 2-5 year old patients with asthma. Pediatric Pulmonology 2005; 40:477-486

Truitt T, Witko J, Halpern M. Levalbuterol compared to racemic albuterol – Efficacy and outcomes in patients hospitalized with COPD or asthma. Chest 2003: 123:128-135

Combination albuterol and ipratropium

**General Information**

Benayoun S, Ernst P, Suissa S. The impact of combined inhaled bronchodilator therapy in the treatment of COPD. Chest 2001; 119:85-92

Campbell S. For COPD a combination of ipratropium bromide and albuterol sulfate is more effective than albuterol base. Arch Intern Med 1999; 159:156-160

Chrischilles E, Gilden D, Kubisiak J, et al. Delivery of ipratropium and albuterol combination therapy for chronic obstructive pulmonary disease: effectiveness of a two-in-one inhaler versus separate inhalers. Am J Manag Care 2002; 8:902-911

Combivent Inhalation Study Group. Routine nebulized ipratropium and albuterol together are better than either alone in COPD. Chest 1997; 112:1514-1521

Dorinsky P, Reisner C, Ferguson G, et al. The combination of ipratropium and albuterol optimizes pulmonary function reversibility testing in patients with COPD. Chest 1999; 115:966-971

Friedman M, Serby D, Menjoge S, et al. Pharmacoeconomic evaluation of a combination of ipratropium plus albuterol compared with ipratropium alone and albuterol alone in COPD. Chest 1999; 115:635-641

Levin, D, Little, K, Laughlin, et al. Addition of anticholinergic solution prolongs bronchodilator effect of beta 2 agonist in patients with chronic obstructive pulmonary disease. Am. J Med 1996; 100(1A):40S-43S

**Advisory Committee Meeting Notes**

Written comments received at the Open Meeting are included in the Response to Comments document with all other written comments received during the comment period.

**Start Date of Comment Period**

03/24/2006

**End Date of Comment Period**

05/08/2006

**Start Date of Notice Period**

04/10/2008

**Revision History Number**

NEB0011

**Revision History Explanation**

Revision Effective Date: 07/01/2008
NATIONAL COVERAGE POLICY:
Added: NCD 200.2
INDICATIONS AND LIMITATIONS OF COVERAGE:

# General Information

Substituted: J7611-J7614 for Q4093, Q4094
Added: Q4099 as a new code for formoterol
Added: Coverage criteria and maximum covered amount for formoterol.
Added: J7604, J7632, and J7676 to the list of compounded drugs that are not covered.
Added: Statement about denial if both formoterol and arformoterol are provided
Added: Least costly alternative statement for levalbuterol.
Added: Least costly alternative statement for unit dose combinations of albuterol and ipratropium.
Revised: Coverage criteria for arformoterol.
Revised: Statements concerning use of rescue medication to include use with formoterol.
HCPCS CODES AND MODIFIERS:
Added: J7604, J7605, J7632, J7676 (effective 1/1/08)
Added: J7611, J7612, J7613, J7614, Q4099 (effective 4/1/08)
Revised: J2545, J7608, J7631, J7639, Q4080 (effective 1/1/08)
Deleted: Q4093, Q4094 (effective 1/1/08)
(Note: Codes J7602 and J7603 were effective 1/1/08 – 3/31/08.)
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: J7605, J7611-J7614, Q4099
Removed: Q4093, Q4094
Added: Covered diagnosis codes for formoterol.
ICD-9 CODES/ DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7604, J7632, J7676
DOCUMENTATION REQUIREMENTS:
Added: Instructions for use of the KX modifier with Perforomist (formoterol).
Revised: Instructions for use of the KX modifier with Brovana (arformoterol).
SOURCES OF INFORMATION/ BASIS FOR DECISION:
Added: Bibliography
LCD ATTACHMENTS:
Response to Comments – April 2008


3/1/2008- In accordance with Section 911 of the Medicare Modernization Act, this policy was transitioned to DME MAC Noridian Administrative Services (19003) LCD L11488 from DME PSC Electronic Data Systems Corp. (77006) LCD L11488.


09/03/2007 - This policy was updated by the ICD-9 2007-2008 Annual Update.


Revision Effective Date: 07/01/2007 (June publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added coverage criteria and maximum covered amount for arformoterol.
Revised statement about J7699 to say that it will be denied when it is used to bill for a compounded inhalation solution.
Added coverage statement and maximum covered amount for albuterol, levalbuterol, and metaproterenol when used in addition to arformoterol.
Substituted code Q4093 and Q4094 for J7611-J7614.
HCPCS CODES:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added: Q4093, Q4094
Deleted: J7611, J7612, J7613, J7614
Added covered diagnosis codes for arformoterol.
ICD-9 CODES/DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Removed J7699 from the list.
DOCUMENTATION REQUIREMENTS:
Added instructions for use of the KX modifier with arformoterol.

## General Information

Revision Effective Date: 07/01/2007 (March publication)
INDICATIONS AND LIMITATIONS OF COVERAGE:
Eliminated coverage for atropine, beclomethasone, betamethasone, bitolterol, dexamethasone, flunisolide,
glycopyrrolate, isoetharine, terbutaline, triamcinolone, and all other compounded inhalation solutions.
Changed ICD-9 code 519.1 to 519.19.
Deleted the statement concerning providing information on a claim about the need for a portable compressor.
Added utilization guideline for budesonide.
HCPCS CODES AND MODIFIERS:
(HCPCS code changes that were effective 01/01/2007.)
Added: J7607, J7609, J7610, J7615, J7634, J7640, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7685
Revised: J7611, J7612, J7613, J7614, J7620, J7622, J7624, J7626, J7627, J7628, J7629, J7635, J7636, J7637,
J7638, J7640, J7641, J7642, J7643, J7644, J7669, J7680, J7681, J7682, J7683, J7684, Q4080
Removed: J7633, J7648, J7649, J7658, J7659, J7668
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Changed ICD-9 code 519.1 to 519.19.
Added: 416.0 and 416.8 to covered codes for A7005.
Removed: J7622, J7624, J7627, J7628, J7629, J7633, J7635, J7636, J7637, J7638, J7640, J7641, J7642,
J7643, J7648, J7649, J7658, J7659, J7668, J7680, J7681, J7683, J7684
ICD-9 CODES AND DIAGNOSES THAT DO NOT SUPPORT MEDICAL NECESSITY:
Added: J7607, J7609, J7610, J7615, J7622, J7624, J7627, J7628, J7629, J7634, J7635, J7636, J7637, J7638,
J7640, J7641, J7642, J7643, J7645, J7647, J7650, J7657, J7660, J7667, J7670, J7680, J7681, J7683, J7684,
J7685, J7699
DOCUMENTATION REQUIREMENTS:
Added a requirement for a specific statement on orders for compounded inhalation solutions.


Revision Effective Date: 03/01/2006
In accordance with Section 911 of the Medicare Modernization Act of 2003, this policy was transitioned to
DME PSC Electronic Data Systems Corp. (77006) from DMERC CIGNA Government Services (05655).


Revision Effective Date: 01/01/2006
INDICATIONS AND LIMITATIONS OF COVERAGE AND MEDICAL NECESSITY:
Inserted new HCPCS Codes A4216, A4218 and deleted codes J7051 and J7699 where appropriate.
Added coverage statement for code A7007.
Added A7007 to the related code table for E0565.
Added A7007 to usual maximum amount.
Added usual maximum amount for A4216 and A4218.
HCPCS CODES & MODIFIERS:
Added: HCPCS codes A4218, G0333, J7620, J7627, Q0513 and Q0514.
Verbiage revision to description of HCPCS codes A4216, J7626.
Deleted: HCPCS codes J7051, J7616, G0371 and G0374.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added J7620 and J7627 to the list of codes requiring ICD-9 code 491.0-508.9; deleted J7616.
Added: A7007 to the 5th paragraph of HCPCS codes requiring specific ICD-9 codes.
Added A4216 and deleted A7051 from the 6th paragraph of HCPCS codes requiring specific ICD-9 codes.
DOCUMENTATION REQUIREMENTS:
Revised E1399 and J7699 documentation requirements.


Revision Effective Date: 10/01/2005
HCPCS CODES & MODIFIERS:
Added codes: K0730 and Q4080 and KX modifier.
INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY:
Added criterion for K0730 and Q4080.
ICD-9 CODES THAT SUPPORT MEDICAL NECESSITY:
Added diagnoses codes 416.0, 416.8, necessary for codes K0730 and Q4080.
DOCUMENTATION REQUIREMENTS:

**General Information**

Added KX modifier requirement for K0730 and Q4080.


Revision Effective Date: 04/01/2005
LMRP converted to LCD and Policy Article.
HCPCS CODES & MODIFIERS:
Added Codes: J7611, J7612, J7613, J7614, J7616, G0371, G0374
Deleted Codes: J7618, J7619, J7621, E0590
INDICATIONS AND LIMITATIONS OF MEDICAL NECESSITY:
Tobramycin coverage expanded.


Revision Effective Date: 04/01/2004
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added references to new HCPCS codes.
HCPCS CODES AND MODIFIERS:
Added: A4217, A7525, J7621
Deleted: A4621, A7019, A7020
CODING GUIDELINES:
Added references to new HCPCS codes.
Clarified use of J7699.
Added billing guidelines for J7621.
Removed billing guidelines for A4323.
Added correct coding guidelines for compounded albuterol and ipratropium.
Added instructions for billing metered dose sterile saline products.


Revision Effective Date: 04/01/2003
HCPCS CODES AND MODIFIERS:
Added: EY modifier, J7633
Revised: E0574, J7626
INDICATIONS AND LIMITATIONS OF COVERAGE:
Added standard language concerning coverage of items without an order.
Added standard language concerning the medical necessity for use of a greater quantity and combinations of
usually contraindicated drugs requirement.
Removed language about physician documenting having considered use of an MDI prior to prescribing a
nebulizer.
Added pneumocystosis and complications of organ transplants as coverage criteria for E0565 or E0572
compressor used with filtered nebulizer (A7006).
Removed specific coverage criteria for dornase alpha, other than its being used for treatment of cystic
fibrosis.
Removed grandfathering language for aerosol compressors and small and large volume ultrasonic generators.
CODING GUIDELINES:
Added: Instructions on how to bill J7626 0.5mg as one unit of service.
Added definitions of equipment and inhalations drugs to this section of policy.
DOCUMENTATION REQUIREMENTS:
Added: Standard language concerning use of EY modifier for items without an order; standard language
regarding excess quantity utilization.
Listed specific codes in which extra documentation should be attached to claim via hardcopy or narrative
field.


The revision dates listed below are the dates the revisions were published and not necessarily the effective
dates for the revisions.


04/01/2002 - Expansion of coverage for large volume

**General Information**

nebulizers with saline or water for use with Tracheobronchial stents (519.1). Expansion of indications for use of pentamidine with added ICD-9 codes. Expansion of indications for use of mucolytics with added ICD-9 codes. New HCPCS E codes replace K codes. New HCPCS codes for inhaled corticosteroids. Revision of HCPCS code for albuterol to include levalbuterol and its proper billing unit.

04/01/2000 – Several K codes crosswalked to A codes or J codes. Added "reasonable and necessary" language in Coverage and Payment Rules section. Revised all references of previous K codes.

06/01/1997 – Removed E0575 information in Documentation section. K0171 removed from covered codes for small volume nebulizer in Coverage and Payment Rules section. K0171 is not medically necessary for the administration of medications other than pentamidine.

03/01/1997 – Refer to article entitled "Nebulizer Policy Update" in the March 1997 DMERC Dialogue for a detailed report of the revision.

**Reason for Change**

**Last Reviewed On Date**
02/20/2008

**Related Documents**
**Article(s)**
A24942 - Nebulizers - Policy Article - Effective July 2008

**LCD Attachments**
Response to Comments (a comment and response document) (PDF - 76,467 bytes)